```
                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF DELAWARE


NIPPON SHINYAKU CO.,    )
LTD.,                   )
                        )
          Plaintiff,    )   C.A. No. 21-1015-JLH
                        )
v.                      )
                        )
SAREPTA THERAPEUTICS,   )
INC.,                   )
                        )
          Defendant.    )



                   Monday, May 6, 2024
                   4:39 p.m.
                   Teleconference


                   844 King Street
                   Wilmington, Delaware



BEFORE:  THE HONORABLE JENNIFER L. HALL
      United States District Court Judge



APPEARANCES:

        MORGAN LEWIS & BOCKIUS, LLP
        BY:  AMY M. DUDASH, ESQ.
        BY:  AMANDA S. WILLIAMSON, ESQ.
        BY:  WAN-SHON LO, ESQ.
        BY:  KRISTA VINK VENEGAS, ESQ.
        BY:  MICHAEL T. SIKORA, ESQ.
        BY:  DAVID SCHRAEDER, ESQ.
        BY:  ALISON PATITUCCI, ESQ.

                        Counsel for the Plaintiff
```

1    APPEARANCES CONTINUED:

2

3            MORRIS, NICHOLS, ARSHT & TUNNELL, LLP
             BY:  JACK BLUMENFELD, ESQ.
             BY:  MEGAN DELLINGER, ESQ.

4

5                        -and-

6            LATHAM & WATKINS,
             BY:  MICHAEL A. MORIN, ESQ.
             BY:  ERNEST YACOB, ESQ.
7            BY:  DAVID P. FRAZIER, ESQ.
             BY:  REBECCA RABENSTEIN, ESQ.

8            -and-

9            FINNEGAN, HENDERSON, FARABOW,
10           GARRET & DUNNER, LLP
             BY:  WILLIAM B. RAICH, ESQ.
11           BY:  RYAN P. O'QUINN, ESQ.
             BY:  ALISSA LIPTON, ESQ.
12           BY:  CHARLES LIPSEY, ESQ.

13                          Counsel for the Defendant

14

15                    ---------------------------

16:39:38 16

16:39:38 17           COURT CLERK:  All rise.  The United States

16:39:40 18   District Court for the District of Delaware is now in

16:39:43 19   session.  The honorable Jennifer L. Hall presiding.

16:39:47 20           THE COURT:  Please be seated.  All right.  We're

16:39:53 21   here for a pretrial conference.  This is Nippon versus

16:40:00 22   Sarepta.  It's 21-1015.

16:40:04 23           Let's go ahead and put our appearances on the

16:40:08 24   record.

16:40:08 25           MS. DUDASH:  Good afternoon, Your Honor.  Amy

16:40:11  1    Dudash from Morgan Lewis on behalf of Nippon Shinyaku and NS

16:40:16  2    Pharma.  And with me are my colleagues from Morgan Lewis,

16:40:19  3    Amanda Williamson, Shon Lo, Michael Sikora.

16:40:24  4               MR. SIKORA:  Hello.

16:40:24  5               MS. DUDASH:  David Schrader.

16:40:26  6               MR. SCHRADER:  Good afternoon.

16:40:27  7               MS. DUDASH:  Krista Venegas.  And Alison

16:40:30  8    Patitucci.

16:40:32  9               THE COURT:  Good afternoon.

16:40:34 10               MR. BLUMENFELD:  Good afternoon, Your Honor,

16:40:36 11    Jack Blumenfeld from Morris Nichols for Sarepta and UWA.  We

16:40:41 12    have a number of people here along with me at counsel table.

16:40:44 13    Michael Morin from Latham & Watkins.

         14               MR. MORIN:  Good afternoon, Your Honor.

16:40:50 15               MR. BLUMENFELD:  Next to Mr. Morin, Charles

16:40:50 16    Lipsey and William Raich from Finnegan Henderson.

16:40:54 17               MR. RAICH:  Good morning.

16:40:55 18               MR. BLUMENFELD:  Behind them, David Frazier and

16:40:56 19    Rebecca Rabenstein from Latham & Watkins.  In the first row,

16:41:03 20    Ernest Yacob and Michele Johnson from Latham & Watkins.

16:41:07 21               In the second row, Ryan O'Quinn from Finnegan

16:41:10 22    Henderson.  And next to Mr. O'Quinn, Marc Evans and Jessica

16:41:14 23    Driscoll, who are in-house at Sarepta.  And I think I'll

16:41:18 24    stop there.

16:41:19 25               THE COURT:  Great.  Thank you very much.  Good

1    afternoon and welcome to everyone.

16:41:21  2         So I can tell you from our side, our team's on

16:41:23  3    its eighth hour in court proceedings today, so we're going

16:41:27  4    to get as far as we can get tonight.  If we have to recess

16:41:31  5    and pick it back up on the phone later this week, we'll do

16:41:34  6    that.

16:41:35  7         Our court reporter has been working diligently

16:41:38  8    transcribing some very fast talkers for the last eight

16:41:42  9    hours, so we'll take it nice and slow tonight with the idea

16:41:45  10   that we can pick up whatever we don't finish.

16:41:49  11        All right.  Okay.  So I have a checklist of

16:42:09  12   things to go through.

16:42:13  13        Why don't we start, while everybody is here,

16:42:18  14   with the MILs, if that make sense, unless you all had a

16:42:23  15   different order you wanted to proceed in.

16:42:27  16        MS. DUDASH:  That makes sense, Your Honor.

16:42:29  17        THE COURT:  All right.  So we have NS MIL No. 1,

16:42:36  18   which has to do with precluding Sarepta from presenting

16:42:40  19   post-priority date evidence in support of its 112 position.

16:42:48  20   Shall we hear argument on that?

16:42:51  21        MS. LO:  Thank you, Your Honor.  Shon Lo on

16:42:58  22   behalf of Nippon Shinyaku.  I believe that our papers set it

16:43:01  23   out, but I think the law is clear and Sarepta does not

16:43:05  24   dispute that compliance with the written description and

16:43:09  25   enablement requirement is determined as of the priority

                                                                5

16:43:12  1    date.

16:43:12  2              And here, their expert, Dr. Dowdy, is relying

16:43:16  3    extensively on post-priority date evidence to validate,

16:43:19  4    confirm, reinforce the inventors' purported discovery.  And

16:43:26  5    Nippon Shinyaku submits that that is improper, there's a

16:43:28  6    high risk of confusing the jury and misleading the jury into

16:43:32  7    thinking that that evidence is relevant to the determination

16:43:36  8    of 112 satisfactions --

16:43:40  9              THE COURT:  Can you give me your best example of

16:43:42 10    where you think he violates that or would confuse the jury?

16:43:45 11              MS. LO:  -- yes, Your Honor.

16:43:47 12              THE COURT:  So I don't take them to dispute that

16:43:51 13    the legal standard is that you have to look at 112 as of the

16:43:54 14    priority date.  Presumably, they're going to say that for

16:43:57 15    some reason, this evidence is evidence of what a POSA would

16:44:01 16    understand as of the priority date, right?  Okay.

16:44:03 17              MS. LO:  Actually --

16:44:07 18              THE COURT:  Everybody agrees on that, right?

16:44:09 19              MS. LO:  I'm sorry, can you --

16:44:10 20              THE COURT:  Everybody agrees that the 112

16:44:12 21    inquiry is the priority date -- as of the priority date.

16:44:15 22              MS. LO:  Yes.

16:44:17 23              THE COURT:  Okay.  All right.  Where is your

16:44:19 24    best example where they're getting that wrong?

16:44:21 25              MS. LO:  I believe it is in Exhibit 1 to our MIL

16:44:24 1    number -- I'm sorry, Exhibit 2 to our MIL No. 1, which is

16:44:30 2    Dr. Dowdy's rebuttal report, specifically paragraph 92 is an

16:44:36 3    example, where Dr. Dowdy states that "numerous researchers

16:44:41 4    independently and repeatedly confirmed that the claimed

16:44:45 5    structural features of the Wilton patents confirmed the

16:44:55 6    claimed function of exon 53 skipping."  There's a table

16:44:55 7    appearing, Fig. 13, on page 67.

16:44:58 8            And all of this evidence is post-priority date.

16:45:05 9    And he is relying on it to confirm, validate this hot spot

16:45:12 10   that is supposedly disclosed in the specification of the

16:45:15 11   Wilton patent.

16:45:16 12           Dr. Dowdy also relies on post-priority date

16:45:19 13   evidence to validate the structure function correlation that

16:45:23 14   he claims to perceive in the specification.  And he also

16:45:28 15   provides opinions that purport to show recognition of the

16:45:32 16   hot spot by Dr. Wilton and others, even though he has no

16:45:36 17   personal knowledge of what was going through Dr. Wilton's

16:45:39 18   mind or the minds of these other researchers.

16:45:44 19           And I can provide citations to paragraphs from

16:45:48 20   his report, if you'd like.

16:45:49 21           THE COURT:  No.  That's fine.

16:45:50 22           MS. LO:  Okay.

16:45:51 23           THE COURT:  Anything else you wanted to add

16:45:53 24   before I hear from the other side.

16:45:54 25           MS. LO:  Yes, sorry.  And there's also -- not --

16:45:58  1    it's somewhat a complicating factor.  But as you know,

16:46:03  2    Sarepta is asserting that the NS patents are obvious.  The

16:46:09  3    NS patents have a priority date of 2011.  And so he is

16:46:11  4    discussing references between the 2005 filing date of the

16:46:15  5    Wilton patents and the 2011 filing date of the NS patents as

16:46:20  6    reportedly validating, confirming, recognizing the hot spot.

16:46:26  7    And we believe that he should not be allowed to characterize

16:46:30  8    that evidence in that way.

16:46:31  9            We're not seeking to preclude them from relying

16:46:34 10    on the prior art references, obviously, you know, for what

16:46:37 11    they actually disclose or what they actually state.  But the

16:46:39 12    way that he discusses them, you know, if he says that, oh,

16:46:43 13    and look, you know, these references validate the hot spot

16:46:46 14    or, look, these researchers recognized from the Wilton

16:46:49 15    specification that there was a hot spot, we feel that that

16:46:53 16    would have an extremely high risk of confusing the jury to

16:46:56 17    think that these references, you know, can support a

16:47:00 18    disclosure of the Wilton patents.

16:47:04 19            THE COURT:  Let me ask you this.  Couldn't this

16:47:06 20    be handled with a jury instruction that said something to

16:47:09 21    the effect of, you've heard testimony about things that

16:47:14 22    happened after the priority date and you should consider

16:47:17 23    that only to the extent that it's evidence about what a

16:47:21 24    person of skill in the art would have known or recognized as

16:47:24 25    of the priority date.

16:47:25 1          And I could even go further.  I could even say,
16:47:28 2     post-priority stuff can only be used to show -- to -- or as
16:47:35 3     evidence of or relevance to what a person would have known
16:47:38 4     as of the priority date for purposes of written description
16:47:42 5     and enablement.
16:47:43 6          Wouldn't that help the jury then to understand
16:47:45 7     what they could use the evidence for?
16:47:47 8          MS. LO:  I think it would help the jury but I
16:47:50 9     think that the risk of confusion is really great.  These
16:47:52 10    patents are in the same field of research, they both focus
16:47:56 11    on exon 53.  And for a juror to kind of separate that out
16:48:01 12    into what, you know, a 2008 reference discloses.
16:48:03 13         And if Dr. Dowdy says, oh, this 2008 reference
16:48:08 14    discloses and confirms that it's the recognition of a hot
16:48:08 15    spot, I think that that's -- there's a high risk that the
16:48:11 16    jurors will just conflate that evidence as improper -- using
16:48:16 17    it improperly.
16:48:17 18         THE COURT:  All right.  Thank you very much.
16:48:28 19         MR. YACOB:  Good afternoon, Your Honor.  Ernest
16:48:32 20    Yacob on behalf of Sarepta.
16:48:35 21         The Federal Circuit has repeatedly specifically
16:48:39 22    held that post-priority evidence by a patentee is allowed.
16:48:43 23    That was NS's main argument throughout its briefing.  It's
16:48:47 24    wrong.
16:48:47 25         The -- in *Amgen v. Hoechst*, the Federal Circuit

16:48:50  1    accepted numerous post-filing publications demonstrating the

16:48:54  2    extent of the enabling disclosure.  That's 314 F.3d at 1336.

16:49:01  3             In *Amgen v. Sanofi*, that's NS's case that they

16:49:02  4    rely on primarily.  The Court again -- or the Federal

16:49:07  5    Circuit again allowed such evidence.

16:49:09  6             Quote, "The jury did not hear relevant

16:49:11  7    post-priority date evidence regarding written description

16:49:14  8    and enablement.  This evidence may show, for example, that

16:49:18  9    practicing the invention did not require undue

16:49:21 10    experimentation, or that the disclosed species are

16:49:25 11    representative of the claimed genus."

16:49:26 12             That's in the 872 F.3d at 1379.

16:49:31 13             Sarepta's brief includes other examples of

16:49:33 14    Federal Circuit cases holding exactly the same thing.  We're

16:49:37 15    happy to go through those, if it's helpful to Your Honor.

16:49:40 16    But Sarepta's post-priority evidence is proper here.  It's

16:49:43 17    consistent with the Federal Circuit precedent.

16:49:47 18             Sarepta's patent describes and then claims ASOs

16:49:51 19    that induce exon skipping.  The claimed ASOs are

16:49:56 20    structurally defined and they are finite in number.  There's

16:50:00 21    no dispute in this case that a person of ordinary skill in

16:50:02 22    the art in 2005 knew how to make those ASOs.

16:50:06 23             What Sarepta is relying on in terms of

16:50:09 24    post-priority evidence is a wealth of direct specific

16:50:14 25    evidence confirming the teachings of the patent.  Every ASO

16:50:20  1    that has the structural features that are taught in the

16:50:24  2    patent induces exon skipping.

16:50:30  3            And unlike the few cases that NS does cite for

16:50:35  4    its position, Sarepta is not trying to rely on post-priority

16:50:41  5    evidence as support for new discoveries, new developments.

16:50:46  6    Sarepta is not arguing that the post-priority evidence is

16:50:50  7    proper to show new ASO sequences, new properties of the

16:50:55  8    claimed ASOs.

16:50:58  9            And, you know, to add a layer of, you know,

16:51:02 10    common sense and fair play to all of this, it's NS that

16:51:06 11    introduced the post-priority evidence in the first place

16:51:09 12    through its own testing.  What NS is trying to advocate for,

16:51:14 13    and what we submit cannot be right, is this double standard

16:51:18 14    that allows NS to tell the jury half the story, to tell the

16:51:23 15    jury that we've identified a number of embodiments that

16:51:28 16    allegedly do not work.  And while precluding Sarepta from

16:51:34 17    relying on any post-priority evidence to refute that

16:51:37 18    contention and show that -- exactly the opposite is true.

16:51:42 19            So for all those reasons, Sarepta submits that

16:51:45 20    the Court should deny NS's motion.

16:51:48 21            THE COURT:  Do you have any issue with some kind

16:51:50 22    of an instruction to the extent they're worried about the

16:51:53 23    jury being confused, having an explicit instruction that

16:51:57 24    makes it very clear that they may have seen post-priority

16:51:59 25    date evidence and that that should only be used for the

16:52:02  1    purpose -- 112 purpose of evidencing what a person of skill

16:52:06  2    in the art would have understood as of the priority date?

16:52:10  3              MR. SIKORA:  Yeah, I mean, we don't dispute,

16:52:12  4    again, that -- that the evidence we're relying on is for the

16:52:15  5    purpose of illuminating the state of the art as of the

16:52:19  6    priority date.

16:52:19  7              And we also submit that, you know, to the extent

16:52:21  8    NS has any issue with that, they also can cross-examine the

16:52:24  9    witnesses on that point.

16:52:25 10              THE COURT:  Okay.  Thank you very much.  And so

16:52:29 11    my questions may have revealed that we haven't closely

16:52:33 12    parsed the proposed final jury instructions yet.  Maybe we

16:52:37 13    would have seen if that was already in there, but we're

16:52:39 14    working as fast as we can.  Thank you very much.

16:52:43 15              MR. YACOB:  Thank you, Your Honor.

16:52:43 16              THE COURT:  So on MIL No. 1, to the extent it

16:52:48 17    requests a blanket exclusion of post-priority date evidence,

16:52:52 18    that request will be denied.  If NS wants some type of a

16:53:01 19    curative instruction at the time the evidence is brought

16:53:03 20    in -- I'm not necessarily thinking that's appropriate -- you

16:53:08 21    could propose that to the other side.  Or if there's a more

16:53:13 22    specific final jury instruction NS wants to propose, that's

16:53:17 23    something the Court would consider.

