# Exhibit A



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NIPPON SHINYAKU CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1015 (GBW) |
| | ) | |
| SAREPTA THERAPEUTICS, INC., | ) | |
| | ) | ███████████████ |
| Defendant. | ) | |
| | ) | |
| SAREPTA THERAPEUTICS, INC. and THE UNIVERSITY OF WESTERN AUSTRALIA, | ) | |
| | ) | |
| Defendant/Counter-Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NIPPON SHINYAKU CO., LTD. and NS PHARMA, INC. | ) | |
| | ) | |
| Plaintiff/Counter-Defendants. | ) | |

**SAREPTA'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO NS'S INTERROGATORIES (NOS. 1-6, 8-23, 25-30, 32-34)[1]**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant/Counter-Plaintiff Sarepta Therapeutics, Inc. ("Sarepta") hereby provides its supplemental objections and responses to Plaintiff/Counter-Defendant Nippon Shinyaku Co., Ltd.'s and Counter-Defendant NS Pharma, Inc.'s (collectively, "NS") First Set of Interrogatories (Nos. 1-6, 8-13), served on March 11, 2022, NS's Second Set of Interrogatories (Nos. 14-21), served on March 3, 2023, and NS's Third Set of Interrogatories (Nos. 22, 23, 25-30, 32-34), served on June 27, 2023.

---

[1] The University of Western Australia joins the General Objections and Specific Objections and Responses with respect to the UWA Patents.

**OUTSIDE COUNSEL EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

of Ryan Wong in the above-captioned matter (*see, e.g.*, Wong Tr. 72:5-74:3) and one or more associated exhibits (Wong Exs. 1-12).

The cited documents and testimony are exemplary and are not intended to be comprehensive or exclusive. Expert discovery has not yet begun. Sarepta accordingly reserves the right to supplement or amend its objections and responses as discovery and its investigation goes forward in this action. Sarepta also reserves the right to rely on any document produced by any party in this litigation or by any third party such as, e.g., any document introduced as an exhibit during the deposition of any Sarepta, UWA, NS, or third-party witness as well as any document cited in Sarepta's responses to other interrogatories. Sarepta also expressly reserves the right to respond to this interrogatory in its expert reports and during the depositions of its experts.

**INTERROGATORY NO. 21:** Describe each step from manufacture to distribution to administration of a unit of golodirsen, including each entity involved in the manufacture of golodirsen, packaging (including steps performed by ▓▓▓▓ and other manufacturers or packagers), distribution up to the clinician administering the product (including distribution by ▓▓▓▓▓▓▓ or others in the distribution chain), in the United States and abroad, and all entities in the production and distribution chain that hold a license or sublicense to the Sarepta Patents.

**RESPONSE TO INTERROGATORY NO. 21:**

Sarepta incorporates the General Objections by reference. Sarepta further objects to this Interrogatory to the extent it calls for information protected by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or immunity. Sarepta objects to this Interrogatory as vague and/or, ambiguous, overbroad, and unduly burdensome, especially with respect to the phrases "manufacturers" and "packagers." Sarepta also objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case considering at least the importance of this Interrogatory in resolving the claims and defenses relevant to this litigation and because the burden or expense of the proposed discovery outweighs its likely benefit. Sarepta further objects to this Interrogatory to the extent that it calls for

**OUTSIDE COUNSEL EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

information related to administration of a product outside of the United States.  Sarepta further objects to this Interrogatory to the extent that it calls for Sarepta to analyze documents that Sarepta has already produced to NS in this lawsuit, which NS can access with equal effort.  Sarepta further objects to this Interrogatory to the extent it seeks information or documents that are not in Sarepta's possession, custody, or control, that is a matter of public record, or that may be obtained from a less burdensome source.

Subject to and without waiving the foregoing general and specific objections, Sarepta responds as follows:



Golodirsen drug substance is manufactured by █████████████████████████████ ████. Golodirsen drug product is manufactured by █████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████. Golodirsen is packaged into commercial units sold as VYONDYS 53® by ██████████████████████████████████████ ████████████████████████████████████████████████████████████.

Sarepta sells golodirsen (in the form of VYONDYS 53® commercial units) to ███ ████████████████████████████████████████████████████████████████████ ███████████████████. Sarepta ships packaged golodirsen (in the form of VYONDYS 53® commercial units) to ████████████████████████████████████████████ █████████████████████████████████. Golodirsen is distributed, under agreement with Sarepta, to hospitals and Covered Entities (as defined at 42 U.S.C. subsection 256b(a)(4)) in the U.S. by ███████████████. ██████████████████████████████████████ dispense golodirsen to physician offices, hospital infusion centers, and patients' homes as prescribed by a patient's physician,  nurse practitioner, or physician assistant.

**OUTSIDE COUNSEL EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

Sarepta's investigation of the facts relevant to the subject matter of this action is ongoing. Sarepta accordingly reserves the right to supplement or amend its objections and responses as discovery and its investigation goes forward in this action.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 21**:

Sarepta maintains the objections to Interrogatory No. 21 provided above.  Subject to and without waiving the foregoing general and specific objections, Sarepta responds as follows:

Samples of each golodirsen drug product batch are tested for quality by ███ before each batch is released for packaging and labeling.  Sarepta further states that information responsive to this interrogatory can be ascertained from the June 22, 2023 testimony of Ethan Jacoby in the above-captioned matter (*see, e.g.*, Jacoby Tr. 59:13-25; 66:14-23; 69:22-70:6; 70:16-21; 75:24-76:12) and one or more associated exhibits (Jacoby Exs. 1-8).

Sarepta states that pursuant to Fed. R. Civ. P. 33(d), information responsive to this interrogatory can be ascertained from documents produced by Sarepta, including: SRPT-VYDS-0219963-990; SRPT-VYDS-0219826-873; SRPT-VYDS-0220068-069.

The cited documents and testimony are exemplary and are not intended to be comprehensive or exclusive.  Expert discovery has not yet begun.  Sarepta accordingly reserves the right to supplement or amend its objections and responses as discovery and its investigation goes forward in this action.  Sarepta also reserves the right to rely on any document produced by any party in this litigation or by any third party such as, e.g., any document introduced as an exhibit during the deposition of any Sarepta, UWA, NS, or third-party witness as well as any document cited in Sarepta's responses to other interrogatories.  Sarepta also expressly reserves the right to respond to this interrogatory in its expert reports and during the depositions of its experts.

**OUTSIDE COUNSEL EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

Sarepta, UWA, NS, or third-party witness as well as any document cited in Sarepta's responses to other interrogatories. Sarepta also expressly reserves the right to respond to this interrogatory in its expert reports and during the depositions of its experts.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Megan E. Dellinger*

OF COUNSEL:

Charles E. Lipsey
J. Derek McCorquindale
Ryan P. O'Quinn
L. Scott Burwell
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, LLP
1875 Explorer Street, Suite 800
Reston, VA  20190-6023
(571) 203-2700

William B. Raich
Michael J. Flibbert
John M. Williamson
Yoonhee Kim
Yoonjin Lee
Kaitlyn S. Pehrson
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC  20001-4413
(202) 408-4000

Alissa K. Lipton
Eric J. Lee, Ph.D.
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, LLP
Two Seaport Lane
Boston, MA  02210-2001
(617) 646-1600

August 15, 2023

_____
Jack B. Blumenfeld (#1014)
Megan E. Dellinger (#5739)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
mdellinger@morrisnichols.com

*Attorneys for Defendant/Counter-Plaintiffs*
*Sarepta Therapeutics, Inc. and The University of*
*Western Australia*

116

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2023, copies of the foregoing were caused to be served upon the following in the manner indicated:

Amy M. Dudash, Esquire                                   *VIA ELECTRONIC MAIL*
MORGAN, LEWIS & BOCKIUS LLP
1201 North Market Street, Suite 2201
Wilmington, DE  19801
*Attorneys for Plaintiff*

Amanda S. Williamson, Esquire                            *VIA ELECTRONIC MAIL*
Christopher J. Betti, Esquire
Krista Vink Venegas, Esquire
Maria E. Doukas, Esquire
Michael T. Sikora, Esquire
Zachary Miller, Esquire
Guylaine Haché, Ph.D.
Wan-Shon Lo, Esquire
MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive, Suite 2800
Chicago, IL  60606
*Attorneys for Plaintiff*

Eric Kraeutler, Esquire                                  *VIA ELECTRONIC MAIL*
Alison P. Patitucci, Esquire
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103
*Attorneys for Plaintiff*

Jitsuro Morishita, Esquire                               *VIA ELECTRONIC MAIL*
MORGAN, LEWIS & BOCKIUS LLP
16F, Marunouchi Building,
2-4-1 Marunouchi, Chiyoda-ku
Tokyo, 100-6316 Japan
*Attorneys for Plaintiff*


*/s/ Megan E. Dellinger*
_____
Megan E. Dellinger (#5739)

# Exhibit B



# Timeline: ███████ & Entity Changes

**Nov. 2008 (Ex. C)**
AVI BioPharma, Inc. receives exclusive license from UWA

**Jul. 2012 (Ex. D)**
AVI BioPharma, Inc. changes name to ST Oregon

**Apr. 2013 (Ex. E)**
UWA license amended to grant exclusive license to both ST Oregon and Sarepta CV

**Jul. 2013 (Ex. F)**
ST Oregon merges with ST Inc.

☐ = first produced Friday, May 3, 2024

☐ = first produced Monday, May 6, 2024

2008 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022

1



# Timeline: ███████ & Entity Changes



**Nov. 2008 (Ex. C)**
AVI BioPharma, Inc. receives exclusive license from UWA

**Jul. 2012 (Ex. D)**
AVI BioPharma, Inc. changes name to ST Oregon

**Apr. 2013 (Ex. E)**
UWA license amended to grant exclusive license to both ST Oregon and Sarepta CV

**Jul. 2013 (Ex. F)**
ST Oregon merges with ST Inc.

██ = first produced **Friday, May 3, 2024**

██ = first produced **Monday, May 6, 2024**

2008  2012  2013  2014  2015  2016  2017  2018  2019  2020  2021  2022

# Timeline: Litigation Events



= first produced
Friday, May 3, 2024

**March 2022**
NS serves RFPs seeking
license agreements

**April 2022**
Sarepta serves responses
and objections to RFPs

**July 2021**
NS FILES LAWSUIT

**Nov. 2022 – Jan. 2023**
Sarepta produces only
EXTERNAL licenses

**Apr. 30, 2024**
NS raises concern
over parties to
UWA license

**May 3, 2024**
Sarepta produces
INTERNAL licenses
for the first time

**2021** **2022** **2023** **2024**

4

# Exhibit C



EXECUTION COPY

## EXCLUSIVE LICENSE AGREEMENT

THIS EXCLUSIVE LICENSE AGREEMENT ("Agreement") is entered into this 24th day of NOV_____ 2008 ("Effective Date") by and between THE UNIVERSITY OF WESTERN AUSTRALIA, a body corporate established pursuant to the provisions of The University of Western Australia Act 1911, with offices at 35 Stirling Highway, Crawley, Western Australia 6009 ("UWA"), and AVI BIOPHARMA, INC., an Oregon corporation, with offices at 4575 S.W. Research Way, Suite 200, Corvallis, Oregon 97333 USA ("Licensee").

## RECITALS

**A.** UWA owns and is entitled to grant license rights with respect to certain Patent Rights and Technical Information (as defined below) invented or developed in the course of certain research conducted under the direction of Stephen D. Wilson, Sue Fletcher and Graham McClorey (hereinafter collectively referred to as the "Inventors").

**B.** Certain of the Patent Rights and Technical Information had been previously assigned by UWA to SmithKline Beecham Corporation doing business as GlaxoSmithKline ("GSK"), as evidenced by the agreement effectuating the assignment attached hereto as APPENDIX A, but have, as of the Effective Date, been reassigned by GSK to UWA, as evidenced by the agreement effectuating the reassignment to be attached hereto as APPENDIX B.

**C.** Licensee is in the process of developing various products for the treatment of Duchenne Muscular Dystrophy by inducing the skipping of certain exons for which the Patent Rights and Technical Information may be useful.

**D.** UWA desires to have the Patent Rights and the Technical Information developed, used and commercialized in the Field of Use (as defined below) by Licensee, and Licensee desires to obtain an exclusive, worldwide license to conduct research in the Field of Use, and to develop, manufacture, use and sell Products (as defined below) in the Field of Use, using the Patent Rights and Technical Information in accordance with the terms of this Agreement. Other than the rights expressly granted by UWA hereunder within the Field of Use, Licensee acknowledges that UWA shall retain all other rights with respect to the Patent Rights and the Technical Information.

NOW, THEREFORE, in consideration of the mutual covenants and premises herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## 1. DEFINITIONS

**1.1** **"Affiliate"** or **"Affiliates"** shall mean any corporation, person or entity, which controls, is controlled by, or is under common control with, a party to this Agreement without regard to stock or other equity ownership. For purposes hereof, the terms "control" and "controls" mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a corporation, person or entity, whether through the ownership of

SRPT-VYDS-0154831

voting securities, by contract or otherwise.

**1.2** **"Confidential Information"** shall mean any confidential or proprietary information furnished by one party (the "Disclosing Party") to the other party (the "Receiving Party") in connection with this Agreement, including, without limitation, all specifications, know-how, trade secrets, technical information, drawings, software, models, business information and patent applications pertaining to the Patent Rights and Technical Information, and as further provided in Section 10 hereof.

**1.3** **"Exons of Interest"** means dystrophin exons 51, 45, 44, 53, 46, 50, 8 and/or 52.

**1.4** **"FDA"** shall mean the United States Food and Drug Administration, or any successor agency thereof.

**1.5** **"Field of Use"** shall mean the treatment of Duchenne Muscular Dystrophy by inducing the skipping of the Exons of Interest and/or by skipping blocks of exons that include any or all of the Exons of Interest through the use of those antisense sequences listed in the Patent Rights.

**1.6** **"Future Patent Rights"** shall mean any patents and/or patent applications claiming Inventions invented after the Effective Date the Valid Claims of which, absent a license by UWA, would be infringed by Licensee, its Affiliates or its sublicensees by the sale of Products in the Field of Use.

**1.7** **"Future Technical Information"** shall mean the following information in the Field of Use developed after the Effective Date and described in Future Patent Rights: know-how, trade secrets, unpublished patent applications, software, bioinformatics, unpatented technology, technical information, statistical information and analyses, biological materials, chemical reagents, preclinical and clinical information, and any and all confidential and proprietary information described in the Future Patent Rights.

**1.8** **"Invention"** shall mean all unpatented, patentable and patented inventions, discoveries, designs, apparatuses, systems, machines, methods, processes, uses, devices, models, composition of matter, technical information, trade secrets, know-how, codes, programs or configurations of any kind which are in the Field of Use.

**1.9** **"Net Sales"** shall mean the total invoiced sales price and/or value of other consideration received for Products and sold by Licensee or an Affiliate thereof, less (a) sales taxes or other taxes, (b) actual shipping and insurance costs, (c) actual rebates, credits, or refunds for returned or defective Products, (d) trade discounts and quantity discounts or retroactive price reductions, (e) rebates, credits, and chargeback payments (or the equivalent thereof) actually granted to managed health care organizations, wholesalers, or to federal, state/provincial, local and other governments, including their agencies, purchasers, and/or reimbursers, or to trade customers, and (f) any import or export duties, tariffs, or similar charges incurred with respect to the import or export of Products into or out of any country in the Territory. Products will be considered "sold" when put into use, sold, leased or otherwise transferred and a "sale" shall be

SRPT-VYDS-0154832

deemed to have occurred upon first use, shipment, invoicing or receipt of payment, whichever shall first occur. Notwithstanding the foregoing, Net Sales shall not include, and shall be deemed zero with respect to, (i) the actual distribution of reasonable quantities of promotional samples of Products, and (ii) Products provided for clinical trials or research purposes at cost or at no charge. Notwithstanding the foregoing, in the event that a Product is sold by Licensee as part of a combination product or bundled product ("Combination Product"), the Net Sales of such Product, for the purposes of determining royalty payments due under this Agreement, shall be determined by multiplying the Net Sales (as originally defined above) of the combination product by the fraction A/(A+B), where A is the average sale price of the Product when sold separately in finished form in any country in which the Combination Product is sold and B is the average sale price of the other product(s) included in the Combination Product when sold separately in finished form, so that A+B is the average sale price of the Combination Product(s) together, in the country in which the Combination Product is sold, in each case during the applicable royalty reporting period in which sales of both occurred, or, if sales of both the Product and the other product(s) did not occur in such period, then in the most recent royalty reporting period in which sales of both occurred. In the event that such average sale price cannot be determined for both the Product and such other product(s) in the Combination Product, Net Sales for the purposes of determining royalty payments with respect to such Combination Product shall be mutually agreed by the parties based on the relative value contributed by each component, such agreement not to be unreasonably withheld.

**1.10** **"Patent Rights"** shall mean International PCT Patent Application No. PCT/AU2005/000943, filed on June 28, 2005 and published as PCT Publication No. WO 2006/000057, and all patents and/or patent applications (including provisional patent applications) existing as of the Effective Date in any other country corresponding to any of the foregoing, and all national phases, divisions, continuations, continuations-in-part, reissues, reexaminations, supplementary protection certificates and extensions thereof, whether domestic or foreign, and any patent that issues thereon. The Patent Rights are all owned by UWA.

**1.11** **"Phase II Trial"** shall mean a controlled clinical study conducted to evaluate the effectiveness of a Product for the treatment of Duchenne Muscular Dystrophy, for example by testing muscle function or endurance, in patients having Duchenne Muscular Dystrophy and to determine the common short-term side effects and risks.

**1.12** **"Phase III Trial"** shall mean, relative to a Phase II Trial, expanded controlled and uncontrolled trials after preliminary evidence suggesting effectiveness of the Product for treatment of Duchenne Muscular Dystrophy has been obtained, and intended to gather additional information to evaluate the overall benefit-risk relationship of the Product and to provide an adequate basis for applying for regulatory approval for commercial sales of the Product.

**1.13** **"Product"** or **"Products"** shall mean any human therapeutics, diagnostics (including algorithms or any components thereof), bioinformatics and any other human health care products and/or services in the Field of Use utilizing or derived in any manner whatsoever from any of the Patent Rights or Technical Information, which Product(s), except for the license granted hereunder, would infringe a Valid Claim of the Patent Rights.

Page 3 of 18

SRPT-VYDS-0154833

**1.14** **"Technical Information"** shall mean, as of the Effective Date, the following information in the Field of Use which is described in the Patent Rights: know-how, trade secrets, unpublished patent applications, software, bioinformatics, unpatented technology, technical information, statistical information and analyses, biological materials, chemical reagents, preclinical and clinical information, in each case which has been conceived or reduced to practice prior to the Effective Date, in the conduct by UWA of the research associated with the Patent Rights. Technical Information is all owned by UWA.

**1.15** **"Territory"** shall mean the entire world.

**1.16** **"Valid Claim"** shall mean a claim of an issued patent included within the Patent Rights, which claim has not (a) lapsed, been canceled or become abandoned, (b) been declared invalid or unenforceable by a non-appealable decision or judgment of a court or other appropriate body or authority of competent jurisdiction (other than with respect to any petition or writ of certiorari to the Supreme Court of the United States), or (c) been admitted to be invalid or unenforceable through reissue, disclaimer or otherwise.

**2.** **LICENSE**

**2.1** **Grant of Exclusive Rights.** Subject to the terms of this Agreement, UWA hereby grants to Licensee, and Licensee hereby accepts from UWA, the exclusive, worldwide license, with the right to grant sublicenses (subject to the terms of Section 2.4 hereof), during the term of this Agreement (as provided in Section 6 hereof) to conduct research in the Field of Use using the Patent Rights and the Technical Information and to develop, use, make, have made, practice, import, carry out, manufacture, have manufactured, offer for sale, sell and/or have sold Products in the Field of Use in the Territory using the Patent Rights and the Technical Information. Notwithstanding any other provision hereof to the contrary, all rights to the Patent Rights and the Technical Information outside of the Field of Use are retained by UWA (for purposes of clarity, the parties agree that UWA retains the right to research and commercialize sequences for exons outside the Field of Use).

**2.2** **Diligence.** Licensee shall use commercially reasonable efforts in pursuing the development, commercialization and marketing of Products. Licensee shall be deemed to have exercised commercially reasonable efforts, and the diligence requirements of this Section 2.2 shall be deemed to have been met, if Licensee, together with its Affiliates and sublicensees, meets the respective requirements set forth on Schedule 1, with each such requirement being deemed a separate and independent condition (each, a "Milestone"). If Licensee, together with its Affiliates and sublicensees, fails to meet any Milestone designated in Schedule 1 hereto, UWA may, at its option and as its sole remedy for Licensee's breach of this Section 2.2, upon written notice to Licensee as provided under Section 6.2(a) ("Milestone Breach Notice") and if Licensee fails to cure such breach within sixty (60) days of such Milestone Breach Notice (rather than thirty (30) days as described in Section 6.2(a)) or if UWA does not agree to a modification to the relevant Milestone(s) to obviate such breach, terminate the Agreement; *provided, however,* that before issuing a Milestone Breach Notice the Parties shall first meet to discuss the status of Licensee's development efforts and UWA shall consider in good faith whether such efforts amount to commercially reasonable efforts under the circumstances, and if UWA determines that

SRPT-VYDS-0154834

EXECUTION COPY

such efforts do not constitute commercially reasonable efforts under the circumstances, then UWA have the option to issue a Milestone Breach Notice.

**2.3    Conditions to Effectiveness.** The following shall be a condition precedent to the effectiveness of this Agreement: the agreement effectuating the reassignment of patent rights (attached hereto as APPENDIX B) shall have been fully executed and delivered by UWA and GSK.

**2.4    Right to Sublicense or Assign Rights.** Licensee shall have the right to grant sublicenses consistent with this Agreement. Licensee shall keep UWA reasonably informed with respect to the progress of any relations entered into with any sublicensees. As an express condition of any such sublicense, any such sublicensee shall be required to agree in writing to be bound by commercially reasonable royalty reporting and recordkeeping, indemnification and inspection provisions, and the applicable provisions of this Agreement, including, without limitation, those pertaining to the use of UWA's name and marks, indemnification of UWA and the use of UWA's Confidential Information. Licensee will be responsible for enforcing each sublicensee's obligations under its sublicense. Licensee understands and agrees that none of its sublicenses hereunder shall reduce in any manner any of its obligations set forth in this Agreement.

**2.5    Certain Future Rights.** UWA shall promptly notify Licensee of any Future Patent Rights and Future Technical Information and such Future Patent Rights and Future Technical Information shall be automatically included in the license granted hereunder as Patent Rights and Technical Information, respectively, under Section 2.1.