16:53:18 24              But to the extent we're asking for a blanket

16:53:21 25    exclusion, that's going to get denied.

16:53:23  1                All right.  Let's move on to MIL No. 2 from NS,

16:53:29  2     which has to do with -- I guess, there are four issues that

16:53:32  3     it has to do with.

16:53:37  4                MR. SIKORA:  Yes, your Honor.  This is Mike

16:53:39  5     Sikora on behalf of Nippon Shinyaku and NS Pharma.

16:53:42  6                So these are four discrete instances where NS

16:53:45  7     and MS Pharma diligently acquired into specific issues that

16:53:50  8     we expect to be frankly, core trial narratives for Sarepta

16:53:56  9     and were stonewalled in discovery.

16:53:58 10                So the first example is how Sarepta chose its

16:54:01 11     accused product beyond it's 53.  Ordinarily, you hear

16:54:06 12     defendants describe how they invented their product and how

16:54:09 13     it's amazing when we inquired about the specific selection

16:54:12 14     of the sequence, many of the witnesses said they had no

16:54:16 15     information other than a single sentence read in a document.

16:54:19 16                And when the author of that document, who ran

16:54:21 17     the research project, we had to subpoena her and approach

16:54:27 18     her, you see in the deposition transcripts, Sarepta

16:54:30 19     repeatedly objected on privilege grounds and instructed her

16:54:32 20     not to answer.

16:54:33 21                So for that reason, we don't think, at least in

16:54:35 22     that one, there should be any possibility of Sarepta now

16:54:39 23     introducing a new narrative as to why it selected the

16:54:42 24     product that elaborates beyond that single sentence that was

16:54:46 25     provided in the document.

16:54:47  1                THE COURT:  Okay.  And my recollection on the

16:54:49  2    papers, at least in my notes, was that they've said they're

16:54:52  3    not going to put on evidence about why it was selected as a

16:54:55  4    final product.

16:54:57  5                MR. SIKORA:  If that's their representation,

16:54:58  6    then we think the Court should hold them to that throughout

16:55:01  7    the trial.

16:55:01  8                THE COURT:  All right.  Thank you very much.  Is

16:55:03  9    that the representation?

16:55:10 10                MR. O'QUINN:  Ryan O'Quinn for Sarepta.

16:55:15 11                Your Honor, we don't intend obviously to dive

16:55:18 12    into privileged material.  The privilege claim here was

16:55:21 13    fairly limited to a single issue.  Thousands of pages were

16:55:27 14    produced on the sequence selection issue and five witnesses

16:55:28 15    were made available.  So we're not going to present what we

16:55:32 16    withheld from them.  We're not going to make a

16:55:36 17    sword-and-shield situation, but we think we should be able

16:55:38 18    to talk about the general development of the product.

16:55:42 19                THE COURT:  So let's get to specifics, instead

16:55:45 20    of generalities.

16:55:46 21                Are you going to have somebody say, we selected

16:55:48 22    it as a final product because blank?

16:55:52 23                MR. O'QUINN:  We intend to make a presentation

16:56:09 24    consistent with that non-privileged evidence, focusing on

16:56:12 25    that single sentence that counsel has provided.  But we

16:56:16  1    don't believe a broad exclusion of evidence is warranted

16:56:19  2    based on this.

16:56:20  3            THE COURT:  So just to make sure I understand

16:56:23  4    and I'm not trying to be difficult, I'm just trying to

16:56:28  5    understand.

16:56:28  6            The witness is going to say, we selected it as

16:56:31  7    our final product because we talked to our attorneys and

16:56:36  8    that's what we decided.  They're not going to say, because

16:56:39  9    it was the best product because some other reason we haven't

16:56:43 10    heard yet?

16:56:44 11            MR. O'QUINN:  That's correct, Your Honor.

16:56:45 12            THE COURT:  Counsel?

16:56:47 13            MR. SIKORA:  If that's the only statement

16:56:49 14    they're going to elicit, that's fine with us.

16:56:52 15            THE COURT:  All right.

16:56:52 16            Are we good?

16:56:54 17            MR. O'QUINN:  Yes.

16:56:55 18            THE COURT:  Okay.  Thank you.  Let's move on to

16:56:57 19    part 2B.

16:57:01 20            MR. SIKORA:  So this is, it relates to other

16:57:06 21    exon 53 research that Sarepta conducted.  Some of this is

16:57:09 22    actually the post-priority date evidence that Dr. Dowdy

16:57:11 23    talks about, was performed by Sarepta researchers, Pierce

16:57:23 24    Thosani and Ryszard Kole.

         25            (Reporter clarification.)

16:57:27  1          MR. SIKORA:  Pierce Thosani and Ryszard Kole.

16:57:27  2   And Nippon Shinyaku attempted to subpoena these witnesses.

16:57:30  3   Counsel for Sarepta then represented them in opposing those

16:57:36  4   subpoenas.  Sarepta itself objected to the subpoenas and

16:57:38  5   they were successful in blocking that discovery.

16:57:41  6          In addition, when Nippon Shinyaku inquired with

16:57:44  7   Sarepta's witnesses that they did make available, including

16:57:48  8   the corporate witness, Dr. Schnell, he disclaimed

16:57:52  9   acknowledge of the design intent behind.

16:57:55 10          And so this is another where, you know, a patent

16:57:57 11   document says what it says, but elaboration beyond that of

16:58:01 12   saying, they were motivated to do this experiment based on

16:58:05 13   Dr. Wilton's work in 2005 or anything else as to why they

16:58:09 14   chose sequences, why they designed all of those to have the

16:58:12 15   length that they did, the complementary that they did, those

16:58:17 16   types of things that -- no Sarepta witness should be

16:58:20 17   speaking to those since we were denied discovery into that

16:58:23 18   and moreover, that should go equally to Sarepta's experts.

16:58:27 19   They shouldn't be speculating on circumstances that there is

16:58:29 20   no evidence in the record regarding --

16:58:31 21          THE COURT:  Okay.  So I just want to make sure I

16:58:34 22   understand.  Dr. Kole and Thosani are not coming to trial,

16:58:40 23   right?

16:58:42 24          MR. SIKORA:  That's our understanding, they are

16:58:43 25   not on either parties' witness list and they're outside --

16:58:45 1        THE COURT:  So you're worried about one of their

16:58:48 2  witnesses saying, here's why they did what they did?

16:58:51 3        MR. SIKORA:  Correct.  And the way Dr. Dowdy

16:58:53 4  characterizes it in his report is one of those instances

16:58:56 5  when he describes it -- you know, you heard my colleague

16:59:00 6  describe confirming the 2005 University of Australia work

16:59:05 7  and things like that.  There's nothing in the patent that

16:59:07 8  says that they were motivated, for example, by that.  And

16:59:10 9  that's just one hypothetical example of something he might

16:59:13 10 say.

16:59:13 11       But if he wants to say, I looked at this

16:59:16 12 reference and this is what the reference says, that's one

16:59:18 13 thing.  But trying to infer some other design intent that we

16:59:23 14 were precluding from discovering, shouldn't allowed.

16:59:26 15       THE COURT:  Well, Dr. Dowdy doesn't say I talked

16:59:28 16 to these -- Drs. Kole and Thosani, does he?

16:59:33 17       MR. SIKORA:  No, he doesn't.

16:59:35 18       THE COURT:  Okay.

16:59:35 19       MR. SIKORA:  But if he is attributing design

16:59:37 20 intent to what they're doing, rather than factually

16:59:40 21 representing what they did.

16:59:41 22       THE COURT:  Okay.

16:59:42 23       MR. SIKORA:  That's the line.

16:59:43 24       THE COURT:  You don't think he should be able to

16:59:47 25 offer his opinion on what the design intent was based on the

16:59:51  1    records that he looked at and that you have --

16:59:55  2             MR. SIKORA:  I don't think he should be able to

16:59:57  3    attempt to speculate as to what was actually in Thosani

17:00:01  4    and -- Dr. Thosani and Kole's mind when they were doing

17:00:04  5    that.  I think that's a quintessential limitation on

17:00:08  6    experts, that they shouldn't be allowed to opine on others

17:00:11  7    intents.

17:00:12  8             So if he wants to describe the structure of the

17:00:14  9    research from that objective point of view, that's a

17:00:17 10    different question.  I'm referring to why they might have

17:00:20 11    selected ASOs and what they were trying to do with their

17:00:24 12    experimentation.

17:00:25 13             THE COURT:  And can you show me -- it's been a

17:00:28 14    long day.  Can you show me an example of where he does that

17:00:32 15    in his report?

17:00:32 16             MR. SIKORA:  I think the example would be the

17:00:34 17    table that my counsel referred you to.  I think it was table

17:00:37 18    13, you mentioned.  But it's the characterization of the

17:00:40 19    results.  There's a -- accompanying paragraphs that describe

17:00:46 20    the research by Thosani and Kole as confirming the prior

17:00:51 21    research.

17:00:52 22             For example, there's no evidence that what they

17:00:54 23    set out to do in 2008/2009, when they did that

17:01:00 24    experimentation, was reconfirm prior research, for example,

17:01:01 25    right?

17:01:01  1          THE COURT:  All right.  Thanks very much.  I

17:01:03  2   think I understand your position.

17:01:06  3          MR. O'QUINN:  Your Honor, we don't intend to put

17:01:10  4   words in the mouth of witnesses that are absent.  And we do

17:01:13  5   believe, however, that expert witnesses should be able to

17:01:16  6   interpret what they read from the perspective of a person of

17:01:19  7   ordinary skill in the art, which is all that we seek to do.

17:01:22  8          THE COURT:  All right.  Yeah.  I understand now

17:01:25  9   better having heard from both sides.

17:01:27 10          So this -- this request is also going to be

17:01:32 11   denied without prejudice to re-raise if, for whatever

17:01:35 12   reason, Dr. Dowdy decides to opine on someone's intent.

17:01:48 13          2C?

17:01:49 14          MR. SIKORA:  Yes, Your Honor.  So this one

17:01:51 15   relates to licensing activity that Sarepta and/or the

17:01:54 16   University of Western Australia engaged in.  Many of these

17:01:57 17   agreements were older agreements, focused in, for example,

17:02:00 18   2008, 2013, those sorts of time frames.  And there are some

17:02:04 19   instances where witnesses were able to provide testimony

17:02:08 20   about the literal, you know -- you know, what provisions are

17:02:12 21   in the agreement, what scenario is the agreement, you know,

17:02:16 22   prepared for that you can read directly from the agreement.

17:02:19 23   That's fine.

17:02:20 24          What we don't want to see at trial is, for

17:02:22 25   example, a narrative saying, oops, Sarepta approached

17:02:26  1    Dr. Wilton at UWA in 2008 because they recognized his

17:02:29  2    amazing research.  When, if that's the case, that testimony

17:02:32  3    was not given.  And even though we probed it with both the

17:02:36  4    University of Western Australia and Sarepta's corporate

17:02:39  5    representatives.

17:02:39  6              THE COURT:  So just to make sure I understand:

17:02:41  7    You don't want there to be a new story at trial about the

17:02:44  8    background for all these licenses that you haven't heard?

17:02:47  9              MR. SIKORA:  Yes, Your Honor.

17:02:48 10              THE COURT:  Okay.  Thank you.

17:02:50 11              Are we going to hear a new story at trial about

17:02:53 12    the licensing negotiations that they haven't heard?

17:02:55 13              MR. O'QUINN:  That is not the plan, Your Honor.

17:02:57 14              THE COURT:  Okay.

17:02:59 15              MR. O'QUINN:  We're a little worried about the

17:03:01 16    broad scope of what knowledge of negotiations means, that

17:03:03 17    was not part of any discovery that was sought.  So we're

17:03:06 18    worried that that could be used to create constant sidebar

17:03:10 19    distractions at trial.

17:03:10 20              You know, the terms of these agreements speak

17:03:13 21    for themselves.  Again, the damages experts that will be

17:03:15 22    looking at these have experience in interpreting these terms

17:03:18 23    and we don't believe there should be any limitations on

17:03:22 24    that, but witnesses, obviously, won't be able to go beyond

17:03:25 25    what they said at their deposition in terms of newly

17:03:29  1    acquired knowledge.

17:03:29  2            THE COURT:  So this is, again, is going to be

17:03:31  3    denied without prejudice to re-raise if we hear testimony

17:03:34  4    that goes beyond what they said they knew about at their

17:03:41  5    depositions.

17:03:42  6            All right.  Damages?

17:03:44  7            MR. SIKORA:  Yes, Your Honor.  So this relates

17:03:46  8    to a similar issue but for products that experts have --

17:03:50  9    Sarepta's expert have hinted at as being competing products

17:03:54  10   but has been appreciably quantified at least as to this,

17:03:58  11   Elevidys product, which is gene therapy that Sarepta

17:04:02  12   launched with a limited label for restricted age range in

17:04:06  13   June of this year.

17:04:07  14           And so one of the things that was specifically

17:04:11  15   inquired with Sarepta's corporate designee, was how Sarepta

17:04:16  16   had expectations for how follow-on products might effect

17:04:19  17   sales of the accused exon 53 products.  And so for one of

17:04:24  18   those products that you don't see in our motion, which was a

17:04:28  19   PPMO 53 product, Sarepta's corporate designee was able to

17:04:33  20   provide a quantitative amount just saying hey, at this point

17:04:36  21   in time, we expected that sales would drop by X percent.

17:04:41  22           Sarepta did not provide that for Elevidys.  Even

17:04:45  23   though there were references in the documents to this gene

17:04:48  24   therapy.  We diligently inquired with the first corporate

17:04:52  25   representee about what Sarepta's expectations were at the

17:04:55  1   time and how it might effect sales after the product was

17:04:58  2   approved.

17:04:59  3          We, again, inquired with the corporate designee

17:05:01  4   who said that Sarepta did not know.  Expert reports came,

17:05:07  5   their expert cited Elevidys as a potential factor but again,

17:05:12  6   did not actually assert that there was some sort of reduce

17:05:15  7   in demand that was going to be captured by this.

17:05:18  8          So if Sarepta created some sort of expectation,

17:05:20  9   it's not in their expert reports, it's not something that

17:05:23 10   was disclosed during fact discovery, and we don't think that

17:05:26 11   they should be allowed to do that as to these other two

17:05:29 12   products that weren't quantified and we didn't get those

17:05:32 13   quantitative financials or anything else to be able to

17:05:36 14   confirm sales data and other things like that.

17:05:38 15          THE COURT:  So you don't want a new number at

17:05:40 16   trial, right, but you also don't want them to be able to say

17:05:44 17   generally what they expect the effect would be or that's

17:05:48 18   okay with you?

17:05:49 19          MR. SIKORA:  For those products that it wasn't

17:05:51 20   disclosed on, that's correct.  So for the one product I

17:05:54 21   mentioned that they did provide that number for PPMO 50, 53.

17:05:58 22   Of course, that's in the record.  They disclosed that.  We

17:06:01 23   don't have a dispute about that.  It's for these other two

17:06:05 24   products for which we did seek information on the products,

17:06:07 25   didn't receive it during fact discovery.  Their experts

17:06:10 1    haven't substantively done that.  We don't want to see a new

17:06:15 2    narrative at trial that we can't rebut where they all of a

17:06:18 3    sudden say, oh, yeah, we've been launching this product for

17:06:21 4    eight months now and it's been doing great.  So yeah, our

17:06:24 5    expectations is that these 53 products are going to go away

17:06:28 6    like that.

17:06:28 7            We don't want to see that type of new narrative

17:06:30 8    from either a fact witness or any of the experts.  We'd

17:06:33 9    object based on the scope of their reports, but absolutely,

17:06:36 10    we don't want to hear it from fact witnesses either.

17:06:38 11            THE COURT:  All right.  Thank you very much.

17:06:43 12            MR. O'QUINN:  Your Honor?

17:06:43 13            THE COURT:  Do you understand what he's talking

17:06:44 14    about and are you going to do what he's worried about?

17:06:47 15            MR. O'QUINN:  I can try to provide a little more

17:06:49 16    context.

17:06:50 17            So Elevidys is a gene therapy product as

17:06:53 18    Mr. Sikora represented, that was approved for a narrow

17:06:56 19    patient population about a year ago.  Sarepta has given the

17:07:03 20    best landscape analysis that it has on this issue as of the

17:07:08 21    cutoff time of discovery.