**3.    REPRESENTATIONS AND WARRANTIES**

**3.1    UWA.** UWA represents and warrants to Licensee that:

(a)    UWA (i) is a body corporate established pursuant to the provisions of The University of Western Australia Act 1911, duly organized, validly existing and in good standing under the laws of Australia, (ii) has the corporate power and authority to enter into this Agreement and to perform its obligations hereunder, and (iii) has taken sufficient steps such that the execution and delivery of this Agreement by UWA and the performance by UWA of its obligations hereunder have been duly authorized by all necessary corporate action;

(b)    to the best of UWA's knowledge, at the Effective Date, there are no claims, judgments or settlements to be paid by UWA with respect to the Patent Rights or Technical Information or pending claims or litigation relating to the Patent Rights or Technical Information;

(c)    with respect to the Patent Rights, UWA has been assigned all right, title and interest from the Inventors and GSK, as the case may be, and UWA is either (i) listed as the sole owner of record in the records of the United States Patent and Trademark Office and any foreign patent offices with respect to Patent Rights that consist of applications or registrations with such offices, or (ii) employing diligent and commercially reasonable efforts to become listed as the sole owner of record in the records of the United States Patent and Trademark Office and

SRPT-VYDS-0154835

any foreign patent offices with respect to Patent Rights that consist of applications or registrations with such offices for those Patent Rights that have been reassigned to UWA from GSK;

(d)     UWA has the right to grant the rights granted to Licensee hereunder and to perform UWA's obligations hereunder, in each case without the consent or approval of any third party;

(e)     UWA has not granted, and will not grant, licenses to the Patent Rights, Technical Information, Future Patent Rights or Future Technical Information to any third party that would conflict with or otherwise compromise the rights granted to Licensee hereunder;

(f)     the Patent Rights have been duly prepared, filed, prosecuted, obtained, and maintained in accordance with all applicable laws, rules, and regulations;

(g)     to the best of UWA's knowledge, no third party's intellectual property rights would be infringed or misappropriated by the practice of the Patent Rights in general and no third party is infringing or misappropriating the Patent Rights;

(h)     UWA does not own or control any patents or patent applications other than the Patent Rights that currently, or when issued, would be infringed by the making, using, offering for sale, selling, or importing of any product or process covered by a claim within the Patent Rights;

(i)     this Agreement constitutes the legal, valid and binding obligation of UWA, enforceable against UWA in accordance with its terms, subject only to (i) applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforceability of creditors' rights generally, (ii) the limitation that the remedy of specific performance or injunctive relief is subject to the discretion of the court or arbitrator before which any proceeding therefor may be brought, and (iii) general legal and equitable principles of good faith, fair dealing and equity; and

(j)     to the best of UWA's knowledge, neither the execution or delivery of this Agreement by UWA, nor the performance by UWA of its obligations hereunder, (i) requires the consent or approval of any third party; (ii) shall constitute a default under any material contract by which UWA or any of its material assets is bound (or any event which, with notice or lapse of time, or both, would constitute such a default); or (iii) shall constitute a violation of any judgment, order or decree of any court, arbitrator, governmental agency or authority binding upon UWA.

For the avoidance of doubt:
- UWA does not warrant or represent that the Patent Rights or Technical Information or any part thereof are or will be valid under this agreement.
- UWA makes no warranties or representations, including as to the accuracy or completeness of any scientific information provided in respect of this agreement.

SRPT-VYDS-0154836

- UWA does not warrant the applicability, utility or usability of the Patent Rights or the Technical Information in respect of the Products and disclaims any and all liability in respect of the application of the Patent Rights or the Technical Information.

**3.2** **Licensee.** Licensee represents and warrants to UWA that:

**(a)** Licensee is a corporation duly organized, validly existing and in good standing under the laws of the State of Oregon and has the corporate power and authority to enter into this Agreement and to perform its obligations hereunder;

**(b)** the execution and delivery of this Agreement by Licensee and the performance by Licensee of its obligations hereunder have been duly authorized by all necessary corporate action;

**(c)** this Agreement constitutes the legal, valid and binding obligation of Licensee, enforceable against Licensee in accordance with its terms, subject only to (i) applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforceability of creditors' rights generally, (ii) the limitation that the remedy of specific performance or injunctive relief is subject to the discretion of the court or arbitrator before which any proceeding therefor may be brought, and (iii) general legal and equitable principles of good faith, fair dealing and equity; and

**(d)** neither the execution or delivery of this Agreement by Licensee, nor the performance by Licensee of its obligations hereunder, (i) requires the consent or approval of any third party; (ii) shall constitute a default under any material contract by which Licensee or any of its material assets is bound (or any event which, with notice or lapse of time, or both, would constitute such a default); or (iii) shall constitute a violation of any judgment, order or decree of any court, arbitrator, governmental agency or authority binding upon Licensee.

**4.** **CONSIDERATION**

In consideration of the execution and delivery by UWA of this Agreement, Licensee agrees as follows:

**4.1** **License Fee.** Within three (3) days of the Effective Date, Licensee shall:

**(a)** pay to UWA an upfront license fee in an amount equivalent to Twelve Thousand Five Hundred U.S. Dollars (USD 12,500) exclusive of any applicable taxes; and

**(b)** reimburse UWA for any payment actually made by UWA to GSK, as evidenced by UWA's written records, for the sole purpose of securing the reassignment of the Patent Rights from GSK to UWA; *provided, however,* that such reimbursement shall be no more than Twenty-Five Thousand U.S. Dollars (USD 25,000).

**4.2** **Payment of Royalties.**

SRPT-VYDS-0154837

(a)      Licensee shall pay, or cause to be paid, to UWA aggregate royalty fees (each, a "Royalty" and collectively, the "Royalties") equal to the following received by Licensee, its Affiliates or its sublicensees:

(i)      0.75% of Net Sales of Product in the United States; *provided, however,* that if the Valid Claims in the United States cover the specific base sequence of the Product for which such Royalty is due but do not provide a meaningful ability for Licensee to exclude from the market other products with different base sequences that cause skipping of the same dystrophin exon as the Product, then the royalty rate shall be reduced to 0.50% of Net Sales for such Product; and

(ii)      1.25% of Net Sales of Product outside the United States; *provided, however,* that, on a country-by-country basis, if the Valid Claims cover the specific base sequence of the Product for which such Royalty is due but do not provide a meaningful ability for Licensee to exclude from the market other products with different base sequences that cause skipping of the same dystrophin exon as the Product, then the royalty rate in any such country shall be reduced to 0.75% of Net Sales for such Product

(b)      Royalties shall accrue and be payable by Licensee on a quarterly basis within forty-five (45) days following the end of each calendar quarter in which any Products generating Net Sales were sold. Each payment of Royalties shall be accompanied by a statement setting forth in reasonable detail the number and each type of Product sold and the Net Sales applicable thereto. The Products shall be considered as being sold for the purpose of the calculation of Royalties under this Agreement when the payments for such Products have been received by Licensee. Except as otherwise provided in Section 4.5, all Royalties shall be paid in United States Dollars and shall be made without set off and free and clear of (and without any deduction or withholding for) any taxes, duties, levies, imposts or similar fees or charges.

(c)      Licensee shall create and maintain complete and accurate records and documentation concerning all Net Sales of Products by Licensee, its Affiliates and sublicensees in sufficient detail to enable the Royalties payable hereunder to be determined. Licensee shall retain such records and documentation for not less than three (3) years from the date of their creation. During the term of this Agreement and for a period of one (1) year thereafter, UWA and its representatives shall have the right to audit such records and documentation as shall pertain to the determination and payment of Royalties no more than once in any calendar year. Such examiners shall have reasonable access during regular business hours to Licensee's offices and the relevant records, files and books of account, and shall have the right to examine any other records reasonably necessary to determine the accuracy of the Royalty calculations provided by Licensee. The costs of any such audit shall be borne by UWA, unless as a result of such inspection it is determined that the amounts payable by Licensee for any period are in error by greater than five percent (5%), in which case the costs of such audit shall be borne by Licensee. UWA shall report the results of any such audit to Licensee within forty-five (45) days of completion. Thereafter, Licensee shall promptly pay to UWA the amount of any underpayment discovered in such audit, or UWA shall credit to Licensee against future Royalty payments the amount of any overpayment discovered in such audit, as the case may be. In addition, Licensee shall pay interest on any underpayment at the rate that is the lower of (i) two percent (2%) over

SRPT-VYDS-0154838

the rate of interest announced by Bank of America in Portland, Oregon (or any successor in interest thereto or any commercially equivalent financial institution if no such successor exists) to be its "prime rate," or (ii) the highest rate permitted by applicable law, from the date such amount was underpaid to the date payment is actually received.

### 4.3    Milestone Fees.

(a)    Licensee shall pay to UWA certain fees (each, a "Milestone Fee"), which shall be determined and paid within thirty (30) days after the occurrence of each of the following corresponding events (each, a "Milestone Event") and which shall apply only to the first two Products that reach the first of such Milestone Events under Section 4.3(a)(i):

(i)    Ten Thousand U.S. Dollars (USD 10,000) upon initiation of a Phase II Trial of a Product (for purposes of clarity, the parties understand and agree that the clinical trial of AVI-4658 scheduled to begin in Q4 2008 is a Phase Ib trial and not a Phase II Trial);

(ii)    Fifteen Thousand U.S. Dollars (USD 15,000) upon initiation of a Phase III Trial of a Product;

(iii)    Twenty Thousand U.S. Dollars (USD 20,000) upon submission of a new drug application ("NDA") to the FDA or equivalent in the European Union for market approval of a Product; and

(iv)    Thirty Thousand Dollars (USD 30,000) upon approval of a NDA or equivalent in the European Union allowing commercialization of the Product described in Section 4.3(c).

(b)    If a Valid Claim specifically covering a Product has not issued in the United States or European Union at the time a Milestone Event for such Product occurs, Licensee shall be entitled to defer payment of 50% of the corresponding Milestone Fee until such time, if any, that such Valid Claim is granted.

**4.4    Infringement.**    In the event that Licensee is legally prevented from commercializing one or more Products as a result of patent infringement issues, all of Licensee's obligations with respect to such Products, including, without limitation, Royalty, Milestone Fees and other payment obligations related to that particular Product in that jurisdiction shall be suspended unless and until such patent infringement issues are resolved. In the event that any such issues are not resolved during the term of the Agreement, or in the event that such issues are resolved in a manner that would continue to prevent Licensee from commercializing such Products, then Licensee shall have no further obligations hereunder with respect to such Products.

**4.5    Currency Transfer Restrictions.**    If any restrictions on the transfer of currency exist in any country or other jurisdiction so as to prevent Licensee from making payments to UWA, Licensee shall take all commercially reasonable steps to obtain a waiver of such restrictions or to otherwise enable Licensee to make such payments. If Licensee is unable to do

SRPT-VYDS-0154839

so, Licensee shall make such payments to UWA in a bank account or other depository designated by UWA in such country or jurisdiction, which payments shall be in the local currency of such country or jurisdiction, unless payment in United States Dollars is permitted. Any payment by Licensee to UWA in currencies other than United States Dollars shall be calculated using the appropriate foreign exchange rate for such currency quoted in the *Wall Street Journal* for the close of business of the last banking day prior to the date on which such payment is being made.

**4.6    Fair Market Value.**    UWA acknowledges and agrees that the Royalties, Milestone Fees and other obligations of Licensee under this Agreement constitute fair market value for the rights granted to Licensee under this Agreement based on arms'-length negotiations with Licensee.

## 5.    PATENT RIGHTS

**5.1    Prosecution.**    Commencing on the Effective Date, Licensee shall assume full responsibility for the application, maintenance, reexamination, reissue, opposition and prosecution of any kind (collectively "Prosecution") relating to the Patent Rights in the Territory, including, but not limited to, payment of all costs, fees and expenses related thereto. Licensee shall provide UWA with copies of any and all material or communications with the United States Patent and Trademark Office or any foreign patent office. Licensee shall consult with UWA as to whether and how to proceed with respect to any event in connection with Prosecution. In the event that Licensee elects to abandon the Prosecution or maintenance of any patent or patent application included in the Patent Rights, Licensee shall notify UWA of such election at least thirty (30) days before a final due date which would result in abandonment or bar of patentability of the patent or patent application and, in such event, UWA may, at its sole option and expense, continue Prosecution or maintenance of the Patent Rights. In the event that Licensee elects not to pursue subject matter in the course of Prosecution that is outside the Field of Use, then the parties will consult with one another in a good faith effort to determine how to proceed.

**5.2    Future Patent Rights.**    Section 5.1 shall not apply to any Future Patent Rights that are included in this Agreement after the Effective Date. UWA shall provide Licensee with copies of any and all material or communications with the United States Patent and Trademark Office or any foreign patent office in connection with Prosecution of the Future Patent Rights, and Licensee shall be afforded the opportunity of prior review and comment on such action or paper. In the event that UWA elects to abandon the Prosecution or maintenance of any patent or patent application included in the Future Patent Rights, UWA shall notify Licensee of such election at least thirty (30) days before a final due date which would result in abandonment or bar of patentability of the patent or patent application and, in such event, Licensee may, at its sole option and expense, continue Prosecution or maintenance of the patent application or patent.

**5.3    Expenses.**    Licensee shall pay all expenses resulting from its obligations in Section 5.1 hereof. UWA shall exercise reasonable efforts to cause the Inventors to cooperate fully with Licensee with respect to the Prosecution, maintenance and protection of the Patent Rights and Future Patent Rights.

SRPT-VYDS-0154840

## 6. TERM AND TERMINATION

**6.1    Term.** Unless earlier terminated as provided in Section 6.2 hereof, the term of this Agreement shall commence on the Effective Date and shall expire, on a country-by-country basis, on the date upon which the last to expire of the patents covering the Patent Rights or a Valid Claim shall expire.

**6.2    Termination.** Except as provided by Section 6.3 hereof, this Agreement shall terminate upon the earliest to occur of the following:

(a)    Upon sixty (60) days' written notice from UWA if, within such sixty (60) day period, Licensee shall fail to cure fully any breach or default of any material obligation under this Agreement as described in such written notice detailing the facts of such breach with reasonable specificity; *provided, however,* that Licensee may avoid such termination if, before the end of such sixty (60) day period, such breach or default has been cured by Licensee to the reasonable satisfaction of UWA;

(b)    Upon sixty (60) days' written notice from Licensee if, within such sixty (60) day period, UWA shall fail to cure fully any breach or default of any material obligation under this Agreement as described in such written notice detailing the facts of such breach with reasonable specificity; *provided, however,* that UWA may avoid such termination if, before the end of such sixty (60) day period, such breach or default has been cured by UWA to the reasonable satisfaction of Licensee;

(c)    Upon the mutual written agreement of the parties hereto (such termination to be effective as of the date mutually agreed upon in such written agreement);

(d)    Immediately upon Licensee passing a resolution for winding-up (otherwise than for the purposes of a solvent amalgamation or reconstruction where the resulting entity is at least as credit-worthy as the Licensee and assumes all of the obligations of the Licensee under this Agreement) or a court shall make an order to that effect; or if a liquidator, receiver, administrator, administrative receiver, manager, trustee, or similar officer is appointed over any of the assets of the Licensee; or

(e)    Immediately upon notice by Licensee that it is no longer desirous of commercializing Products.

**6.3    Obligations Upon Termination.** Upon any termination of this Agreement pursuant to Section 6.2 hereof, nothing herein shall be construed to release any party from any liability for any obligation incurred through the effective date of termination or for any breach of this Agreement prior to the effective date of such termination. Licensee may, for a period of one (1) year after the effective date of such termination, sell all tangible Products customarily classified as "inventory" that it has on hand at the date of termination, subject to payment by Licensee to UWA of the applicable Royalty under Section 4 hereof.

**6.4    Effect of Termination.** In the event of any termination of this Agreement

SRPT-VYDS-0154841

EXECUTION COPY

pursuant to Section 6.2 hereof, where such termination has not been caused by any action or inaction on the part of any sublicensee of Licensee or by any breach by such sublicensee of its obligations under its sublicense from Licensee, such termination of this Agreement shall be without prejudice to the rights of each non-breaching sublicensee of Licensee and each non-breaching sublicensee shall be deemed to be a licensee of UWA thereunder, and UWA shall be entitled to all rights, but shall not be subject to any obligations (other than the grant of license and appurtenant obligations under this Agreement to the extent provided for in such sublicense) of Licensee thereunder.

**6.5    Right to Institute Legal Actions.** Notwithstanding the provisions of Section 6.2 hereof, UWA, on the one hand, and Licensee, on the other hand, may institute any other legal action or pursue any other remedy against the other party permitted by applicable law if the other party does not substantially cure any breach or default of any material obligation as provided herein.

**6.6    Reversion of Rights.** Notwithstanding anything to the contrary set forth herein (including, but not limited to, Section 5 hereof), full responsibility for Prosecution of the Patent Rights shall, at the option of UWA and at its sole expense from the date of reversion, revert to UWA upon any termination of this Agreement.

## 7.    INFRINGEMENT AND PROSECUTION BY THIRD PARTIES

**7.1    Enforcement.** Licensee shall have the first right and the obligation to enforce, at its sole expense, any Patent Rights to the extent licensed hereunder against infringement by third parties and shall notify UWA in writing in advance of all such enforcement efforts. Upon Licensee's undertaking to pay all expenditures reasonably incurred by UWA, UWA shall reasonably cooperate in any such enforcement and, as necessary, join as a party therein. Licensee shall reimburse UWA for all expenses, including reasonable attorneys' fees, incurred in connection with any such enforcement. In the event that Licensee does not file suit against or commence and conclude settlement negotiations with a substantial infringer of Patent Rights within ninety (90) days of receipt of a written demand from UWA that Licensee bring suit, then the parties will consult with one another in an effort to determine whether a reasonably prudent licensee would institute litigation to enforce the patent in question in light of all relevant business and economic factors (including, but not limited to, the projected cost of such litigation, the likelihood of success on the merits, the probable amount of any damage award, the prospects for satisfaction of any judgment against the alleged infringer, the possibility of counterclaims against the parties hereto, the impact of any possible adverse outcome on Licensee and the effect any publicity might have on the parties' respective reputations and goodwill). If, after such process, it is determined that a suit should be filed and Licensee does not file suit or commence settlement negotiations forthwith against the infringer, then UWA shall have the right, at its own expense, to enforce any Patent Rights licensed hereunder on behalf of itself and Licensee. Any amount recovered in any such action or suit, whether by judgment or settlement, shall be paid to or retained entirely by whichever party brought the action, or where both parties participate in such action or suit, all such amounts shall be allocated to each party in the ratio of expenses incurred, after first paying each party's out-of-pocket expenses, including reasonable attorneys' fees.

SRPT-VYDS-0154842

**7.2     Defense of Patent Rights.** In the event that any Patent Rights are the subject of a legal action seeking declaratory relief or of any reexamination or opposition proceeding instituted by a third party, then Licensee shall bear the expenses, including attorneys' fees, associated with such defense and in any recoupment of expenses, and UWA shall assist and cooperate with Licensee in such proceedings and shall exercise reasonable efforts to cause the Inventors to assist and cooperate fully.

**7.3     Third Party Patent Rights.** If Licensee reasonably determines that any Product infringes upon the rights of a third party because of the use of the Patent Rights, Future Patent Rights, Technical Information or Future Technical Information in the manufacture, use or sale of such Product, and, as a result, Licensee elects to oppose, seek reexamination of, pursue declaratory relief with respect to and/or undertake other legal action with respect to such third party's patent(s) or patent application(s) before a patent office and/or the courts of any jurisdiction in the Territory (collectively "Opposition"), then UWA shall assist and cooperate with Licensee in any such Opposition. UWA shall exercise reasonable efforts to cause the Inventors to cooperate fully with Licensee at Licensee's expense with respect to any Opposition.

**8.     INDEMNIFICATION**

**8.1     Indemnification by Licensee.** UWA shall not be liable for any loss or damage sustained by Licensee or any other person directly or indirectly from or in connection with Licensee's use, licence or commercialisation of any part of the Products, Patent Rights, Future Patent Rights, Technical Information or Future Technical Information, except to the extent that such loss or damages results from the negligence or willful acts or omissions of UWA. Subject to Section 8.3 hereof, Licensee hereby releases and indemnifies UWA, its officers, employees and agents (each, a "UWA Indemnified Party", and collectively, the "UWA Indemnified Parties") from and against all actions, claims, proceedings and demands whatsoever, including through contract and tort which may be made or brought by any person, body or authority against it or them or any of them in respect of any loss, injury or damage including death and consequential loss arising out of Licensees' use of the Products, Patent Rights, Future Patent Rights, Technical Information or Future Technical Information, except to the extent that such Losses result from the negligence, or willful acts or omissions of UWA.

**8.2     Indemnification by UWA.** Subject to Section 8.3 hereof, UWA shall hold harmless, defend and indemnify Licensee and each of its officers, directors, employees and agents from and against any and all claims, damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees and expenses and costs of investigation, whether or not suit is filed) suffered or incurred in connection with any negligence, willful acts or omissions or breach on the part of UWA directly resulting from the assignment (attached hereto as APPENDIX A) or reassignment (attached hereto as APPENDIX B) of the Patent Rights between UWA and GSK.

**8.3     Notice of Claim.** The parties shall promptly notify one another in writing of any claim, action or material threat thereof brought against any party in respect of which indemnification may be sought hereunder, and, to the extent allowed by law, shall reasonably cooperate with the indemnifying party in defending or settling any such claim or action. No

SRPT-VYDS-0154843

EXECUTION COPY

settlement of any claim, action or threat thereof received by a party and for which that party intends to seek indemnification (for itself or on behalf of any other party) shall be made without the prior joint written approval of UWA and Licensee.

## 9. USE OF NAMES

Neither party shall, unless as required by any law or governmental regulation, use the name of the other party and/or any of its trademarks, service marks, trade names or fictitious business names without express prior written consent of the other party.

## 10. CONFIDENTIALITY

**10.1 Non-Disclosure.** The parties hereto shall keep the terms of this Agreement and all business and scientific discussions relating to the business of the parties strictly confidential. It may, from time to time, be necessary for the parties, in connection with performance under this Agreement, to disclose Confidential Information (including know-how) to each other. The Receiving Party (as defined in Section 1.2 hereof) shall keep in strictest confidence the Confidential Information of the Disclosing Party (as defined in Section 1.2 hereof), using the standard of care it normally uses for information of like character, and shall not disclose the Confidential Information to any third party or use it except as expressly authorized by the prior written consent of the Disclosing Party or as otherwise permitted by this Agreement; *provided, however,* that Licensee may disclose the Confidential Information received from UWA to its Affiliates and sublicensees as shall be reasonably necessary to carry out the intent of this Agreement or any sublicense granted by Licensee as contemplated by this Agreement if, but only if, such Affiliates and/or sublicensees each execute a confidentiality agreement containing confidentiality provisions no less restrictive than those confidentiality provisions contained in this Section 10. The Receiving Party's obligation hereunder shall not apply to Confidential Information that the Receiving Party can show:

(a) Is or later becomes part of the public domain through no fault or neglect of the Receiving Party;

(b) Is received in good faith from a third party having no obligations of confidentiality to the Disclosing Party, *provided, however,* that the Receiving Party complies with any restrictions imposed by the third party;

(c) Is independently developed by the Receiving Party without use of the Disclosing Party's Confidential Information; or

(d) Is required by law or regulation to be disclosed (including, without limitation, in connection with FDA filings or filings with another government agency), *provided, however,* that the Receiving Party uses reasonable efforts to restrict disclosure and to obtain confidential treatment.

**10.2 Limits on Permitted Disclosures.** Each party agrees that any disclosure or distribution of the other party's Confidential Information within its own organization shall be made only as is reasonably necessary to carry out the intent of this Agreement. The parties

SRPT-VYDS-0154844

EXECUTION COPY

further agree that all of their respective officers, employees, agents, representatives or sublicensees to whom any Confidential Information is disclosed or distributed shall have agreed to maintain its confidentiality.

**10.3    Legally Required Disclosures.**  If a subpoena or other legal process concerning Confidential Information is served upon any party hereto pertaining to the subject matter hereof, the party served shall notify the other party immediately, the other party shall cooperate with the party served, at the other party's expense, in any effort to contest the validity of such subpoena or other legal process.  This Section 10.3 shall not be construed in any way to limit any party's ability to satisfy any disclosure of its relationship with the other party required by any governmental authority.

**10.4    Return of Confidential Information.**  In the event of any termination of this Agreement, the Receiving Party shall, upon the Disclosing Party's request, promptly return all Confidential Information and any copies made thereof previously made available to the Receiving Party by the Disclosing Party.