17:07:09 22            This product is still in flux we are still

17:07:12 23    expecting an FDA decision on a potentially expanded patient

17:07:15 24    population in the coming weeks.  The reason the witnesses

17:07:18 25    can't give a specific number is because there's no way to

17:07:21 1    know a specific number.

17:07:22 2          But we are worried about the risk, as you raised

17:07:24 3    a moment ago, that general holistic statements about these

17:07:29 4    other products, either at trial, potentially in post-trial

17:07:34 5    briefing are going to be scraped off because of an inability

17:07:37 6    to make a specific number.

17:07:41 7          And -- go ahead.

17:07:42 8          THE COURT:  Can you just put a little more

17:07:44 9    detail on it?  Explain to me what -- it sounds to me like

17:07:48 10   your witness might say something and so give me an idea what

17:07:52 11   the witness might say.

17:07:53 12         MR. O'QUINN:  There isn't a future lost profits

17:07:55 13   claim in this case, so it's not a concern about speculation

17:07:58 14   by the experts as to where the sales will go in the coming

17:08:02 15   years.

17:08:02 16         We don't plan to make a lot about Elevidys in

17:08:06 17   this case.  This case is about Vyondys, our product, and

17:08:11 18   Viltepso, their product.  Exondys, the other product that

17:08:14 19   Mr. Sikora mentioned, has a small overlap but isn't a huge

17:08:19 20   factor in this damages case either.  So we're just worried

17:08:23 21   that they're again trying to look for an overbroad exclusion

17:08:28 22   on the ground -- we're not planning to come up with a number

17:08:31 23   and say sales will be cannibalized by X%.  We can't make

17:08:36 24   that statement.

17:08:36 25         THE COURT:  But your witness will say Elevidys

17:08:41 1    is going to affect the sales, we think it's going to affect

17:08:45 2    the sales of the other products?

17:08:46 3              MR. O'QUINN:  It's potentially also that the

17:08:49 4    physician witnesses on either side may discuss how that

17:08:52 5    product is affecting prescribing habits.  And so that's the

17:08:56 6    fear, is that if we have a broad exclusion of any discussion

17:09:00 7    of Elevidys, you may not get the full picture for the jury

17:09:03 8    of how these patients are being treated.  But we're not

17:09:07 9    going to make a categorical statement with a new number at

17:09:10 10   trial that they haven't received.

17:09:12 11             THE COURT:  Okay.  So when you say the

17:09:13 12   physicians might discuss it, those are your expert witness

17:09:17 13   physicians?

17:09:17 14             MR. O'QUINN:  Experts also.

17:09:18 15             THE COURT:  And is there anything about Elevidys

17:09:20 16   in the expert reports?

17:09:23 17             MR. O'QUINN:  Yes.

17:09:24 18             THE COURT:  Okay.  All right.  And they're not

17:09:26 19   going to testify outside of what they say in the expert

17:09:29 20   reports?

17:09:30 21             MR. O'QUINN:  No, Your Honor.

17:09:32 22             THE COURT:  All right.  Anything else you wanted

17:09:34 23   to add before I hear again from either side?

17:09:34 24             MR. SIKORA:  Nothing further, Your Honor.

17:09:35 25             THE COURT:  All right.  So on that one, again it

17:09:37  1    is going to be denied without prejudice to re-raise in the

17:09:41  2    particular context of the testimony.

17:09:45  3             MR. SIKORA:  Yes, Your Honor.

17:09:47  4             MR. O'QUINN:  Thank you, Your Honor.

17:09:48  5             THE COURT:  All right.  So this one has to do

17:09:56  6    with mentioning the IPRs.  And so I guess it might be

17:10:14  7    helpful for me to hear from Sarepta first about how you

17:10:22  8    intend to use evidence of the IPRs, and then we can talk

17:10:28  9    about whether or not we think that the prejudice outweighs

17:10:34 10    the probative value.

17:10:38 11             MR. RAICH:  Bill Raich of Finnegan, for Sarepta.

17:10:42 12             So the principal use for the IPRs will be to

17:10:46 13    reflect Sarepta's state of mind in response to NS's

17:10:50 14    allegations of willful infringement.  So NS put Sarepta's

17:10:55 15    state of mind in play with their allegation of willfulness.

17:10:59 16    Before this litigation, Sarepta filed seven IPR petitions

17:11:03 17    showing its belief that the NS patents are invalid.

17:11:06 18             Further, the PTO's favorable institutions of

17:11:10 19    those proceedings shows the reasonableness of that belief,

17:11:14 20    as the institution requires establishing a reasonable

17:11:17 21    likelihood that the claims are unpatentable.

17:11:21 22             So we think the weight of the authority supports

17:11:23 23    our position that IPR evidence should be considered for

17:11:27 24    willfulness.  Now, the cases that NS is relying on are in a

17:11:32 25    posit.  Many of them don't address willfulness, or, for

17:11:36  1    example, in the case of Sight Sciences, they involve a

17:11:40  2    denial of institution on discretionary grounds.

17:11:42  3            And I think there's a fundamental difference

17:11:45  4    between a denial of institution and a grant of institution.

17:11:48  5    There are lots of reasons why IPR petitions can be denied.

17:11:52  6    It could be because the examiner already considered the art

17:11:56  7    and it's just exercising their discretion not to go forward.

17:12:00  8    There could be co-pending litigation, so it's a waste of

17:12:03  9    resources.  There could be time bars, there could be

17:12:07 10    formality problems.

17:12:08 11            So there's a wide variety of things.  I mean, in

17:12:11 12    all of those instances, the board wouldn't have reached,

17:12:14 13    like, the underlying substance of the merits of the

17:12:17 14    decision.

17:12:17 15            But a grant is different.  There's only one

17:12:20 16    reason why the IPR petitions are granted.  That's because

17:12:23 17    there's a reasonable likelihood that the claims are

17:12:26 18    unpatentable, and this is highly probative of the

17:12:30 19    reasonableness of Sarepta's belief, which undermines NS's

17:12:34 20    allegations of willful infringement.

17:12:36 21            THE COURT:  Can I just ask -- I just want to

17:12:38 22    make sure I understand the timeline.  Sarepta files the IPRs

17:12:43 23    a couple weeks before this lawsuit begins; is that right?

17:12:51 24            MR. RAICH:  Weeks to months before, I don't have

17:12:53 25    the exact, but certainly before the lawsuit began.  I don't

17:12:55 1    know the exact time.

17:12:56 2              THE COURT:  And then the institution decisions

17:12:58 3    happened after we're in this?

17:13:01 4              MR. RAICH:  That is correct, Your Honor.  Yes,

17:13:02 5    that is correct.

17:13:03 6              THE COURT:  And let me ask you this, if I agree

17:13:06 7    with them that I don't think it's appropriate and would be

17:13:15 8    confusing and prejudicial to the jury that the evidence that

17:13:24 9    the PTAB instituted the IPR, means that the patents are

17:13:32 10   less -- more likely to be obvious -- I think you are

17:13:36 11   tracking what I'm saying.

17:13:38 12             MR. RAICH:  I am, yes.

17:13:39 13             THE COURT:  You say you still want that evidence

17:13:46 14   to show state of mind.  By that, you mean you filed -- you

17:13:49 15   were so convinced as to the invalidity of these patents that

17:13:52 16   you filed the IPR before this litigation even started.

17:13:56 17             MR. RAICH:  A good faith belief.  Yes, that's

17:13:59 18   right, Your Honor.

17:14:00 19             THE COURT:  And do you think that -- I'm not

17:14:02 20   going to be able to articulate this very well.  But, what

17:14:07 21   you're going to say is, we couldn't be willful infringers

17:14:12 22   because we thought that the patents were invalid and would

17:14:15 23   get invalidated in the IPRs, except for that I guess the

17:14:19 24   Federal Circuit has already held you shouldn't have been

17:14:22 25   able to file the IPRs to begin with.

17:14:24  1          So you really could have only thought they were

17:14:27  2    invalid based on how it ends up in this litigation, and

17:14:31  3    isn't that the jury that's supposed to be deciding if

17:14:34  4    they're invalid.  Do you understand what I'm asking?  Isn't

17:14:37  5    it confusing for the jury for you to say we didn't have a --

17:14:42  6    we weren't willful because we thought the patents would be

17:14:45  7    invalid, so we filed the IPR, but you really couldn't have

17:14:48  8    thought that because you weren't supposed to be filing the

17:14:51  9    IPR.

17:14:51  10          Does that make sense?

17:14:53  11          MR. RAICH:  I understand the point, Your Honor.

17:14:55  12    I think from our perspective, Sarepta was acting in good

17:15:00  13    faith.  Sarepta filed the IPRs, the petitions are

17:15:04  14    reflections of the beliefs of Sarepta.

17:15:06  15          The fact that ultimately based on contractual

17:15:09  16    reasons, you know, there was a Federal Circuit decision

17:15:13  17    overriding the district court's decision findings, having a

17:15:18  18    different interpretation.

17:15:19  19          We just don't think that in any way is

17:15:21  20    meaningful with respect to Sarepta's belief, and in fact,

17:15:24  21    it's a good faith belief that the patents are invalid.  We

17:15:27  22    think it's a separate issue.

17:15:29  23          THE COURT:  Is there anything I should take from

17:15:31  24    the fact that the IPRs get filed so close in time to when

17:15:34  25    this litigation starts?  So we've got opinions from, I

17:15:37  1   think, Judge Bryson and others that say, well, if you file

17:15:40  2   for the IPR after the litigation gets started, it's not

17:15:43  3   really all that probative of willfulness.

17:15:47  4              Here, we just have a couple weeks before.  Isn't

17:15:50  5   -- is that more probative --

17:15:52  6              MR. RAICH:  I think --

17:15:53  7              THE COURT:  -- of nonwillfulness?

17:15:56  8              MR. RAICH:  I think if a litigation is upon you

17:15:58  9   and then in response to that litigation, you file IPR

17:16:01 10   petitions, that's a very different situation than filing

17:16:05 11   IPRs before a complaint ever gets filed.

17:16:07 12              And here, keep in mind, it was Nippon Shinyaku

17:16:10 13   that initiated the litigation.  And so Sarepta filed its IPR

17:16:15 14   petitions, and then in response to that, Nippon Shinyaku

17:16:19 15   brought suit.  But Sarepta's good faith belief existed

17:16:23 16   before the litigation was filed, and I think the IPRs are

17:16:27 17   strong evidence of that.

17:16:28 18              THE COURT:  Okay.  Thank you very much.

17:16:31 19   Anything you wanted to add before we hear from the other

17:16:35 20   side?

17:16:35 21              MR. RAICH:  Just really quickly.  I mean, I

17:16:37 22   think this has come up in terms of -- there is relevance to

17:16:41 23   the IPRs that if Nippon Shinyaku argues that the PTO has

17:16:45 24   previously considered the references or references that are

17:16:49 25   cumulative to them, and is making that point, I think it's

17:16:54 1    only fair that Sarepta be permitted to tell the jury that

17:16:56 2    upon a second look the US PTO found that there was a

17:17:00 3    reasonable likelihood that the references would result in

17:17:03 4    finding the NS patents unpatentable.

17:17:05 5              So if they put this into play by relying on what

17:17:08 6    the PTO did and relying on it, I think it's fair to say,

17:17:12 7    well, the PTO actually determined there was a reasonable

17:17:15 8    likelihood that the patents were invalid.  That's sort of a

17:17:18 9    second independent play, depending on their actions during

17:17:21 10   the case.

17:17:22 11             THE COURT:  All right.  Thank you very much.

17:17:24 12             MR. RAICH:  Thank you, Your Honor.

17:17:28 13             MS. DUDASH:  Your Honor, as you saw from the

17:17:32 14   papers, the Federal Circuit has cautioned against the

17:17:34 15   limited value of PTAB decisions for purposes of willfulness.

17:17:38 16   That's the *SSL Services* case which cites others, that say

17:17:42 17   that the Federal Circuit has warned of the limited value of

17:17:45 18   actions by the PTO to establish a good faith belief of

17:17:48 19   invalidity.

17:17:49 20             This comes up in every case where a party wants

17:17:52 21   to use IPRs for willfulness.  Numerous courts, as you

17:17:56 22   mentioned, Judge Bryson, in the *Iogen* case, and numerous

17:18:00 23   other ones cited in our paper, such as Judge Stark's cases,

17:18:03 24   *Integra Life Sciences* court, but I won't go through them

17:18:06 25   all, that have held that it simply is too prejudicial.

17:18:09  1          Even in the cases Sarepta cited, courts said you

17:18:13  2  couldn't say PTAB and IPR because the jury doesn't know what

17:18:16  3  that means.  And then it will turn into a sideshow where

17:18:19  4  we'll have to explain that the patent office applies the

17:18:22  5  completely different presumption that invites confusion.

17:18:25  6  That's just simply unnecessary here.

17:18:28  7          One thing we do want to note is we just heard

17:18:32  8  argument just about willfulness.  Dr. Dowdy, in his report,

17:18:35  9  as the court is familiar from the Daubert motion, cites this

17:18:39 10  all over the place to say the IPRs confirm his belief of

17:18:42 11  invalidity.  That's exactly why there's prejudice here.

17:18:45 12          The jury is going to be confused and think that

17:18:47 13  invalidity must mean a reasonable likelihood, but we all

17:18:51 14  know it's clear and convincing evidence, and that's exactly

17:18:54 15  what the courts have found in excluding this.

17:18:56 16          We would say that we heard a lot about, you

17:19:00 17  know, Sarepta needs this to say that they challenged the

17:19:03 18  patents.  If the Court is inclined, we would be willing to

17:19:07 19  say Sarepta could have a statement saying that they

17:19:10 20  challenged the validity of the patents before suit and end

17:19:14 21  it there.  No mention of IPR, PTAB, institution decision,

17:19:19 22  which as the Court knows, NS wasn't able to respond.

17:19:22 23  There's no fulsome record.

17:19:23 24          There's a lot of courts that have excluded this

17:19:25 25  kind of evidence simply because the PTAB proceedings were

17:19:29  1    not complete.  They had to withdraw them because they were

17:19:31  2    inappropriately filed, which is not an issue we're here to

17:19:35  3    relitigate.  The federal circuit already found in our favor

17:19:37  4    on that.

17:19:38  5           But the bottom line is, we don't want this to

17:19:40  6    turn into a sideshow at trial and prejudice us in a way that

17:19:43  7    we think would constitute reversible error.

17:19:46  8           THE COURT:  Let me ask you about that last

17:19:48  9    suggestion because that was sort of what I was thinking that

17:19:54 10    maybe the parties could work out.  It sounds to me like you

17:19:58 11    might be amenable to it, where they could, say, put on

17:20:02 12    evidence that, yeah, we tried to challenge the patents by a

17:20:06 13    process to go to the PTO and the court later held that that,

17:20:12 14    the obviousness of the patent had to get decided by this

17:20:17 15    court, by this jury, or something like that.

17:20:19 16           MS. DUDASH:  I think, Your Honor, we could work

17:20:21 17    something out.  Just a statement, when you said put on

17:20:24 18    evidence, I have concerns with making it a sideshow.  We

17:20:28 19    could probably work out the contours.

17:20:29 20           But as long as it wasn't going to be explaining

17:20:32 21    the patent office has this procedure, it's called an IPR,

17:20:36 22    here, let me tell you all about it.  Because honestly, in

17:20:38 23    the time we're allowed.  That's just not going to be

17:20:40 24    possible.  And I think, in fairness, that simply is far too

17:20:43 25    confusing for the jury.

17:20:44  1          THE COURT:  I understand what you are saying.  I

17:20:46  2   will say this.  If you're saying that they willfully

17:20:48  3   infringed, they ought to be able to have somebody sit here

17:20:52  4   on the stand and say no, we weren't willfully infringing and

17:20:55  5   we tried to challenge the patents three weeks before and,

17:20:58  6   you know, the Court said we couldn't do it that way, we had

17:21:01  7   to do it here.

17:21:02  8          So you're not precluding that a witness could

17:21:05  9   put on evidence but you just don't want it to go too far.

17:21:08 10          MS. DUDASH:  Right, Your Honor.  If it was a

17:21:09 11   statement like what you just said, we filed -- we attempted

17:21:13 12   to challenge the patent and it was decided that the jury

17:21:16 13   must decide and here is the reason I, as an expert, think

17:21:19 14   the patent is obvious, which of course will come in, we're

17:21:23 15   comfortable with that with the clear guardrails on.  This is

17:21:29 16   not one of those opening-the-door situations.

         17          (Reporter clarification.)

17:21:32 18          MS. DUDASH:  Sorry.