**10.5    Remedies.**  Both parties acknowledge and agree that it would be difficult to measure damages for breach by either party of the covenants set forth in this Section 10, and that injury from any such breach would be incalculable, and that money damages would therefore be an inadequate remedy for any such breach.  Accordingly, either party shall be entitled, in addition to all other remedies available hereunder or under law or equity, to injunctive or such other equitable relief as a court may deem appropriate to restrain or remedy any breach of such covenants.

**11.    MISCELLANEOUS**

**11.1    Notices.**  Any notice, request, instruction or other document required by this Agreement shall be in writing and shall be deemed to have been given (a) if mailed with the United States Postal Service by prepaid, first class, certified mail, return receipt requested, at the time of receipt by the intended recipient, (b) if sent by Federal Express®, Airborne®, or other overnight carrier, signature of delivery required, at the time of receipt by the intended recipient, or (c) if sent by facsimile transmission, when so sent and when receipt has been acknowledged by appropriate telephone or facsimile receipt, addressed as follows:

In the case of UWA to:

The University of Western Australia
35 Stirling Highway
Crawley, WA 6009
Attention: Director, Office of Industry and Innovation
Fax: +61 8 6488 2333

SRPT-VYDS-0154845

or in the case of Licensee to:

AVI BioPharma, Inc.
4575 SW Research Way, Suite 200
Corvallis, Oregon 97333 USA
Attention: Leslie Hudson, Ph.D., Chief Executive Officer
Fax: 541-754-3545

with a copy to:

Michael Phillips, Esq.
Davis Wright Tremaine LLP
1300 SW Fifth Avenue, Suite 2300
Portland, Oregon 97201 USA

or to such other address or to such other person(s) as may be given from time to time under the terms of this Section 11.1.

**11.2 Governing Law.** This Agreement shall be construed and enforced in accordance with the laws of: (a) the United States of America and of the State of Oregon in any action brought by UWA against Licensee, and (b) Perth, Western Australia in any action brought by Licensee against UWA, irrespective of choice of laws provisions. The parties agree that: (a) Portland, Oregon shall be the situs of any legal proceeding arising out of or relating to this Agreement if initiated by UWA against Licensee, and (b) Perth, Western Australia shall be the situs of any legal proceeding arising out of or relating to this Agreement if initiated by Licensee against UWA.

**11.3 Waiver.** Failure of any party to enforce a right under this Agreement shall not act as a waiver of that right or the ability to assert that right relative to the particular situation involved.

**11.4 Enforceability.** If any provision of this Agreement shall be found by a court of competent jurisdiction to be void, invalid or unenforceable, the same shall be reformed to comply with applicable law or stricken if not so conformable, so as not to affect the validity or enforceability of the remainder of this Agreement.

**11.5 Modification.** No change, modification, or addition or amendment to this Agreement, or waiver of any term or condition of this Agreement, is valid or enforceable unless in writing and signed and dated by the authorized officers of the parties to this Agreement.

**11.6 Entire Agreement.** This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and replaces and supersedes as of the Effective Date any and all prior agreements and understandings, whether oral or written, between the parties with respect to the subject matter of such agreements; *provided, however,* that this Agreement shall have no effect on the Mutual Confidentiality Agreement dated October 1, 2008between the parties.

SRPT-VYDS-0154846

**11.7     Successors.**  Except as otherwise expressly provided in this Agreement, this Agreement shall be binding upon, inures to the benefit of, and is enforceable by, the parties and their respective heirs, legal representatives, successors and permitted assigns.

**11.8     Construction.**  This Agreement has been prepared, examined, negotiated and revised by each party and their respective attorneys, and no implication shall be drawn and no provision shall be construed against any party to this Agreement by virtue of the purported identity of the drafter of this Agreement or any portion thereof.

**11.9     Counterparts.**  This Agreement may be executed simultaneously in one or more counterparts, each of which shall constitute one and the same instrument.  This Agreement may be executed by facsimile.

**11.10   Attorneys' Fees.**  In the event of any action at law or in equity between the parties hereto to enforce any of the provisions hereof, the unsuccessful party to such litigation shall pay to the successful party all reasonable costs and expenses, including reasonable attorneys' fees, incurred therein by such successful party; and if such successful party shall recover a judgment in any such action or proceeding, such reasonable costs, expenses and attorneys' fees may be included in and as part of such judgment.

**11.11   Assignment.**  This Agreement may not be assigned by either party without the prior written consent of the other party, and any such attempted assignment shall be void and of no effect, except that either party may assign this Agreement to any successor in connection with the merger, consolidation or sale of all or substantially all of its assets or that portion of its business to which this Agreement relates.

**11.12   Further Assurances.**  At any time and from time to time after the Effective Date, each party shall do, execute, acknowledge and deliver, and cause to be done, executed, acknowledged or delivered, all such further acts, transfers, conveyances, assignments or assurances as may be reasonably required to consummate the transactions contemplated by this Agreement.

**11.13   Survival.**  The terms and conditions of the following provisions will survive termination or expiration of this Agreement for as long as necessary to permit their full discharge: Section 1 ("Definitions"), Section 6 ("Term and Termination"), Section 8 ("Indemnification"), Section 9 ("Use of Names") and Section 10 ("Confidentiality").  The provisions set forth in Section 4 ("Consideration") also shall survive any expiration or earlier termination of this Agreement, to the extent set forth therein.

*[Signature page follows.]*

SRPT-VYDS-0154847

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Agreement as of the date first above written.

"UWA":

THE UNIVERSITY OF WESTERN
AUSTRALIA, A BODY CORPORATE
ESTABLISHED PURSUANT TO THE PROVISIONS
OF THE UNIVERSITY OF WESTERN AUSTRALIA
ACT 1911

By: _____

Name: _____ **Professor Doug McEachern**

Its: _____ Deputy Vice-Chancellor (Research & Innovation)
The University of Western Australia

Date: 24ᵗʰ November, 2008

"LICENSEE":

AVI BIOPHARMA, INC., AN OREGON
CORPORATION

By: _____

Name: _____ Dr. L. Hudson

Its: President & CEO

Date: January 7, 2008

Page 18 of 18

SRPT-VYDS-0154848

EXECUTION COPY

## SCHEDULE 1

### Diligence Milestones

1. Within two (2) years following announcement of the success of a Phase Ib trial of AVI-4658, Licensee (and/or its Affiliates or sublicensees) shall have initiated a Phase II Trial of AVI-4658.

2. Within two (2) years following completion of a successful Phase II Trial of AVI-4658, Licensee (and/or its Affiliates or sublicensees) shall have initiated a Phase III Trial of AVI-4658.

3. Within two (2) years following completion of a successful Phase III Trial of AVI-4658, Licensee (and/or its Affiliates or sublicensees) shall have submitted a new drug application to the FDA or equivalent in the European Union for market approval of AVI-4658.

4. If any of the aforementioned Milestones are unsuccessful, and provided the provisions of Section 2.2 are observed by UWA, UWA may terminate the Agreement in accordance with Section 2.2 unless Licensee has initiated a Phase I Trial of a different Product within two (2) years of a Milestone for AVI-4658 being unsuccessful. Any such Product(s) shall likewise be commercialized in accordance with Section 2.2.

SRPT-VYDS-0154849

EXECUTION COPY

## APPENDIX A

Patent Assignment Agreement between UWA and GSK

*See attached.*

SRPT-VYDS-0154850

## PATENT ASSIGNMENT AGREEMENT

**THIS PATENT ASSIGNMENT AGREEMENT** (hereinafter, the "Assignment") is made and entered into this 10th day of March, 2006 by and between:

(1)    **SMITHKLINE BEECHAM CORPORATION, DOING BUSINESS AS GLAXOSMITHKLINE**, a company incorporated in the Commonwealth of Pennsylvania, with its principal office at One Franklin Plaza, 200 N. 16th Street, Philadelphia, Pennsylvania 19101 USA ("Assignee"); and

(2)    **THE UNIVERSITY OF WESTERN AUSTRALIA**, a body corporate established pursuant to the provisions of The University of Western Australia Act 1911 (Western Australia), of 35 Stirling Highway, Crawley, Western Australia 6009 ("Assignor").

### RECITALS

(A)    Whereas, the Assignor owns and has applied for certain patent applications (the "Patent Applications") defined below in respect of the inventions disclosed in the Patent Applications (the "Inventions");

(B)    Whereas, Assignor has agreed to assign to Assignee the Patent Applications and the Inventions disclosed therein as hereinafter set forth; and

(C)    Whereas, Assignee desires to obtain all of Assignor's right, title, and interest in and to the Patent Applications and Inventions.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, in consideration of the promises and mutual covenants contained herein, and intending to be legally bound hereby, the parties hereto agrees as follows:

1. Definitions.
    a. "Inventions" has the meaning given to it in Recital (A) above.

    b. "Net Sales" shall mean the gross receipts worldwide from sales of the Product by Assignee to third parties, less all customary deductions using generally accepted accounting standards for:
        i)    trade, cash and quantity credits, discounts, refunds or rebates;
        ii)   allowances or credits to customers actually granted on account of rejection, damage, or return of Product;
        iii)  sales commissions;
        iv)   sales and excise taxes (including value added tax) and any other governmental charges imposed upon the production, importation, use or sale of Product;

1

SRPT-VYDS-0154851

v) transportation charges, including insurance, for transporting Product to the extent specifically invoiced to the customer; and

vi) product rebates, discounts and charge backs including, without limitation, those granted to managed-care entities and government agencies.

Product sales between GSK, its Affiliates and its and their sublicensees, shall be excluded from the computation of Net Sales and no royalties shall be payable on such sales.

c. "Patent Applications" means the international patent application PCT/AU2005/000943, filed on 28 June 2005 and published as WO 2006/000057 on 5TH January 2006, together with any further national application, divisional application, continuation in part and the like deriving from said international or national patent application(s) in any country in the world.

d. "Product" means any product or part thereof, the manufacture, use, or sale of which would infringe one or more Valid Claims included within the Patent Applications.

e. "Valid Claim" shall mean a claim of an issued patent included in the Patent Applications which has not been abandoned, lapsed, expired or been declared invalid or unenforceable in a final, unappealable decision (or a decision from which no appeal was taken) of a court of competent jurisdiction.

2. Assignment of Patent Applications and Inventions. Assignor hereby assigns to Assignee all right, title, and interest in and to the Inventions and the Patent Applications, and any patents granted thereon, and all rights associated therewith, including but not limited to the right to apply for and obtain patents and similar forms of protection in respect of the Inventions and the Patent Applications throughout the world; the right to make any new application or applications in respect of any part or parts of the subject matter of any application or specification filed in connection with the Inventions and the Patent Applications; the right to claim priority from the Patent Applications; the right to bring proceedings for any previous infringement of the rights assigned by this Assignment; and the right to claim priority of the Patent Applications under the Paris Convention (as amended) in all countries and territories and to hold the same unto the Assignee.

3. License Grant. Assignee hereby grants to Assignor a fully paid up, irrevocable non-exclusive license to the Patent Applications and Inventions for internal research purposes only.

4. Payment. Assignor acknowledges that certain consideration for obtaining the right title and interest in and to the Patent Applications and Inventions has already been

2

given, namely, that Assignee paid all fees associated with the filing of the Patent Applications. In addition, Assignee shall continue to assume all patent filing and prosecution costs associated with the Invention and the Patent Applications.

5. Royalty. In further consideration for the license granted to Assignee hereunder, Assignee shall pay a royalty to Assignor of 0.5 percent (0.5%) on the Net Sales of Assignee on Products. Royalties shall be calculated on an annual, calendar year basis and paid to Assignor within sixty (60) days of the end of each calendar year.

    5.1    Record Retention. Assignee shall keep complete and accurate records in sufficient detail to permit Assignor to confirm the accuracy of calculations of all royalties due hereunder. Such records shall be retained by Assignee for a three (3) year period following the year in which any such royalty payments were due hereunder.

    5.2    The obligation to pay royalties hereunder shall terminate on expiration, invalidation, lapse or abandonment of the last Valid Claim of the Patent Applications except that the royalties accrued but not paid prior to such expiration shall be payable with the next payment cycle under the provisions of this Article 5. A patent shall be deemed to expire at midnight of the day of expiration.

6. Cooperation. Assignor shall reasonably cooperate with Assignee, at Assignee's sole discretion and expense, to assist Assignee with filing patent applications or other documents related to the Inventions and the Patent Applications, including but not limited to, assisting in preparing and prosecuting the patent applications, and consulting with Assignee and Assignee's legal counsel regarding the Inventions and patent applications. Assignor further agrees to cooperate in executing all documents, instruments, and other papers and taking actions as necessary for Assignee to secure patent rights and as necessary to effect the transfer of all right, title and interest in and to the Patent Applications and the Inventions to Assignee, and to record and perfect title therein in the sole name of Assignee.

7. Publication Rights. Assignor shall not publish or present any part of the Inventions or any information included therein until a patent application directed thereto has been filed. Assignee shall notify Assignor immediately in writing upon the filing of any such patent application. Upon receipt of said notification from Assignee, Assignor shall have the right to publish any information related to or included within the Patent Applications, provided that Assignor requests permission to publish or present from Assignee, and Assignee, in its sole discretion, reviews and approves the information to be published or presented. If Assignee does not, within ninety (90) days of receipt of a request for permission to publish from Assignor, indicate either approval or rejection of the publication or presentation, then Assignee will be deemed to have approved the proposed publication or presentation. Any publication or presentation by the Assignee shall acknowledge the Assignor and appropriate employees of the Assignor as co-authors on the publication or presentation.

3

SRPT-VYDS-0154853

8. No Publicity. Neither party hereto shall identify the other party in any promotional advertising, press releases or other promotional materials to be disseminated to the public or any portion thereof without the express prior written consent of the other party. Assignor shall not use the name of Assignee or the name of any Assignee's directors, officers, employees, or agents, as applicable, or any trademark, service mark, trade name, or symbol of Assignee, without Assignee's express prior written consent. Any promotional advertising, press releases or other promotional materials prepared by Assignee and concerning the Invention shall acknowledge Assignor's participation in the development of the Invention.

9. Warranties; Disclaimer of Warranties.

9.1  Assignor hereby represents and warrants that the subject matter of the Patent Applications and the Inventions was developed by its employees, that such employees have assigned their ownership rights in the Inventions and Patent Applications to Assignor, and that Assignor has the full right and legal authority to perform its obligations and grant the rights granted to Assignee herein.

9.2  Assignor hereby represents and warrants that to Assignor's knowledge the manufacture, use or sale of any product or process under the Patent Applications and the Inventions do not infringe any patent, copyright, trademark, or other intellectual property rights of any third party. Assignor also hereby represents and warrants that, to Assignor's knowledge, no third party is infringing the intellectual property rights contained in the Patent Applications and Inventions.

9.3     Except as expressly stated in Section 9.1 and 9.2, ASSIGNOR MAKES NO WARRANTIES OR REPRESENTATIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED UNDER THIS AGREEMENT, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR REPRESENTATIONS AS TO THE PURITY, ACTIVITY, SAFETY, OR USEFULNESS OF THE INVENTION ASSIGNED TO ASSIGNEE UNDER THIS AGREEMENT.

10. Assignment of Agreement. Neither party may assign this Agreement or its rights and obligations hereunder, in whole or in part, to any third party without obtaining the prior written consent of the other party; provided, however, that ASSIGNEE may assign this Agreement, or its rights and obligations hereunder, in whole or in part, to any of its Affiliates (as defined below) or to any entity with which it may merge or consolidate or to which it may transfer all or substantially all of its assets relating to the Inventions. Assignor may assign this Agreement to an Affiliate only after obtaining the prior written consent of Assignee. "Affiliate" means any entity that, directly or indirectly, is controlled by, controls or is under common control with a party hereto. "Control" means having the power to direct, or cause the direction of,

4

the management and policies of any entity, whether through ownership of voting
securities, by contract or otherwise.

11. Notices. Any notices, payments or statements to be made under this Agreement shall
be made as follows:

*If to Assignor:*

Name: Simon Handford
Title: Project Manager Commercialisation,
University of Western Australia, 35 Stirling Highway, Nedlands WA 6009
Fax:    +61 8 6488 2333

*if to Assignee:*

GlaxoSmithKline
Name: Dr. P. Anthony Akkari
Title: Human Genetics Manager
Mail Stop: MAI 1217
Five Moore Drive
Research Triangle Park, NC 27709
USA
Fax: 919-483-0659

*with a copy to:*
    GlaxoSmithKline
    R&D Legal Ops
    VP and Senior Counsel
    Mail Stop RN0220
    2301 Renaissance Blvd.
    King of Prussia, PA 19406
    USA
    Fax: 610-787-7084

or at such other address later designated in writing by either Party for such purposes.
Such notices shall be effective upon receipt.

12. Choice of Law. This Agreement shall be interpreted and governed in accordance
with the laws of the Commonwealth of Pennsylvania, United States of America,
without giving effect to conflict of law provision of any jurisdiction.

13. Survival. The provisions of Sections 1, 2, 4, 6, 7, 8, 9, 10, 11, 12, and 13, hereof
shall survive any expiration or termination of this Agreement.

5

SRPT-VYDS-0154855

14. Entire Agreement. This Agreement constitutes the entire understanding of the parties with respect to the terms of the subject matter hereof and shall not be modified except by subsequent mutual written agreement.

IN WITNESS WHEREOF the parties hereto have executed this Assignment by their duly authorised officers as of the date and year first above written.

SmithKline Beecham Corporation
doing business as GlaxoSmithKline
By:_____

Name: Allen D. Roses

Title: Sr. VP, Genetics Research

University of Western Australia

By:_____

Name: _____

Title: Professor Doug McEachern
Pro Vice-Chancellor (Research & Innovation)

6

SRPT-VYDS-0154856

EXECUTION COPY

## APPENDIX B

Patent Assignment Agreement between UWA and GSK

*See attached.*

SRPT-VYDS-0154857

SRPT-VYDS-0154858

## PATENT ASSIGNMENT AGREEMENT

**THIS PATENT ASSIGNMENT AGREEMENT** (hereinafter the "Assignment") is made and entered into this 19th day of November 2008 (the "Effective Date") by and between:

(1) **SMITHKLINE BEECHAM CORPORATION, DOING BUSINESS AS GLAXOSMITHKLINE**, a company incorporated in the Commonwealth of Pennsylvania, with its principal office at One Franklin Plaza, 200 N. 16th Street, Philadelphia, Pennsylvania 19101 USA ("Assignor"); and

(2) **THE UNIVERSITY OF WESTERN AUSTRALIA**, a body corporate established pursuant to the provisions of The University of Western Australia Act 1911 (Western Australia), of 35 Stirling Highway, Crawley, Western Australia 6009 ("Assignee").

### RECITALS

(A) Whereas the Assignor owns and has applied for certain patent applications (the "Patent Applications") defined below in respect of the inventions disclosed in the Patent Applications (the "Inventions").

(B) Whereas Assignor has agreed to assign to Assignee the Patent Applications and the Inventions disclosed therein as hereinafter set forth; and

(C) Whereas Assignee desires to obtain all of Assignor's right, title, and interest in and to the Patent Applications and Inventions.

**NOW THEREFORE,** in consideration of the promises and mutual covenants contained herein, and intending to be legally bound hereby, the parties hereto agree as follows:

1. Definitions
   a. "Inventions" has the meaning given to it in Recital (A) above.

   b. "Patent Applications" means the international patent application PCT/AU2005/000943 filed on 28 June 2005 and published as WO 2006/000057 on 5th January 2006, the United States patent application Serial No. 11/570,691, and the European patent application No. 05754344, together with any further national applications, divisional applications, continuations-in-part and the like deriving from said international, regional or national patent application(s) in any country in the world.

2. Assignment of Patent Applications and Inventions. Assignor hereby assigns to Assignee all right, title, and interest in and to the Inventions and the Patent

SRPT-VYDS-0154859

Applications, and any patents granted thereon, and all rights associated therewith, including but not limited to the right to apply for and obtain patents and similar forms of protections in respect of the Inventions and the Patent Applications throughout the world; the right to make any new application or applications in respect of any part or parts of the subject matter of any application or specification filed in connection with the Inventions and the Patent Applications; the right to claim priority form the Patent Applications; the right to bring proceedings for any previous infringement of the rights assigned by these Assignment; and the right to claim priority of the Patent Applications under the Paris Convention (as amended) in all countries and territories and to hold the same unto the Assignee.

3. License Grant. Assignee hereby grants to Assignor a fully paid up, irrevocable non-exclusive, royalty-free license to the Patent Applications and Inventions for internal research purposes only, including research conducted by any of Assignor's Affiliates (as defined below) or any entity with which it may merge or consolidate or to which it may transfer all or substantially all of its assets relating to the Inventions. "Affiliate" means any entity that, directly or indirectly, is controlled by, controls or is under common control with a party hereto. As used in the definition of Affiliate, the term "Control" means having the power to direct, or cause the direction of, the management and policies of any entity, whether through ownership of voting securities, by contract, or otherwise.

4. Payment. In consideration for obtaining the right, title, and interest in and to the Patent Applications and Inventions, Assignee agrees to pay Assignor the sum of twenty-two thousand US dollars (US $22,000) within thirty days after execution of this Agreement. This amount is non-refundable.

5. Cooperation. Assignor shall reasonably cooperate with Assignee, at Assignee's sole discretion and expense, in executing all documents, instruments, and other papers and taking actions as necessary for Assignee to secure patent rights and as necessary to effect the transfer of all right, title and interest in and to the Patent Applications and the Inventions to Assignee, and to record and perfect title therein in the sole name of Assignee.

6. No Publicity. Neither party hereto shall identify the other party in any promotional advertising, press releases or other promotional materials to be disseminated to the public or any portion thereof without the express prior written consent of the other party. Assignee shall not use the name of Assignor or the name of any Assignor's directors, officers, employees, or agents, as applicable, or any trademark, service mark, trade name, or symbol of Assignor, without Assignor's express prior written consent.

7. Disclaimer of Warranties. THE PATENT APPLICATIONS ARE PROVIDED "AS IS" AND ASSIGNOR MAKES NO WARRANTIES OR REPRESENTATIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED UNDER THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY

SRPT-VYDS-0154860

OR FITNESS FOR A PARTICULAR PURPOSE OR REPRESENTATIONS AS TO
THE PURITY, ACTIVITY, SAFETY, OR USEFULNESS OF THE INVENTION
ASSIGNED TO ASSIGNEE UNDER THIS AGREEMENT OR FREEDOM FROM
INFRINGEMENT OF THE INTELLECTUAL PROPERTY RIGHTS OF A THIRD
PARTY. ASSIGNOR SHALL NOT BE LIABLE HEREUNDER UNDER ANY
CONTRACT, NEGLIGENCE, STRICT LIABILITY OR OTHER LEGAL OR
EQUITABLE REMEDIES FOR ANY INCIDENTAL OR CONSEQUENTIAL
DAMAGES OR LOST PROFIT.

8. No Liability. In no event shall Assignor have any liability of any kind in connection
with any use of the Invention or any product or service which is based upon, derived
from or incorporates the Invention by Assignee, its licensees or assigns.

9. Notices. Any notices, payments or statements to be made under this Agreement shall
be made as follows:

*If to Assignor:*

GlaxoSmithKline
Name: Ashley H. Bates
Head Of Research & Development Alliances, Australia
*{address}*

*with a copy to:*

GlaxoSmithKline
R&D Legal Ops
VP and Senior Counsel
Mail Stop RN0220
2301 Renaissance Blvd.
King of Prussia, PA 19406
USA
Fax: 610-787-7084

*If to Assignee:*

Name: Simon Handford
Title: Project Manager Commercialization
University of Western Australia,
35 Stirling Highway , Nedlands, WA 6009
Fax: +61 8 6488 2333

Or at such other address later designated in writing by either Party for such purposes.
Such notices shall be effective upon receipt.