17:21:33 19          And this is a -- I'm very concerned with

17:21:35 20   prejudice, so this is one area where I know on some of the

17:21:38 21   MILs we've been, you know, we could renew.  The minute the

17:21:40 22   jury hears, the prejudice is really incurable.

17:21:44 23          So as long as we had clear guardrails, we are

17:21:46 24   amenable to that.  And just a statement that they challenge

17:21:49 25   the patents, not really discussing the patent office.

17:21:52  1    That's exactly what other courts have found.  Even when they

17:21:55  2    let this evidence in in different context, needs to be

17:21:59  3    excluded.

17:21:59  4            THE COURT:  Understood.  Thank you very much.

17:22:01  5    So on this one, I don't like IPRs getting discussed in front

17:22:10  6    of the jury because I agree with the courts that have held

17:22:13  7    that it's confusing and prejudicial, especially in light of

17:22:19  8    the different burdens and additionally, in light of the fact

17:22:23  9    that this is an institution decision and not a final

17:22:27 10    decision.

17:22:28 11            Also problematic here in light of the fact that

17:22:32 12    we've got this contractual provision that the Federal

17:22:37 13    Circuit has said means that Sarepta wasn't allowed to file

17:22:41 14    an IPR, although, again, my decision on this MIL is

17:22:45 15    independent of that.

17:22:48 16            We're not going to allow Sarepta to argue that

17:22:54 17    the PTAB's decision to institute supports Sarepta's view on

17:22:59 18    obviousness.  That's not going to happen.  I do think that

17:23:07 19    there is some minimal probative value potentially on having

17:23:12 20    Sarepta say that they weren't willful and they tried to

17:23:16 21    challenge these patents.  And I'm hearing from NS that

17:23:19 22    they'll work with Sarepta on some guardrails to let that

17:23:23 23    evidence in.

17:23:25 24            So we're not going to have the PTAB's

17:23:28 25    institution decision come in.  We're not going to have

17:23:32  1    anything the PTAB did be admitted in support of Sarepta's

17:23:39  2    obviousness opinion.  We're going to have a minimal

17:23:43  3    discussion of Sarepta's decision to ask for an IPR as

17:23:52  4    evidence of their non-willfulness.

17:23:55  5              Does anybody have any questions about what I've

17:24:00  6    said?

17:24:02  7              MR. SIKORA:  No, Your Honor.

17:24:05  8              THE COURT:  All right.  Thanks very much.  All

17:24:06  9    right.  And you should meet and confer to see if you can

         10    come to agreement on making sense of the Court's ruling.

17:24:12 11              All right.  We're turning to Sarepta's MIL and

17:24:15 12    we're going to start with Sarepta's No. 1, which has to do

17:24:24 13    with patents not in suit.  And I'm not sure I 100%

17:24:28 14    understood everything that's going on here, so you might

17:24:30 15    have to walk me through it.

17:24:31 16              MR. RAICH:  Yeah, Your Honor, Bill Raich again.

17:24:34 17    So our motion is to exclude evidence of satellite

17:24:39 18    proceedings related to patent other than the patents in

17:24:44 19    suit.  And we think the case law overwhelmingly supports

17:24:47 20    exclusion because any possible probative value is outweighed

17:24:50 21    by jury confusion and sort of time wasted.

17:24:54 22              And so in terms of background, NS wants to rely

17:24:58 23    on certain types of information.  And the first involve

17:25:03 24    prosecution histories of patent applications and patents

17:25:06 25    that are not related to the patents-in-suit.  They are

17:25:10  1   different families, they have different priority dates, they

17:25:12  2   have different specifications, they have claims of different

17:25:15  3   scope.  They're not prior art.  They're later in time.

17:25:19  4           Many of the statements that they're seeking to

17:25:21  5   rely on relate to other exons, not Exon 53 or areas outside

17:25:27  6   of the Dr. Wilton's hot spot that you're going to hear a lot

17:25:30  7   about.

17:25:30  8           And so we think it's just extremely prejudicial

17:25:34  9   to Sarepta and UWA to have statements taken out of context

17:25:39 10   that were made in really very different situations with

17:25:43 11   different applications, different priority dates, you know,

17:25:49 12   just different claims, et cetera.

17:25:52 13           And so, again, this is, we think, very

17:25:56 14   prejudicial to Sarepta and UWA.

17:25:58 15           And let me give you one example that I think

17:26:01 16   might be helpful.  So Nippon Shinyaku argues that Sarepta,

17:26:05 17   in some of these cases, sought claims over the Papawell

17:26:10 18   reference, which is one of the references that we're

17:26:12 19   asserting against the Nippon Shinyaku patent.  And they

17:26:17 20   point out that Sarepta made statements that they feel are in

17:26:22 21   conflict with the positions taken in this litigation.

17:26:25 22           THE COURT:  What do you mean by Sarepta?  Do you

17:26:27 23   mean your -- an expert declaration or do you mean

17:26:30 24   prosecution counsel?

17:26:31 25           MR. RAICH:  I mean, prosecution counsel in

17:26:33 1    pursuing -- yeah, good question.  Prosecution counsel in

17:26:36 2    pursuing applications in these other families made

17:26:39 3    statements that they would like to use in this case, even

17:26:42 4    though they're very out of context.

17:26:44 5            And they're also ignoring the bigger picture,

17:26:47 6    which is that, although certain arguments were made, the

17:26:50 7    patent office actually rejected Sarepta's arguments.  They

17:26:53 8    maintained the obviousness rejections.  And Sarepta

17:26:58 9    abandoned those cases.  So that information should be

17:27:00 10   excluded.  It's really prejudicial and just not relevant to

17:27:05 11   our patent and our case here.

17:27:07 12           And I heard NS's counsel talk about, you know,

17:27:10 13   the time allotted in order to explain things.  I think the

17:27:13 14   time allotted to address patents that are so different, that

17:27:19 15   have all of these different issues that would require an

17:27:22 16   incredible amount of context to explain what is going on is

17:27:25 17   a serious problem.

17:27:27 18           THE COURT:  You're asking for more than just

17:27:29 19   them not using the statement of prosecution counsel, right,

17:27:31 20   you're also asking for them not to be able to use

17:27:34 21   declarations made by people who are going to be witnesses in

17:27:36 22   this trial?

17:27:37 23           MR. RAICH:  I don't think it rises to that

17:27:46 24   level.  I don't recall there being specific declarations,

17:27:49 25   but yeah, I am specifically discussing the prosecution files

17:27:56  1    and what happened in those proceedings.  So -- I guess the

17:28:04  2    one -- the one, perhaps, exception to that -- and this goes

17:28:08  3    to the second category of evidence that is implicated by

17:28:10  4    this motion, and this relates to the interference, and so

17:28:15  5    it's a little bit different because the interference did

17:28:18  6    involve an application that was related to the Wilton

17:28:22  7    patents-in-suit.

17:28:23  8           But it's a very -- an interference is a

17:28:26  9    specialized proceeding at the US PTO that sort of is a

17:28:31 10    priority contest between that and a different earlier

17:28:35 11    application that was filed earlier and from a different

17:28:39 12    party.  So it's a very different procedural posture.

17:28:43 13           And there were statements made by UWA, the

17:28:49 14    University of Western Australia, in the interference

17:28:51 15    proceeding that were made in support of the invalidity of

17:28:54 16    this unrelated patent application from a different entity

17:28:57 17    that's not a party to this suit and that had a different

17:29:00 18    priority date from the Wilton patents.

17:29:03 19           And so any minimal value -- any minimal

17:29:07 20    probative value, such as, you know, statements that they're

17:29:10 21    trying to take out of context is outweighed for the

17:29:12 22    potential for confusion.

17:29:14 23           Now, there's one further, I think, complicating

17:29:17 24    factor, and this actually goes to your question.  And that

17:29:21 25    is, UWA's expert in that interference was someone named Matt

17:29:25  1    Wood.  And Matt Wood is one of the NS experts in this case.

17:29:30  2         And there's just no reason to bring up his

17:29:34  3    declaration or statements that he made in that interference

17:29:37  4    talking about the different applications there, because he

17:29:41  5    has reports that he's submitted in this case about the

17:29:44  6    patents-in-suit.  And we think that he should be limited to

17:29:48  7    offering testimony about the patents-in-suit, not what he

17:29:51  8    said in a different proceeding relating to different patents

17:29:54  9    in a different factual situation.

17:29:57 10         And we -- again, in terms of authority, we think

17:29:59 11    the authority is overwhelmingly in favor of excluding this

17:30:02 12    type of information.

17:30:04 13         And I will be brief, but just to discuss two

17:30:08 14    cases briefly, one is *Solvay v. Honeywell*.  This is civ

17:30:15 15    number 06-557-SLR D.I. 329.  And there, a motion in limine

17:30:22 16    sought to exclude statements made during the prosecution of

17:30:25 17    a related application -- a related application that

17:30:30 18    characterized the prior art after an examiner had made a

17:30:33 19    rejection.  And the case was abandoned.  And the Court

17:30:39 20    excluded that satellite proceeding because the marginal

17:30:45 21    relevance was far outweighed by the prejudice involved.  We

17:30:48 22    think that that's the case here.

17:30:50 23         And then finally, the one case that they cited

17:30:52 24    in their opposition brief was a case called *Procter & Gamble*

17:30:56 25    *v. Nabisco*.  And they cited it for the fact that prosecution

17:31:00  1    admissions are purportedly binding.

17:31:04  2              But there, the Court was discussing admissions

17:31:07  3    made during the prosecution of the patent that was

17:31:10  4    litigated.  It was the same patent that was ultimately

17:31:13  5    litigated in the case, not these unrelated applications

17:31:16  6    with, you know, so many differences that would need to be

17:31:20  7    explained.

17:31:20  8              So I hope that's helpful.  I'm happy to take

17:31:22  9    questions to try to put this more in context.

17:31:25 10              THE COURT:  So I think what would be helpful is

17:31:27 11    so how do you expect this to come in, through the testimony

17:31:30 12    of their experts?

17:31:31 13              MR. RAICH:  Yeah, their experts have cited to

17:31:36 14    these prosecution statements and are attempting to try to

17:31:39 15    explain how they are relevant to, you know, the instant

17:31:43 16    cases.  And we just think that -- again, that the prejudice

17:31:46 17    substantially outweighs any marginal relevance that might

17:31:49 18    come from the statement.

17:31:51 19              THE COURT:  I apologize.  Do I have something in

17:31:53 20    the paper about exactly what paragraphs of their expert

17:31:55 21    report you think are going over the line?

17:31:58 22              And the reason why I'm asking is because it

17:32:03 23    would be helpful to me to decide it, but also because they

17:32:06 24    say this is really a move by your side to get out them

17:32:13 25    asking witnesses about declarations that they've made.

17:32:18  1          MR. RAICH:  I mean, again, I think this goes far

17:32:20  2     beyond the declarations.  And if we don't have a specific

17:32:24  3     paragraph for you, we'll get it to you by the end of this

17:32:27  4     conference or soon thereafter, because it's something that's

17:32:31  5     done substantially in their expert reports.

17:32:34  6          THE COURT:  All right.  Thanks very much.  Let's

17:32:36  7     hear from the other side.

17:32:41  8          MR. SIKORA:  So, first of all, Your Honor, to

17:32:44  9     the extent that Sarepta does provide anything later, we'd

17:32:47 10     like a chance to consider those and respond to the extent

17:32:49 11     that they weren't in the briefing.

17:32:51 12          Now, we disagree with counsel's characterization

17:32:53 13     of what is being done here across the board.  So I want to

17:32:59 14     start first with the interference proceeding that was

17:33:01 15     mentioned, and then I want to transition over to these other

17:33:04 16     prosecutions of the other Sarepta patents.

17:33:06 17          So the interference involved exon 53 skipping

17:33:12 18     oligonucleotides from another University of Western

17:33:15 19     Australia family member.  It involved certain counsel from

17:33:18 20     Sarepta in this room who were arguing factually to the PTAB

17:33:23 21     that the state of exon 53 skipping was unpredictable in

17:33:29 22     2005, continued to be unpredictable all the way through the

17:33:33 23     filing of those briefs, which was in 2014, 2015.

17:33:38 24          Those are party admissions that the University

17:33:41 25     of Western Australia made and that Sarepta made because it

17:33:44 1    was in control of the prosecution history.  They were

17:33:46 2    successful in convincing the PTAB to adopt those factual

17:33:49 3    assertions, and they won that proceeding.

17:33:52 4           Then, when the patent-in-suit was being

17:33:54 5    prosecuted, the '851 Patent, Sarepta amended the claims so

17:33:57 6    they were identical to what they ultimately issued as.  They

17:34:02 7    were rejected as obvious.  And then Sarepta's patent

17:34:06 8    attorney controlling prosecution made virtually identical

17:34:10 9    arguments to those that were made in the interference, cited

17:34:13 10   the same evidence, almost word for word, the citation.

17:34:19 11          And then at the end, made the exact same

17:34:23 12   assertion that it continued, that lack of recognition -- or

17:34:26 13   I'm sorry, a recognition with a lack of unpredictability

17:34:29 14   continued beyond 2005.  And again, this is in the

17:34:31 15   prosecution of the asserted patent.

17:34:33 16          And then concluded by saying, by the way, the

17:34:37 17   Patent Trial and Appeal Board already considered this exact

17:34:41 18   issue in this interference.  They found the art was

17:34:46 19   unpredictable, and you, patent examiner, should adopt the

17:34:50 20   exact same ruling.

17:34:52 21          The patent office agreed, found the arguments

17:34:55 22   persuasive, withdrew the obviousness rejection.  And the

17:34:59 23   asserted patent, having the exact claims that are being

17:35:02 24   asserted against Nippon Shinyaku now, issued.

17:35:05 25          Sarepta now wants to sweep all of that under the

17:35:07 1   rug and say that Nippon Shinyaku cannot mention any of those

17:35:12 2   statements from the interference.

17:35:13 3          And when I say "statements from the

17:35:15 4   interference," I want to be very clear that the use of the

17:35:18 5   interference is for the factual assertions being made.

17:35:22 6   Unlike counsel who represented that they were going to use

17:35:24 7   the IPRs or, in their brief, they mentioned European

17:35:29 8   proceedings for the outcome of those proceedings, we don't

17:35:32 9   intend to argue to the jury that, well, the patent office --

17:35:36 10  the PTAB found this so you should too.

17:35:39 11         What we instead plan to do is highlight the

17:35:41 12  factual assertions being made by the party.  Where Sarepta

17:35:45 13  says the art remains unpredictable through 2014, remained

17:35:50 14  unpredictable past 2005.

17:35:52 15         Those party admissions by the patentee before

17:35:55 16  the patent office about a fundamental issue that's central

17:35:58 17  to the 112 issues in this case.  Those are the statements

18  that are being used from the interference.

17:36:01 19         And we don't believe that Sarepta has a credible

17:36:04 20  way to argue that they shouldn't come in because they put

17:36:07 21  them at issue in the asserted claim by relying upon them

17:36:10 22  during prosecution of the patent.

17:36:12 23         When we had the meet and confer over this issue,

17:36:14 24  I asked counsel whether or not the statements from the

17:36:17 25  prosecution history where the prosecuting attorney, of the

17:36:21 1    '851 Patent specifically explicitly relied upon the

17:36:24 2    interferences of predictability, whether they intended that

17:36:28 3    to be excluded as well, even though it was in the

17:36:30 4    prosecution history of the asserted patent.  They said yes.

17:36:34 5    That's how far they want to go.

17:36:35 6              And I do think the distinction is important that

17:36:38 7    we are focusing on factual party admissions when it comes to

17:36:43 8    unpredictability, when we're talking about interference.

17:36:46 9    Those are fair game.  They're not something that are going

17:36:50 10   to require Sarepta to explain the context of the proceeding

17:36:53 11   or anything else.  The only thing they will have to explain

17:36:55 12   away is anybody who is in the same position where they make

17:36:58 13   a factual admission and then have to try to explain it away

17:37:01 14   later when it's directly contradictory to their litigation

17:37:05 15   position.

17:37:06 16             That's the only prejudice that they have, and

17:37:08 17   it's not unfair prejudice.  That's just having an

17:37:11 18   inconsistent prior party admission.