3 of 4

SRPT-VYDS-0154861

10. Choice of Law. This Agreement shall be interpreted and governed in accordance with the laws of the Commonwealth of Pennsylvania, United States of America, without giving effect to conflict of law provision of any jurisdiction.

11. Survival. The provisions of Sections 1, 2, 3, 4, 5, 6, 7, 8, 9, 10 and 11 hereof shall survive any expiration or termination of this Agreement.

12. Entire Agreement. This Agreement constitutes the entire understanding of the parties with respect to the terms of the subject matter hereof and shall not be modified except by subsequent mutual written agreement.

**IN WITNESS WHEREOF** the parties hereto have executed this Assignment by their duly authorized officers as of the date and year first above written.

**SmithKlineBeecham Corporation**
**Doing business as GlaxoSmithKline**

By: _____

Name: Lon R. Cardon

Title:  Senior Vice President, Genetics

**University of Western Australia**

By: _____

Name: _____ **Professor Doug McEachern**
            Deputy Vice-Chancellor (Research & Innovation)
Title: _____ The University of Western Australia

*AE McGrory*
*VG Campen*

SRPT-VYDS-0154862

# Exhibit D





**Articles of Amendment - Business/Professional**

Secretary of State - Corporation Division - 255 Capitol St. NE, Suite 151 - Salem, OR 97310-1327 - http://www.FilingInOregon.com - Phone: (503) 986-2200

**FILED**

**JUL 1 1 2012**

REGISTRY NUMBER: 145980-15

**OREGON
SECRETARY OF STATE**

In accordance with Oregon Revised Statute 192.410-192.490, the information on this application is public record.
We must release this information to all parties upon request and it will be posted on our website.

For office use only

Please Type or Print Legibly in **Black** Ink.

1) ENTITY NAME: AVI BIOPHARMA, INC.

2) STATE THE ARTICLE NUMBER(S): and set forth the article(s) as it is amended to read. (Attach a separate sheet if necessary.)

Articles I and II as set forth on Exhibit A attached hereto.

3) THE AMENDMENT WAS ADOPTED ON: July 10, 2012

(If more than one amendment was adopted, identify the date of adoption of each amendment.)

4) CHECK THE APPROPRIATE STATEMENT:

☑ Shareholder action was required to adopt the amendment(s).

The vote was as follows:

| Class or series of shares | Number of shares outstanding | Number of votes entitled to be cast | Number of votes cast FOR | Number of votes cast AGAINST |
|---|---|---|---|---|
| See Attached Vote | | | | |

☐ Shareholder action was not required to adopt the amendment(s). The amendment(s) was adopted by the board of directors without shareholder action.

☐ The corporation has not issued any shares of stock. Shareholder action was not required to adopt the amendment(s). The amendment(s) was adopted by the Incorporators or by the board of directors.

5) EXECUTION: (Must be signed by at least one officer or director.)
By my signature, I declare as an authorized authority, that this filing has been examined by me and is, to the best of my knowledge and belief, true, correct, and complete. Making false statements in this document is against the law and may be penalized by fines, imprisonment or both.

Signature

Printed Name:
Christopher Garabedian

Title:
President and CEO

CONTACT NAME: (To resolve questions with this filing.)

Linda J. Lorenat

SAREPTA THERAPEUTICS, INC.

14598015-13639400    AMDART

FEES

Required Processing Fee    $100

No Fee for President/Secretary Change.

Processing Fees are nonrefundable.    Please make check payable to "Corporation Division."

Free copies are available at FilingInOregon.com, using the Business Name Search program.

SRPT-VYDS-0247089

**ATTACHMENT**
to
**ARTICLES OF AMENDMENT**

The amendment of the Fourth Restated and Amended Articles of Incorporation required shareholder approval. The record date for such shareholder approval was set as May 14, 2012 (the "Record Date"). The vote of shareholders as of the Record Date was as follows:

Shareholder approval to amend the Fourth Restated and Amended Articles of Incorporation to change the name of the Company from "AVI BioPharma, Inc." to "Sarepta Therapeutics, Inc.":

| Designation of Security | Number of Outstanding Shares | Number of Votes Entitled to be Cast | Number of Votes Cast FOR | Number of Votes Cast AGAINST |
|---|---|---|---|---|
| Common Stock | 135,743,787 | 135,743,787 | 104,286,234 | 12,268,753 |

Shareholder approval to amend the Fourth Restated and Amended Articles of Incorporation to effect a 1-for-6 reverse stock split:

| Designation of Security | Number of Outstanding Shares | Number of Votes Entitled to be Cast | Number of Votes Cast FOR | Number of Votes Cast AGAINST |
|---|---|---|---|---|
| Common Stock | 135,743,787 | 135,743,787 | 93,284,765 | 23,270,222 |

SV\917562.1

SRPT-VYDS-0247090

## EXHIBIT A

## AMENDMENT TO FOURTH RESTATED AND AMENDED
## ARTICLES OF INCORPORATION
## OF
## AVI BIOPHARMA, INC.

1.    **Amendment to Article I**. Article I is hereby amended in its entirety to read as follows:

### "ARTICLE I.
### Name

The name of the Corporation is Sarepta Therapeutics, Inc."

2.    **Amendment to Article II**. Section 2.1 of Article II is hereby amended in its entirety to read as follows:

"2.1 *Authorized Capital.* The Corporation is authorized to issue two classes of stock which are designated, respectively, "Common Stock" and "Preferred Stock." The total number of shares of stock which the Corporation shall have authority to issue shall be 53,333,333, consisting of 50,000,000 shares of Common Stock, having \$0.0001 par value per share, and 3,333,333 shares of Preferred Stock, having \$0.0001 par value per share."

Article II is hereby amended to insert the following Section 2.1A immediately following Section 2.1:

"2.1A *Reverse Stock Split.* Effective upon the filing date of these Articles of Amendment (the "Effective Time"), the Corporation shall effect a reverse split in its issued and outstanding shares of Common Stock so that the shares currently issued and outstanding shall be reverse split, or consolidated, on a 1-for-6 basis, and shareholders shall receive one share of the Corporation's post-split Common Stock for each six shares of Common Stock held by them prior to the reverse split (the "Reverse Stock Split"). In lieu of any fractional share to which a holder would otherwise be entitled, after aggregating all such fractions of a share, such holder shall be entitled to receive cash in an amount equal to the product obtained by multiplying such fraction by the average closing price of the Corporation's Common Stock as quoted on the Nasdaq Global Market for the five trading days immediately preceding the filing date of these Articles of Amendment, such payment to be made by the Corporation upon surrender of a certificate or certificates representing the shares of Common Stock of the Corporation issued and outstanding immediately prior to the Effective Time held by such holder, together with a properly completed and executed transmittal form, which shall be provided to all shareholders of record, to the Corporation's transfer agent acting on the Corporation's behalf. The Corporation's transfer agent, acting on the Corporation's behalf, shall provide certificates representing the split, consolidated and reclassified shares of Common Stock of the Corporation in exchange for and upon receipt and surrender of certificates representing shares of the Common Stock of the

SV\916427.1

Corporation issued and outstanding immediately prior to the Effective Time. From and after the Effective Time, certificates representing shares of Common Stock of the Corporation issued and outstanding immediately prior to the Effective Time until they are surrendered shall represent only the right of the holders thereof to receive shares of the split, consolidated and reclassified shares of Common Stock of the Corporation resulting from the Reverse Stock Split.

* * *

Except as amended above in this Amendment, the Fourth Restated and Amended Articles of Incorporation shall remain in full force and effect.

SRPT-VYDS-0247092

# Exhibit E

EXECUTION VERSION

## AMENDED AND RESTATED EXCLUSIVE LICENSE AGREEMENT

THIS AMENDED AND RESTATED EXCLUSIVE LICENSE AGREEMENT ("Agreement") is effective as of November 24, 2008 (the "Effective Date"), and is restated as of this 10th day of April, 2013 ("Restatement Date") by and between THE UNIVERSITY OF WESTERN AUSTRALIA, a body corporate established pursuant to the provisions of The University of Western Australia Act 1911, with offices at 35 Stirling Highway, Crawley, Western Australia 6009 ("UWA"), on the one hand, and SAREPTA THERAPEUTICS, with offices at 245 First Street Suite 1800 Cambridge, MA 02142 USA ("Sarepta") and Sarepta International CV ("Sarepta Netherlands," and collectively with Sarepta, "Licensee"), on the other hand.

### RECITALS

A.    UWA owns and is entitled to grant license rights with respect to certain Patent Rights and Technical Information (as defined below) invented or developed in the course of certain research conducted under the direction of Stephen D. Wilson, Sue Fletcher, Graham McClorey, Abbie Adams and Penny Meloni (hereinafter collectively referred to as the "Inventors").

B.    Certain of the Patent Rights and Technical Information had been previously assigned by UWA to SmithKline Beecham Corporation doing business as GlaxoSmithKline ("GSK"), but have, as of the Effective Date, been reassigned by GSK to UWA.

C.    Licensee is in the process of developing various products for the treatment of muscular dystrophy arising from defects in the dystrophin gene by inducing the skipping of certain exons in such gene for which the Patent Rights and Technical Information may be useful.

D    UWA and Licensee entered into a certain Exclusive License Agreement, dated as of the Effective Date (the "Prior License Agreement"), pursuant to which UWA granted to Licensee certain exclusive license rights under certain patent rights and technical information relating to the treatment of Duchenne muscular dystrophy by inducing the skipping of certain specified exons or blocks of exons through the use of certain specified antisense sequences (the "Prior License Rights").

E.    Licensee and UWA desire to expand the Prior License Rights to allow Licensee to conduct research in the Field of Use, and to develop, manufacture, use and sell Products in the Field of Use, using the Patent Rights and Technical Information (as each term is defined below) in accordance with the terms of this Agreement, and UWA desires to have the Patent Rights and the Technical Information developed, used and commercialized in the Field of Use by Licensee. Other than the rights expressly granted by UWA hereunder within the Field of Use, Licensee acknowledges that UWA shall retain all other rights with respect to the Patent Rights and the Technical Information.

NOW, THEREFORE, in consideration of the mutual covenants and premises herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

SRPT-VYDS-0154863

1.    **DEFINITIONS**

**1.1**    **"Affiliate"** or **"Affiliates"** shall mean any corporation, person or entity, which controls, is controlled by, or is under common control with, a party to this Agreement without regard to stock or other equity ownership. For purposes hereof, the terms "control" and "controls" mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a corporation, person or entity, whether through the ownership of voting securities, by contract or otherwise.

**1.2**    **"Confidential Information"** shall mean any confidential or proprietary information furnished by one party (the "Disclosing Party") to the other party (the "Receiving Party") in connection with this Agreement or, prior to the Restatement Date, pursuant to the Prior License Agreement or the Mutual Confidentiality Agreement dated October 1, 2008 between the parties, including, without limitation, all specifications, know-how, trade secrets, technical information, drawings, software, models, business information and patent applications pertaining to the Patent Rights and Technical Information, and as further provided in Section 10 hereof.

**1.3**    **"EMA"** shall mean the European Medicines Agency, or any successor agency thereof.

**1.4**    **"FDA"** shall mean the United States Food and Drug Administration, or any successor agency thereof.

**1.5**    **"Field of Use"** shall mean the treatment of muscular dystrophies arising from defects in the dystrophin gene or in the transcription or translation thereof, including without limitation Duchenne and Becker muscular dystrophies.

**1.6**    **"Improvements"** shall mean all unpatented, patentable and patented inventions, discoveries, designs, apparatuses, systems, machines, methods, processes, uses, devices, models, composition of matter, technical information, trade secrets, know-how, codes, programs or configurations of any kind that relate to (i) the use of antisense oligonucleotides or other compounds to induce exon-skipping and that have application in the Field of Use, or (ii) to compositions or methods useful in connection with subsection (i), in each case that are conceived by or on behalf of UWA and are owned or controlled by UWA after the Restatement Date.

**1.7**    **"Net Sales"** shall mean the total invoiced sales price and/or value of other consideration received for Products sold by Licensee, its Affiliates or sublicensees, less (a) sales taxes or other taxes, (b) actual shipping and insurance costs, (c) actual rebates, credits, or refunds for returned or defective Products, (d) trade discounts and quantity discounts or retroactive price reductions, (e) rebates, credits, and chargeback payments (or the equivalent thereof) actually granted to managed health care organizations, wholesalers, or to federal, state/provincial, local and other governments, including their agencies, purchasers, and/or reimbursers, or to trade customers, and (f) any import or export duties, tariffs, or similar charges incurred with respect to the import or export of Products into or out of any country in the Territory. Products will be considered "sold" when put into use, sold, leased or otherwise transferred and a "sale" shall be deemed to have occurred upon first use, shipment, invoicing or receipt of payment, whichever

SV\1023529.12

SRPT-VYDS-0154864

shall first occur. Notwithstanding the foregoing, Net Sales shall not include, and shall be deemed zero with respect to, (i) the actual distribution of reasonable quantities of promotional samples of Products, and (ii) Products provided for clinical trials or research purposes at cost or at no charge. Notwithstanding the foregoing, amounts invoiced by Licensee or its Affiliates, or their respective sublicensees, for the sale of Products among Licensee or its Affiliates or their respective sublicensees for resale shall not be included in the computation of Net Sales hereunder. Notwithstanding the foregoing, in the event that a Product is sold by Licensee, its Affiliates or sublicensees as part of a combination product or bundled product ("Combination Product"), the Net Sales of such Product, for the purposes of determining Royalty payments due under this Agreement, shall be determined by multiplying the Net Sales (as originally defined above) of the Combination Product by the fraction $A/(A+B)$, where A is the average sale price of the Product when sold separately in finished form in any country in which the Combination Product is sold and B is the average sale price of the other product(s) included in the Combination Product when sold separately in finished form, so that A+B is the average sale price of the Combination Product(s) together, in the country in which the Combination Product is sold, in each case during the applicable Royalty reporting period in which sales of both occurred, or, if sales of both the Product and the other product(s) did not occur in such period, then in the most recent Royalty reporting period in which sales of both occurred. In the event that such average sale price cannot be determined for both the Product and such other product(s) in the Combination Product, Net Sales for the purposes of determining Royalty payments with respect to such Combination Product shall be mutually agreed by the parties based on the relative value contributed by each component, such agreement not to be unreasonably withheld.

**1.8** **"Patent Rights"** shall mean, subject to Section 2.4, (i) those patent applications and patents listed in Schedule 1.8, (ii) all other patent applications and patents owned or controlled by UWA as of the Restatement Date that claim inventions relating to (A) the use of antisense oligonucleotides to induce exon-skipping and that have application in the Field of Use, or (B) to compositions or methods useful in connection with subsection (A), and (iii) all patents and/or patent applications (including provisional patent applications) existing as of the Restatement Date in any country corresponding to any of the foregoing, and all national phases, divisions, continuations, continuations-in-part, reissues, reexaminations, supplementary protection certificates and extensions thereof, whether domestic or foreign, and any patent that issues thereon. The Patent Rights listed in Schedule 1.8 are all owned by UWA.

**1.9** **"Phase II Trial"** shall mean a controlled clinical study conducted to evaluate the effectiveness of a Product for the treatment of muscular dystrophy, for example by testing muscle function or endurance, in patients having muscular dystrophy and to determine the common short-term side effects and risks.

**1.10** **"Phase III Trial"** shall mean, relative to a Phase II Trial, expanded controlled and uncontrolled trials after preliminary evidence suggesting effectiveness of the Product for treatment of muscular dystrophy has been obtained, and intended to gather additional information to evaluate the overall benefit-risk relationship of the Product and to provide an adequate basis for applying for Regulatory Approval for commercial sales of the Product.

**1.11** **"Product"** or **"Products"** shall mean any human therapeutics, diagnostics (including algorithms or any components thereof), bioinformatics and any other human health

SV\1023529.12

SRPT-VYDS-0154865

care products and/or services covered by the Patent Rights, including without limitation those products targeting the exons listed on Exhibit A.

**1.12** **"Regulatory Approval"** shall mean all approvals (including pricing and reimbursement approvals), licenses, registrations or authorizations by any regulatory authority, necessary for the manufacture and sale of a Product in a regulatory jurisdiction in the Territory.

**1.13** **"Technical Information"** shall mean know-how, trade secrets, unpublished patent applications, software, bioinformatics, unpatented technology, technical information, statistical information and analyses, biological materials, chemical reagents, preclinical and clinical information, and the like, in written, electronic or other form, now known or hereafter developed, whether or not patentable, in each case relating to (i) the use of antisense oligonucleotides to induce exon-skipping and that have application in the Field of Use, (ii) to compositions or methods useful in connection with subsection (i), or (iii) information disclosed in the Patent Rights, in each case that are conceived in whole or in part by or on behalf of UWA and are owned or controlled by UWA after the Restatement Date.

**1.14** **"Territory"** shall mean the entire world.

**1.15** **"Valid Claim"** shall mean a claim of an issued patent included within the Patent Rights, which claim has not (a) lapsed, been canceled or become abandoned, (b) been declared invalid or unenforceable by a non-appealable decision or judgment of a court or other appropriate body or authority of competent jurisdiction (other than with respect to any petition or writ of certiorari to the Supreme Court of the United States), or (c) been admitted to be invalid or unenforceable through reissue, disclaimer or otherwise.

## 2. LICENSE

**2.1** **Grant of Exclusive Rights.** Subject to the terms of this Agreement, UWA hereby grants to Licensee, and Licensee hereby accepts from UWA, the exclusive, worldwide license, with the right to grant sublicenses (subject to the terms of Section 2.3 hereof), during the term of this Agreement (as provided in Section 6.1 hereof) to conduct research in the Field of Use using the Patent Rights and the Technical Information and to develop, use, make, have made, practice, import, carry out, manufacture, have manufactured, offer for sale, sell and/or have sold Products in the Field of Use in the Territory using the Patent Rights and the Technical Information; provided that UWA retains the right under the Patent Rights and Technical Information to conduct noncommercial research (with any Improvements resulting from such noncommercial research by UWA being subject to Section 2.4 and other relevant provisions of this Agreement). For clarity, UWA retains all rights under the Patent Rights and the Technical Information outside of the Field of Use.

**2.2** **Diligence.**

(a) Subject to the terms of Section 4.5, Licensee shall use commercially reasonable efforts in pursuing the development, commercialization and marketing of Products. Without limiting the foregoing, Licensee shall be deemed to have exercised commercially reasonable efforts, the diligence requirements of this Section 2.2(a) shall be deemed to have been

SV\1023529.12

SRPT-VYDS-0154866

met, and UWA may not issue a Diligence Breach Notice pursuant to Section 2.2(b), if, on a Product-by-Product basis, Licensee, together with its Affiliates and sublicensees:

      **(1)**    is actively engaged in, or has plans to engage in, pre-clinical or clinical development efforts with respect to, or commercialization of, such Product in any country or jurisdiction within the Territory;

      **(2)**    as to the Product known as AVI-4658, meets the respective requirements set forth on Schedule 2.2, with each such requirement being deemed a separate and independent condition (each, a "Milestone"); provided that if patent infringement issues prevent Licensee from meeting any such Milestone, then the timing for such Milestone shall be tolled until such issues are resolved and the parties shall in good faith negotiate and agree on an appropriate modification to the timing of such Milestone, if necessary;

      **(3)**    as to the Product known as AVI-4658, fails to meet any Milestone designated in Schedule 2.2 hereto, but, after the parties meet to discuss the status of Licensee's development efforts, Licensee demonstrates that Licensee's efforts amounted to commercially reasonable efforts under the circumstances, in which case the parties shall in good faith negotiate and agree on an appropriate modification to the relevant Milestone(s); or

      **(4)**    as to the Product known as AVI-4658, fails to meet any Milestone designated in Schedule 2.2 hereto, and the proviso in subsection (2) does not apply, but Licensee, its Affiliates or Sublicensees initiate a ▮▮▮▮ trial of a different Product within ▮▮▮▮ after the date upon which Licensee, its Affiliate or Sublicensee failed to meet such Milestone, in which case the Milestones obligations designated in Schedule 2.2 hereto shall apply with respect to such different Product instead of AVI-4658 for the purposes of this Section 2.2; provided that if patent infringement issues prevent Licensee from meeting any such Milestone for such different Product, then the timing for such Milestone shall be tolled until such patent infringement issues are resolved or the parties in good faith negotiate and agree on an appropriate modification to the timing of such Milestone.

      **(b)**    Subject to the terms of Section 2.2(a), if UWA believes that Licensee has failed to meet its diligence obligations as set forth in Section 2.2(a), UWA may give Licensee written notice of the deficiency ("Diligence Breach Notice"). Licensee shall thereafter have one hundred and twenty (120) days to cure the deficiency. If Licensee fails to cure the deficiency within such one hundred and twenty (120) day period, UWA may terminate this Agreement with respect to the relevant Product upon written notice to Licensee, *provided, however,* that UWA may not terminate this Agreement with respect to any Product as to which Licensee is actively engaged in, or has plans to engage in, pre-clinical or clinical development efforts or commercialization in any country or jurisdiction within the Territory. Such right to terminate this Agreement as to a given Product shall be UWA's sole remedy for Licensee's breach of this Section 2.2.

    **2.3**    **Right to Sublicense or Assign Rights.** Licensee shall have the right to grant sublicenses consistent with this Agreement. Licensee shall keep UWA reasonably informed with respect to the progress of any relations entered into with any sublicensees. As an express condition of any such sublicense, any such sublicensee shall be required to agree in writing to be

SV\1 023529.12

SRPT-VYDS-0154867

bound by commercially reasonable royalty reporting and recordkeeping, indemnification and inspection provisions, and the applicable provisions of this Agreement, including, without limitation, those pertaining to the use of UWA's name and marks, indemnification of UWA and the use of UWA's Confidential Information. Licensee will be responsible for enforcing each sublicensee's obligations under its sublicense. Licensee understands and agrees that none of its sublicenses hereunder shall reduce in any manner any of its obligations set forth in this Agreement.

      **2.4**    **Future Rights.** UWA shall notify Licensee of any Improvements promptly after the identification or disclosure thereof. All patent applications and patents claiming such Improvements shall automatically be included in the Patent Rights and licensed to Licensee pursuant to Section 2.1.

      **2.5**    **Commercialization in Australia.** After Licensee has received Regulatory Approval in Australia with regard to a Product, Licensee shall use commercially reasonable efforts to commercialize such Product in Australia during the term of this Agreement, *provided, however,* that Licensee shall have no obligation to commercialize, or continue to commercialize, any Product in Australia under this Section 2.5 if (i) Licensee has a good faith belief that such commercialization would infringe or misappropriate any third party's intellectual property rights, or (ii) such Product does not qualify for reimbursement in Australia at a rate equal to or greater than the applicable rate established in the European Union for (1) such Product, or (2) a pharmaceutical product mutually agreed by the parties to be substantially similar to such Product with respect to reimbursement, if no reimbursement rate has been established in the European Union for such Product. If subsection (ii) applies, UWA may identify and propose to Licensee third parties who, notwithstanding such reimbursement situation, may desire to obtain a sublicense to develop and/or commercialize such Product in Australia. If UWA proposes any such potential sublicensees to Licensee, Licensee shall discuss in good faith the terms of such a sublicense with such third party for up to sixty (60) days.