17:37:13 19             Now, the other set that counsel mentioned, these

17:37:15 20   additional prosecutions, you've heard Bestwick mentioned,

17:37:19 21   you've heard Tonsani mentioned.  These are post-priority

17:37:23 22   date research performed by Sarepta, that Sarepta filed

17:37:27 23   patents on, that Dr. Dowdy relies upon as post priority date

17:37:31 24   evidence.  But then when Nippon Shinyaku's experts want to

17:37:34 25   rely upon those same applications and the actions Sarepta

17:37:38   1    took with those same applications, now that's out of bounds

17:37:41   2    because, again, Sarepta is making arguments that are

17:37:44   3    inconsistent with its litigation position.

17:37:47   4            So, if it's fair game for Dr. Dowdy to introduce

17:37:50   5    the subsequent research by Sarepta in their patent

17:37:53   6    applications, it should also be fair game for Nippon

17:37:57   7    Shinyaku to then flag to the jury what exactly Sarepta

17:38:00   8    asserted it had invented in those applications and what was

17:38:04   9    patentable over their asserted prior art.

17:38:06  10            And so with those, even though there is some

17:38:09  11    discussion of the specific claims being sought, there is

17:38:12  12    sponsoring expert testimony to put it in context.  The jury

17:38:17  13    will be instructed.  We've agreed to play the patent video

17:38:20  14    which talks about prosecution.  So this is not a situation

17:38:22  15    for those where the jury is going to have to be instructed

17:38:25  16    about other proceedings that aren't already at issue.

17:38:29  17            And so we think that there's a stark difference

17:38:32  18    between the uses that Nippon Shinyaku is using this for and

17:38:35  19    what Sarepta is using this for.  And realistically, if they

17:38:41  20    are allowed to use post-priority date evidence, that should

17:38:44  21    open the door to Nippon Shinyaku's reliance to rebut their

17:38:48  22    points, that they're making for invalidity and validity as

17:38:52  23    well.

17:38:53  24            So pause there if you have any questions for me,

17:38:55  25    because I know that was a lot of information.

17:38:57 1          THE COURT:  No, I don't.  Thank you very much.

17:38:59 2    So I think on this one, what we'd like to do, is take a

17:39:02 3    closer look at it.  Not because we think that the issue is

17:39:08 4    particularly challenging to decide, but because we just want

17:39:13 5    to understand exactly what's being objected to.

17:39:16 6          So I'm going to ask Sarepta to let us know with

17:39:19 7    a letter by noon tomorrow which paragraphs exactly they're

17:39:24 8    talking about and we'll take a look at those.  And if we

17:39:29 9    need briefing from the parties, we'll ask for it at that

17:39:35 10   point, but just a letter with the paragraphs and no argument

17:39:40 11   would be our preference.

17:39:43 12         And I was mostly tracking, but not 100%, so I

17:39:48 13   think we just need to take some time and I want to get you a

17:39:51 14   good decision.

17:39:54 15         MR. SIKORA:  Yes, Your Honor.

17:39:56 16         THE COURT:  All right.

17:39:58 17         MR. RAICH:  May I briefly respond to a couple of

17:40:00 18   those points?

17:40:01 19         THE COURT:  Sure.

17:40:02 20         MR. RAICH:  Okay.  Thank you.

17:40:09 21         Just a few things about this:  First of all, in

17:40:14 22   Category 1, involving sort of the other prosecution cases

17:40:17 23   that are unrelated, you know, if the -- if the jury were to

17:40:23 24   hear arguments about the argument -- if the jury were to

17:40:29 25   hear arguments that were made in those cases by Sarepta in

17:40:32 1    an attempt to get those claims allowed, they would also need

17:40:35 2    to hear that the PTO rejected those arguments and that

17:40:38 3    Sarepta abandoned those cases.  I think that's only fair, to

17:40:42 4    provide sort of the full context for what happened there.

17:40:44 5        We think it's much simpler to just preclude this

17:40:48 6    evidence rather than having to go through it but that is

17:40:51 7    certainly fair from our perspective.

17:40:53 8        Second of all, with respect to Dr. Wood, the

17:40:55 9    interference expert, you know he's now their expert and they

17:40:58 10   really shouldn't be given the opportunity to bolster his

17:41:02 11   opinions by saying that he used to be an expert for UWA.

17:41:06 12   That seems, to us, to be prejudicial.

17:41:11 13       A third point, again, this is -- this is very

17:41:16 14   much like the PTAB IPR decisions.  They're talking about

17:41:22 15   different proceedings, with different specific issues, all

17:41:25 16   the things that I mentioned about priority dates, claim

17:41:28 17   scope, patent specifications, the types of proceedings, it

17:41:33 18   would take -- it is a very fast, compressed trial with

17:41:36 19   patents going in both directions and we think the time that

17:41:39 20   would be needed to explain all of that, simply would be

17:41:46 21   exceedingly problematic and prejudicial.

17:41:51 22       I think in terms of their statement about what's

17:41:57 23   in the file history, we would be, of course, fine with them

17:42:03 24   citing a specific statement in the 85 -- in the file history

17:42:05 25   of the Wilton patent that's at suit.  That's not the issue.

17:42:09  1    But we don't think that that opens the door to all of the

17:42:13  2    briefing and declarations and underlying materials from the

17:42:16  3    interference.

17:42:18  4              So --

17:42:19  5              THE COURT:  Thank you very much.

17:42:21  6              MR. SIKORA:  Your Honor, if I may briefly, just

17:42:23  7    one or two points?

17:42:25  8              THE COURT:  Sure.

17:42:27  9              MR. SIKORA:  So first of all, I think it's

17:42:30 10    important to note, if you look at the face of the '851

17:42:33 11    Patent, the references that were provided to the Patent

17:42:36 12    Office during prosecution included the underlying briefing

17:42:39 13    from the PTAB and those were cited to the Patent Office.  So

17:42:43 14    this isn't a situation where it's not intrinsic evidence to

17:42:49 15    the asserted patent in that patent's prosecution and in any

17:42:52 16    event, because it's a related family member, it's intrinsic

17:42:55 17    evidence even if Sarepta hadn't specifically cited it in

17:43:00 18    connection with the '851 Patent.

17:43:01 19              So we don't think that that distinction holds

17:43:04 20    water.

17:43:04 21              As to Professor Wood, if their representation is

17:43:08 22    that they are not going to impeach his credibility at all,

17:43:11 23    at trial, then maybe we can discuss the issue that they

17:43:16 24    brought about notifying that he previously worked for

17:43:18 25    Sarepta.

17:43:19  1          But if they do anything to impeach his

17:43:21  2    credibility, it's fair game to point out that he was willing

17:43:24  3    to offer virtually the exact same opinions about exon 53

17:43:28  4    skipping the unpredictable for Sarepta and UWA when they

17:43:33  5    wanted him to.

17:43:34  6          So with that, I'll stop.

17:43:35  7          THE COURT:  All right.  Thanks very much.

17:43:38  8          All right.  We'll take that one under

17:43:42  9    advisement.

17:43:43 10          Let's move on to Sarepta Motion No. 2.

17:43:51 11          MR. MORIN:  Good afternoon, Your Honor.  Mike

17:43:54 12    Morin on behalf of Sarepta.

17:43:55 13          I think we've said most of what we wanted to say

17:43:57 14    in our papers but if you'd like a little bit more

17:44:01 15    background, both parties and both companies, when they got

17:44:06 16    their products approved, did separate and independent tests,

17:44:10 17    not head-to-head tests but separate tests, to determine the

17:44:15 18    amount of dystrophin increase that their respective products

17:44:19 19    got.  They were not comparative, they were with different

17:44:22 20    patient population, they were different studies, different

17:44:25 21    attributes and for that reason, the FDA won't allow either

17:44:28 22    side to make any comparative claims about the efficacy of

17:44:31 23    the two products compared to each other.

17:44:33 24          Flat out-of-bounds and we cited in our brief,

17:44:35 25    their admissions by the 30(b)(6) witness on that, the

17:44:38  1   admissions by their expert on that, the documents that

17:44:42  2   support that.  We --

17:44:44  3           THE COURT:  And they're not going to do that.

17:44:47  4           MR. MORIN:  They say they're not going to do

17:44:49  5   that but in our reply brief, you may have another -- this is

17:44:52  6   on page -- we have a one-page reply brief where we pointed

17:44:55  7   out on page 3, where they say they're not going to try to

17:44:57  8   say that one is better than the other.

17:44:58  9           But on page 2, they cite that they wanted to say

17:45:01 10   that they have the highest dystrophin in levels and if the

17:45:04 11   question is, I'm not allowed to compare myself to Jack,

17:45:07 12   Mr. Blumenfeld, but I'm going to say I'm the tallest of the

17:45:10 13   two of us, you're doing the exact same thing.

17:45:12 14           So they want to say that they have the highest

17:45:15 15   dystrophin levels as compared to us and they say that on

17:45:18 16   page 2 and their expert has said that in their report.

17:45:22 17           What we fear, Your Honor, we have no problem and

17:45:24 18   we'll do the same thing, we have competing patents, Your

17:45:27 19   Honor, so we're seeking lost profits.  Your Honor is well

17:45:30 20   aware of lost profits.  We have no problem with our friends

         21   wanting to get up say they compete with one another, we have

17:45:36 22   safe and effective products and all of that.

17:45:38 23           But the turmoil and the prejudice to us if they

17:45:41 24   suggest in any way that their level of 5% should be compared

17:45:45 25   to our level of 1%, both of which are tenfold increases from

17:45:50 1   the baseline levels with different patient populations, if

17:45:53 2   there's even a suggestion that that shows in any way that

17:45:57 3   theirs is better than ours, which is disallowed by the FDA,

17:46:00 4   and which they say they're not going to do on page 3 but

17:46:03 5   they do on page 2 of their brief, then we have to unwind

17:46:07 6   that because as Your Honor must appreciate any jury is going

17:46:09 7   to look at it and any suggestion that their product is

17:46:12 8   better than ours is going to start affecting who they

17:46:14 9   believe or the innovators here and what's better than what.

17:46:19 10          When it is uncontested, I think, and the FDA has

17:46:19 11   mandated that those comparisons wouldn't mean anything, that

17:46:24 12   they're not the same studies, then they're not comparable

17:46:26 13   and no one is allowed to say it outside of the courtroom, I

17:46:29 14   don't know why they should be allowed to say it inside the

17:46:33 15   courtroom.

17:46:33 16          And we also set forth in -- if your Honor thinks

17:46:34 17   it wouldn't be an issue, I mean, on the possibility that

17:46:36 18   they might do this, that was triggered by some of what they

17:46:39 19   did in the litigation, their expert reports debating, these

17:46:43 20   are different studies and this one had this patient

17:46:45 21   population.

17:46:46 22          None of that should come in front of the jury.

17:46:48 23   They can certainly say they have a safe and effective

17:46:51 24   product.  We won't dispute that actually.  I think with both

17:46:53 25   sides, there's a two supplier market generally in these exon

17:46:57 1   skippers, that either side can say they're in direct

17:47:01 2   competition and we have lost profits claim, we're going to

3   do the same thing.  We can come up and try to prove there

17:47:05 4   are other metrics, ours is better than theirs.  No one

17:47:06 5   should be doing that.  Both are good, effective drugs,

17:47:08 6   that's all they need.

17:47:10 7          THE COURT:  All right.  Let's hear from the

17:47:12 8   other side.

17:47:13 9          MR. SIKORA:  Just briefly, I just want to

17:47:20 10  reaffirm what your Honor noted, which is that we already

17:47:22 11  stated that we don't intend to draw clear comparisons.  The

17:47:25 12  quote that they keep using in their brief, I think is taken

17:47:29 13  significantly out of context, what the expert was opining on

17:47:33 14  if you read that section is not A clinical comparison, it's

17:47:37 15  actually from an economic expert.

17:47:38 16         What the economic expert is rebutting is this

17:47:41 17  allegation that Nippon Shinyaku's ramp-up period in the

17:47:45 18  but-for world, how long it took them to get up to scale,

17:47:49 19  would have taken less time -- or I'm sorry, would have

17:47:52 20  taken -- Sarepta alleged that it would have taken more time

17:47:56 21  for Nippon Shinyaku to do what they did when they ramped up.

17:47:58 22  And the expert was rebutting that by pointing to factors in

17:48:02 23  the market that were not present for the Viltepso product

17:48:06 24  that were present for Vyondys 53.

17:48:11 25         So in Vyondys 53, Sarepta's product in the case,

17:48:12  1    there was a clinical hold -- or I'm sorry, not a clinical

17:48:15  2    hold but a complete response letter issued and the FDA

17:48:19  3    actually deferred judgment and did not approve it right

17:48:21  4    away.

17:48:21  5            So it's about a market perception problem that

17:48:24  6    Nippon Shinyaku did not have to face.  That's the crux of

17:48:28  7    the opinion.  That's the opinion that would be elicited at

17:48:31  8    trial.  It's not -- the opinion never was focused or

17:48:35  9    attempting to prove superiority.

17:48:39 10            So I think if you read the full opinion in

17:48:42 11    context, the goal of the expert, you know, he's not the

17:48:44 12    clinician.  If you look at the clinician's report, the

17:48:47 13    clinician doesn't make -- that quote wasn't taken out of the

17:48:50 14    doctor's report, that was taken out of the economics expert

17:48:52 15    report where he's talking about market perception and what

17:48:55 16    led to the ramp-up period.

17:48:57 17            So I think the opinion that he's going to give

17:48:59 18    at trial is not going to be the cherry-picked portion

17:49:02 19    Sarepta relies upon.  I can firmly say we don't intend on

17:49:08 20    making explicit compare- -- you know, superiority.  The data

17:49:09 21    is what the data is, but we don't intend to make specific

17:49:12 22    comparisons between them.

17:49:13 23            THE COURT:  Okay.

17:49:14 24            Go ahead, Counsel.

17:49:15 25            MR. MORIN:  Your Honor, I worry when he says

17:49:18  1    clear comparisons and explicit comparisons and he qualifies

17:49:20  2    that.  First, my colleagues who are more familiar with the

17:49:23  3    clinical reports as to Dr. Strober, their clinician says

17:49:28  4    physicians could decide Viltepso better based on those

          5    numbers.

17:49:32  6              So now if it's one separate move and they want

17:49:33  7    to say we're not saying it's better, we're just saying

17:49:36  8    people could conclude it's better, then you have to unwind

17:49:39  9    it in the exact same way.  So maybe we don't have an issue.

17:49:42 10              THE COURT:  It doesn't sound like we necessarily

17:49:44 11    do.  Do you want to talk -- he's saying his expert's only

17:49:48 12    going to say what's in the report.

17:49:50 13              MR. MORIN:  I understand, but maybe we can -- I

17:49:52 14    think if we're on the same page, then there should be no

17:49:55 15    problem with an agreement that no one is not only going to

17:49:57 16    say one is better than the other, but no one is going to

17:50:00 17    suggest that one is better than the other; putting the

17:50:02 18    numbers side by side or saying people might decide on this

17:50:07 19    because it's a higher number.  If we're in agreement there,

17:50:09 20    we're fine.

17:50:10 21              THE COURT:  Okay.  Maybe this is something

17:50:11 22    you-all can work on.  I don't want to preclude him from

17:50:15 23    talking about what's in their label either, right, and have

17:50:18 24    you say that they've broken the agreement.  So maybe it just

17:50:20 25    has to do with putting them all right next to each other on

17:50:24 1   a split screen.

2       MR. MORIN:  It's on a split screen, or this is

17:50:26 3   5, let's turn your label, it's 1; anything like that.  Of

17:50:28 4   course, they can talk about what's on their label, but we

17:50:31 5   don't want any suggestion.  The little bit of suggestion of

17:50:35 6   any length to a jury, Your Honor, that theirs is better

17:50:38 7   based on that number will take forever to unwind because

17:50:42 8   jurors are going to look at that and could conclude that one

17:50:44 9   is better than the other, which is something the FDA has

17:50:45 10  specifically said, and I think our friends agree, you can't

17:50:49 11  conclude from there.  So we should stay away from that.

17:50:50 12      THE COURT:  Understood.  Is that something you

17:50:51 13  might be able to work with them on?

17:50:53 14      MR. SIKORA:  Yes, Your Honor.  I think this is a

17:50:55 15  situation similar to earlier ones where, you know, on a

17:50:57 16  case-by-case basis if something crosses the line, I think

17:51:01 17  should be raised with -- you know --

17:51:01 18      THE COURT:  With the understanding, though, that

17:51:03 19  we're not going to have any direct comparisons at trial.

17:51:06 20      MR. SIKORA:  Right.  We do not intend to put

17:51:08 21  them on a slide side by side and say 5.9 is better than .9%.

17:51:17 22  We don't intend to provide that demonstrative.

17:51:20 23      THE COURT:  Okay.