## 3.    REPRESENTATIONS AND WARRANTIES

      **3.1**    **UWA.** UWA represents and warrants to Licensee that:

      **(a)**    UWA (i) is a body corporate established pursuant to the provisions of The University of Western Australia Act 1911, duly organized, validly existing and in good standing under the laws of Australia, (ii) has the corporate power and authority to enter into this Agreement and to perform its obligations hereunder, and (iii) has taken sufficient steps such that the execution and delivery of this Agreement by UWA and the performance by UWA of its obligations hereunder have been duly authorized by all necessary corporate action;

      **(b)**    to the best of UWA's knowledge, at the Restatement Date, there are no claims, judgments or settlements to be paid by UWA with respect to the Patent Rights or Technical Information or pending claims or litigation relating to the Patent Rights or Technical Information;

      **(c)**    with respect to the Patent Rights, UWA has been assigned all right, title and interest from the Inventors and UWA is listed as the sole owner of record in the records of

SV\1023529.12

SRPT-VYDS-0154868

the United States Patent and Trademark Office and any foreign patent offices with respect to Patent Rights that consist of applications or registrations with such offices,

     **(d)**    UWA has the right to grant the rights granted to Licensee hereunder and to perform UWA's obligations hereunder, in each case without the consent or approval of any third party;

     **(e)**    UWA has not granted, and will not grant, licenses to the Patent Rights, Technical Information or Improvements to any third party that would conflict with or otherwise compromise the rights granted to Licensee hereunder;

     **(f)**    the Patent Rights have been duly prepared, filed, prosecuted, obtained, and maintained in accordance with all applicable laws, rules, and regulations;

     **(g)**    to the best of UWA's knowledge, and except as specified on Schedule 3.1, no third party's intellectual property rights would be infringed or misappropriated by the practice of the Patent Rights in general and no third party is infringing or misappropriating the Patent Rights;

     **(h)**    UWA does not own or control any patents or patent applications other than the Patent Rights that currently, or when issued, would be infringed by the making, using, offering for sale, selling, or importing of any product or process covered by a claim within the Patent Rights;

     **(i)**    this Agreement constitutes the legal, valid and binding obligation of UWA, enforceable against UWA in accordance with its terms, subject only to (i) applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforceability of creditors' rights generally, (ii) the limitation that the remedy of specific performance or injunctive relief is subject to the discretion of the court or arbitrator before which any proceeding therefor may be brought, and (iii) general legal and equitable principles of good faith, fair dealing and equity; and

     **(j)**    to the best of UWA's knowledge, neither the execution or delivery of this Agreement by UWA, nor the performance by UWA of its obligations hereunder, (i) requires the consent or approval of any third party; (ii) shall constitute a default under any material contract by which UWA or any of its material assets is bound (or any event which, with notice or lapse of time, or both, would constitute such a default); or (iii) shall constitute a violation of any judgment, order or decree of any court, arbitrator, governmental agency or authority binding upon UWA.

For the avoidance of doubt:
- UWA does not warrant or represent that the Patent Rights, Technical Information or Improvements or any part thereof are or will be valid under this Agreement.
- UWA makes no warranties or representations regarding any scientific information, including without limitation as to the accuracy or completeness thereof, provided in respect of this Agreement.

Page 7 of 21

SV\1023529.12

SRPT-VYDS-0154869

- UWA does not warrant the applicability, utility or usability of the Patent Rights, the Technical Information or Improvements in respect of the Products and disclaims any and all liability in respect of the application of the Patent Rights, the Technical Information or Improvements.

**3.2    Licensee.**  Licensee represents and warrants to UWA that:

**(a)**    Sarepta is a corporation duly organized, validly existing and in good standing under the laws of the State of Oregon, and Sarepta Netherlands is a corporation duly organized, validly existing and in good standing under the laws of the Netherlands, and each of Sarepta and Sarepta Netherlands has the corporate power and authority to enter into this Agreement and to perform its obligations hereunder;

**(b)**    the execution and delivery of this Agreement by Licensee and the performance by Licensee of its obligations hereunder have been duly authorized by all necessary corporate action;

**(c)**    this Agreement constitutes the legal, valid and binding obligation of Licensee, enforceable against Licensee in accordance with its terms, subject only to (i) applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforceability of creditors' rights generally, (ii) the limitation that the remedy of specific performance or injunctive relief is subject to the discretion of the court or arbitrator before which any proceeding therefor may be brought, and (iii) general legal and equitable principles of good faith, fair dealing and equity; and

**(d)**    neither the execution or delivery of this Agreement by Licensee, nor the performance by Licensee of its obligations hereunder, (i) requires the consent or approval of any third party; (ii) shall constitute a default under any material contract by which Licensee or any of its material assets is bound (or any event which, with notice or lapse of time, or both, would constitute such a default); or (iii) shall constitute a violation of any judgment, order or decree of any court, arbitrator, governmental agency or authority binding upon Licensee.

**4.    CONSIDERATION**

In consideration of the execution and delivery by UWA of this Agreement and the rights and licenses granted to Licensee hereunder, Licensee agrees as follows:

**4.1    License Fees.**

**(a)**    Within thirty (30) days of the Restatement Date, Licensee shall pay to UWA a one-time, upfront license fee in an amount equal to ▮▮▮▮▮▮▮ U.S. Dollars (USD ▮▮▮▮▮▮);

**(b)**    Within thirty (30) days of the Restatement Date, Licensee shall pay to UWA a one-time fee for patent filing costs in an amount equal to ▮▮▮▮▮▮▮▮▮▮ U.S. Dollars (USD ▮▮▮▮▮); and

**(c)**    Within ninety (90) days of each of the second, third and fourth

SV\1023529.12

SRPT-VYDS-0154870

anniversaries of the Restatement Date, Licensee shall pay to UWA a license maintenance fee in an amount equal to ████████ U.S. Dollars (USD██).

     **4.2    Payment of Royalties.**

        **(a)**     Licensee shall pay to UWA on a Product-by-Product and a country-by-country basis, royalty fees (each, a "Royalty" and collectively, the "Royalties") equal to █% of aggregate Net Sales of all Products by Licensee, its Affiliates or sublicensees.

        **(b)**     Royalties shall accrue and be payable by Licensee on a quarterly basis within forty-five (45) days following the end of each calendar quarter in which any Products generating Net Sales were sold. Each payment of Royalties shall be accompanied by a statement setting forth in reasonable detail the number and each type of Product sold and the Net Sales applicable thereto in the applicable calendar quarter. The Products shall be considered as being sold for the purpose of the calculation of Royalties under this Agreement when the payments for such Products have been received by Licensee. Except as otherwise provided in Section 4.6, all Royalties shall be paid in United States Dollars.

        **(c)**     Licensee shall create and maintain complete and accurate records and documentation concerning all Net Sales of Products in sufficient detail to enable the Royalties payable hereunder to be determined. Licensee shall retain such records and documentation for not less than three (3) years from the date of their creation. During the term of this Agreement and for a period of one (1) year thereafter, UWA and its representatives shall have the right to audit such records and documentation as shall pertain to the determination and payment of Royalties no more than once in any calendar year. Such examiners shall have reasonable access during regular business hours to Licensee's offices and the relevant records, files and books of account, and shall have the right to examine any other records reasonably necessary to determine the accuracy of the Royalty calculations provided by Licensee. The costs of any such audit shall be borne by UWA, unless as a result of such inspection it is determined that the amounts payable by Licensee for any period are in error by greater than five percent (5%), in which case the costs of such audit shall be borne by Licensee. UWA shall report the results of any such audit to Licensee within forty-five (45) days of completion. Thereafter, Licensee shall promptly pay to UWA the amount of any underpayment discovered in such audit, or UWA shall credit to Licensee against future Royalty payments the amount of any overpayment discovered in such audit, as the case may be. In addition, Licensee shall pay interest on any underpayment at the rate that is the lower of (i) two percent (2%) over the rate of interest announced by Bank of America in Massachusetts (or any successor in interest thereto or any commercially equivalent financial institution if no such successor exists) to be its "prime rate," or (ii) the highest rate permitted by applicable law, in each of cases (i) and (ii) from the date such amount was underpaid to the date payment is actually received.

     **4.3    Royalty Purchase.**

        **(a)**     Licensee may, at its sole option, choose to terminate its obligation to pay Royalties to UWA under Section 4.2 by providing written notice thereof to UWA at any time after the first Regulatory Approval of any Product in the Territory, but prior to April 1, ████, (the "Royalty Purchase Notice") and agreeing to pay to UWA (i) a one-time payment of ████

SV\1023529.12

█████ U.S. Dollars (USD █████) (the "Royalty Purchase Upfront Payment"), (ii) a one-time payment of █████ U.S. Dollars (USD █████) the first time that aggregate Net Sales of all Products in the Territory exceed █████ U.S. Dollars (USD █████) in any calendar year prior to January 1, ███ and (iii) a one-time payment of █████ U.S. Dollars (USD █████) the first time aggregate Net Sales of all Products in the Territory exceed █████ U.S. Dollars (USD █████) in any calendar year prior to January 1, ███ ((ii) and (iii) each, a "Royalty Purchase Milestone Payment," and collectively with the Royalty Purchase Upfront Payment, the "Royalty Purchase Payment"), pursuant to the terms of this Section 4.3 (the "Royalty Purchase"). For clarity, if the Royalty Purchase becomes effective, if aggregate Net Sales of all Products in the Territory exceed █████ U.S. Dollars (USD █████) for the first time in the same year that aggregate Net Sales of all Products in the Territory exceed █████ U.S. Dollars (USD █████) for the first time, then both Royalty Purchase Milestone Payments shall be triggered and Licensee shall pay to UWA █████ U.S. Dollars (USD █████). For clarity, in no event shall Licensee be obligated to pay to UWA pursuant to this Section 4.3 more than a total of █████ U.S. Dollars (USD █████), if Licensee provides a Royalty Purchase Notice and each of the milestones set forth in subsections (ii) and (iii) are achieved.

(b)     During the period beginning on the date upon which UWA receives the Royalty Purchase Notice and ending █████ thereafter, unless such period is earlier terminated by written notice from UWA to Licensee (the "Royalty Purchase Period"), UWA may solicit offers to assign to a third party ███ its right, █████, to receive Royalties from Licensee under Section 4.2 (the "Royalty Rights"). If, during the Royalty Purchase Period, █████ offer to UWA compensation in exchange for the Royalty Rights █████ (each, a "Competing Bid"), UWA shall notify Licensee, in writing, of the █████ Competing Bid received during the Royalty Purchase Period (the "Leading Bid") █████ after receiving such Leading Bid. During the █████ period beginning upon Licensee's receipt of such notification of a Leading Bid (the "Decision Period"), Licensee may provide written notice to UWA that it agrees to the Royalty Purchase on the terms of the Leading Bid instead of the Royalty Purchase Payment under Section 4.3(a) ("Match Notice"). If Licensee does not provide a Match Notice to UWA during the Decision Period, UWA may assign the Royalty Rights to the third party that made the Leading Bid on the terms of the Leading Bid, in which case Licensee shall have no further right to exercise the Royalty Purchase under Section 4.3(a) █████

█████████████████████████████
█████████████████████████████
█████████████████████████████
█████████████████████████████
█████. If no Leading Bid is received during the Royalty Purchase Period, UWA may not assign the Royalty Rights to any third party. Licensee may not exercise the Royalty Purchase and shall have no obligation to pay to UWA any portion of the Royalty Purchase Payment during the Royalty Purchase Period.

(c)     █████████████████, if UWA has not exercised its right to assign the Royalty Rights to a third party under Section 4.3(b), Licensee may exercise the Royalty Purchase at any time by

Page 10 of 21

providing written notice thereof to UWA and (i) by making any payments necessary pursuant to the terms of the Leading Bid specified in the latest Match Notice, or (ii) if no Match Notice was provided by Licensee to UWA, by paying the Royalty Purchase Upfront Payment within ████ days after UWA's receipt of Licensee's notice exercising the Royalty Purchase, and each Royalty Purchase Milestone Payment within ████████ days after December 31 of the year for which such Royalty Purchase Milestone Payment was earned.

(d)    If the Royalty Purchase becomes effective, Licensee shall have no further obligation under Section 4.2 to pay to UWA any Royalty on sales of any Product that occur after the date on which UWA received the Royalty Purchase Notice. To the extent any Royalties have been paid by Licensee to UWA pursuant to Section 4.2 for sales of Product after UWA's receipt of the Royalty Purchase Notice, such Royalties shall be fully credited toward any payment made by Licensee to UWA pursuant to Section 4.3(c). Notwithstanding anything in this Section 4.3 to the contrary, Licensee's obligations under Section 4.4 shall remain in effect even in the event the Royalty Purchase becomes effective.

**4.4    Milestone Fees.**

(a)    Licensee shall pay to UWA the following fees (each, a "Milestone Fee"), which shall be determined and paid within ninety (90) days after the occurrence of each of the following corresponding events (each, a "Milestone Event"):

(i)    With respect to the Product known as of the Restatement Date as eteplirsen ("Eteplirsen"), ████████ U.S. Dollars (USD ████████) upon first commercial sale in any country or jurisdiction within the Territory.

(ii)    With respect to Products other than Eteplirsen, each of the following Milestone Fees shall be paid, if ever, for each such Product that achieves the corresponding Milestone Event; *provided, however,* that no such Milestone Fee shall be paid by Licensee more than ████ times, regardless of the number of Products that achieve the corresponding Milestone Event:

(1)    ████████████ U.S.  Dollars (USD ████) upon initiation of a Phase II Trial of a Product;

(2)    ████████████ U.S.  Dollars (USD ████) upon initiation of a Phase III Trial of a Product;

(3)    ████████████ U.S. Dollars (USD ████) upon Regulatory Approval of a Product by the first of the FDA or the EMA.

(b)    If any Milestone Event is achieved with respect to a given Product, all previously listed Milestone Events, if not already achieved for such Product, shall be considered to be simultaneously achieved and Licensee shall pay to UWA the aggregate Milestone Fees associated with all such Milestone Events. As an example, and solely for clarity, if no Phase II Trial is required or initiated for a particular Product, Licensee shall pay to UWA an aggregate of ████████████ U.S. Dollars (USD ████) within ninety (90) days after initiation of a Phase III Trial for such Product. Additionally, for clarity, in no event shall Licensee be obligated

Page 11 of 21

SV\1023529.12

SRPT-VYDS-0154873

to pay to UWA more than ▮▮▮ U.S. Dollars (USD ▮▮▮) pursuant to this Section 4.4.

    **(c)**    Notwithstanding anything to the contrary in this Section 4.4, if a Valid Claim specifically covering a Product has not issued in the United States or European Union at the time a Milestone Event for such Product is achieved, Licensee shall only be obligated to pay to UWA ▮▮ percent (▮%) of the corresponding Milestone Fee until such time, if any, that such Valid Claim is granted in the United States or European Union.

    **4.5**    **Infringement.**  In the event that Licensee is prevented from developing, manufacturing or commercializing one or more Products in a particular jurisdiction in the Territory as a result of patent infringement issues, all of Licensee's obligations with respect to such Products in such jurisdiction, including, without limitation, Royalty and other obligations, shall be suspended unless and until such patent infringement issues are resolved. In the event that any such issues are not resolved during the term of the Agreement, or in the event that such issues are resolved in a manner that would continue to prevent Licensee from developing, manufacturing or commercializing such Products, then Licensee shall have no further obligations hereunder with respect to such Products.

    **4.6**    **Currency Transfer Restrictions.**  If any restrictions on the transfer of currency exist in any country or other jurisdiction so as to prevent Licensee from making payments to UWA, Licensee shall take all commercially reasonable steps to obtain a waiver of such restrictions or to otherwise enable Licensee to make such payments. If Licensee is unable to do so, Licensee shall make such payments to UWA in a bank account or other depository designated by UWA in such country or jurisdiction, which payments shall be in the local currency of such country or jurisdiction, unless payment in United States Dollars is permitted. Any payment by Licensee to UWA in currencies other than United States Dollars shall be calculated using the appropriate foreign exchange rate for such currency quoted in the *Wall Street Journal* for the close of business of the last banking day prior to the date on which such payment is being made.

    **4.7**    **Fair Market Value.**  UWA acknowledges and agrees that the Royalties, Milestone Fees and other obligations of Licensee under this Agreement constitute fair market value for the rights granted to Licensee under this Agreement based on arms'-length negotiations with Licensee.

    **4.8**    **Withholding Tax.**  Licensee shall make all payments to UWA under this Agreement without deduction or withholding for taxes except to the extent that any such deduction or withholding is required by applicable law in effect at the time of payment. Any tax required to be withheld on amounts payable under this Agreement shall promptly be paid by Licensee on behalf of UWA to the appropriate governmental authority, and Licensee shall furnish UWA with proof of payment of such tax. Any such tax required to be withheld will be borne by Licensee. Each party will cooperate with respect to all documentation required by any taxing authority or reasonably requested by Licensee to secure a reduction in the rate of applicable withholding taxes.

SV\1023529.12

SRPT-VYDS-0154874

## 5.    PATENT RIGHTS

**5.1    Prosecution of Existing Patent Rights.** Licensee shall assume full responsibility for the application, maintenance, reexamination, reissue, opposition and prosecution of any kind (collectively "Prosecution") relating to the Patent Rights in the Territory, including without limitation those Patent Rights claiming Improvements, including, but not limited to, payment of all costs, fees and expenses related thereto. Licensee shall provide UWA with copies of any and all material or communications with the United States Patent and Trademark Office or any foreign patent office.   In the event that Licensee elects to abandon the Prosecution or maintenance of any patent or patent application included in such Patent Rights, Licensee shall notify UWA of such election at least thirty (30) days before a final due date which would result in abandonment or bar of patentability of the patent or patent application and, in such event, UWA may, at its sole option and expense, continue Prosecution or maintenance of the Patent Rights.

**5.2    Expenses.** Licensee shall pay all expenses resulting from its obligations in Section 5.1 hereof. UWA shall exercise reasonable efforts to cause the Inventors to cooperate fully with Licensee with respect to the Prosecution, maintenance and protection of the Patent Rights, including without limitation any patents or patent applications covering the Improvements.

## 6.    TERM AND TERMINATION

**6.1    Term.** Unless earlier terminated as provided in Section 6.2 hereof, the term of this Agreement shall commence on the Effective Date and shall expire, on a country-by-country basis, on the date upon which the last to expire Valid Claim of the Patent Rights shall expire in such country.

**6.2    Termination.** Except as provided by Section 6.3 hereof, this Agreement shall terminate, in its entirety or on a Product-by-Product basis (as provided in this Section 6.2) upon the earliest to occur of the following:

**(a)**    Subject to the terms of Section 2.2 and Section 4.5, upon sixty (60) days' written notice from UWA if, within such sixty (60) day period, Licensee shall fail to cure fully any breach or default of any material obligation under this Agreement with respect to a given Product or Products, as described in such written notice detailing the facts of such breach with reasonable specificity; *provided, however,* that Licensee may avoid such termination if, before the end of such sixty (60) day period, such breach or default has been cured by Licensee to the reasonable satisfaction of UWA;

**(b)**    Upon sixty (60) days' written notice from Licensee if, within such sixty (60) day period, UWA shall fail to cure fully any breach or default of any material obligation under this Agreement as described in such written notice detailing the facts of such breach with reasonable specificity; *provided, however,* that UWA may avoid such termination if, before the end of such sixty (60) day period, such breach or default has been cured by UWA to the reasonable satisfaction of Licensee;

**(c)**    Upon the mutual written agreement of the parties hereto (such termination

Page 13 of 21

SV\1023529.12

SRPT-VYDS-0154875

to be effective as of the date mutually agreed upon in such written agreement);

(d)    Immediately upon Licensee passing a resolution for winding-up (otherwise than for the purposes of a solvent amalgamation or reconstruction where the resulting entity is at least as credit-worthy as the Licensee and assumes all of the obligations of the Licensee under this Agreement) or a court shall make an order to that effect; or if a liquidator, receiver, administrator, administrative receiver, manager, trustee, or similar officer is appointed over any of the assets of the Licensee; or

(e)    Immediately by Licensee, in its sole discretion, upon notice to UWA that Licensee is no longer desirous of commercializing a given Product or Products. For clarity, if Licensee terminates this Agreement pursuant to this Section 6.2(e) as to a given Product, Licensee's license under Section 2.1 and its other rights under this Agreement shall terminate solely with respect to such Product, but Licensee's license under Section 2.1 and its other rights under this Agreement shall continue in full force and effect thereafter with respect to all other Products.

**6.3    Obligations Upon Termination.**    Upon any termination of this Agreement pursuant to Sections 2.2 or 6.2 hereof, nothing herein shall be construed to release any party from any liability for any obligation incurred through the effective date of termination or for any breach of this Agreement prior to the effective date of such termination. Licensee may, for a period of one (1) year after the effective date of such termination, sell all tangible Products customarily classified as "inventory" that it has on hand at the date of termination, subject to payment by Licensee to UWA of the applicable Royalty under Sections 4.2 and 4.3 hereof.

**6.4    Effect of Termination.**    In the event of any termination of this Agreement pursuant to Sections 2.2 or 6.2 hereof, where such termination has not been caused by any action or inaction on the part of any sublicensee of Licensee or by any breach by such sublicensee of its obligations under its sublicense from Licensee, such termination of this Agreement shall be without prejudice to the rights of each non-breaching sublicensee of Licensee and each non-breaching sublicensee shall be deemed to be a licensee of UWA thereunder, and UWA shall be entitled to all rights, but shall not be subject to any obligations (other than the grant of license and appurtenant obligations under this Agreement to the extent provided for in such sublicense) of Licensee thereunder.

**6.5    Right to Institute Legal Actions.**    Notwithstanding the provisions of Section 6.2 hereof, UWA, on the one hand, and Licensee, on the other hand, may institute any other legal action or pursue any other remedy against the other party permitted by applicable law if the other party does not substantially cure any breach or default of any material obligation as provided herein.

**6.6    Reversion of Rights.**    Notwithstanding anything to the contrary set forth herein (including, but not limited to, Section 5 hereof), full responsibility for Prosecution of the Patent Rights shall, at the option of UWA and at its sole expense from the date of reversion, revert to UWA upon any termination of this Agreement. Upon any termination of this Agreement, Licensee shall have no further obligation to Prosecute the Patent Rights under Section 5.1 and shall not be responsible for any expenses relating to Prosecution of Patent Rights incurred after

SV\1023529.12

SRPT-VYDS-0154876

the effective date of such termination.

## 7.   INFRINGEMENT AND PROSECUTION BY THIRD PARTIES

**7.1   Enforcement.**  Licensee shall have the first right, but not the obligation, to enforce, at its sole expense, any Patent Rights to the extent licensed hereunder against infringement by third parties and shall notify UWA in writing in advance of all such enforcement efforts.  Upon Licensee's undertaking to pay all expenditures reasonably incurred by UWA, UWA shall reasonably cooperate in any such enforcement and, as necessary, join as a party therein.  Licensee shall reimburse UWA for all expenses, including reasonable attorneys' fees, incurred in connection with any such enforcement.  In the event that Licensee does not file suit against or commence and conclude settlement negotiations with a substantial infringer of Patent Rights within ninety (90) days of receipt of a written demand from UWA that Licensee bring suit, then the parties will consult with one another in an effort to determine whether a reasonably prudent licensee would institute litigation to enforce the patent in question in light of all relevant business and economic factors (including, but not limited to, the projected cost of such litigation, the likelihood of success on the merits, the probable amount of any damage award, the prospects for satisfaction of any judgment against the alleged infringer, the possibility of counterclaims against the parties hereto, the impact of any possible adverse outcome on Licensee and the effect any publicity might have on the parties' respective reputations and goodwill).  If, after such process, it is determined that a suit should be filed and Licensee does not file suit or commence settlement negotiations forthwith against the infringer, then UWA shall have the right, at its own expense, to enforce any Patent Rights licensed hereunder on behalf of itself and Licensee.  Any amount recovered in any such action or suit, whether by judgment or settlement, shall be paid to or retained entirely by whichever party brought the action, or where both parties participate in such action or suit, all such amounts shall be allocated to each party in the ratio of expenses incurred, after first paying each party's out-of-pocket expenses, including reasonable attorneys' fees.