17:51:20 24      MR. MORIN:  Okay.  And hopefully we all agree

17:51:22 25  that it goes beyond providing that demonstrative and it's

17:51:22 1   not -- we just saw five, now let's talk about the other

17:51:25 2   product.  This should be not mentioned in accordance with

17:51:29 3   one another.

17:51:30 4           MR. SIKORA:  I think this is where it goes to,

17:51:33 5   Your Honor's point, that I'm hesitant to say more because I

17:51:36 6   don't want to preclude us from --

17:51:38 7           THE COURT:  Right.  I think -- all right.  We're

17:51:39 8   going to hear something about -- we're going to hear

17:51:55 9   something from NS's damages expert about ramp-up time.  And

17:52:00 10   none of that testimony should be discussing that our product

17:52:04 11   is better or anything like that.  That's where we'll leave

17:52:08 12   it.  And I think everybody understands how we're going to

17:52:13 13   proceed.

17:52:13 14           MR. MORIN:  We do.  And just, Your Honor, not to

17:52:15 15   beat a dead horse, and then I will sit down.  The reason we

17:52:18 16   brought it as limine rather than Daubert is it could affect

17:52:22 17   anything.  You opened and you say, let's look at this label,

17:52:24 18   now let's look at that label, and you start making

17:52:26 19   insinuations, which is why we didn't limit it to a Daubert.

17:52:28 20   It could be cross-examination, it could be all sorts of

17:52:31 21   things.  That's why we brought it in this forum, Your Honor,

17:52:34 22   just so you're aware.

17:52:35 23           THE COURT:  I understand.  All right.  So that's

17:52:38 24   resolved.

17:52:41 25           And so now we have Sarepta MIL No. 3.

17:53:03 1          MR. RAICH:  Bill Raich again, Your Honor.  So

17:53:05 2  I'm going to try to respond, because there was an order that

17:53:09 3  you issued relating to our MIL No. 3, where you indicated

17:53:14 4  that you're considering whether to clarify or amend the

17:53:18 5  construction of base sequence before the case goes to the

17:53:22 6  jury.

17:53:22 7          And I really want to answer your questions in

17:53:26 8  discussing this.  Just by way of background, so Sarepta

17:53:30 9  proposed a construction of base sequence that required a

17:53:37 10 100% complementary throughout the entire length of the

17:53:40 11 antisense oligonucleotide.  And then Nippon Shinyaku's

17:53:44 12 proposed construction did not.  It required only that a

17:53:46 13 portion of the antisense oligonucleotide have a 100%

17:53:52 14 complementary, but there could be another portion that was

17:53:56 15 random basis, for example, under the way that they were

17:54:00 16 interpreting base sequence.  And that construction was

17:54:01 17 adopted.

17:54:02 18          Now, we think that clarifying the construction

17:54:05 19 of base sequence to require a 100% complementary through the

17:54:10 20 full length of the antisense oligonucleotide would

17:54:15 21 streamline the written description and enablement issues in

17:54:18 22 dispute.

17:54:19 23          So let me try to explain this.  So Dr. Hastings,

17:54:22 24 who is Nippon Shinyaku's expert, argues that the claims are

17:54:26 25 overly broad because they cover oligonucleotides that have

17:54:32  1    random bases or things that fold on themselves instead of

17:54:35  2    binding to the target.  And those types of claim scope

17:54:41  3    arguments with a construction that makes it clear that the

17:54:45  4    claim is directed to things that are a 100% complementary

17:54:50  5    through the full length, would eliminate those types of

17:54:53  6    claim scope arguments that allow for the random basis or the

17:54:57  7    self-folding oligonucleotides.

17:55:00  8            Now, she has other arguments that she makes for

17:55:03  9    112 based on, for example, specification, you know, support

17:55:08 10    in the specification for specific claim terms.  Those would

17:55:11 11    not be foreclosed by tightening the construction.  And so in

17:55:15 12    that sense, NS and Dr. Hastings would be free to make

17:55:19 13    written description enablement arguments on that basis.

17:55:22 14            So we think that a narrowing construction is

17:55:25 15    appropriate and I'll explain why momentarily.  But it would

17:55:36 16    be appropriate and it would prevent Dr. Hastings from

17:55:40 17    offering testimony about the scope of the genus to the jury.

17:55:46 18    And so I want to turn now to the construction issues and why

17:55:50 19    we think that the narrowing construction is appropriate.

17:55:54 20            So the construction that NS offered is -- we

17:55:58 21    think it's just wrong.  And there are really -- it is wrong

17:56:03 22    on the law and it is wrong on the facts.

17:56:06 23            So in terms of the law, Claim 1 separately

17:56:12 24    requires a bay sequence comprising 12 consecutive bases of

17:56:18 25    seek ID number 195, okay.  That's a requirement of the

17:56:22 1    claim.  And that sequence, those 12 bases, are 100 percent

17:56:29 2    complementary to the exon 53 target region.

17:56:34 3            So if you say that the bay sequence limitation

17:56:40 4    applies to only part of the claim, only part of the claim

17:56:44 5    needs to be a hundred percent complementary -- excuse me,

17:56:48 6    only part of the oligonucleotide needs to be a hundred

17:56:52 7    percent complementary, there's already part of the claim

17:56:55 8    that requires that, and that's the seek ID number 195

17:56:59 9    limitation.  It's already there.

17:57:00 10           So the term, a bay sequence comprising 12

17:57:05 11   consecutive bases of seek ID number 195 renders superfluous

17:57:10 12   the bay sequence that requires a hundred percent

17:57:15 13   complementary throughout the antisense oligonucleotide.

17:57:17 14   Now, scientifically -- oh, one other thing is that Dr.

17:57:21 15   Hastings, Nippon Shinyaku's expert, admits that under that

17:57:26 16   construction, the term is superfluous.  She says in her

17:57:31 17   opening expert report at paragraph 45, "Because a bay

17:57:35 18   sequence comprising 12 consecutive bases of seek ID number

17:57:41 19   195 is a hundred percent complementary, the 12 consecutive

17:57:42 20   bases of the target region, as construed by the Court, I

17:57:46 21   interpret the limitation, a hundred percent complementary,

17:57:50 22   to be subsumed by the limitation at least 12 consecutive

17:57:54 23   bases of seek ID number 195."

17:57:57 24           The constructions that render claim terms

17:57:59 25   superfluous are disfavored.  So we think that legally that's

17:58:03  1   inappropriate.  And scientifically, there's just no

17:58:07  2   publication that describes an antisense oligonucleotide as

17:58:12  3   having two or more bay sequences.  You're just talking about

17:58:16  4   the bay sequence of the antisense oligonucleotide.

17:58:20  5        Sarepta's construction, which requires a hundred

17:58:24  6   percent complementary, we think should be adopted.  So the

17:58:28  7   specification depicts every antisense oligonucleotide with a

17:58:32  8   single sequence.  The understanding of the person of

17:58:36  9   ordinary skill is that in the context of an antisense

17:58:40 10   oligonucleotide there's a correlation between the bay

17:58:42 11   sequence and what the antisense oligonucleotide is.

17:58:47 12        And Nippon Shinyaku's attacks, we think just

17:58:49 13   aren't with merit.  Their principal attack on Sarepta's

17:58:53 14   proposed construction involves something called a WEASEL.

17:58:58 15   And a WEASEL is individual oligonucleotides, each of which

17:59:05 16   themselves are a hundred percent complementary, but are then

17:59:08 17   tethered together.

17:59:09 18        It's sort of this separate idea of having two

17:59:12 19   things tethered together by a linker, or three things

17:59:15 20   tethered together by a linker.  But it's abundantly clear

17:59:19 21   from the specification that these claims are not intended to

17:59:22 22   cover WEASELS.  These claims are limited to things that are

17:59:25 23   20 to 31 nucleotides in length.  And the examples in the

17:59:28 24   specification are much longer than that.

17:59:30 25        For example, the only exon 53 WEASEL that's set

17:59:34  1    forth -- and this is at Table 1C, Column 21, is 75

17:59:39  2    nucleotides long or 75 bases long, not 20 to 31.  And it's

17:59:44  3    of course perfectly appropriate, claims don't have to cover

17:59:47  4    every single embodiment in the specification.  They

17:59:51  5    shouldn't be contorted to do so.

17:59:54  6            Now, just one more point, I think.  So in terms

18:00:00  7    of Dr. Dowdy's position on antisense, when they say that the

18:00:15  8    additional bases in the claims antisense oligonucleotide can

18:00:22  9    be random, as Dr. Dowdy explains, that's just fundamentally

18:00:25 10    inconsistent with the plain and ordinary meaning of what an

18:00:28 11    antisense oligonucleotide is.

18:00:32 12            Clarifying that a bay sequence would require a

18:00:35 13    hundred percent complementary throughout the antisense

18:00:41 14    oligonucleotide is consistent, it tightens up Dr. Dowdy's

18:00:44 15    position, the plain and ordinary meaning of an antisense

18:00:48 16    oligonucleotide is something that is highly complementary,

18:00:52 17    if not a hundred percent complementary.

18:00:55 18            The bay sequence construction would further

18:00:57 19    clarify the scope of the claim in a way that's consistent

18:00:59 20    with the plain and ordinary meaning.

18:01:05 21            THE COURT:  Don't have any questions.  Thanks

18:01:07 22    very much.

18:01:20 23            MS. WILLIAMSON:  Your Honor, in preparation, I

18:01:23 24    have prepared some demonstratives for the argument and I

18:01:26 25    actually -- I prepared two different presentations because I

18:01:30  1    wasn't sure of the scope that -- of argument that you wanted

18:01:35  2    and what kind of clarification that you might be seeking.

18:01:39  3             So at the outset, I'd just like to say that if

18:01:45  4    you were to adopt or pursue my colleague's argument that bay

18:01:52  5    sequence should be now reconstrued as 100% complementary,

18:01:56  6    you would be full stop reversing Judge Williams' opinion.

18:01:59  7    It would not be a clarification.  It would be a full

18:02:02  8    reversal of his opinion.  It is also entirely inconsistent

18:02:07  9    with the arguments that are in the motion in limine.

18:02:10 10             THE COURT:  Well, it would be -- it would be

18:02:24 11    clarifying his construction but it certainly would be

18:02:27 12    different than the opinion text right before he announced

18:02:31 13    what his construction was.  I can't disagree with that.

18:02:34 14             MS. WILLIAMSON:  Yes.  So if we could just turn

18:02:37 15    to the MIL presentation.

18:02:43 16             MR. SIKORA:  I'm sorry, Your Honor, is there a

18:02:44 17    button that needs to be pressed on your end to permit

18:02:47 18    viewing on the lectern or something?

18:02:48 19             THE COURT:  We're working on it.

18:03:00 20             MS. WILLIAMSON:  So if we could proceed to

18:03:03 21    slide --

18:03:04 22             THE COURT:  I mean, he says -- before you get to

18:03:06 23    that, he says any sequence of bases that is part of the

18:03:10 24    antisense oligonucleotide.  And your view is that that means

18:03:22 25    that read in the context of the claim, not the whole

18:03:27 1    antisense oligonucleotide has to be a hundred percent

18:03:31 2    complementary.

18:03:31 3           But his construction doesn't really resolve that

18:03:34 4    issue, but I get that what he said seems to be contrary to

18:03:39 5    what they said in his opinion.  And you-all made arguments

18:03:42 6    about this before the Markman hearing and he -- I don't

18:03:46 7    think I can dispute that he appeared to reject theirs and

18:03:50 8    adopt yours, and that your experts proceeded on that basis.

18:03:54 9           MS. WILLIAMSON:  Yeah.  So actually, could we --

18:03:57 10   so here is the -- the crux of the dispute was whether a bay

18:04:01 11   sequence can be a portion of the claimed oligonucleotide or

18:04:04 12   whether it must include all bases of the antisense

18:04:10 13   oligonucleotide.

18:04:10 14          And the Court found that there was no evidence

18:04:13 15   in the claims, specification or prosecution history, to

18:04:16 16   support limiting a bay sequence to the entirety of the

18:04:19 17   claimed antisense oligonucleotide.  That was based in part

18:04:24 18   on several points, if we proceed forward.  This is the

18:04:29 19   claim's language here.  An antisense oligonucleotide of 20

18:04:36 20   to 31 bases comprises a bay sequence.  That is 100%

18:04:42 21   complementary.  And two of the key parts of the claim

18:04:45 22   language to Judge Williams' opinion are the comprising

18:04:48 23   terms, obviously, and the term "a" base sequence with the

18:04:53 24   article "a".

18:04:55 25          And he found that indeed the patentee chose to

18:04:59  1   recite "a" base sequence as a separate claim term from

18:05:05  2   antisense oligonucleotide.  If Your Honor were to find the

18:05:07  3   entire sequence 100% complementary, you would be conflating

18:05:11  4   the term antisense oligonucleotide with the base sequence.

18:05:15  5   So it would no longer be an antisense oligonucleotide

18:05:20  6   comprising a base sequence among other things, it would be

18:05:24  7   just that one thing.

18:05:27  8          And so that is a construction that is highly

18:05:32  9   disfavored in the Federal Circuit.  The claim -- sorry.

18:05:37 10   This is what we see when we adopt Sarepta's language, that

18:05:43 11   20 to 31 bases comprising a base sequence that is 100%

18:05:47 12   complementary, that portion of the claim is literally

18:05:50 13   omitted.  It's just deleted.

18:05:53 14          And it becomes an antisense oligonucleotide of

18:05:57 15   20 to 31 bases that is 100% complementary.  If that's what

18:06:02 16   Sarepta had wanted, that's what Sarepta should have claimed

18:06:05 17   in the first place.  But they elected a comprising claim,

18:06:08 18   which is different than the NS claims that are at issue in

18:06:13 19   this suit.

18:06:14 20          We elected a consisting of claim.  They elected

18:06:17 21   a comprising of claim and then they had named elements after

18:06:21 22   that included a base sequence.

18:06:28 23          So as the Court found, the plain language of the

18:06:32 24   claim suggests the claimed antisense oligonucleotide

18:06:35 25   includes a base sequence that meets subsequently recited

18:06:38  1    limitations.  The claim language does not require the

18:06:42  2    claimed antisense oligonucleotide, consists only of the

18:06:46  3    recited base sequence.

18:06:54  4            So then we look to the next -- so in addition to

18:06:57  5    reading out comprising, Sarepta's construction also reads

18:07:03  6    out "a" or "an", which is an open meaning term, and suggests

18:07:07  7    additional portions.  So "a" base sequence plus another base

18:07:14  8    sequence.

18:07:15  9            So there is no language in the claims or the

18:07:18 10    specification that necessitates a departure from the general

18:07:21 11    rule, which is what the Court found, that as a matter of

18:07:24 12    law, one would read a base sequence as a part of the

18:07:28 13    antisense oligonucleotide.

18:07:31 14            In addition, when we go through the other

18:07:35 15    factors, we also see -- and this is part of a list of

18:07:37 16    problems with Sarepta's proposed construction.  It reads out

18:07:41 17    comprising, it would conflate two claim terms so it doesn't

18:07:47 18    give them their full meaning, and the construction renders

18:07:51 19    that term superfluous.

18:07:53 20            So my colleague said their construction

18:07:57 21    preserves meaning with respect to the 100% complementarity

18:08:01 22    because the 12 consecutive bases supplies that

18:08:07 23    functionality.  That's just not correct.  The claim term

18:08:11 24    requires 100% complementarity, and that can go beyond the 12

18:08:15 25    consecutive bases, it's not just those bases.  It says at

18:08:20  1    least those 12 bases but is also 100% complementary.  So

18:08:23  2    more than the 12 bases of seek ID can be 100% complementary,

18:08:27  3    so that term is not superfluous under our reading.

18:08:31  4          Further, the particular embodiments that are

18:08:35  5    recited in the specification, preferred embodiments do not

18:08:39  6    fit into that claim language.  The specification

18:08:43  7    specifically contemplated antisense oligonucleotides that

18:08:49  8    are not 100% complementary.  It says that flat out, that the

18:08:53  9    antisense oligonucleotides of the claim that are in the

18:08:58 10    specification need not be 100% complementary.

18:09:01 11          My colleagues also mentioned WEASEL.  It

18:09:04 12    includes WEASEL embodiments that would not be within their

18:09:09 13    reading.  So we have at least six canons of claim

18:09:14 14    construction that Judge Williams relied on that are violated

18:09:17 15    by a construction that conflates the antisense

18:09:20 16    oligonucleotides with a 100% complementary base sequence

18:09:26 17    that spans the entirety of the antisense oligonucleotides.