**7.2   Defense of Patent Rights.**  In the event that any Patent Rights are the subject of a legal action seeking declaratory relief or of any reexamination or opposition proceeding instituted by a third party, then Licensee shall have the first right to conduct such defense, bear the expenses, including attorneys' fees, associated with such defense and shall receive, in its entirety, any recoupment of expenses.  UWA shall assist and cooperate with Licensee in such proceedings and shall exercise reasonable efforts to cause the Inventors to assist and cooperate fully.  During the term of this Agreement, UWA shall maintain and make available to Licensee laboratory notebooks relating to the inventions claimed in the Patent Rights.

**7.3   Third Party Patent Rights.**  If Licensee reasonably determines that any Product infringes upon the rights of a third party because of the use of the Patent Rights, Technical Information or Improvements in the manufacture, use or sale of such Product, and, as a result, Licensee elects to oppose, seek reexamination of, pursue declaratory relief with respect to and/or undertake other legal action with respect to such third party's patent(s) or patent application(s) before a patent office and/or the courts of any jurisdiction in the Territory (collectively "Opposition"), then UWA shall assist and cooperate with Licensee in any such Opposition.  UWA shall exercise reasonable efforts to cause the Inventors to cooperate fully with Licensee at Licensee's expense with respect to any Opposition.

SV\1023529.12

SRPT-VYDS-0154877

## 8.    INDEMNIFICATION

**8.1    Indemnification by Licensee.**  UWA shall not be liable for any loss or damage sustained by Licensee or any other person directly or indirectly from or in connection with Licensee's use, licence or commercialisation of any part of the Products, Patent Rights, Improvements or Technical Information, except to the extent that such loss or damages results from the negligence or willful acts or omissions of UWA.  Subject to Section 8.2 hereof, Licensee hereby releases and indemnifies UWA, its officers, employees and agents from and against all actions, claims, proceedings and demands whatsoever, including through contract and tort which may be made or brought by any person, body or authority against it or them or any of them in respect of any loss, injury or damage including death and consequential loss ("Losses") arising out of Licensees' use of the Products, Patent Rights, Improvements or Technical Information, except to the extent that such Losses result from the negligence, or willful acts or omissions of UWA.

**8.2    Indemnification by UWA.**  Subject to Section 8.3 hereof, UWA shall hold harmless, defend and indemnify Licensee and each of its officers, directors, employees and agents from and against any and all claims, damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees and expenses and costs of investigation, whether or not suit is filed) suffered or incurred in connection with any negligence, willful acts or omissions or breach on the part of UWA directly resulting from the assignment or reassignment of the Patent Rights between UWA and GSK.

**8.3    Notice of Claim.**  UWA shall promptly notify Licensee in writing of any claim, action or material threat thereof brought against UWA in respect of which indemnification may be sought hereunder, and, to the extent allowed by law, shall reasonably cooperate with Licensee in defending or settling any such claim or action.  No settlement of any claim, action or threat thereof received by UWA and for which UWA intends to seek indemnification (for itself or on behalf of any other party) shall be made without the prior joint written approval of UWA and Licensee.

## 9.    USE OF NAMES

Neither party shall, unless as required by any law or governmental regulation, use the name of the other party and/or any of its trademarks, service marks, trade names or fictitious business names without express prior written consent of the other party.

## 10.    CONFIDENTIALITY

**10.1    Non-Disclosure.**  The parties hereto shall keep the terms of this Agreement and all business and scientific discussions relating to the business of the parties strictly confidential. It may, from time to time, be necessary for the parties, in connection with performance under this Agreement, to disclose Confidential Information (including know-how) to each other.  The Receiving Party (as defined in Section 1.2 hereof) shall keep in strictest confidence the Confidential Information of the Disclosing Party (as defined in Section 1.2 hereof), using the standard of care it normally uses for information of like character, but in no case less than a reasonable standard of care, and shall not disclose the Confidential Information to any third party

SV\1023529.12

SRPT-VYDS-0154878

or use it except as expressly authorized by the prior written consent of the Disclosing Party or as otherwise permitted by this Agreement; *provided, however,* that Licensee may disclose the Confidential Information received from UWA to its Affiliates and sublicensees as shall be reasonably necessary to carry out the intent of this Agreement or any sublicense granted by Licensee as contemplated by this Agreement if, but only if, such Affiliates and/or sublicensees each execute a confidentiality agreement containing confidentiality provisions no less restrictive than those confidentiality provisions contained in this Section 10. The Receiving Party's obligation hereunder shall not apply to Confidential Information that the Receiving Party can show:

    **(a)**    Is or later becomes part of the public domain through no fault or neglect of the Receiving Party;

    **(b)**    Is received in good faith from a third party having no obligations of confidentiality to the Disclosing Party, *provided, however,* that the Receiving Party complies with any restrictions imposed by the third party;

    **(c)**    Is independently developed by the Receiving Party without use of the Disclosing Party's Confidential Information; or

    **(d)**    Is required to be disclosed by law or regulation (including, without limitation, in connection with FDA filings, SEC filings or filings with another government agency) or by the rules of a securities exchange, *provided, however,* that the Receiving Party uses reasonable efforts to restrict disclosure and to obtain confidential treatment.

    **10.2**    **Limits on Permitted Disclosures.** Each party agrees that any disclosure or distribution of the other party's Confidential Information within its own organization shall be made only as is reasonably necessary to carry out the intent of this Agreement. The parties further agree that all of their respective officers, employees, agents, representatives or sublicensees to whom any Confidential Information is disclosed or distributed shall be subject to written confidentiality and non-use obligations no less restrictive than the confidentiality and non-use obligations provided for in this Section 10.

    **10.3**    **Legally Required Disclosures.** If a subpoena or other legal process concerning Confidential Information is served upon any party hereto pertaining to the subject matter hereof, the party served shall notify the other party immediately, the other party shall cooperate with the party served, at the other party's expense, in any effort to contest the validity of such subpoena or other legal process. This Section 10.3 shall not be construed in any way to limit any party's ability to satisfy any disclosure of its relationship with the other party required by any governmental authority or rules of a securities exchange.

    **10.4**    **Return of Confidential Information.** In the event of any termination of this Agreement, the Receiving Party shall, upon the Disclosing Party's request, promptly return all Confidential Information and any copies made thereof previously made available to the Receiving Party by the Disclosing Party, *provided, however,* that counsel of each party may retain one (1) copy of such Confidential Information to ensure compliance with this Section 10.

    **10.5**    **Remedies.** Both parties acknowledge and agree that it would be difficult to

SV\1023529.12

SRPT-VYDS-0154879

measure damages for breach by either party of the covenants set forth in this Section 10, and that injury from any such breach would be incalculable, and that money damages would therefore be an inadequate remedy for any such breach. Accordingly, each party shall be entitled, in addition to all other remedies available hereunder or under law or equity, to injunctive or such other equitable relief as a court may deem appropriate to restrain or remedy any breach of such covenants.

**10.6    Confidentiality Period.** The obligations of confidentiality and non-use set forth in this Section 10 shall apply during the term of this Agreement and for a period of five (5) years thereafter. Notwithstanding the foregoing, any Confidential Information that is expressly labeled or noted by Licensee as a trade secret shall not be subject to such five (5) year term, but shall continue to be subject to the obligations of confidentiality and non-use set forth in this Section 10 for as long as such trade secret remains confidential.

**10.7    Publicity.** Notwithstanding anything to the contrary set forth herein, UWA agrees that Licensee shall have the right to issue one or more press releases announcing the execution of this Agreement and the terms hereof, the contents of which press releases shall be in Licensee's sole discretion; provided that where practicable, Licensee shall provide to UWA a reasonable opportunity to review such press releases to allow UWA to confirm their factual accuracy. UWA shall not disclose the terms of this Agreement without the prior written consent of Licensee, *provided, however,* that UWA shall not require Licensee's consent to disclose subsequently any terms of this Agreement that have already been disclosed in accordance with this Section 10.7. Furthermore, UWA shall have the right to issue a press release in Australia stating that UWA has granted a license to Licensee, which press release shall be subject to Licensee's prior written consent. Neither party may reference the other party in any other public announcements or press releases without the prior written approval of the other party, except such as may be required by law .

## 11.    MISCELLANEOUS

**11.1    Notices.** Any notice, request, instruction or other document required by this Agreement shall be in writing and shall be deemed to have been given (a) if mailed with the United States Postal Service by prepaid, first class, certified mail, return receipt requested, at the time of receipt by the intended recipient, (b) if sent by Federal Express®, Airborne®, or other overnight carrier, signature of delivery required, at the time of receipt by the intended recipient, (c) if sent by electronic mail and no delivery failure notification has been received, one (1) business day after sending, or (d) if sent by facsimile transmission, when so sent and when receipt has been acknowledged by appropriate telephone or facsimile receipt, addressed as follows:

In the case of UWA to:

The University of Western Australia
35 Stirling Highway
Crawley, WA 6009
Attention: Director, Office of Industry and Innovation
Fax: +61 8 6488 2333

Page 18 of 21

SV\1023529.12

SRPT-VYDS-0154880

or in the case of Licensee to:

Sarepta Therapeutics
245 First Street Suite 1800 Cambridge,
MA 02142 USA
Attention: Chris Garabedian, Chief Executive Officer
Fax:

with a copy to:

Latham & Watkins
140 Scott Drive
Menlo Park, CA 94025
Attention: Judith Hasko
Facsimile: (650) 463-2600

or to such other address or to such other person(s) as may be given from time to time under the terms of this Section 11.1.

**11.2    Governing Law.**  This Agreement shall be construed and enforced in accordance with the laws of the United States of America and of the State of Massachusetts, irrespective of choice of laws provisions. The parties agree that Boston, Massachusetts shall be the situs of any legal proceeding arising out of or relating to this Agreement.

**11.3    Waiver.**  Failure of any party to enforce a right under this Agreement shall not act as a waiver of that right or the ability to assert that right relative to the particular situation involved.

**11.4    Enforceability.**  If any provision of this Agreement shall be found by a court of competent jurisdiction to be void, invalid or unenforceable, the same shall be reformed to comply with applicable law or stricken if not so conformable, so as not to affect the validity or enforceability of the remainder of this Agreement.

**11.5    Modification.**  No change, modification, or addition or amendment to this Agreement, or waiver of any term or condition of this Agreement, is valid or enforceable unless in writing and signed and dated by the authorized officers of the parties to this Agreement.

**11.6    Entire Agreement.**  This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and replaces and supersedes as of the Restatement Date any and all prior agreements and understandings, whether oral or written, between the parties with respect to the subject matter of such agreements, including without limitation the Prior License Agreement and the Mutual Confidentiality Agreement dated October 1, 2008 between the parties.

**11.7    Successors.**  Except as otherwise expressly provided in this Agreement, this

SV\1023529.12

SRPT-VYDS-0154881

Agreement shall be binding upon, inures to the benefit of, and is enforceable by, the parties and their respective heirs, legal representatives, successors and permitted assigns.

**11.8    Construction.**  This Agreement has been prepared, examined, negotiated and revised by each party and their respective attorneys, and no implication shall be drawn and no provision shall be construed against any party to this Agreement by virtue of the purported identity of the drafter of this Agreement or any portion thereof.

**11.9    Counterparts.**  This Agreement may be executed simultaneously in one or more counterparts, each of which shall constitute one and the same instrument.  This Agreement may be executed by facsimile or electronic mail.

**11.10  Attorneys' Fees.**  In the event of any action at law or in equity between the parties hereto to enforce any of the provisions hereof, the unsuccessful party to such litigation shall pay to the successful party all reasonable costs and expenses, including reasonable attorneys' fees, incurred therein by such successful party; and if such successful party shall recover a judgment in any such action or proceeding, such reasonable costs, expenses and attorneys' fees may be included in and as part of such judgment.

**11.11  Assignment.**  This Agreement may not be assigned by either party without the prior written consent of the other party, and any such attempted assignment shall be void and of no effect, except that either party may assign this Agreement to any successor in connection with the merger, consolidation or sale of all or substantially all of its assets or that portion of its business to which this Agreement relates.

**11.12  Further Assurances.**  At any time and from time to time after the Restatement Date, each party shall do, execute, acknowledge and deliver, and cause to be done, executed, acknowledged or delivered, all such further acts, transfers, conveyances, assignments or assurances as may be reasonably required to consummate the transactions contemplated by this Agreement.

**11.13  Survival.**  The terms and conditions of the following provisions will survive termination or expiration of this Agreement for as long as necessary to permit their full discharge: Section 1 ("Definitions"), Section 6 ("Term and Termination") (except Sections 6.1 and 6.2), Section 8 ("Indemnification"), Section 9 ("Use of Names"), Section 10 ("Confidentiality") and Section 11 ("Miscellaneous").  The provisions set forth in Section 4 ("Consideration") also shall survive any expiration or earlier termination of this Agreement, to the extent payments thereunder are accrued but remain unpaid upon the effective date of such expiration or termination and as set forth in Section 4.2(c).  Except as otherwise provided in this Section 11.13, all other provisions of this Agreement shall terminate upon the expiration or termination of this Agreement,

**11.14  Joint and Several Liability.**  Each of Sarepta and Sarepta Netherlands shall be jointly and severally liable for Licensee's performance under this Agreement. .

*[Signature page follows.]*

Page 20 of 21

SV\1023529.12

SRPT-VYDS-0154882

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Agreement as of the date first above written.

"UWA":

THE UNIVERSITY OF WESTERN AUSTRALIA, A BODY CORPORATE ESTABLISHED PURSUANT TO THE PROVISIONS OF THE UNIVERSITY OF WESTERN AUSTRALIA ACT 1911

By: _Robyn Owens_

Name: **Professor Robyn Owens**
      **Deputy Vice-Chancellor (Research)**
      **The University of Western Australia**

Title: _____

'LICEN SEE":

SAREPTA THERAPEUTICS

By: _____

Name: _Chris Garabedian_

Title: _President + CEO_

SAREPTA INTERNATIONAL CV

By: _____

Name: _Sandesh Mahatme_

Title: _President_

Page 21 of 21

SV\1023529.12

SRPT-VYDS-0154883

**EXHIBIT A**

Exons

███████████████████████████████████████████

SV\1023529.12

SRPT-VYDS-0154884

SCHEDULE **1.8**

Patent Rights



SV\1023529.12

SRPT-VYDS-0154885



SV\1023529.12

SRPT-VYDS-0154886



SV\1023529.12

SRPT-VYDS-0154887

## SCHEDULE 2.2

## Diligence Milestones



SV\1023529.12

SRPT-VYDS-0154888

**SCHEDULE 3.1**

<u>Litigation</u>



SV\1023529.12

SRPT-VYDS-0154889

# Exhibit F

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 07:52 AM 06/05/2013*
*FILED 07:52 AM 06/05/2013*
*SRV 130737336 - 5345340 FILE*

## CERTIFICATE OF INCORPORATION

### OF

## SAREPTA THERAPEUTICS, INC.

### FIRST

The name of the corporation (the "Corporation") is Sarepta Therapeutics, Inc.

### SECOND

The address of the Corporation's registered office in the State of Delaware is 2711 Centerville Road, Suite 400 in the City of Wilmington, County of New Castle, 19808.  The name of its registered agent at such address is Corporation Service Company.

### THIRD

The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of the State of Delaware, as the same exists or may hereafter be amended ("DGCL") or any successor statute.

### FOURTH

The total number of shares of all classes of stock that the Corporation shall have authority to issue is ten thousand (10,000) shares, all of which are Common Stock with a par value of $0.0001.

### FIFTH

The name and mailing address of the sole incorporator is:

Chandni Patel
c/o Latham & Watkins LLP
140 Scott Drive
Menlo Park, California  94025

### SIXTH

In furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to adopt, alter, amend or repeal the bylaws of the Corporation.

### SEVENTH

Election of directors need not be by written ballot unless the bylaws of the Corporation shall so provide.

SV\1033957.1

SRPT-VYDS-0247083

## EIGHTH

A director of this Corporation shall not be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent that exculpation from liability is not permitted under the DGCL as in effect at the time such liability is determined. No amendment or repeal of this Article EIGHTH shall apply to or have any effect on the liability or alleged liability of any director of the Corporation for or with respect to any acts or omissions of such director occurring prior to such amendment or repeal.

## NINTH

(A)    The Corporation shall indemnify its directors and officers to the fullest extent authorized or permitted by the DGCL, and such right to indemnification shall continue as to a person who has ceased to be director or officer of the Corporation and shall inure to the benefit of his or her heirs, executors and administrators; provided, however, that, except for proceedings to enforce rights to indemnification, the Corporation shall not be obligated to indemnify any director or officer (or his or her heirs, executors or administrators) in connection with a proceeding (or part thereof) initiated by such person unless such proceeding (or part thereof) was authorized by the Board of Directors of the Corporation. The right to indemnification conferred in this paragraph shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending or otherwise participating in any proceeding in advance of its final disposition.

(B)    The Corporation shall have the express authority to enter into such agreements as the Board of Directors deems appropriate for the indemnification of directors and officers of the Corporation. Such agreements may contain provisions relating to, among other things, the advancement of expenses, a person's right to bring suit against the Corporation to enforce his or her right to indemnification, the establishment of a trust to assure the availability of funds to satisfy the Corporation's indemnification obligations to such person and other matters as the Board of Directors deems appropriate or advisable.

(C)    The rights to indemnification and to the advancement of expenses conferred in this Article NINTH shall not be exclusive of any other right which any person may have or hereafter acquire under this Certificate of Incorporation, the bylaws of the Corporation, any statute, agreement, vote of stockholders or disinterested directors or otherwise.

(D)    The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the DGCL.

(E)    Any repeal or modification of the foregoing provisions of this Article NINTH shall not adversely affect any right or protection of a director or officer of the Corporation, or other person indemnified by the Corporation, with respect to any acts or omissions of such director, officer or other person existing at the time of such repeal or modification.

2.

SRPT-VYDS-0247084

## **TENTH**

Subject to such limitations as may be from time to time imposed by other provisions of this Certificate of Incorporation, by the bylaws of the Corporation, by the DGCL or other applicable law, or by any contract or agreement to which the Corporation is or may become a party, the Corporation reserves the right to amend or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon stockholders herein are granted subject to this express reservation.

**I, THE UNDERSIGNED**, being the sole incorporator hereinbefore named, for the purpose of forming a corporation pursuant to the General Corporation Law of the State of Delaware, do make this certificate, herein declaring and certifying that this is my act and deed and the facts herein stated are true, and accordingly have hereunto set my hand this 5th day of June, 2013.


/s/ Chandni Patel
Chandni Patel, *Sole Incorporator*

SRPT-VYDS-0247085

## ARTICLE VIII

The Court of Chancery of the State of Delaware shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director or officer of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation arising pursuant to any provision of the Delaware General Corporation Law or this Certificate of Incorporation or the Bylaws of the Corporation, or (iv) any action asserting a claim against the Corporation governed by the internal affairs doctrine.

## ARTICLE IX

Notwithstanding any other provisions of this Certificate of Incorporation or any provision of law which might otherwise permit a lesser vote or no vote, but in addition to any affirmative vote of the holders of any particular class or series of the Voting Stock required by law, this Certificate of Incorporation or any Certificate of Designation, the affirmative vote of the holders of at least sixty-six and two-thirds percent (66-2/3%) of the voting power of all of the then-outstanding shares of the Voting Stock, voting together as a single class, shall be required to alter, amend or repeal Articles V, VI, VII and VIII.

## ARTICLE X

This Certificate of Incorporation shall be effective as of June 6, 2013.

\* \* \* \*

5

SRPT-VYDS-0247086

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 01:17 PM 06/06/2013*
*FILED 01:17 PM 06/06/2013*
*SRV 130744725 - 5345340 FILE*

CERTIFICATE OF MERGER

MERGING

Sarepta Therapeutics, Inc.

(an Oregon corporation)

WITH AND INTO

Sarepta Therapeutics, Inc.

(a Delaware corporation)

In accordance with Section 252 of the Delaware General Corporation Law, Sarepta Therapeutics, Inc., a Delaware corporation, DOES HEREBY CERTIFY as follows:

(1) The name and state of incorporation of the constituent corporations are Sarepta Therapeutics, Inc., a Delaware corporation (the "Company"), and Sarepta Therapeutics, Inc. an Oregon corporation ("Parent");

(2) An agreement of merger has been approved, adopted, certified, executed and acknowledged by each of the constituent corporations in accordance with Section 252(c) of the Delaware General Corporation Law;

(3) The name of the Company, which shall be the surviving corporation, shall be Sarepta Therapeutics, Inc., a Delaware corporation;

(4) The Certificate of Incorporation of the surviving corporation as currently filed with the Secretary of State of the State of Delaware shall be its Certificate of Incorporation;

(5) A copy of the executed agreement of merger is on file at the offices of the Company, the address of which is 215 First Street, Suite 7, Cambridge, MA 02142;

(6) A copy of the agreement of merger will be furnished by the Company, upon request and without cost to any stockholder of Parent or the Company; and

(7) Parent, the only constituent corporation that is not a Delaware corporation, has a total authorized capital stock of 53,333,333 shares, of which 50,000,000 are designated as Common Stock, par value $0.0001 per share, and 3,333,333 are designated as Preferred Stock, par value $0.0001 per share.

*[SIGNATURE PAGE FOLLOWS]*

SV\1068723.2

**IN WITNESS WHEREOF,** the undersigned has signed his name and affirmed that this instrument is the act and deed of the corporation and that the statements herein are true, under penalties of perjury, this 6th day of June, 2013.

SAREPTA THERAPEUTICS, INC.
(a Delaware corporation)

By: /s/ Christopher Garabedian
   Christopher Garabedian
   *President and Chief Executive Officer*

SIGNATURE PAGE TO CERTIFICATE OF MERGER

# Exhibit G



REDACTED

IN ITS

ENTIRETY

# Exhibit H



REDACTED

IN ITS

ENTIRETY

# Exhibit I



REDACTED

IN ITS

ENTIRETY

# Exhibit J



REDACTED

IN ITS

ENTIRETY

# Exhibit K



REDACTED

IN ITS

ENTIRETY

# Exhibit L

**Sikora, Michael T.**

| | |
|---|---|
| **From:** | O'Quinn, Ryan <Ryan.O'Quinn@finnegan.com> |
| **Sent:** | Monday, May 6, 2024 3:14 PM |
| **To:** | Sikora, Michael T. |
| **Cc:** | SareptaNippon.LWTEAM@lw.com; NS District Court; Rebecca.Rabenstein@lw.com; JBlumenfeld@morrisnichols.com; Lipton, Alissa; Burwell, Scott; Williamson, John; Pehrson, Kaitlyn; Lee, Eric; Amanda.Reeves@lw.com; Anna.Rathbun@lw.com; Graham.Haviland@lw.com; Cremer, John (DC); Will.Orlady@lw.com; Michael.Morin@lw.com; David.Frazier@lw.com; Ernest.Yakob@lw.com; mdellinger@morrisnichols.com; McCorquindale, J. Derek; Flibbert, Michael; Kim, Yoonhee; Lee, Yoonjin; Lipsey, Charles |
| **Subject:** | RE: Sarepta / Nippon - Pretrial Order and Amendment of Pleadings |

[EXTERNAL EMAIL]
Mike,

Obviously we disagree.  That said, Sarepta will not oppose NS's proposed briefing schedule at the pretrial conference, so long as the Court is amenable.