18:09:30 18          And this is the portion of the specification

18:09:32 19    that I was referring to.  It says, "An antisense molecule

18:09:37 20    need not be 100% complementary."

18:09:40 21          This is also consistent with Dr. Dowdy, --

18:09:44 22    Dr. Dowdy's subsequent opinions where he says that he

18:09:46 23    recognizes that antisense and base sequence are separate.

18:09:53 24    So he's going to construe antisense on top of base sequence

18:09:58 25    and say that the term "antisense" carries with it a

18:10:02  1    complementarity requirement.

18:10:04  2              And he acknowledges that even under his POSA's

18:10:08  3    definition, that the antisense oligonucleotide can tolerate

18:10:13  4    one or two mismatches.  So that would be inconsistent with

18:10:16  5    the finding that the claims require 100% complementary.

18:10:19  6              THE COURT:  You agree that antisense

18:10:21  7    oligonucleotides is a limitation, though, right?  The

18:10:23  8    preamble is limiting.

18:10:26  9              MS. WILLIAMSON:  It was our position that it was

18:10:28 10    not, but if Your Honor -- if Your Honor is inclined to

18:10:32 11    determine that it is, we can live with that.  And we think

18:10:35 12    it can be separately construed and it can preserve the

18:10:38 13    meaning that both of the parties have based their expert

18:10:42 14    reports upon.

18:10:43 15              You know, at this stage, to be clear, I don't

18:10:47 16    think that either party has properly opined on a scope of

18:10:52 17    the claims that's limited to only 100% complementary

18:10:56 18    antisense oligonucleotides.  We would be highly prejudiced

18:11:00 19    by going to trial on the current set of opinions because

18:11:02 20    they just don't address that construction.  They address a

18:11:06 21    construction where the base sequence is 100% complementary.

18:11:11 22              And Dr. Dowdy has given further opinions that it

18:11:14 23    should be limited to up to what we think is four mismatches,

18:11:18 24    based on his deposition testimony.

18:11:21 25              Dr. Hastings has responded that in her practice,

18:11:24  1    she has sought patents on antisense oligonucleotides that

18:11:28  2    are up to 70 percent complementary, so 30 percent

18:11:33  3    noncomplementary.

18:11:33  4         So there's a dispute in the record amongst the

18:11:36  5    experts on okay, yes, we agree that not all antisense

18:11:40  6    oligonucleotides are 100% complementary.  That's well known

18:11:44  7    and agreed to.  But in the record, there's a factual dispute

18:11:49  8    about the level of complementarity that is necessary.

18:11:52  9         And I think if Your Honor is going to issue a

18:11:55 10    clarification, it should be to that term, "antisense

18:12:01 11    oligonucleotides," not a disruption of Judge Williams'

18:12:05 12    construction about the base sequence, which for the reasons

18:12:08 13    I've said is legally correct.

18:12:09 14         THE COURT:  Well, what's the jury even going to

18:12:11 15    take from it, I guess is what I'm wondering?  So again, I

18:12:15 16    don't want to beat a dead horse here, but he says -- the

18:12:21 17    Court says, "A base sequence means any sequence of bases

18:12:25 18    that's part of the antisense oligonucleotides."

18:12:28 19         How does a jury understand that that means it

18:12:31 20    can include -- right.  It can have a part that is 100%

18:12:36 21    complementary to consecutive bases in the target region and

18:12:40 22    a part that can't.  I mean, it's your expert that is going

18:12:42 23    to say that, but his construction doesn't say that.

18:12:48 24         MS. WILLIAMSON:  I'm sorry, Your Honor, could

18:12:49 25    you repeat --

18:12:50  1          THE COURT:  Yeah, I'm just sort of saying we

18:12:52  2     all, for those of us who have some experience in this

18:12:56  3     technology, we all understand what the dispute here is, but

18:12:58  4     the jury is not going to understand that based on this claim

18:13:02  5     construction is all I'm saying.

18:13:03  6          MS. WILLIAMSON:  So I think what we'd say is

18:13:05  7     it's a portion.  What Judge Williams says is it's -- the

18:13:09  8     base sequence has certain requirements.  And here there's

18:13:12  9     really -- there's no actual dispute on infringement, so we

18:13:14 10     don't have to confuse the jury with any kind of

18:13:17 11     infringement.

18:13:17 12          THE COURT:  Thank goodness for that.

18:13:19 13          MS. WILLIAMSON:  Really, the only thing that we

18:13:21 14     are discussing with the jury that relies on -- that relies

18:13:27 15     on the term "antisense oligonucleotides" now is how large is

18:13:31 16     the genus, what kind of genus are we talking about?

18:13:34 17          THE COURT:  Right.  And so your expert says it

18:13:36 18     has at least two billion compounds because it can include

18:13:41 19     these random sequences on the end.  And then their expert

18:13:44 20     says no, it's really only 2,000 compounds.  And then your

18:13:48 21     expert says, you know what, even if it's only 2,000, it

18:13:53 22     still fails for lack of written description and lack of

18:13:56 23     enablement.

18:13:56 24          So you have an opinion on if it's only 2,000,

18:13:59 25     right?

18:13:59   1          MS. WILLIAMSON:  Correct.  The amount is not

18:14:02   2   2,000, but we have an opinion under Dr. Dowdy's

18:14:05   3   construction.  And we're willing to go forward on that and

18:14:09   4   clarify the construction in a way that will frame that issue

18:14:12   5   for the jury in terms of -- in terms of putting bounds on

18:14:18   6   the genus.

18:14:19   7          THE COURT:  So I guess my question is, if I

18:14:22   8   don't let NS argue to the jury that this construction that

18:14:29   9   Judge Williams gave you -- or maybe I even clarify it, that

18:14:32  10   says what this doesn't mean is that you can have a part

18:14:35  11   that's complementary and then a whole part that's not at

18:14:38  12   all.  If I don't let you say that, you still have a position

18:14:41  13   under 112 and you can move forward with the trial next week?

18:14:44  14          MS. WILLIAMSON:  So, as the experts have opined

18:14:47  15   on it so far, Dr. Dowdy's position is that, you know, he

18:14:54  16   construed base sequence and he said, okay, fine, that's 100%

18:14:58  17   complementary.  But look here at antisense oligonucleotides,

18:15:02  18   that has to be 100% complementary or highly complementary.

18:15:06  19          If that is the construction that Your Honor

18:15:10  20   adopts or the clarification that you adopt, then the experts

18:15:13  21   have opined on it and our expert has an opinion.  And

18:15:16  22   there's a factual dispute about what that highly

18:15:20  23   complementary area would mean.

18:15:22  24          THE COURT:  Right.

18:15:22  25          MS. WILLIAMSON:  Excluding that highly

18:15:24  1    complementary area from the construction is contrary to the

18:15:26  2    specification, because the specification indication

18:15:29  3    expressly allows for not 100% complementary.

18:15:33  4              All of the experts agree that there are many

18:15:35  5    reasons for mismatches and other things in the design of

18:15:38  6    antisense oligonucleotides.

18:15:40  7              And so just as a matter of science, requiring a

18:15:44  8    hundred percent complementary is not the -- and in NS's

18:15:48  9    respectful view is not the correct response to the ambiguity

18:15:51 10    that might be in the base sequence of the claim.

18:15:58 11              So we would propose that we construe antisense

18:16:00 12    oligonucleotides.  We have proposed -- we are proposing now.

18:16:06 13              THE COURT:  And then are you going to put on --

18:16:08 14    if we do it that way, Dr. Hastings is not going to say

18:16:12 15    there's two billion species in the genus, right?

18:16:16 16              MS. WILLIAMSON:  Correct.

18:16:17 17              THE COURT:  And there's not going to be any

18:16:18 18    discussion about "and so, therefore, the Court's base

18:16:22 19    sequence can allow all this other different stuff too"?

18:16:26 20              I'm just trying to figure out how we can fix

18:16:29 21    this without digging a bigger hole or restarting all the

18:16:32 22    expert reports.  I understand perfectly what happened here.

18:16:35 23              Is there a path forward?

18:16:36 24              MS. WILLIAMSON:  Yes.  I think there is.  So the

18:16:38 25    construction we would now propose is an antisense

18:16:43 1    oligonucleotide that binds to a pre-MRNA target with

18:16:50 2    sufficient complementarity to avoid nonspecific binding.

18:16:54 3             This is the wording from the specification.

18:16:56 4    Dr. Dowdy relies on this wording in formulating his opinion

18:17:01 5    that an antisense molecule is highly, if not 100%

18:17:06 6    complementary.  We think it would be proper or more proper

18:17:09 7    to go to the words of the specification and construe

18:17:12 8    complementarity in this manner.

18:17:14 9             And so there has to be sufficient -- so it would

18:17:17 10   take care of Your Honor's concern that there's this enormous

18:17:21 11   amount of random -- I'm not sure if you said random stuff

18:17:25 12   but --

18:17:25 13            THE COURT:  Right.  We all understand.  Yeah.

18:17:27 14   But I guess it wouldn't take care of their concern that

18:17:29 15   really it needs to be 100%, and they want me to tell the

18:17:33 16   jury that it's 100%.

18:17:35 17            MS. WILLIAMS:  But that's not what they said in

18:17:38 18   their MIL.  They said they wanted 100% or nearly 100%.  They

18:17:43 19   never argued.  That was today that they've argued -- they're

18:17:46 20   rearguing claim construction that was done --

18:17:49 21            THE COURT:  At my request.  At my request

18:17:52 22   because I'm scared that I'm seeing these MILs flying back

18:17:55 23   and forth.  And I can resolve them in a way that I think

18:17:57 24   would fix things but might just be digging a deeper hole and

18:18:01 25   then we're going to waste our time next week.  And that's

18:18:04  1    what I'm worried about.

18:18:05  2              And so I understand your point.  Your expert was

18:18:08  3    in bounds in terms of how they understood what Judge

18:18:11  4    Williams did.  If I tell the jury that this requires 100%

18:18:17  5    complementarity because of the language of the claim, and I

18:18:19  6    understand that you disagree with that, do you have a 112

18:18:23  7    defense?  What does that do to your expert's ability to

18:18:26  8    opine on 112?

18:18:28  9              MS. WILLIAMSON:  We have a 112 defense, but we

18:18:30  10   would need to go back to the board and reformulate it.

18:18:34  11   Because the things we focused on in our expert reports were

18:18:37  12   not what we would focus on if we had been talking about 100%

18:18:40  13   complementary.  It's just an entirely different inquiry for

18:18:44  14   us to understand the scope of the claim.  The genus would

18:18:48  15   still be quite large.

18:18:49  16             THE COURT:  Right.  Still 2000, somewhere close

18:18:52  17   to.

18:18:52  18             MS. WILLIAMSON:  It's actually quite a bit

18:18:58  19   larger, because we -- and --

18:19:01  20             THE COURT:  At least 2000.

18:19:04  21             MS. WILLIAMSON:  It's at least 2000 but there

18:19:06  22   are many issues we did not address in our expert reports,

18:19:09  23   changes in different backbone chemistry and other chemical

18:19:14  24   modifications and other things, just because it was not as

18:19:18  25   important.

18:19:18  1          THE COURT:  Because you had the 1 in 2 million.

18:19:22  2    And I totally understand that.

18:19:22  3          MS. WILLIAMSON:  It was qualitatively unfair for

       4    to -- to be forced to go forward without redeveloping, and

18:19:26  5    redoing expert reports on the scope of the genus under a new

18:19:28  6    claim construction and it really would be an entirely new

18:19:31  7    and different claim construction in a reversal of what Judge

18:19:35  8    Williams would do.

18:19:36  9          So I would urge the Court to find a middle

18:19:39 10    ground or even to adopt what Dr. Dowdy is now arguing, that

18:19:44 11    we can resolve this by looking at what is an antisense

18:19:47 12    molecule and what does a POSA believe that that requires.

18:19:52 13          So he says, "1 to 4 mismatches."

18:19:54 14          Our expert says somewhere in the area of 1 to 6

18:19:58 15    mismatches -- if we can go to that.

18:20:07 16          This is from one of the patents, the Bestwik

18:20:10 17    patents that Sarepta's expert relies on in his report.  In

18:20:15 18    the specification, it talks about preferably 645,321

18:20:21 19    mismatches.  So this is a very, very common scientifically

18:20:25 20    acceptable point of view for what an antisense

18:20:30 21    oligonucleotide is.

18:20:32 22          THE COURT:  And understood.  Again, maybe if we

18:20:35 23    change the base sequence construction.  So I think I hear

18:20:43 24    what you're saying, which is, if the Court clarifies Judge

18:20:53 25    Williams' claim construction and essentially reverses his

18:20:55  1    his reasoning behind it, that you would not be prepared to

18:20:59  2    go forward next week?

18:21:00  3                    MS. WILLIAMSON:  That's correct.

18:21:01  4                    THE COURT:  All right.  Let me hear from the

18:21:04  5    other side.  Just on the issue --

18:21:08  6                    MS. WILLIAMSON:  Sorry, I just wanted to --

18:21:10  7                    THE COURT:  You want to finish your --

18:21:12  8                    MS. WILLIAMSON:  Oh, no.  That's okay.  I just

18:21:13  9    wanted to make sure to mention that its still our position

18:21:16 10    that the base sequence would be in the preamble.

18:21:19 11                    MR. SIKORA:  So, in other words, Your Honor --

18:21:21 12                    THE COURT:  That the preamble would be limiting?

18:21:24 13    No.

18:21:24 14                    MR. SIKORA:  So there are actually three

18:21:26 15    different interpretations that are floating around.  One is

18:21:29 16    what Jude Williams adopted, which is only the base sequence

18:21:32 17    has a complementary limitation and the preamble is

18:21:36 18    nonlimiting.

18:21:37 19                    The one that counsel argued today is that the

18:21:39 20    entire antisense oligonucleotide is exactly 100% and the one

18:21:44 21    that we were proposing, that they argued in the motion in

18:21:48 22    limine, that Dr. Dowdy is arguing for, is that the entire

18:21:51 23    thing is mostly that the base sequence is 100.  That's the

18:21:55 24    one that we were proposing.

18:21:56 25                    THE COURT:  Right.  Fully understand.  Yep.

18:22:09  1          MR. RAICH:  So, I think first of all, that the

18:22:13  2     claim should be construed ultimately just based on what is

18:22:17  3     the proper construction of the term.  It's not ultimately a

18:22:21  4     question of what's convenient, it's what is the appropriate

18:22:25  5     construction?  And so we do think that base sequence needs

18:22:30  6     to be looked at very carefully and very closely.  I think

18:22:33  7     that's the first thing.

18:22:36  8          Dr. Dowdy, in talking about the meaning of

18:22:40  9     antisense was operating under the Court's construction.  And

18:22:43 10     so when Dr. Dowdy said that there could be a mismatch in the

18:22:48 11     context of an oligonucleotide, that was operating under the

18:22:53 12     construction that we were operating under, but he also

18:22:57 13     performed calculations in terms of the scope of the genus,

18:23:02 14     in the context of the report where there was 100%

18:23:09 15     complementary, which is essentially what we are adopting as

18:23:11 16     the base sequence.

18:23:12 17          THE COURT:  So you're ready to go forward next

18:23:14 18     week, but they're not.

18:23:17 19          MR. RAICH:  Well, respectfully, I think that

18:23:18 20     they are, because first of all, they responded at least to

18:23:21 21     doctor -- as I said before, they have other sort of theories

18:23:24 22     of the case that aren't just based on the scope of the

18:23:32 23     genus.  And as sort of an additional point, you know, I

18:23:39 24     heard Ms. Williamson state that they would agree with --

18:23:45 25     there's a new construction that they -- it's the first time

18:23:47  1    that we've heard about it, that wasn't set forth in any of

18:23:51  2    their expert reports.

18:23:51  3            THE COURT:  I'm sure they were thinking about it

18:23:53  4    all weekend because I -- to be this late -- and on Friday.

          5            MR. RAICH:  Understood.  Understood.

18:23:56  6            THE COURT:  So I'm not blaming them for that.

18:23:58  7            MR. RAICH:  They said that Dr. Dowdy, you know,

18:24:01  8    agreed with having four mismatches in an oligonucleotide.  I

18:24:08  9    also don't think that's correct.  And I heard in argument,

18:24:10 10    going back to the base sequence, about how we're reading out

18:24:14 11    comprising from the claim because it's a comprising claim.

18:24:18 12            And antisense oligonucleotide has different

18:24:22 13    parts to it.  It has a base sequence, it has a chemical

18:24:26 14    backbone that supports the bases and holds them in place.