With best regards,
Ryan

**Ryan P. O'Quinn, Ph.D.**
Partner
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
1875 Explorer Street, Suite 800, Reston, VA 20190-6023
571.203.2426 | fax: 202.408.4400 | oquinnr@finnegan.com | www.finnegan.com

---

**From:** Sikora, Michael T. <michael.sikora@morganlewis.com>
**Sent:** Monday, May 6, 2024 2:46 PM
**To:** O'Quinn, Ryan <Ryan.O'Quinn@finnegan.com>; Rebecca.Rabenstein@lw.com; JBlumenfeld@morrisnichols.com; Lipton, Alissa <Alissa.Lipton@finnegan.com>; Burwell, Scott <scott.burwell@finnegan.com>; Williamson, John <John.Williamson@finnegan.com>; Pehrson, Kaitlyn <Kaitlyn.Pehrson@finnegan.com>; Lee, Eric <Eric.Lee@finnegan.com>; Amanda.Reeves@lw.com; Anna.Rathbun@lw.com; Graham.Haviland@lw.com; Cremer, John (DC) <john.cremer@lw.com>; Will.Orlady@lw.com; Michael.Morin@lw.com; David.Frazier@lw.com; Ernest.Yakob@lw.com; mdellinger@morrisnichols.com; McCorquindale, J. Derek <Derek.McCorquindale@finnegan.com>; Flibbert, Michael <michael.flibbert@finnegan.com>; Kim, Yoonhee <Yoonhee.Kim@finnegan.com>; Lee, Yoonjin <Yoonjin.Lee@finnegan.com>; Lipsey, Charles <charles.lipsey@finnegan.com>
**Cc:** SareptaNippon.LWTEAM@lw.com; NS District Court <NSDistrictCourt@morganlewis.com>
**Subject:** RE: Sarepta / Nippon - Pretrial Order and Amendment of Pleadings

Ryan,

Thank you for providing Sarepta's updated position.  It is clear we have a dispute regarding at least the effect of █████████████ ██████████ that needs to be addressed by the Court before trial.  We propose that NS submit a five-page letter brief by 5 ET on Tuesday, May 7 and that Sarepta respond with a five-page letter brief by 5 ET on Wednesday May 8.  We recommend that these letters address the discovery deficiencies in connection with license agreements and how to

OUTSIDE COUNSEL EYES ONLY

address any related defects in injury-in-fact, standing, and/or Sarepta entities' ability to claim damages.  <u>Please confirm that you are amenable to this process, as we intend to propose it at the Pre-Trial Conference.</u>

To be clear, we disagree with both interpretations of the operation of the agreements Sarepta raised on the meet-and-confer yesterday.  Specifically, contrary to your stated positions, ███████████████████████████████ ███████  Thus, during the period of time between ███████████████ ████████  Sarepta Therapeutics, Inc. did not hold exclusive rights under the UWA Patents in the United States and did not suffer any injury-in-fact from any alleged infringement during that timeframe. We also have significant questions regarding any Sarepta entities' ability to recover damages before ████████.

We continue to reserve all rights related to Sarepta's late production of this information, including the right to seek sanctions and remedies affiliated with this issue.  Please let us know whether you agree to the proposed briefing schedule as soon as possible.

Best regards,

Mike

**Michael T. Sikora**
**Morgan, Lewis & Bockius LLP**
110 North Wacker Drive, Suite 2800 | Chicago, IL 60606-1511
Direct: +1.312.324.1482 | Main: +1.312.324.1000 | Fax: +1.312.324.1001
michael.sikora@morganlewis.com | www.morganlewis.com

---

**From:** O'Quinn, Ryan <Ryan.O'Quinn@finnegan.com>
**Sent:** Monday, May 6, 2024 1:13 PM
**To:** Sikora, Michael T. <michael.sikora@morganlewis.com>; Rebecca.Rabenstein@lw.com; JBlumenfeld@morrisnichols.com; Lipton, Alissa <Alissa.Lipton@finnegan.com>; Burwell, Scott <scott.burwell@finnegan.com>; Williamson, John <John.Williamson@finnegan.com>; Pehrson, Kaitlyn <Kaitlyn.Pehrson@finnegan.com>; Lee, Eric <Eric.Lee@finnegan.com>; Amanda.Reeves@lw.com; Anna.Rathbun@lw.com; Graham.Haviland@lw.com; Cremer, John (DC) <john.cremer@lw.com>; Will.Orlady@lw.com; Michael.Morin@lw.com; David.Frazier@lw.com; Ernest.Yakob@lw.com; mdellinger@morrisnichols.com; McCorquindale, J. Derek <Derek.McCorquindale@finnegan.com>; Flibbert, Michael <michael.flibbert@finnegan.com>; Kim, Yoonhee <Yoonhee.Kim@finnegan.com>; Lee, Yoonjin <Yoonjin.Lee@finnegan.com>; Lipsey, Charles <charles.lipsey@finnegan.com>
**Cc:** SareptaNippon.LWTEAM@lw.com; NS District Court <NSDistrictCourt@morganlewis.com>
**Subject:** RE: Sarepta / Nippon - Pretrial Order and Amendment of Pleadings

[EXTERNAL EMAIL]
Mike,

Thanks for your email and for the meet and confer yesterday.

Per your request, attached are:

- The record of AVI Biopharma, Inc. (Oregon) name change to Sarepta Therapeutics, Inc. (Oregon);

- The Sarepta Therapeutics Inc. (Oregon) merger agreement with Sarepta Therapeutics, Inc. (Delaware); and

- ████████████████████████████████████████████ ████████

Since our call yesterday, we have confirmed the following:

**OUTSIDE COUNSEL EYES ONLY**

- Sarepta Therapeutics, Inc. had an exclusive license to the Wilton Patents beginning with the 2008 UWA-AVI BioPharma agreement.

- Sarepta Therapeutics, Inc. held an exclusive right to bring suits for infringement of the Wilton Patents as reflected by ███████████████.

- Sarepta Therapeutics, Inc. was granted an exclusive right to manufacture and commercialize finished golodirsen product in the United States in █████████████████████████████.

- All of the rights above were continued through the sublicense reflected in ██████████████.

- ██████████████████████████████████████████████████

- The parties operated under this unified agreement beginning on the listed Effective Date of ██████████████████

- Sarepta has investigated and pulled the DocuSign signatures on ███████████, which confirmed in ████████ Both Sarepta Therapeutics, Inc. and ST Holdings International Two, Inc. executed the ██████ on January 4, 2022. The DocuSign audit trail and email confirmation are attached.

- In summary, as reflected in the above, Sarepta Therapeutics, Inc. was a proper counter-plaintiff for the entirety of the damages period when Sarepta and UWA's infringement counterclaims were filed on January 28, 2022.

Accordingly, your posited scenario that Sarepta "attempt[ed] to retroactively fix" an issue purportedly caused by NS's First Set of Requests for Production between March and April 2022 is incorrect. We believe that the inability to capture these intra-party agreements stemmed from the timing of the search in April, 2022. This was before ███████████████████████████████████████████████████. Sarepta performed a reasonable search for agreements that were relevant to the Wilton Patents and produced any relevant agreements that were found.

As for timing of agreement production, your message leaves out some relevant context from the time period. There were essentially three tranches of agreement production: (1) the license agreements between Sarepta and UWA, (2) other third-party licenses, ████████████████████████, and (3) non-license agreements ██████ ████████████.

There were at least three circumstances leading to why the UWA agreements were produced when they were. First, as you recall, ████████████████████████████████████████████ ██████. Second, Sarepta wanted to ensure that ████████████████ ████████████████████ Finally, the parties were still negotiating the scope of agreement production on both sides – ████████████████████████████████████. (*See, e.g.,* August 3, 2022 letter from Aaron Clay to Michael Sikora; December 13, 2022 email from Aaron Clay to Michael Sikora; January 17, 2023 letter from Michael Sikora to Aaron Clay; January 30, 2023 letter from Yoonhee Kim to Michael Sikora).

OUTSIDE COUNSEL EYES ONLY

For the second tranche ████████████████████████████████████, production of those agreements required notice and approval by those third parties pursuant to the confidentiality provisions of those agreements, which took time.  Finally, NS and Sarepta did not agree on the scope of production of ████████ ████████ until spring of 2023 as 30(b)(6) fact depositions approached.  (*See, e.g.*, January 30, 2023 letter from Yoonhee Kim to Michael Sikora.)


With best regards,
Ryan


**Ryan P. O'Quinn, Ph.D.**
Partner
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
1875 Explorer Street, Suite 800, Reston, VA 20190-6023
571.203.2426 | fax: 202.408.4400 | oquinnr@finnegan.com | www.finnegan.com

---

**From:** O'Quinn, Ryan
**Sent:** Monday, May 6, 2024 10:27 AM
**To:** Sikora, Michael T. <michael.sikora@morganlewis.com>; Rebecca.Rabenstein@lw.com; JBlumenfeld@morrisnichols.com; Lipton, Alissa <Alissa.Lipton@finnegan.com>; Burwell, Scott <scott.burwell@finnegan.com>; Williamson, John <John.Williamson@finnegan.com>; Pehrson, Kaitlyn <Kaitlyn.Pehrson@finnegan.com>; Lee, Eric <Eric.Lee@finnegan.com>; Amanda.Reeves@lw.com; Anna.Rathbun@lw.com; Graham.Haviland@lw.com; Cremer, John (DC) <john.cremer@lw.com>; Will.Orlady@lw.com; Michael.Morin@lw.com; David.Frazier@lw.com; Ernest.Yakob@lw.com; mdellinger@morrisnichols.com; McCorquindale, J. Derek <Derek.McCorquindale@finnegan.com>; Flibbert, Michael <michael.flibbert@finnegan.com>; Kim, Yoonhee <Yoonhee.Kim@finnegan.com>; Lee, Yoonjin <Yoonjin.Lee@finnegan.com>; Lipsey, Charles <charles.lipsey@finnegan.com>
**Cc:** SareptaNippon.LWTEAM@lw.com; NS District Court <NSDistrictCourt@morganlewis.com>
**Subject:** RE: Sarepta / Nippon - Pretrial Order and Amendment of Pleadings

Mike,

We are in receipt of your emails and expect to be able to respond by 1 PM ET.  The client is continuing to investigate and our goal is to get you as complete an answer as we possibly can.

With best regards,
Ryan

**Ryan P. O'Quinn, Ph.D.**
Partner
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
1875 Explorer Street, Suite 800, Reston, VA 20190-6023
571.203.2426 | fax: 202.408.4400 | oquinnr@finnegan.com | www.finnegan.com

---

**From:** Sikora, Michael T. <michael.sikora@morganlewis.com>
**Sent:** Sunday, May 5, 2024 9:50 PM
**To:** O'Quinn, Ryan <Ryan.O'Quinn@finnegan.com>; Rebecca.Rabenstein@lw.com; JBlumenfeld@morrisnichols.com; Lipton, Alissa <Alissa.Lipton@finnegan.com>; Burwell, Scott <scott.burwell@finnegan.com>; Williamson, John <John.Williamson@finnegan.com>; Pehrson, Kaitlyn <Kaitlyn.Pehrson@finnegan.com>; Lee, Eric <Eric.Lee@finnegan.com>; Amanda.Reeves@lw.com; Anna.Rathbun@lw.com; Graham.Haviland@lw.com; Cremer, John (DC) <john.cremer@lw.com>; Will.Orlady@lw.com; Michael.Morin@lw.com; David.Frazier@lw.com; Ernest.Yakob@lw.com; mdellinger@morrisnichols.com; McCorquindale, J. Derek <Derek.McCorquindale@finnegan.com>; Flibbert, Michael <michael.flibbert@finnegan.com>; Kim, Yoonhee

OUTSIDE COUNSEL EYES ONLY

<Yoonhee.Kim@finnegan.com>; Lee, Yoonjin <Yoonjin.Lee@finnegan.com>; Lipsey, Charles <charles.lipsey@finnegan.com>
**Cc:** SareptaNippon.LWTEAM@lw.com; NS District Court <NSDistrictCourt@morganlewis.com>
**Subject:** RE: Sarepta / Nippon - Pretrial Order and Amendment of Pleadings

All,

Apologies.  There was an erroneous date in my original email, which has been corrected as highlighted below.

Best,

Mike

**Michael T. Sikora**
**Morgan, Lewis & Bockius LLP**
110 North Wacker Drive, Suite 2800 | Chicago, IL 60606-1511
Direct: +1.312.324.1482 | Main: +1.312.324.1000 | Fax: +1.312.324.1001
michael.sikora@morganlewis.com | www.morganlewis.com

---

**From:** Sikora, Michael T. <michael.sikora@morganlewis.com>
**Sent:** Sunday, May 5, 2024 9:47 PM
**To:** O'Quinn, Ryan <Ryan.O'Quinn@finnegan.com>; Rebecca.Rabenstein@lw.com; JBlumenfeld@morrisnichols.com; Lipton, Alissa <Alissa.Lipton@finnegan.com>; Burwell, Scott <scott.burwell@finnegan.com>; Williamson, John <John.Williamson@finnegan.com>; Pehrson, Kaitlyn <Kaitlyn.Pehrson@finnegan.com>; Lee, Eric <Eric.Lee@finnegan.com>; Amanda.Reeves@lw.com; Anna.Rathbun@lw.com; Graham.Haviland@lw.com; Cremer, John (DC) <john.cremer@lw.com>; Will.Orlady@lw.com; Michael.Morin@lw.com; David.Frazier@lw.com; Ernest.Yakob@lw.com; mdellinger@morrisnichols.com; McCorquindale, J. Derek <Derek.McCorquindale@finnegan.com>; Flibbert, Michael <michael.flibbert@finnegan.com>; Kim, Yoonhee <Yoonhee.Kim@finnegan.com>; Lee, Yoonjin <Yoonjin.Lee@finnegan.com>; Lipsey, Charles <charles.lipsey@finnegan.com>
**Cc:** SareptaNippon.LWTEAM@lw.com; NS District Court <NSDistrictCourt@morganlewis.com>
**Subject:** RE: Sarepta / Nippon - Pretrial Order and Amendment of Pleadings

Charles, Ryan,

Thank you for the meet-and-confer earlier.  As I mentioned on the call, we request that Sarepta produce the following:

- The record of AVI Biopharma, Inc. (Oregon) name change to Sarepta Therapeutics, Inc. (Oregon)

- The Sarepta Therapeutics Inc. (Oregon) merger agreement with Sarepta Therapeutics, Inc. (Delaware)

- ██████████████████████████████████████████████████████████████

From the call, we understand Sarepta contends the following:

- ██████████████████████████████████████████████████████████████

- ██████████████████████████████████████████████████████████████

5

OUTSIDE COUNSEL EYES ONLY

- ████████████████████████████████████████████████
- ████████████████████████████████████████████████████
- ██████████████████████████████████████████████████████
  ████████████████████████████ .

You stated that the two possibilities Sarepta believes possible are that (1) ████████████
████████████████████████████████████████████████████ and (2)
████████████████████ . You stated that Sarepta did not currently have a position regarding whether the
████████████ However, Mr. Lipsey expressed his personal view that ██████████████
████████ As requested on the call, please provide Sarepta's position on the "correct" chain of title tonight, so that we may consider it.

Regarding the timing of the production, you explained that Sarepta conducted its search for responsive license agreements before the ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████ .

Unfortunately, this explanation leaves us with further concerns. NS served its First Set of Requests for Production (which, as noted below, expressly encompassed these agreements) on *March 11, 2022*. Sarepta responded to these RFPs on *April 11, 2022*. Sarepta's search for responsive licenses presumably occurred during this timeframe. ██████████████████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████████████████████████████████████ he production first containing the UWA licensing agreements were produced on November 4, 2022 in SRPT_VOL006 (spanning SRPT-VYDYS-0154830 to SRPT-VYDS-0154901). *See* Clay Ltr. (Nov. 4, 2022). Other Sarepta agreements, such as t█████████████████████████
████████████████████████████████████████ , were not produced for yet another two months (January 20, 2023), in SRPT-VYDYS_VOL010 (spanning SRPT-VYDS-0183248 to SRPT-VYDS-0208198). *See* Clay Ltr. (Jan. 20, 2023).

Best regards,

Mike

**Michael T. Sikora**
**Morgan, Lewis & Bockius LLP**
110 North Wacker Drive, Suite 2800 | Chicago, IL 60606-1511
Direct: +1.312.324.1482 | Main: +1.312.324.1000 | Fax: +1.312.324.1001
michael.sikora@morganlewis.com | www.morganlewis.com

---

**From:** Sikora, Michael T.
**Sent:** Sunday, May 5, 2024 5:52 PM
**To:** 'O'Quinn, Ryan' <Ryan.O'Quinn@finnegan.com>; Rebecca.Rabenstein@lw.com; JBlumenfeld@morrisnichols.com; Lipton, Alissa <Alissa.Lipton@finnegan.com>; Burwell, Scott <scott.burwell@finnegan.com>; Williamson, John

OUTSIDE COUNSEL EYES ONLY

<John.Williamson@finnegan.com>; Pehrson, Kaitlyn <Kaitlyn.Pehrson@finnegan.com>; Lee, Eric <Eric.Lee@finnegan.com>; Amanda.Reeves@lw.com; Anna.Rathbun@lw.com; Graham.Haviland@lw.com; Cremer, John (DC) <john.cremer@lw.com>; Will.Orlady@lw.com; Michael.Morin@lw.com; David.Frazier@lw.com; Ernest.Yakob@lw.com; mdellinger@morrisnichols.com; McCorquindale, J. Derek <Derek.McCorquindale@finnegan.com>; Flibbert, Michael <michael.flibbert@finnegan.com>; Kim, Yoonhee <Yoonhee.Kim@finnegan.com>; Lee, Yoonjin <Yoonjin.Lee@finnegan.com>
**Cc:** SareptaNippon.LWTEAM@lw.com; NS District Court <NSDistrictCourt@morganlewis.com>
**Subject:** RE: Sarepta / Nippon - Pretrial Order and Amendment of Pleadings

Thank you for the heads-up.  We will talk to you at 6:30 ET.

Do you expect to send answers to our questions before the meet-and-confer?

Best regards,

Mike
**Michael T. Sikora**
**Morgan, Lewis & Bockius LLP**
110 North Wacker Drive, Suite 2800 | Chicago, IL 60606-1511
Direct: +1.312.324.1482 | Main: +1.312.324.1000 | Fax: +1.312.324.1001
michael.sikora@morganlewis.com | www.morganlewis.com

---

**From:** O'Quinn, Ryan <Ryan.O'Quinn@finnegan.com>
**Sent:** Sunday, May 5, 2024 5:50 PM
**To:** Sikora, Michael T. <michael.sikora@morganlewis.com>; Rebecca.Rabenstein@lw.com; JBlumenfeld@morrisnichols.com; Lipton, Alissa <Alissa.Lipton@finnegan.com>; Burwell, Scott <scott.burwell@finnegan.com>; Williamson, John <John.Williamson@finnegan.com>; Pehrson, Kaitlyn <Kaitlyn.Pehrson@finnegan.com>; Lee, Eric <Eric.Lee@finnegan.com>; Amanda.Reeves@lw.com; Anna.Rathbun@lw.com; Graham.Haviland@lw.com; Cremer, John (DC) <john.cremer@lw.com>; Will.Orlady@lw.com; Michael.Morin@lw.com; David.Frazier@lw.com; Ernest.Yakob@lw.com; mdellinger@morrisnichols.com; McCorquindale, J. Derek <Derek.McCorquindale@finnegan.com>; Flibbert, Michael <michael.flibbert@finnegan.com>; Kim, Yoonhee <Yoonhee.Kim@finnegan.com>; Lee, Yoonjin <Yoonjin.Lee@finnegan.com>
**Cc:** SareptaNippon.LWTEAM@lw.com; NS District Court <NSDistrictCourt@morganlewis.com>
**Subject:** RE: Sarepta / Nippon - Pretrial Order and Amendment of Pleadings

[EXTERNAL EMAIL]
Mike,

We need until 6:30 PM ET due to travel issues.  We will speak with you then.

Best
Ryan

**Ryan P. O'Quinn, Ph.D.**
Partner
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
1875 Explorer Street, Suite 800, Reston, VA 20190-6023
571.203.2426 | fax: 202.408.4400 | oquinnr@finnegan.com | www.finnegan.com

---

**From:** O'Quinn, Ryan
**Sent:** Sunday, May 5, 2024 1:49 PM
**To:** Sikora, Michael T. <michael.sikora@morganlewis.com>; Rebecca.Rabenstein@lw.com;

OUTSIDE COUNSEL EYES ONLY

JBlumenfeld@morrisnichols.com; Lipton, Alissa <Alissa.Lipton@finnegan.com>; Burwell, Scott <scott.burwell@finnegan.com>; Williamson, John <John.Williamson@finnegan.com>; Pehrson, Kaitlyn <Kaitlyn.Pehrson@finnegan.com>; Lee, Eric <Eric.Lee@finnegan.com>; Amanda.Reeves@lw.com; Anna.Rathbun@lw.com; Graham.Haviland@lw.com; Cremer, John (DC) <john.cremer@lw.com>; Will.Orlady@lw.com; Michael.Morin@lw.com; David.Frazier@lw.com; Ernest.Yakob@lw.com; mdellinger@morrisnichols.com; McCorquindale, J. Derek <Derek.McCorquindale@finnegan.com>; Flibbert, Michael <michael.flibbert@finnegan.com>; Kim, Yoonhee <Yoonhee.Kim@finnegan.com>; Lee, Yoonjin <Yoonjin.Lee@finnegan.com>
**Cc:** SareptaNippon.LWTEAM@lw.com; NS District Court <NSDistrictCourt@morganlewis.com>
**Subject:** RE: Sarepta / Nippon - Pretrial Order and Amendment of Pleadings


Mike,

6 PM ET works.  We can use the following dial-in:

(877) 304-9269
Passcode 115209
One-touch 18773049269,,115209#


Thanks
Ryan

**Ryan P. O'Quinn, Ph.D.**
Partner
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
1875 Explorer Street, Suite 800, Reston, VA 20190-6023
571.203.2426 | fax: 202.408.4400 | oquinnr@finnegan.com | www.finnegan.com

**From:** Sikora, Michael T. <michael.sikora@morganlewis.com>
**Sent:** Sunday, May 5, 2024 1:12 PM
**To:** O'Quinn, Ryan <Ryan.O'Quinn@finnegan.com>; Rebecca.Rabenstein@lw.com; JBlumenfeld@morrisnichols.com; Lipton, Alissa <Alissa.Lipton@finnegan.com>; Burwell, Scott <scott.burwell@finnegan.com>; Williamson, John <John.Williamson@finnegan.com>; Pehrson, Kaitlyn <Kaitlyn.Pehrson@finnegan.com>; Lee, Eric <Eric.Lee@finnegan.com>; Amanda.Reeves@lw.com; Anna.Rathbun@lw.com; Graham.Haviland@lw.com; Cremer, John (DC) <john.cremer@lw.com>; Will.Orlady@lw.com; Michael.Morin@lw.com; David.Frazier@lw.com; Ernest.Yakob@lw.com; mdellinger@morrisnichols.com; McCorquindale, J. Derek <Derek.McCorquindale@finnegan.com>; Flibbert, Michael <michael.flibbert@finnegan.com>; Kim, Yoonhee <Yoonhee.Kim@finnegan.com>; Lee, Yoonjin <Yoonjin.Lee@finnegan.com>
**Cc:** SareptaNippon.LWTEAM@lw.com; NS District Court <NSDistrictCourt@morganlewis.com>
**Subject:** RE: Sarepta / Nippon - Pretrial Order and Amendment of Pleadings


Ryan,

Does 6pm work for you?  If so, please send the dial-in.