18:24:30 15    It may have a modification at the end, like a tail it's

18:24:35 16    called.  And so we're not reading out comprising.  It's an

18:24:40 17    antisense oligonucleotide with the base sequence, whatever

18:24:43 18    those bases are, is 100% complementary over the full length.

18:24:47 19            And then there are additional parts other than

18:24:50 20    the base sequence such as the particular chemical backbone.

18:24:54 21    That's why comprising is appropriate there.

18:24:59 22            THE COURT:  So -- and I get the point on claim

18:25:01 23    construction.  I'm trying to think of the most efficient way

18:25:05 24    to go forward.  This Court's construction of "base sequence"

18:25:13 25    doesn't tell the jury really one way or the other anything

18:25:16  1    about the dispute we're talking about here, does it?

18:25:19  2              MR. RAICH:  You're right.  It's sort of

18:25:23  3    interpreting it in the broader context of the claim and what

18:25:26  4    the effect of it is.  So I think it's almost like you have

18:25:28  5    to explain what the dispute is to even understand the effect

18:25:32  6    of the construction.  So I do agree with that.

18:25:35  7              THE COURT:  And so the plaintiff has proposed

18:25:38  8    that we go -- we let the jury hear the case and I'm going to

18:25:44  9    give the construction, which they haven't asked for a

18:25:48 10    clarification of.  They can tell the jury, what this means

18:25:50 11    is, you can hook on -- a bunch of junk onto the end and that

18:25:54 12    that still falls within the Court's claim construction.

18:25:56 13              You want to be able to say, it doesn't or you're

18:26:00 14    happy with letting that go forward and then you-all can talk

18:26:04 15    to the jury about what antisense oligonucleotide means and

18:26:08 16    it means it can have up to four mismatches.

18:26:11 17              You want to be able to go forward or you want me

18:26:14 18    to tell the jury that this has to be 100% complementary?

18:26:18 19              MR. RAICH:  I think from our perspective, saying

18:26:22 20    something other than 100% complementary would ultimately be

18:26:29 21    improper, but I also think the case is primed to go forward

18:26:33 22    because Dr. Hastings has offered additional opinions that

18:26:38 23    relate to things other than just the scope of the genus.

18:26:44 24              As I mentioned before, there is arguments that

18:26:46 25    she makes about things in the specification.  So I think

18:26:53 1   that the case is primed to go forward and that it should do

18:26:56 2   so with the appropriate construction.

18:26:59 3                   MR. MORIN:  May I add something, Your Honor?  I

18:27:01 4   don't mean to play two-on-one kind of thing but may I add

18:27:04 5   something just --

6                   THE COURT:  Sure.

18:27:05 7                   MR. MORIN:  -- just from the perspective of

18:27:06 8   sitting in that chair.

18:27:08 9            I want to reemphasize something that Mr. Raich

18:27:11 10  said, which is, we think that the clear construction of the

18:27:19 11  term requires 100% complementary bases.  And we think that

18:27:24 12  ultimately, respectfully, to Judge Williams, that the folks

18:27:31 13  in Washington, we think are going to see it that way.  I

18:27:34 14  think Your Honor should respectfully construe the claim the

18:27:37 15  way the claim is correct.

18:27:38 16           And if our friends need more time, I understand

18:27:41 17  that putting off a trial is drastic remedy, but if they

18:27:46 18  think they need more time in view of that construction, that

18:27:49 19  is the more efficient way to deal with things and we get it

18:27:53 20  right and we come back and we do it.  It's never the first

18:27:57 21  choice of anybody obviously.

18:27:59 22           But, it is a -- the most important thing is

18:28:03 23  to -- and we think Your Honor has identified -- potentially

18:28:06 24  an issue that we felt very strongly about the first time

18:28:09 25  around, when they say anything about what Dr. Dowdy did,

18:28:12 1    it's obviously operating under what Judge Williams said was

18:28:15 2    the construction of the claim.  He had to do with it what he

18:28:17 3    could, which he did.  But anything saying it could be nearly

18:28:21 4    100% was in the context of the ruling on base sequence

18:28:25 5    already that he was required to operate under.  And we told

18:28:27 6    them that that's a fixed body.

18:28:29 7            But if it would mean that, it would mean that,

18:28:32 8    but the important thing is to get it right now, Your Honor.

18:28:35 9            THE COURT:  All right.  Appreciate it.  I hope

18:28:37 10   everyone understands, I didn't mean to cutoff anyone's

18:28:40 11   *Markman* arguments.  I can assure you, I'm fully aware of

18:28:44 12   everyone's positions.  We've poured over the *Markman*

18:28:48 13   briefing.  We've reviewed the patents.  We've reviewed Judge

18:28:53 14   Williams' claim construction order.  I'm worried about

18:28:59 15   digging a deeper hole than what I think we might already be

18:29:02 16   in, but I'm not prepared to make a final decision on what

18:29:08 17   should be done.

18:29:09 18           I am hearing from plaintiff, though, that if the

18:29:12 19   Court is inclined to tell the jury that base sequence

18:29:21 20   requires 100% complementary, that plaintiff needs more time.

18:29:29 21           It looked to me from the expert reports like

18:29:33 22   there was a 112 defense still in there, but I can't -- let

18:29:43 23   me put it this way:  I can't understand plaintiffs' point

18:29:46 24   that they would have emphasized different things in the

18:29:49 25   expert report.  And I appreciate that.

18:29:54  1          So I guess we should have addressed this right

18:29:58  2    at the outset.  So why don't we all sleep on it and I'll

18:30:04  3    sleep on it.  I am in the middle of another trial right now.

18:30:10  4    We'll work as hard as we can at night and during breaks to

18:30:14  5    see if we can come up with an answer.

18:30:16  6          I have to tell you, as you might have guessed,

18:30:18  7    my inclination is that there does need to be a clarification

18:30:23  8    or a change to Judge Williams' base sequence claim

18:30:26  9    construction.  And what my experience has told me, is that

18:30:37 10    going to the jury trial and hoping things work out, doesn't

18:30:40 11    actually work the way you think it's going to work and that

18:30:44 12    wasting people's time, if you're going to ultimately change

18:30:47 13    something later, is not a preferred course of action.

18:30:52 14          So those are my thoughts on that.  And I realize

18:30:57 15    that the outcome of that has to do with how we're going to

18:31:02 16    rule on No. 3, as well as whether we're going to have the

18:31:06 17    trial at all.

18:31:07 18          So we do need to give the court reporter a break

18:31:10 19    because she has now been going for nine hours, transcribing.

18:31:14 20    So let's proceed this way.  We're going to work on what we

18:31:18 21    think about the claim construction.  It doesn't sound like

18:31:23 22    we have agreements between the parties about how we could

18:31:27 23    potentially proceed with the expert reports we have, but I'd

18:31:29 24    like you to continue to talk.  And if somebody thinks of an

18:31:32 25    idea of how we might go forward, I'm happy to hear it

18:31:36  1    because we have you on the calendar and we moved a lot

18:31:39  2    around to get everybody to trial next week, despite being

18:31:42  3    only assigned this case a few weeks ago.

18:31:49  4              Why don't we plan to have a letter from the

18:31:55  5    parties by Wednesday evening.  Just telling us if there's

18:32:11  6    been any change to their position, again, the position that

18:32:13  7    I'm hearing from plaintiffs is that, if there's a change to

18:32:17  8    the claim construction, that we need to redo the expert

18:32:20  9    reports.

18:32:21 10              And defendants' position, that we could move

18:32:24 11    forward based on what we have so far.  And then we'll have a

18:32:28 12    status call Thursday at 10 a.m.  and we'll put the number on

18:32:37 13    the court's line.  And then if we're going to move forward,

18:32:42 14    we'll discuss the rest of the issues in the pretrial order,

18:32:49 15    none of which were all that challenging and we're ready to

18:32:54 16    tell you what our rulings are on those.

18:32:57 17              I hate to leave it up in the air like this for a

18:33:02 18    couple of days but this is where we're at.  Does anybody

18:33:05 19    have a better idea?

18:33:06 20              MR. MORIN:  I don't.  I wanted to address just a

18:33:08 21    couple things, Your Honor, hopefully in the sake of

18:33:11 22    efficiency.  I know it's late.

18:33:12 23              The first is, there was a dispute between the

18:33:15 24    parties about the number of hours for the bench trial on

18:33:18 25    unenforceability.  And we figured we would tell you what we

18:33:21 1    told our friends just before this hearing.

18:33:24 2            We've decided not to pursue our unenforceability

18:33:27 3    claim against them.  We looked at it and decided it was

18:33:31 4    redundant with the obviousness claim and it will arise or

18:33:34 5    fall -- we think rise -- with our obviousness arguments, but

18:33:37 6    since they were somewhat redundant in what the result was

18:33:41 7    going to be, that we would take that off the table, which I

18:33:44 8    think means the competing proposals, them for four hours per

18:33:48 9    side and us for two would be cut in half.  So half of that

18:33:52 10   will happen then.  So hopefully that's welcome news for the

18:33:56 11   Court on that front.

18:33:57 12           I should also advise the Court that we have not

18:34:00 13   yet resolved the breach of contract issue.  We're optimistic

18:34:05 14   we will.  Compared to the patent issues, it's very low -- I

18:34:07 15   won't say the amount, but a very low -- very, very low

18:34:11 16   amount compared to the other main issues in the case.  We

18:34:14 17   have a proposal out to them.

18:34:15 18           Reasonably, their folks are on Golden Week, so

18:34:20 19   they haven't been able to respond.  We're hoping to take it

18:34:23 20   off your table but our friends propose -- and we are not

18:34:26 21   contesting that -- if that still remains, which we're very

18:34:29 22   optimistic it won't, again, it's a small amount, that with

18:34:34 23   Your Honor's blessing, we would do it while the jury is

18:34:37 24   deliberating a week from Friday and no more than one hour

18:34:40 25   per side.

18:34:41  1          We think it may be 15 or 20 minutes, it's very

18:34:43  2  little, we think, on that.  But we agree with our friends

18:34:46  3  that if it's not resolved with the Court's blessing, we

18:34:50  4  would do it that Friday.

18:34:51  5          One other thing that I'm hesitant, I know you

18:34:54  6  want to get out of here, but we have -- our friends brought

18:34:59  7  up an issue percolated by an e-mail from them last Tuesday,

18:35:03  8  that has to deal with some standing and damages issues, that

18:35:07  9  they would like -- we think we're still fine but they would

18:35:10 10  like some expedited briefing on this week.

18:35:14 11          And they proposed -- and I think they were going

18:35:16 12  to propose that they would file a brief tomorrow and we

18:35:19 13  would file a response on Wednesday.  I only say that because

18:35:21 14  if the Court were inclined to postpone the trial and pick

18:35:25 15  another day, this expedited briefing on damages and standing

18:35:29 16  and stuff could be dealt with in a more deliberate and

18:35:34 17  considered fashion.

18:35:37 18          It has to do with an issue they raised last

18:35:40 19  Tuesday.  We identified some additional agreements in

18:35:43 20  response to that that hadn't been produced that we did

18:35:48 21  produce and investigation and discussions have been going on

18:35:50 22  kind of nonstop to kind of bring it to Your Honor in a

18:35:54 23  reasonable way.

18:35:55 24          But later in your cross, the issue of the claim

18:35:58 25  construction, it might be a prudent decision for us to be

18:36:03  1   able to take sometime for the briefing and the discovery of

18:36:07  2   the information for Your Honor rather than have layering on

18:36:10  3   top of your other bench trial and these claim construction

18:36:14  4   issues in these other briefs, sets of briefs on this new

18:36:17  5   issue where they are now contending, as far as I can tell

18:36:20  6   that there's a standing and a damages issue and we are going

18:36:23  7   to be opposing that.

18:36:24  8        A little bit of daylight before people are all

18:36:28  9   in town from the other people and a little daylight to come

18:36:32 10   and try this case once both the claim construction issue is

18:36:36 11   resolved and that's resolved, might be a more prudent way to

18:36:40 12   do things.  I say that not lightly.  Trial dates being moved

18:36:43 13   are -- I know Your Honor had to move things around, like you

18:36:46 14   said, and everybody does and the clients and the witnesses

18:36:49 15   and I appreciate that but we want to get it right, Your

18:36:52 16   Honor.

18:36:52 17        So I only raise that so it's not a surprise to

18:36:55 18   Your Honor.

18:36:56 19        THE COURT:  All right.  Thank you very much.

18:36:57 20        MR. SIKORA:  Your Honor, just a quick point of

18:37:00 21   clarification, because when somebody says "standing," that

18:37:03 22   usually implicates a bigger deal.

18:37:05 23        Our current understanding is there's at least a

18:37:08 24   13-month period within the damages period in which the

18:37:11 25   Sarepta Therapeutics entity, the plaintiff on their patent

18:37:16  1   claims in the lawsuit, lost exclusive rights.

18:37:17  2           And so that's our current understanding.  It's

18:37:20  3   still evolving.  The agreements weren't produced during

18:37:24  4   litigation.  They involved internal transfer with Sarepta.

18:37:27  5   We're prepared to go forward on briefing what we think the

18:37:30  6   issue is, including the discovery issues and the failure to

18:37:32  7   disclose those timely tomorrow by 5 p.m.

18:37:36  8           Sarepta agreed to their responsive brief, a

18:37:41  9   5-page letter brief by Wednesday of the same and so we're

18:37:45 10   happen to do that if Your Honor is willing to entertain that

18:37:49 11   briefing.

18:37:49 12           THE COURT:  Counsel?

18:37:51 13           MR. MORIN:  As we indicated to our friends, we'd

18:37:53 14   be willing on that briefing schedule but I guess what I'm

18:37:56 15   saying is --

         16           THE COURT: I understand, yeah.

18:37:57 17           MR. MORIN: -- there's a lot of moving parts and

18:37:58 18   if you have to deal with 5 p.m. and 5 p.m. on damages being

18:38:01 19   changed, also in addition to the claim construction and he

18:38:05 20   says he doesn't see a standing issue, but we heard issues of

18:38:10 21   when exclusivity was, which --

18:38:12 22           THE COURT:  I understand.  So here's what I'll

18:38:14 23   say:  I'm not going to decide the damages issue if we're not

18:38:17 24   going forward with the trial next week.  I'm not going to

18:38:20 25   decide it on Thursday night.  So with that in mind, I'm

18:38:24 1    hearing from plaintiffs that maybe you need to talk to your

18:38:28 2    people and confirm about whether or not you want to go

18:38:31 3    forward if the Court is inclined to change the claim

18:38:34 4    construction or amend the claim construction.

18:38:36 5            And so if you know that you're not going to go

18:38:38 6    forward, you don't have to file your damages brief when

18:38:42 7    you've agreed with them, but you have to tell them you're

18:38:45 8    not planning on going forward.  Does that make sense?

18:38:47 9    Otherwise, we're going to proceed with the briefing.

18:38:49 10           MR. SIKORA:  And just to clarify, Your Honor.

18:38:52 11   Our view was that if the interpretation from Dr. Dowdy in

18:38:56 12   his report of some number of mismatches but not the full,

18:38:59 13   everything, if the construction advanced by them in their

18:39:05 14   expert reports was the one -- the middle ground that we

18:39:09 15   referred to, if that was adopted by the Court clarifying the

18:39:13 16   preamble term antisense, we would be prepared to go forward

18:39:17 17   next week.  It's simply if Your Honor reversed Judge's

18:39:20 18   Williams entirely, that we would more time.

18:39:24 19           And that is what we obviously contend is the

18:39:24 20   correct result and the one that we think the folks in

18:39:29 21   Washington would agree with.

18:39:31 22           THE COURT:  Right.

18:39:32 23           MR. MORIN:  Thank you, Your Honor.

18:39:34 24           THE COURT:  Okay.  I guess we'll talk to

18:39:37 25   everybody on Thursday.  I didn't take any of this lightly.

18:39:40  1    I hope everyone knows.  We'll work as hard as we can to get

18:39:44  2    you an answer.

18:39:45  3              MR. MORIN:  We appreciate your Honor's time.

18:39:49  4              COURT CLERK:  All rise.

18:39:52  5              (Court adjourned at 6:39 p.m.)

          6

          7                    ---------------------------------

          8

          9

          10         I hereby certify the foregoing is a true and
               accurate transcript from my stenographic notes in the
          11   proceedings.

          12                              /s/ Stacy M. Ingram, RPR
                                          Official Court Reporter
          13                               U.S. District Court

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25