Best,

Mike

**Michael T. Sikora**
**Morgan, Lewis & Bockius LLP**
110 North Wacker Drive, Suite 2800 | Chicago, IL 60606-1511
Direct: +1.312.324.1482 | Main: +1.312.324.1000 | Fax: +1.312.324.1001
michael.sikora@morganlewis.com | www.morganlewis.com

OUTSIDE COUNSEL EYES ONLY

**From:** O'Quinn, Ryan <Ryan.O'Quinn@finnegan.com>
**Sent:** Sunday, May 5, 2024 10:58 AM
**To:** Sikora, Michael T. <michael.sikora@morganlewis.com>; Rebecca.Rabenstein@lw.com; JBlumenfeld@morrisnichols.com; Lipton, Alissa <Alissa.Lipton@finnegan.com>; Burwell, Scott <scott.burwell@finnegan.com>; Williamson, John <John.Williamson@finnegan.com>; Pehrson, Kaitlyn <Kaitlyn.Pehrson@finnegan.com>; Lee, Eric <Eric.Lee@finnegan.com>; Amanda.Reeves@lw.com; Anna.Rathbun@lw.com; Graham.Haviland@lw.com; Cremer, John (DC) <john.cremer@lw.com>; Will.Orlady@lw.com; Michael.Morin@lw.com; David.Frazier@lw.com; Ernest.Yakob@lw.com; mdellinger@morrisnichols.com; McCorquindale, J. Derek <Derek.McCorquindale@finnegan.com>; Flibbert, Michael <michael.flibbert@finnegan.com>; Kim, Yoonhee <Yoonhee.Kim@finnegan.com>; Lee, Yoonjin <Yoonjin.Lee@finnegan.com>
**Cc:** SareptaNippon.LWTEAM@lw.com; NS District Court <NSDistrictCourt@morganlewis.com>
**Subject:** RE: Sarepta / Nippon - Pretrial Order and Amendment of Pleadings

[EXTERNAL EMAIL]
Mike,

We are available to meet and confer after 5 PM ET today; much of our team is traveling.  Please advise of a preferred time and we can send dial-in information.

Best
Ryan

**Ryan P. O'Quinn, Ph.D.**
Partner
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
1875 Explorer Street, Suite 800, Reston, VA 20190-6023
571.203.2426 | fax: 202.408.4400 | oquinnr@finnegan.com | www.finnegan.com

**From:** Sikora, Michael T. <michael.sikora@morganlewis.com>
**Sent:** Sunday, May 5, 2024 10:09 AM
**To:** O'Quinn, Ryan <Ryan.O'Quinn@finnegan.com>; Rebecca.Rabenstein@lw.com; JBlumenfeld@morrisnichols.com; Lipton, Alissa <Alissa.Lipton@finnegan.com>; Burwell, Scott <scott.burwell@finnegan.com>; Williamson, John <John.Williamson@finnegan.com>; Pehrson, Kaitlyn <Kaitlyn.Pehrson@finnegan.com>; Lee, Eric <Eric.Lee@finnegan.com>; Amanda.Reeves@lw.com; Anna.Rathbun@lw.com; Graham.Haviland@lw.com; Cremer, John (DC) <john.cremer@lw.com>; Will.Orlady@lw.com; Michael.Morin@lw.com; David.Frazier@lw.com; Ernest.Yakob@lw.com; mdellinger@morrisnichols.com; McCorquindale, J. Derek <Derek.McCorquindale@finnegan.com>; Flibbert, Michael <michael.flibbert@finnegan.com>; Kim, Yoonhee <Yoonhee.Kim@finnegan.com>; Lee, Yoonjin <Yoonjin.Lee@finnegan.com>
**Cc:** SareptaNippon.LWTEAM@lw.com; NS District Court <NSDistrictCourt@morganlewis.com>
**Subject:** RE: Sarepta / Nippon - Pretrial Order and Amendment of Pleadings

Ryan,

Thank you for providing the agreements. That said, we are extremely concerned by their late production.  At least two of these agreements (SRPT-VYDS-0247020 and SRPT-VYDS-0246897) were executed during fact discovery when NS has already served document requests.  While we are still reviewing them, most appear to

9

OUTSIDE COUNSEL EYES ONLY

As you are aware, these agreements are responsive to at least Request for Production Nos. 4 ("All Documents related to agreements or licenses between Sarepta and its related entities or any Third Party regarding the Accused Sarepta Products, including, but not limited to, agreements or licenses related to research, design, selection, development, testing, manufacture, use, regulatory approval or certification, distribution, export/importation, marketing, sale, sourcing, customer support, purchase, consulting and/or clinical trials (including clinical trial agreements)."), 89 ("All Documents related to any ownership, assignment, license, security interest, lien, or transfer of any right(s) in any Sarepta Patent, whether to or from Sarepta or a Third Party."), and 90 ("All Documents relating to any patent licenses entered into by Sarepta regarding the Sarepta Patent-Practicing Products, including any patent licenses entered into to secure rights to manufacture, market, and/or sell the Sarepta Patent-Practicing Products, and any discussions related thereto regardless whether a license was executed.").

<u>We would like to meet-and-confer regarding this issue (including the appropriate parties) this afternoon.</u>  Could you please provide your team's availability?  In advance of the meet-and-confer, please provide:

(1) an explanation as to why Sarepta did not previously produce these agreements (particularly those executed ████████████████████████████████████████████████); and

(2) your basis for concluding that Sarepta Therapeutics Inc. and UWA should remain the counter-plaintiffs for the entire damages period sought.

As noted, our review of these agreements is ongoing.  We reserve the right to seek any and all relief for Sarepta's failure to timely disclose them.

Best regards,

Mike

**Michael T. Sikora**
**Morgan, Lewis & Bockius LLP**
110 North Wacker Drive, Suite 2800 | Chicago, IL 60606-1511
Direct: +1.312.324.1482 | Main: +1.312.324.1000 | Fax: +1.312.324.1001
michael.sikora@morganlewis.com | www.morganlewis.com

---

**From:** O'Quinn, Ryan <Ryan.O'Quinn@finnegan.com>
**Sent:** Friday, May 3, 2024 2:49 PM
**To:** Sikora, Michael T. <michael.sikora@morganlewis.com>; Rebecca.Rabenstein@lw.com; JBlumenfeld@morrisnichols.com; Lipton, Alissa <Alissa.Lipton@finnegan.com>; Burwell, Scott <scott.burwell@finnegan.com>; Williamson, John <John.Williamson@finnegan.com>; Pehrson, Kaitlyn <Kaitlyn.Pehrson@finnegan.com>; Lee, Eric <Eric.Lee@finnegan.com>; Amanda.Reeves@lw.com; Anna.Rathbun@lw.com; Graham.Haviland@lw.com; Cremer, John (DC) <john.cremer@lw.com>; Will.Orlady@lw.com; Michael.Morin@lw.com; David.Frazier@lw.com; Ernest.Yakob@lw.com; mdellinger@morrisnichols.com; McCorquindale, J. Derek <Derek.McCorquindale@finnegan.com>; Flibbert, Michael <michael.flibbert@finnegan.com>; Kim, Yoonhee <Yoonhee.Kim@finnegan.com>; Lee, Yoonjin <Yoonjin.Lee@finnegan.com>
**Cc:** SareptaNippon.LWTEAM@lw.com; NS District Court <NSDistrictCourt@morganlewis.com>
**Subject:** RE: Sarepta / Nippon - Pretrial Order and Amendment of Pleadings

[EXTERNAL EMAIL]
Mike,

Thanks for your email.  We have looked into your question, and confirmed that Sarepta International C.V. ("CV") no longer exists and that Sarepta Therapeutics Inc. and UWA should remain the counter-plaintiffs.  But if NS disagrees, and believes CV's successor (ST International Holdings Two, Inc.) should be added, we would be open to discussing it.

OUTSIDE COUNSEL EYES ONLY

On that note, in investigating your inquiry this week, we discovered ████████████████████████ ██████) that do not appear to have been previously produced, so are producing them herewith for completeness. These documents are marked Outside Counsel Eyes Only under the protective order.

With best regards,
Ryan

**Ryan P. O'Quinn, Ph.D.**
Partner
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
1875 Explorer Street, Suite 800, Reston, VA 20190-6023
571.203.2426 | fax: 202.408.4400 | oquinnr@finnegan.com | www.finnegan.com

---

**From:** Sikora, Michael T. <michael.sikora@morganlewis.com>
**Sent:** Friday, May 3, 2024 11:27 AM
**To:** Rebecca.Rabenstein@lw.com; JBlumenfeld@morrisnichols.com; Lipton, Alissa <Alissa.Lipton@finnegan.com>; Burwell, Scott <scott.burwell@finnegan.com>; Williamson, John <John.Williamson@finnegan.com>; Pehrson, Kaitlyn <Kaitlyn.Pehrson@finnegan.com>; Lee, Eric <Eric.Lee@finnegan.com>; Amanda.Reeves@lw.com; Anna.Rathbun@lw.com; Graham.Haviland@lw.com; Cremer, John (DC) <john.cremer@lw.com>; Will.Orlady@lw.com; Michael.Morin@lw.com; David.Frazier@lw.com; Ernest.Yakob@lw.com; mdellinger@morrisnichols.com; McCorquindale, J. Derek <Derek.McCorquindale@finnegan.com>; Flibbert, Michael <michael.flibbert@finnegan.com>; Kim, Yoonhee <Yoonhee.Kim@finnegan.com>; Lee, Yoonjin <Yoonjin.Lee@finnegan.com>; O'Quinn, Ryan <Ryan.O'Quinn@finnegan.com>
**Cc:** SareptaNippon.LWTEAM@lw.com; NS District Court <NSDistrictCourt@morganlewis.com>
**Subject:** RE: Sarepta / Nippon - Pretrial Order and Amendment of Pleadings


Counsel,

Could you please let us know where Sarepta and UWA stand on this issue?

Best,

Mike
**Michael T. Sikora**
Morgan, Lewis & Bockius LLP
110 North Wacker Drive, Suite 2800 | Chicago, IL 60606-1511
Direct: +1.312.324.1482 | Main: +1.312.324.1000 | Fax: +1.312.324.1001
michael.sikora@morganlewis.com | www.morganlewis.com

---

**From:** Sikora, Michael T.
**Sent:** Tuesday, April 30, 2024 10:05 AM
**To:** Rebecca.Rabenstein@lw.com; JBlumenfeld@morrisnichols.com; 'Lipton, Alissa' <Alissa.Lipton@finnegan.com>; Burwell, Scott <scott.burwell@finnegan.com>; Williamson, John <John.Williamson@finnegan.com>; Pehrson, Kaitlyn <Kaitlyn.Pehrson@finnegan.com>; Lee, Eric <Eric.Lee@finnegan.com>; Amanda.Reeves@lw.com; Anna.Rathbun@lw.com; Graham.Haviland@lw.com; Cremer, John (DC) <john.cremer@lw.com>; Will.Orlady@lw.com; Michael.Morin@lw.com; David.Frazier@lw.com; Ernest.Yakob@lw.com; mdellinger@morrisnichols.com; McCorquindale, J. Derek <Derek.McCorquindale@finnegan.com>; Flibbert, Michael <michael.flibbert@finnegan.com>; Kim, Yoonhee <Yoonhee.Kim@finnegan.com>; Lee, Yoonjin <Yoonjin.Lee@finnegan.com>; O'Quinn, Ryan <Ryan.O'Quinn@finnegan.com>
**Cc:** SareptaNippon.LWTEAM@lw.com; NS District Court <NSDistrictCourt@morganlewis.com>
**Subject:** Sarepta / Nippon - Pretrial Order and Amendment of Pleadings

OUTSIDE COUNSEL EYES ONLY

Counsel,

In revisiting the Pre-Trial Order, we noticed that the only Sarepta entity joined to this case is Sarepta Therapeutics, Inc., but that Sarepta's license agreements with UWA defines both Sarepta Therapeutics, Inc. and Sarepta International C.V. as "Licensee" to the UWA patent family. ███████████████████████████████

To ensure there is no jurisdictional issue, could you please confirm that Sarepta International C.V. no longer exists, and that Sarepta Therapeutics, Inc. has been the sole "Licensee" to the UWA Patents under the applicable license agreements throughout the duration of this case? Alternatively, if Sarepta International C.V. (or another Sarepta entity) does exist and holds rights as a "Licensee," we propose a stipulated joining of Sarepta International C.V. to the relevant claims as part of the amendment of pleadings under the Pre-Trial Order.

Best regards,

Mike

**Michael T. Sikora**
**Morgan, Lewis & Bockius LLP**
110 North Wacker Drive, Suite 2800 | Chicago, IL 60606-1511
Direct: +1.312.324.1482 | Main: +1.312.324.1000 | Fax: +1.312.324.1001
michael.sikora@morganlewis.com | www.morganlewis.com

This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

**OUTSIDE COUNSEL EYES ONLY**

This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

OUTSIDE COUNSEL EYES ONLY

# Exhibit M

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NIPPON SHINYAKU CO., LTD., | |
| Plaintiff, | C.A. No. 21-1015-GBW |
| v. | ███████████████ |
| SAREPTA THERAPEUTICS, INC., | |
| Defendant. | |
| SAREPTA THERAPEUTICS, INC. and THE UNIVERSITY OF WESTERN AUSTRALIA, | |
| Defendant/Counter-Plaintiffs, | |
| v. | |
| NIPPON SHINYAKU CO., LTD. and NS PHARMA, INC. | |
| Plaintiff/Counter-Defendants. | |

## OPENING EXPERT REPORT OF JOHN C. JAROSZ

September 8, 2023

██████████████████████████████████████

██████████████████████████████████████

████████████████████ █ █████████████████████

██████████████████████████████████████

███████████████████████████████ This evidence indicates both

that the physicians and patients reached by Sarepta and NS in their sale of their respective products

are similar and that NS did not likely expand the universe of patients that would seek an exon

skipping therapy.

96.    ████████████████████████████████████████

███████

### E.    Calculation of Lost Profits from Lost Sales

97.    I understand that the Counterclaim Patents-in-Suit cover the advantages noted

above. Moreover, I have seen no tangible evidence of NS's ability to design-around any of the

patents in an acceptable fashion such that it would have retained sales during the damages period

(August 2020 to present).

98.    <mark>I estimated Sarepta's U.S. lost profits from lost sales based on the sales that would

have been made by VYONDYS 53® and/or EXONDYS 51® in a but-for infringement world.</mark>[194]

99.    I started by considering the number of VILTEPSO® vials sold based on data

available to-date.[195] According to NS's sales data, from August 19, 2020, through April 30, 2023,

---

[192]  NS00058280-321, at 308.
[193]  NS00058280-321, at 315. *See also* Tab 17 and Tab 19.
[194]  I did not calculate lost profits on lost O.U.S. sales. For those, I applied reasonable royalty damages.
[195]  While one could also consider starting from the number of patients, the number of vials sold already accounts for patient weight, which can have a large impact on the sales of exon skipping products such as VYONDYS 53® and VILTEPSO® since the number of vials per patient per month is heavily dependent on the patient's weight. *See e.g.*, SRPT-VYDS-0213046-052, at 049; NS00041583-587, at 584-585.

████████████████████████████████

251. ████████████████████████████████████████

██████████  ██████████████████████████████████

████████████████████████████████████████

252.    My analysis only calculates U.S. lost profits and reasonable royalty damages through April 2023 and O.U.S. reasonable royalty damages through May 2023, which is reflective of the data available to me as of the date of this report. I will update my analysis, if allowed, to incorporate additional data made available as of trial.

253.    Assuming liability is established at trial, an on-going royalty may be appropriate to compensate Sarepta for losses associated with the continued sale of VILTEPSO® between May 14, 2024 (after the expected trial date) and June 28, 2025 (the expiration of the Counterclaim Patents-in-Suit). At the point at which an on-going royalty is deemed to be appropriate, I am prepared to provide my opinion on what that should be.

John C. Jarosz
September 8, 2023

---

[438]    Tab 3.

# Exhibit N

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| NIPPON SHINYAKU CO., LTD., Plaintiff,<br><br>v.<br><br>SAREPTA THERAPEUTICS, INC.,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| SAREPTA THERAPEUTICS, INC.,<br>Defendant and Counter-Plaintiff<br><br>v.<br><br>NIPPON SHINYAKU CO., LTD. and<br>NS PHARMA, INC., Plaintiff and Counter-<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    C.A. No. 21-1015 (MN)<br>)<br>) |

**PLAINTIFF/COUNTERCLAIM DEFENDANT NIPPON SHINYAKU CO. LTD.'S AND
COUNTERCLAIM DEFENDANT NS PHARMA, INC.'S FIRST SET OF REQUESTS
FOR PRODUCTION TO DEFENDANT SAREPTA THERAPEUTICS, INC. (NOS. 1-149)**

Plaintiff/Counterclaim Defendant Nippon Shinyaku Co., Ltd. and Counterclaim Defendant

NS Pharma (collectively "NS") pursuant to Fed. R. Civ. P. 34, hereby requests that Defendant

Sarepta Therapeutics, Inc. produce copies of, or produce for inspection and reproduction at the

offices of Morgan, Lewis & Bockius LLP, 1201 N. Market Street, Suite 2201, Wilmington, DE

19801, or a location mutually agreeable to the parties, all documents and things in the possession,

custody or control of Plaintiff as requested herein within thirty (30) days of service of these request

for production ("Requests"). The following definitions and instructions shall apply to these

Requests.

**DEFINITIONS**

1.      "Nippon Shinyaku," means Plaintiff/Counterclaim Defendant Nippon Shinyaku Co., Ltd., its successors, predecessors, assigns, members, directors, officers, employees, agents, and any other person acting on its behalf.

2.      "NS Pharma" means Counterclaimant Defendant NS Pharma, Inc. its successors, predecessors, assigns, members, directors, officers, employees, agents, and any other person acting on its behalf.

3.      "Sarepta" means Defendant Sarepta Therapeutics, Inc., including without limitation any corporate parents; corporate predecessors (including Antivirals, Inc. and AVI Biopharma, Inc.); corporate affiliates; past or present subsidiaries (directly, indirectly, wholly, or partly owned); joint ventures; divisions; departments; and any present or former officers, directors, managers, general partners, limited partners, principals, shareholders, agents, representatives, and employees of Sarepta Therapeutics, Inc., or any such predecessor in interest, parent, predecessor, affiliate, subsidiary, or joint venture. "AZL" means Academisch Ziekenhuis Leiden, along with any corporate parents; corporate predecessors; corporate affiliates; past or present subsidiaries (directly, indirectly, wholly, or partly owned); present or former officers, directors, managers, general partners, limited partners, principals, shareholders, agents, representatives, and employees.

4.      "BioMarin" means BioMarin Leiden Holding BV, BioMarin Nederlands BV, BioMarin Technologies BV, along with any corporate parents; corporate predecessors; corporate affiliates; past or present subsidiaries (directly, indirectly, wholly, or partly owned); present or former officers, directors, managers, general partners, limited partners, principals, shareholders, agents, representatives, and employees of these entities.

5.      "Prosensa" means Prosensa Holding BV and Prosensa Technologies BV, along with any corporate parents; corporate predecessors; corporate affiliates; past or present subsidiaries

2

## REQUESTS FOR PRODUCTION

**REQUEST NO. 1:**    Documents showing Sarepta's corporate structure, including organizational charts or documents showing affiliates, parent companies, subsidiaries, partnerships, joint ventures, acquisitions, and divisions, and any role each organization has related to the Accused Sarepta Products.

**REQUEST NO. 2:**    Documents showing Sarepta's leadership and company organization from 2016-present, including organizational charts or documents showing the names, positions, titles, duties, and reporting relationships of officers, employees, and other personnel in any groups, units, divisions, or departments who have or have had responsibility for or duties relating to the research, design, selection, development, testing, manufacture, use, regulatory approval or certification, distribution, export/importation, marketing, sale, sourcing, customer support, purchase, and/or licensing of any Accused Sarepta Products.

**REQUEST NO. 3:**    Documents sufficient to show each of Sarepta's relationships with any Third Party that are or have been engaged in the research, design, selection, development, testing, manufacture, use, regulatory approval or certification, distribution, export/importation, marketing, sale, sourcing, customer support, purchase, and/or licensing of the Accused Sarepta Products.

**REQUEST NO. 4:**    All Documents related to agreements or licenses between Sarepta and its related entities or any Third Party regarding the Accused Sarepta Products, including, but not limited to, agreements or licenses related to research, design, selection, development, testing, manufacture, use, regulatory approval or certification, distribution, export/importation, marketing, sale, sourcing, customer support, purchase, consulting and/or clinical trials (including clinical trial agreements).

**REQUEST NO. 5:**    All Documents and Things relating to conception, reduction to

13

from 2008 through 2011.

**REQUEST NO. 89:** All Documents related to any ownership, assignment, license, security interest, lien, or transfer of any right(s) in any Sarepta Patent, whether to or from Sarepta or a Third Party.

**REQUEST NO. 90:** All Documents related to Sarepta's agreements with UWA relating to the UWA Patent Family, including without limitation any correspondence relating to the negotiation of such agreements.

**REQUEST NO. 91:** All Documents relating to any patent licenses entered into by Sarepta regarding the Sarepta Patent-Practicing Products, including any patent licenses entered into to secure rights to manufacture, market, and/or sell the Sarepta Patent-Practicing Products, and any discussions related thereto regardless whether a license was executed.

**REQUEST NO. 92:** All Documents relating to any licensing or discussions of licensing Sarepta's patents that purportedly cover the Sarepta Patent-Practicing Products, including the UWA Patents.

**REQUEST NO. 93:** All Documents relating to the development of oligonucleotide therapies or intellectual property therefor, including without limitation any agreements Sarepta entered into with Third Parties, such as UWA, BioMarin, Prosensa, AZL, Royal Holloway, and/or individuals associated with these institutions.

**REQUEST NO. 94:** All Documents relating to any agreements relating to work leading to the conception or reduction to practice of any invention claimed in any Sarepta Patent, including without limitation any employment agreements, consulting agreements, or testing agreements relating to such work or persons conducting such work.

**REQUEST NO. 95:** All patents assigned to, owned by, or licensed by Sarepta that relate, in whole or in part, to the Sarepta Patent-Practicing Products, the manufacturing process for the

25

Dated:  March 11, 2022

MORGAN, LEWIS & BOCKIUS LLP

Amanda S. Williamson (admitted *pro hac vice*)
Christopher J. Betti (admitted *pro hac* vice)
Krista V. Venegas (admitted *pro hac* vice)
Maria E. Doukas (admitted *pro hac vice*)
Zachary Miller (admitted *pro hac vice*)
Guylaine Haché (admitted *pro hac vice*)
Michael T. Sikora (admitted *pro hac vice*)
110 N. Wacker Drive, Ste 2800
Chicago, IL  60601
Telephone:  312.324.1000
Fax:  312.324.1001
amanda.williamson@morganlewis.com
christopher.betti@morganlewis.com
krista.venegas@morganlewis.com
maria.doukas@morganlewis.com
zachary.miller@morganlewis.com
guylaine.hache@morganlewis.com
michael.sikora@morganlewis.com

*/s/Amy M. Dudash*
Amy M. Dudash (DE Bar No. 5741)
1201 N. Market Street
Suite 2201
Wilmington, Delaware 19801
Telephone:  302.574.3000
Fax:  302.574.3001
amy.dudash@morganlewis.com

*Attorneys for Plaintiff/Counterclaim Defendant Nippon Shinyaku Co., Ltd. and Counterclaim Defendant NS Pharma, Inc.*

35

## <u>CERTIFICATE OF SERVICE</u>

   I certify that on March 11, 2022, I caused a true and correct copy of the foregoing document to be served on the parties listed below via e-mail:

Jack B. Blumenfeld
Megan E. Dellinger
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
mdellinger@morrisnichols.com