IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NIPPON SHINYAKU CO., LTD., Plaintiff,

v.

SAREPTA THERAPEUTICS, INC., Defendant.

C.A. No. 21-1015-JLH

Monday, December 9, 2024
3:00 p.m.
Courtroom 2D

844 King Street
Wilmington, Delaware

BEFORE: THE HONORABLE JENNIFER L. HALL
United States District Court Judge

APPEARANCES:

MORGAN LEWIS & BOCKIUS, LLP
BY: AMY M. DUDASH, ESQ.
BY: AMANDA S. WILLIAMSON, ESQ.
BY: WAN-SHON LO, ESQ.
BY: KRISTA VINK VENEGAS, ESQ.
BY: MICHAEL T. SIKORA, ESQ.
BY: JULIE S. GOLDEMBERG, ESQ.
BY: ZACHARY D. MILLER, ESQ.
BY: DAVID L. SCHRADER, ESQ.

Counsel for the Plaintiff

APPEARANCES CONTINUED:

MORRIS, NICHOLS, ARSHT & TUNNELL, LLP
BY: RODGER D. SMITH, II, ESQ.
BY: MEGAN E. DELLINGER, ESQ.

-and-

LATHAM & WATKINS,
BY: MICHAEL A. MORIN, ESQ.
BY: DAVID P. FRAZIER, ESQ.
BY: REBECCA L. RABENSTEIN, ESQ.

-and-

FINNEGAN, HENDERSON, FARABOW,
GARRET & DUNNER, LLP
BY: WILLIAM B. RAICH, ESQ.
BY: RYAN P. O'QUINN, ESQ.
BY: D. BRIAN KACEDON, ESQ.
BY: YOONJIN LEE, ESQ.

Counsel for the Defendant

----------------------------

15:06:02 COURT CLERK: All rise. Court is now in session. The Honorable Jennifer L. Hall presiding.

15:06:11 THE COURT: Good afternoon. Please be seated.

15:06:16 All right. We're here for a pretrial conference part 2. This is Nippon Shinyaku v. Sarepta Therapeutics. It's civil action number 21-1015.

15:06:52 We've got a lot of folks in the courtroom today. We've got two pages of attorneys. Let's go ahead and put our appearances on the record.

MS. DUDASH: Good afternoon, Your Honor. Amy Dudash from Morgan Lewis for Nippon Shinyaku and NS Pharma. And with me are my colleagues from Morris Lewis, Amanda Williamson, Shan Lo, Julie Goldemberg, Jack Miller, Mike Sikora, Krista Venegas, and David Schrader.

THE COURT: Good afternoon, everyone.

MR. SMITH: Good afternoon, Your Honor. Roger Smith from Morris Nichols on behalf of defendant Sarepta. With me at counsel table from Latham & Watkins, Michael Morin, David Frazier, Reba Rabenstein. Also our co-counsel from Finnegan Henderson, William Raich, Brian Kacedon, Brian O'Quinn, and the first row, Yoonjin Lee, my partner Megan Dellinger, and our client, Mark Evans.

THE COURT: Great. Good to see everybody.

So before we get going, let me just let you know that we're obviously not in my courtroom right now. That's because Judge Murphy's in my courtroom trying a case. And that's because there was a water main break last week that shut the courthouse down. And so the challenge I'm having right now is just making sure that all of my pages and pages of notes are getting loaded onto this computer. You may or may not know, sometimes the government doesn't always have the best IT, so it's loading up. So I don't have any notes right now.

There's something counsel wanted to say before

we get started?

MS. DUDASH: I just wanted to bring to your attention the parties had reached agreement regarding two disputes that were in the pretrial order, if I could just flag those for Your Honor.

THE COURT: Great.

MS. DUDASH: Of course subject to your approval. The first being the length of time for the bench trial portion of the case. This was at the pretrial order amended paragraph 81, footnotes 10 and 12. The parties have jointly agreed to suggest to Your Honor 2.25 hours of time.

THE COURT: So that's an extra four and a half hours of trial time that we're going to do in the evening -- oh, 2.25 total or each side?

MS. DUDASH: Each side.

THE COURT: So that's four and a half total of bench trial hours that we're going to do in the evening?

MS. DUDASH: Yes, Your Honor. And my understanding is that both sides are also amenable to doing some portion, if it would fit Your Honor's schedule, while the jury is deliberating potentially on Friday, but of course that's up to your availability and preference.

THE COURT: Okay.

MS. DUDASH: And then the parties have reached agreement regarding Nippon Shinyaku's motion in limine #3

15:09:48 which was regarding what language could be used to refer to the IPR proceedings that had occurred. And if I could read it into the record, the language that the parties have agreed to is, "Before NS filed this lawsuit, Sarepta challenged the validity of the NS patents through a process at the patent office. It was determined that Sarepta's challenge to the validity of the NS patents had to be decided in this court rather than the patent office."

15:10:17 THE COURT: Okay. We have agreed on that?

15:10:21 MR. MORIN: We have. The only very brief thing I would just say for the record is Your Honor is aware from May we had proposed that more of the IPR come in on willfulness. You've ruled against us. We're not waving our rights with respect to disagreeing with that ruling, but in view of the ruling we have agreed to that compromise given Your Honor's ruling.

15:10:40 THE COURT: That's fine. Thank you.

15:11:18 MR. MORIN: Your Honor, not to interrupt, but if it would be efficient there are a couple of things that we wanted to inquire about that aren't in the pretrial order. If it would be efficient to raise them now while your notes are loading, we'd be happy do that.

15:11:33 THE COURT: Just give me one moment. My notes, if I don't write it down, it doesn't happen.

15:11:40 MR. MORIN: Of course.

THE COURT: All right. We're in good shape. All right. Let's go ahead and raise those, then.

MR. MORIN: Very briefly, if Your Honor wouldn't mind giving us some guidance or where and when to be for jury selection this Friday, that would be appreciated.

THE COURT: Absolutely. So the jury gets brought up when they're finished with the jury coordinator. That usually happens at approximately 9 a.m. Let me check with Mr. Kohler.

Okay. All right. So I'm informed that the courtroom 6D will be open, so everyone should appear there. And that will be happening in front of Judge Fallon.

MR. MORIN: Terrific. Very quick point. There's not agreement yet, but we've proposed to our friends to add one additional voir dire question just asking the jurors about any strong feelings about animal testing. Both sides did some. We don't intend to make it a big deal, but if anyone is going to be hostile to either or both sides, we'd like to add one additional question this we'll submit, Your Honor.

THE COURT: All right. I will take that under advisement and we have the voir dire. I haven't gone through it yet, but we'll post our edits to that. I'm sure we won't ask all the questions proposed, but we will add that to the list.

MR. MORIN: We will bounce it off our friends to make sure we're in agreement first. We haven't done that yet. To their credit, we haven't sent it to them yet, but it should be something simple and then we'll send it no later than tomorrow to Your Honor, if that's agreeable.

THE COURT: That's fine.

MR. MORIN: This is not as quick, we can take to the end, but we realized when we were looking through the pretrial order we have an unusual case here, as you know, that there's patents going both directions. And it occurred to us as we were looking through things that if both patents are upheld, in other words, found to be valid, then logically and mathematically there wouldn't be lost profits available to either side because it would be additional infringement by one side in that lost profits role, which would then have to be offset and the like. There's nothing to do yet, but we would like to propose an additional jury instruction question and something on the verdict form for that, which obviously doesn't have to be dealt with until next week, but we wanted to put Your Honor on notice that we'll be proposing something.

THE COURT: I was wondering what was going to happen with the competing lost profits. That's one of the first things that I thought about. Has this not been addressed in the expert reports or discussed between the

parties?

MR. MORIN: The offset has not been addressed and we realized it's on both sides, it's bilateral, both sides are seeking lost profits, but it's a very unusual situation where almost by operation of law, and no one has done the calculation, if they made more sales, if they win, then they would owe us more lost profits, so it gets nearly impossible.

THE COURT: And you're telling me this is just coming up?

MR. MORIN: I am, Your Honor.

THE COURT: That's -- that's incredible, because it was the first thing that popped off the page to me when I looked at the verdict form.

Okay. Counsel, do you have anything you have to say about that?

MR. MILLER: Yes, Your Honor. Zach Miller from Morgan Lewis, Your Honor. Opposing counsel just raised this with us last night and we haven't fully looked into the case law yet, Your Honor, to be able to address legally what the correct issue is. I don't think we agree factually that there is a problem with lost profits. But, you know, certainly we don't think that there should be any change to the verdict form just because, as a practical matter, if we instruct the jury not to provide a lost profits analysis, if

both patents are found to be valid, if the Court or an appellate court later reverses that validity finding, then we have to retry all of the -- all of the damages trial, Your Honor. And so what we would propose is something akin to our already proposed jury verdict where the jury is requested to provide a whether or not lost profits are awarded, and whether, if lost profits are awarded, both the amount of lost profits and then also an additional what the royalty would be for any units that are not subject to lost profits. That way, following the verdict, if it's found that both sides' patents are valid, then the Court could -- and Sarepta's argument that lost profits are not appropriate under the law, Sarepta could move for a judgment to address that damages issue and we wouldn't need to retry anything to the jury, the jury would have already found what it believed that the appropriate royalty amount is, and the parties could calculate the appropriate damages based on that information.

THE COURT: All right. Thank you very much. I don't think we need to hear any more argument on this. I don't want to make the record any more complicated than it is, but I'm sort of -- I think I understood what you were saying. I'm challenged to how the jury is going to understand anything about asking about numbers if we've got experts opining in a hypothetical assuming one side's patent

is valid and the other isn't. And then if the jury finds that not to be the case, I don't know what the jury is going to make of that in terms of putting numbers on the page. I'm just throwing that out there, because that puzzles me.

MR. MILLER: And, Your Honor, the experts have both provided their opinions on lost profit amounts. In both cases they've done all the mathematical calculations. There's nothing at this point that could change, because the -- based on the experts' previous opinion because they have done all of the calculations, I don't think it would be fair to allow the experts not to do new calculations based on some scenario they hadn't considered yet. So I don't know how --

THE COURT: But the experts have not said what happens, because you all have not thought about what happens if both sides' patents are valid.

MR. MILLER: We believe the experts have provided that analysis. And I'll take -- I'll advise you, Your Honor, we haven't seen any case law that opposing has indicated that lost profits can't go both ways when both patents are valid.

THE COURT: Isn't -- isn't this what's known in your field as somebody having a blocking patent over another, and doesn't that sort of change the whole framework about what we're looking at?

15:18:55 MR. MILLER: Not that I'm aware of, Your Honor. Have course we'll consider any case law that counsel advises us of, but we have seen -- you know, based on our understanding, our experts performed the correct damages calculation, at least damages calculation sufficient for a jury to find lost profits on both sides. And if counsel provides us case law to the contrary, we'll of course consider it, but to date we have seen nothing to suggest that this, counsel's proposed argument, actually has legal merit.

15:19:25 THE COURT: All right. Thanks very much. All right. Anything else before --

15:19:36 MR. MORIN: I'll be very brief. We will work with our friends and we'll figure out what we're going to try to submit. I can only apologize. There's a lot of smart people in this room and it became apparent to me when we were looking at things yesterday, that you talk about blocking patents. It's exactly what it is. And the secondary problem is if they sold 10 more units, they would owe us lost profits on ten more units and it all ends up going haywire, so in that scenario it should be a reasonable royalty. But I understand you haven't had the advantage of briefing or any more thought on the subject.

15:20:10 THE COURT: In fact, I've been using all of my available brain power, which isn't that much these days, to

try to analyze the 50 disputes that we do have.

MR. MORIN: All I can say, I personally apologize for bringing it up so late, but I also didn't want to let it linger until we're in the middle or done with trial and not having brought it up so that's why we're bringing it up.

THE COURT: All right. Thanks very much.

Okay. I'm not sure the right order to take these in. Some of them are easier than others, so let me assess some of the pending disputes that are fresh in my mind.

All right. Let's talk about Sarepta's four new Daubert motions. Motion #1, exclude NS's expert opinions and testimony applying a new and improper construction of "morpholino."

MS. LEE: And Your Honor, we prepared a couple of demonstratives. May I approach?

THE COURT: All right.

MS. LEE: Yoonjie Lee on behalf of Sarepta and UWA. Sarepta and UWA respectfully request the Court to exclude the testimony and opinions of the NS experts, Dr. Hastings and Dr. Wood, applying a new and incorrect construction of the term "morpholino antisense oligonucleotide" recited in the patent.

Before May 2024, NS' 112 theories each from the

15:22:35 idea claim of the Wilton patent is extremely broad, because 15:22:39 the claimed "antisense oligonucleotide" could include random 15:22:45 linkage.

15:22:45 In May 2024 Your Honor ruled that the claimed 15:22:50 antisense oligonucleotide must be 100% complimentary to 15:22:54 their target regions.

15:22:55 Since then NS has brought up additional 112 15:23:00 challenges and one of the challenges is based on the construction of the term "morpholino antisense oligonucleotide."

15:23:07 Now, Dr. Hastings and Dr. Wood argue that the 15:23:12 claim of the Wilton patent is still broad because the term 15:23:17 "morpholino antisense oligonucleotide" is broader than PMO 15:23:19 and includes inter-subunit linkages added in the phosphorodiamidate.

15:23:23 The problem with the NS experts' positions is 15:23:26 that these are squarely opposite to the position they took 15:23:29 before May 2024. So let's take a look at those positions.

15:23:35 Before May 2024, Dr. Hastings and Dr. Wood both 15:23:41 understood the term "morpholino antisense oligonucleotide" 15:23:45 is limited to only one inter-subunit linkage, the 15:23:52 phosphorodiamidate linkage. Dr. Hastings had a claim 15:23:57 construction declaration that was filed and served before 15:23:59 May 2024. In paragraph 110, Dr. Hastings equated the term 15:24:03 "PMO" with "morpholino antisense oligonucleotide." In

paragraph 111, Dr. Hastings reproduced a structure of, quote, "morpholino oligomers." And the only chemical structure that Dr. Hastings depicted in paragraph 111 includes phosphorodiamidate linkages. That's a PMO.

Dr. Hastings also conducted a testing for this litigation before claim construction ruling. In it Dr. Hastings only tested PMOs and when asked about in deposition, Dr. Hastings admitted the PMOs were selected for those testing based on our understanding of the, quote, "breadth of the genus at the time."

And Dr. Wood shared the same understanding before May 2024. On the right side, Your Honor, Dr. Wood's opinion in his opening expert report that was served before May 2024. In paragraph 61, Dr. Wood explained the phosphorodiamidate morpholino oligomers are called, quote, "morpholinos" or "PMOs."

In paragraph 58, Dr. Wood again equated the term "morpholino" with "PMO" twice. And else reproduced the chemical structure of a morpholino or PMO. That's the only chemical structure then Dr. Wood produced in paragraph 58, again including phosphorodiamidate linkages. That, again, is a PMO.

Now that the Court's amended construction requiring "100% complimentary" significantly narrowed the scope of the Wilton patent claim, NS amended their prior

position and now took the opposite position that the term morpholino antisense oligonucleotide is broader than PMO and includes other types of oligonucleotide linkages. But the Court's amended construction provides no basis for NS experts to change their prior positions and now improperly extend the claim scope of the Wilton patent by including something more in the PMO.

And we know that NS experts were right before May 2024 for at least two reasons. First, the intrinsic evidence is consistent with the term morpholino antisense oligonucleotide means PMO. During prosecution of the '007 Patent, which belongs to the same family as the Wilton patent-in-suit, the applicant explained to the patent office the term morpholino antisense oligonucleotide means the chemical structure of an oligonucleotide where nucleotides are joined by phosphorodiamidate linkages. That's a PMO.

The applicant also explained to the Patent Office that morpholino antisense oligonucleotide was well known in the art and cited 3 references, *Summerton* 1997, *Heasman* 2002 and *Gebski* 2003. And those are the three same references the applicants cited during the prosecution of the Wilton patents-in-suit in explaining to the patent office that the term morpholino antisense oligonucleotide was well known in the art.

THE COURT: Can you I ask you a question?

MS. LEE: Yes.

THE COURT: So the premise of your motion is that the other side's experts are applying an incorrect instruction, but the Court has not construed morpholino in this case, is that right?

MS. LEE: That is correct, Your Honor, because before May 2024 --

THE COURT: There wasn't a dispute before May 2024. The dispute arose later, but do they have a dispute now about the construction of morpholino?

MS. LEE: Absolutely, Your Honor.

THE COURT: And so are you asking me to construe it or are you just hoping I'll -- I need everybody to be precise about what they want me to do, because it seems like in a lot of these motions I feel like the Court is getting gamed. I'm not just saying it's coming from your side, I think it's coming from both sides. So you want me to construe this? Should I have a claim construction hearing and we construe this?

MS. LEE: Unfortunately, our position is that this issue should be resolved before the jury.

THE COURT: Okay. That's a different question. Do you want me to construe it?

MS. LEE: Yes, Your Honor.

THE COURT: Okay. So you're asking me for claim

construction of morpholino?

MS. LEE: And so that all experts agree on the same term and the same meaning so the jury can hear only the one meaning of the term which is PMO.

THE COURT: So yes?

MS. LEE: Yes.

THE COURT: So yes, I want you, Judge Hall, to construe the term "morpholino."

MS. LEE: Agreed.

THE COURT: Nowhere in the papers was that asked for.

MS. LEE: Well, before May 2024 all parties were operating under assumption --

THE COURT: Oh, I understand that completely. I'm just talking about right now. In getting prepared for the argument today, you say they applied an incorrect construction. There was no construction. I'm looking anywhere in your paper to say the Court should construe this and I'm not seeing that, which seems like your first position was going to be, we're trying to get their testimony completely excluded. If we don't win that, then we'll tell the Court we need to have it construed. So that approach is not good for me.

So the approach is we want to have it construed? Because they didn't get a chance to respond to that argument

15:29:32 that you want to have it construed, right? I'm sure they've got stuff they want to point to if the question is claim construction.

MS. LEE: Ultimately, Your Honor, disagreement turned out to be a little bit of a claim construction dispute because the term morpholino antisense oligonucleotide, before we understood to be the plain and ordinary meaning in the are, which means a PMO. And only after May 2024 that was the first that Sarepta heard through their experts explaining, no, no, no, no, no, the term morpholino antisense oligonucleotide actually means something else.

THE COURT: No. I know, but now it's December 2024. All right. Let me just -- I can tell you this -- and I appreciate your slides. I've read all of this, I understand it completely. I understand what the arguments are. There were a number of exhibits. I looked through every single one. I get what the argument is. I didn't get what you were asking me to do.

Let me hear from the other side. I'll give you a chance to respond about what you think I need to do about this.

MS. LO: This is Shan Lo from Morgan Lewis on behalf of Nippon Shinyaku. I believe that in their reply brief on this issue Sarepta conceded that their requested

relief was overbroad. They admitted that Dr. Hastings' opinions and calculations did, in fact, exclude inter-subunit linkage variations and then she offered additional opinions based on expanding on those. So we think that their initial requested relief should be denied.

THE COURT: I get that. They've asked for too much. You say they tried to trick the Court into excluding additional paragraphs that don't implicate the definition of morpholino.

MS. LO: Okay. Thank you.

THE COURT: I'm not going to be tricked by that, but I do want to know what your view is on what appears to be a claim construction dispute. Do you think they've waived it? Do you think they're asked for it too late? Does the Court need to resolve this before it can instruct the jury?

MS. LO: Well, it does appear that there is a live dispute. Now, I suppose that is within our control, but we do have a presentation about the intrinsic evidence that supports a broader construction of morpholino and cuts against a limitation that isn't even found in an embodiment or the written description into the claims. Counsel put up a lot of extrinsic evidence from Dr. Wood and Dr. Hastings' prior expert reports. We submit that that is a matter for cross-examination and that is extrinsic evidence. However,

the best evidence is of course the specification of the patent and the specification of the patent expressly contemplates nucleotides that do not have a phosphorus atom in the backbone.

THE COURT: It does, but it doesn't say that in the context of something being a morpholino, right?

MS. LO: Correct. And it's a general statement. And I can direct you either to the patent itself, which is an exhibit -- I'm sure you have it in front of you.

THE COURT: Thank you.

MS. LO: And I apologize, I do not have an electronic copy of this; however, if you want to turn to, there's only one slide. The patent itself is D.I. 612-1, Exhibit 9, and column 27, lines 13 through 20, which is highlighted on the slide says, "as defined in this specification, oligonucleotides having modified backbones include those that retain a phosphorus atom in the backbone," like native DNA and RNA, "and those that do not have a phosphorus atom in the backbone." And it goes on, "For purposes of this specification, and as sometimes referenced in the art, modified oligonucleotides that do not have a phosphorus atom their inter-nucleoside can also be considered to be oligonucleosides."

And below we have figures from our response brief as well as the *Summerton* and *Weller,* exhibit 2 at D.I.

612, article in which clearly shows that there are alternate inter-subunit linkages that do not have phosphorus atoms in the backbone.

And so what Sarepta is seeking to limit, the definition have morpholino, is not just to the phosphoryl group shown in the right, here, but to a very specific molecule that they showed up on the slide. That is not, that figure and that image, chemical structure is not in the specification. And the reason why we're here is because the only mention of morpholino in the patent is in a table heading that just mentioned in passing --

THE COURT: And in the claim that they're asserting.

MS. LO: Yeah. And in the claim that they're asserting, but they also find in the specification there's not clear evidence of an intent to limit.

THE COURT: Okay.

MS. LO: But I think.

THE COURT: Okay. Have a seat. Let me tell you what I think we're going to do and then I'll give you a chance to make a comment. I'm not going to construe the claim, so don't worry, but I'll give everybody a chance to tell me about what they think of my proposed approach.

What I think we should do, because a lot of this dispute relies on extrinsic evidence, including what the

experts in this case think that a morpholino is, and because we have very little in the way of instant evidence about morpholino, is I think that we should let everybody testify and present all of their opinions. The Court will decide, in the context of doing the jury instructions, what the construction of morpholino is and that's what we'll tell the jury. And then if somebody thinks they've got a great argument about it, such that they want to waste time on it at trial, and roll the dice about the Court not going their way about the construction of morpholino, then that's what we'll do.

My understanding of the law is, I don't need to decide the claim construction until I instruct the jury and I don't think that would be legal error. Let me hear from each side if you disagree and think that would be legal error what I propose to do and what you think about what I've proposed.

MS. LEE: So, Your Honor, the fundamental dispute is a little broader than claim construction. What the Sarepta and UWA ultimately is seeking for is to hold NS patents and NS experts to the position they held before. And that is pretty simple. Their position before May 2024 was the term morpholino antisense oligonucleotide was limited to PMO.

And Your Honor mentioned there was very little

intrinsic evidence, and respectfully, Your Honor, in our briefing we did identify the history of the '007 Patent, which is a part of the Wilton patent family and is a part of the extrinsic evidence where the applicant expressly defined the term morpholino antisense oligonucleotide to mean PMO.

THE COURT: So what you're saying this is like a witness estoppel thing or they raised the argument too late?

MS. LEE: I mean, ultimately the parties were operating under the same understanding before May 2024 that the term "morpholino" means a PMO. And then now they changed their position. If they were seeking to change their position compared to what everybody understood on the plain and ordinary meaning, I believe NS would like to approach the Court to ask for the claim construction explaining that now they changed their position of the meaning of morpholino antisense oligonucleotide from the previously understood plain and ordinary meaning.

And now, Your Honor, also the Federal Circuit in *O2Micro* explains the dispute about the claim scope -- of the claim term is something that the district court should consider resolving before it goes to the jury, otherwise this jury may hear competing construction as to the claim scope of the patent term and that leads to heightened jury confusion and ultimately the results might not be --

THE COURT: I understand. So the struggle that

I have is that it's your side is the one asking for relief. I could have gotten expert testimony on this if I had had a request for supplemental claim construction. Now we're in the in a position to be able to do that. And --

Thank you very much. Anything else you want to say? But you agree with me, I think based on what you said about *O2Micro*, that it just needs to be construed before the case goes to the jury?

MS. LEE: True, but I guess the ultimate question here is whether the experts should be upheld to the positions they took before May 2024. That is Sarepta's ultimate position that they should be.

THE COURT: All right. Thank you very much.

MS. LO: Your Honor, we are fine with your proposal.

THE COURT: All right. So on this dispute we're going to go with my proposal and the experts can testify about what they think it means. The Court will look at the intrinsic evidence and the extrinsic evidence, including the testimony, and I'll instruct the jury on morpholino.

I suspect this dispute is going to go away. And if it does, you should let me know if and when it does, if NS, for example, decides not to present this part of it and you represented that you had an independent opinion even if I agree with them on the definition of morpholino.

Okay. Sarepta motion -- excuse me. Sarepta Daubert motion #2. This is, I think, the third similar such motion, having to do with Dr. Wood. I have a few questions about this, one of which is I'm completely at a loss as to why we're talk about inventorship. Is Dr. Wood going to testify about inventorship? I don't understand what's going on here.

MS. RABENSTEIN: Reba Rabenstein of Latham & Watkins for Sarepta.

The only legal standard in any of Dr. Wood's reports -- and to be clear, Your Honor, we're not challenging the earlier reports, we're just focused on the supplemental one. That was what was at issue with these Dauberts. But the only legal standard in any of his reports is for a person of ordinary skill and inventorship. And he testified at his supplemental deposition that he is not offering opinions on the invalidity of the Wilton patent, on written description or enablement, and he has no legal standards for those in his reports.

THE COURT: Okay. So just back up a little bit. So he put a legal standard about inventorship? Are you expecting him to testify about inventorship or are you just saying that to make the point that he didn't put the legal standard for 112 in his report?

MS. RABENSTEIN: I'm sorry, Your Honor. He is

going to testify about his analysis of inventorship. His legal standard on inventorship talks about what the inventors recognized and appreciated.

THE COURT: Okay. Stand by.

Is he going to testify about inventorship?

MS. LO: No, Your Honor.

THE COURT: Okay. He's not going to testify about inventorship. You can see why I'm confused.

MS. RABENSTEIN: I understand why you're confused. We're confused to a certain extent too, right?

So, again, that is the only legal standard in his expert report.

THE COURT: Okay. I get that. He's not going to testify about it. So let's pretend it's not there. We're not talking about inventorship.

MS. RABENSTEIN: The issue with the supplemental reports, and the reason we're seeking some exclude them, if you recall, Your Honor, these reports are limited to issues on which Nippon Shinyaku bears of the burden of proof that were implicated by the Court's clarified claim construction. The only issues that are implicated by that are with respect to the invalidity of the Wilton patent. Those two issues that will go to the jury are written description and enablement. And Dr. Wood testified at his supplemental deposition he is not testifying on, and I have the

language -- oh, I'm sorry. I have slides, if that can help.

THE COURT: Sure.

MS. RABENSTEIN: So this is testimony from Dr. Wood's supplemental deposition where we asked him point blank, are you testifying offering opinions concerning the validity of the '851 Patent? He's not. He's not offering opinions on written description. He's not offering opinions on enablement. We asked him before about his declaration from before where he said he's not offering these opinions and he said I'm standing by that. And we asked him point blank, "You're not providing opinions to support NS's arguments on invalidity but just not saying the words 'invalidity' yourself?" And he answered, "I'm not expressing an opinion on the validity of that patent."

The supplemental reports are limited just to the invalidity of that patent, and so those supplemental reports should be excluded. He still has his other reports.

THE COURT: So I just want to make sure I understand. I mean, there's no question that they're offering his testimony as an expert to give evidence to the jury that is relevant to validity. Just one second.

That is what you were doing, right?

MS. LO: Yes, Your Honor.

THE COURT: And but -- and so you're saying they shouldn't be able to do that?

MS. RABENSTEIN: Correct. He has said he's not offering evidence for validity.

THE COURT: Where? Where did he say that?

MS. RABENSTEIN: The question at top on the left, "Now you're not offering opinions concerning the validity of the '851 Patent, correct? And he said, "That's correct."

THE COURT: You knew what he was offering because you had his report and you knew it was relevant to validity, right?

MS. RABENSTEIN: Right, except for what's in his report is a discussion of him looking outside the four corners of the specification, looking at materials on publications and other things, extrinsic evidence, and saying this is what Dr. Wilton and Dr. Fletcher would have recognized and appreciated about their invention. And then he uses that "recognized and appreciated" language, which is from his inventorship standard in his expert reports, to say they didn't have possession of the invention and that is going to be confusing and misleading to the jury. And they, Nippon Shinyaku, bears the burden of proving that Dr. Wood's offered testimony in his supplemental reports meet the Federal Rule of Evidence 702 requirement for fit, which means it has to help the jury decide an issue in the case. And it has to not mislead or confuse the jury.

And I proffer, Your Honor, that if he's offering his analysis of inventorship and using a standard --

THE COURT: He's not offering inventorship.

MS. RABENSTEIN: If he's offering an opinion about what the inventor -- or excuse me, what the inventors recognized and appreciated about their invention, that is going to confuse and mislead the jury because that is not the written description standard. The written description legal standard that the jury will be tasked with answering is looking at the four corners of the document, what would a person of ordinary skill, taking an objective look, what would they understand the inventors to have possessed?

THE COURT: So let me just ask you -- I understand your argument about this. It would be improper for him to sort of talk about what the inventors subjectively thought they invented. I thought we dealt with that the last time. Is he or is he not going to say this is what the inventors thought they had invented? He's not going to say that, right?

MS. LO: Your Honor, I would just like to point out that my friend is extrapolating opinions from Dr. Wood's former reports into his current reports. Nowhere in his supplemental reports does he use this language of inventorship or --

THE COURT: Just confirm for me right now. He's

not going to say anything about what the inventors thought they had invented?

MS. LO: Correct, yes, Your Honor.

THE COURT: We're taking that off the table too.

MS. RABENSTEIN: One point, Your Honor. There are paragraphs in his supplemental reports where he talks about what they recognized and appreciated.

THE COURT: Okay. Let's look at that. Pick your best one.

MS. RABENSTEIN: Sure. Here you go. This is actually his testimony about -- so we asked him -- let's go back to exhibit 101, which is the opening supplemental expert report. And if you turn to paragraph 58, you see a sentence there. It says, finally --

THE COURT: Can you just show me the report. I'm sorry. I'll give you plenty of time. Can you just tell me which report you're talking about here.

MS. RABENSTEIN: So this is the opening supplemental expert report.

THE COURT: Which exhibit is that in your appendix?

MS. RABENSTEIN: It's exhibit 5.

THE COURT: Okay. Stand by.

MS. RABENSTEIN: Or no, that's the supplemental. One moment while I step away.

MS. LO: Your Honor, if I may, this is --

THE COURT: 17?

MS. LO: Exhibit 7, I believe page 21, and the statement is that it reflects --

THE COURT: Well, have a seat. We'll let you talk in just a second.

Paragraph 58. Stand by. All right. Go ahead.

MS. RABENSTEIN: So paragraph 58, that's page 21 to 22 of exhibit 7. "Finally, that this publication came two years after the priority date reflects that Drs. Wilton and Fletcher had neither made nor recognized nor appreciated that the reported exon skipping activity of SEQ ID 195," that's the ID in the claims, "or other 'sub-optimal' sequence could be extrapolated to the PMO backbone chemistry as of the priority date."

THE COURT: Understood. So I see what you're saying. So really it should say, if this is what his opinion is, a person of ordinary skill would think that, based on this Dr. Wilton and Fletcher neither had made nor recognized nor appreciated. Is that what he's going to say?

MS. LO: Yes. And this paragraph is responding to Dr. Dowdy's contention that any POSA would have done that extrapolation. Dr. Wood is responding that based on the state of the art at the time as well as afterwards, it shows that this extrapolation was not within the general

knowledge.

THE COURT: Yeah. Yeah. So the point here is is this was not worded great. And the jury is going to be instructed on the applicable standard, which is what a person of skill in the art would take from this.

MS. RABENSTEIN: Correct. And our view with respect to the motion to exclude Dr. Wood is that if he is able to offer this poorly worded testimony, it's going to mislead and confuse the jury.

THE COURT: Well, he's not going to. We're not going to let him say this. And if he says something about what the inventors thought or appreciated, you're going to object and I'm going to sustain it and we're going to rephrase the question to make clear what his opinion is and/or we're going to offer a supplemental instruction on that.

MS. RABENSTEIN: Thank you, Your Honor.

THE COURT: But you're asking to exclude his entire supplemental report, though, is that right?

MS. RABENSTEIN: Yes, Your Honor, because he had said -- and again, it is not his belief -- like, he fully believes and he testified that he's not opining on the invalidity of the Wilton patent. He's come out and said that repeatedly. He even said that most recently in his deposition transcript, except that's precisely what NS is

trying to do. And what Nippon Shinyaku has told Your Honor, in some of the previous briefing about Dr. Wood's, again where he was applying this inventorship standard, they had said, look, it should be evidence from his reports, that he's not talking about written description. But they've turned their -- they've turned that theory around now and they're saying well, of course it's relevant to written description and of course we're going to offer it in support of our arguments for invalidity, which is something Dr. Wood himself does not believe it's being offered for.

THE COURT: Let me ask you that. I don't remember that. Where did he say he's not going to give evidence relevant to written description?

MS. RABENSTEIN: So that was in one of their prior briefings. I think it was D.I. 387.

THE COURT: Stand by.

MS. RABENSTEIN: And that is in our reply brief. I can pull the cite to it, but we quoted it in our reply brief. So in our reply brief at page 6, we explained that NS previously asserted, quote, "Nowhere in any report does Dr. Wood opine on the invalidity of the Sarepta asserted patents," end quote. And again, quote, "it should be clear from the reports themselves that Dr. Wood is not opining on the invalidity of the Sarepta/UWA asserted patents under the written description requirement," end quote. That's D.I.

387 at 2. And they emphasized the word "not" in the original briefing.

THE COURT: So you take that statement to mean that he's not going to offer any evidence that might be relevant to the ultimate issue of written description?

MS. RABENSTEIN: Correct. That's their own characterization of his reports and the analysis that he's doing.

THE COURT: Stand by.

Okay.

MS. RABENSTEIN: Do you have further questions Your Honor. I mean, I can continue on, but --

THE COURT: I do. So your view is Dr. Wood should be able to tell the jury that exon skipping is unpredictable because that's relevant to 112?

MS. RABENSTEIN: That's not our view. Our view is we're only to seeking on exclude what is in his supplemental expert reports. Recall, Your Honor, that the Dauberts here for limited to the supplemental expert reports from your scheduling order, so we're seeking to have whatever he has in those supplemental expert reports excluded. That testimony is off the books. They can't use that testimony.

Now, one thing I do know you had noted, and my apologies for this, it was not clearly worded, but in our

15:54:20 cover motion we mentioned we want to exclude the supplemental expert reports including any references that he had made and they're incorporated by reference into the supplemental reports from his prior testimony. We meant that in context of excluding the supplemental reports as a whole. So the supplemental reports should be out. Anything that's in them should be out in that context, but we're not challenging the reports.

15:54:47 I should also add, excluding these supplemental reports, there's no prejudice to Nippon Shinyaku here. And the reason why there's no prejudice is because they have another expert, Dr. Hastings, who is going to be testifying as to written description and enablement and her opinions. And when we asked her at her supplemental deposition whether she was relying on Dr. Wood, you can see here, she said no, she's not relying on him. And if anything, all they're doing is something cumulative. So as she explained here when we asked her what are you doing with Dr. Wood, she said, "Look, we have similar expertise in terms of the use of antisense oligonucleotides. And he," Dr. Wood, "agreed with me, and I agree with him, on our opinions." So Nippon Shinyaku has a separate expert who is going to come and talk about written description and enablement. So excluding Dr. Wood here excludes the risk of confusing the jury with respect to his testimony. And there's no prejudice to NS on

the other side because they'll still have Dr. Hastings to be able to speak to these opinions.

THE COURT: All right. Thank you very much.

MS. LO: So, Your Honor, we have some voluminous prior filings on Dr. Wood in which we compiled Sarepta's attempts to exclude his opinions and strike his opinions for one basis for another. So it's now really repeating itself. It's circling back to the same arguments that the Court previously rejected.

And I want to point out that in their reply Sarepta doesn't even attempt to deny that it raised nearly the same argument in its prior unsuccessful Daubert motion to exclude Dr. Wood at D.I. 393, 395 and 533. And D.I. 489 they raised the same issue, Dr. Wood's testimony wrongly intermingles two separate legal concepts. I think you just resolved that today.

But also, Sarepta makes no attempt to explain how its current argument, which is lack of relevance and no fit, is not squarely contrary to its prior assertion to this court again in seeking to exclude Dr. Wood, that his opinions are pertinent to evaluating written description.

With respect to the statements about Dr. Wood not offering those opinions, we never said that he would not offer evidence relevant to written description and enablement. And, in fact, the subject matter of his

testimony, which was set forth in his declaration that has been raised multiple times, D.I. 309, the first thing he says is to offer my opinions relating to the state of the art of exon-skipping therapies for the treatment of DMD. And that is the subject for which he is uniquely qualified in this litigation. Dr. Dowdy doesn't work in exon skipping much less for DMD. Dr. Hastings is an expert on antisense oligonucleotides for splice switching, but she doesn't have specific experience in DMD. And he is a long-time researcher, he was there, he has facts that are highly relevant, highly probative and will be highly informative to the jury in assisting them to reach decisions on the validity of both sides' patents. And I could go on, but --

THE COURT: Nope. That's good. Thank you very much. I appreciate it.

Okay. We took a careful look at this one. We read everything that had happened before. I know it's all fresh in your minds, but we've had hundreds of motions and 10 trials since the last time we were last in the room together, so we spent the time this weekend and looked at everything.

The basis for the motion as filed was under Rule 702 and 403. The motion is requesting to exclude his entire supplemental report. That's going to be denied.

The main argument seemed to be that it was not

testifying about the ultimate issue, he's irrelevant or confusing. And I disagree with that.

We also had an argument that he had promised not to testify about evidence relevant to written description and enablement and we looked at all of the figures carefully and I heard the oral argument today and I agree with NS that they never said they'd never offer opinions on scientific stuff that was relevant to 112. So I reject that argument.

We've also got an argument that NS already had one expert on 112 so they shouldn't have another one because, one, she didn't rely on Wood, and 2, it's improperly cumulative. We reject that as well for the reasons stated by NS's counsel.

I think it's perfectly appropriate for Wood to testify, for example, that exon skipping was unpredictable as of the relevant date. It's relevant to written description and enablement. The state of the art as of the priority date, perfectly appropriate for him to testify about -- and I don't think that it's improper bolstering, which was another argument raised by Sarepta.

I think that covers everything I have in my notes on that. So that's the --

All right. Next we have Sarepta motion #3. Let me just tell you how I'm thinking about it, which might make this go a little faster and then you can tell me why I got

it wrong.

I read the cases that Sarepta cited. And it seemed to me that this was a little bit different of a situation than what was in those cases, because here we've got a claim that's directed to a molecule, but it uses the comprising format and so in a sense it's a genus claim because it says it's using a comprising format even though it's a molecule. And Sarepta says that these 5 prime and 3 prime modifications fall within the claim, and so if the genus is broad enough to cover them, doesn't the full scope have to be enabled. And I recognize that none of the cases that I have deal with this situation, but that's how I'm thinking about it.

So I get that Sarepta has framed the issue as whether unrecited elements need to be enabled. I don't know it's that helpful in this context where the claim is to a molecule, but it really is a genus claim. So for example, you wouldn't say that, you know, 20 years from now somebody invented a flying car. You wouldn't say that. You know, mixing the oligo with a flying car, you would have to enable the flying car, but this is a different situation because we're talking about a comprising claim directed to a molecule. And you do need to enable the scope of the claimed genus.

So that's how I'm thinking about it. How do I

have it wrong?

MR. FRAZIER: Thank you, Your Honor. David Frazier from Latham. So I think your point about it being a comprising claim is right on. And I think, frankly, and we cited the *Therapeutics* case, the *United Therapeutics* case, and that's actually illustrated so we cited it for the proposition that the party there had tried to read into that claim -- it's a method of treatment claim and there was an attempt to read in say, oh, it has to be safe it has to be efficacious, and the Court rejected that. Probably also interesting in that case, that is a comprising claim for a pharmaceutical composition, so the pharmaceutical composition contained a drug and then it's made in certain ways and so forth, right? And so this is where we get to this idea that they're taking -- they say they plan to have Dr. Hastings come and testify, well, people in the prior art knew various ways to modify the ends. And I've looked in the patent and I don't see examples of all of that and so the patent is essentially covering all those prior art ways of modifying ends and it must not be enabled because it should have shown me examples of all of that. And so I'm just drawing the analogy that you think of sort of a standard pharmaceutical composition claim that says a composition comprising a drug and maybe that's it, drug and water, and you can say, oh, well, suppose you put gasoline

in there, suppose you put cyanide in there, you didn't enable it, you didn't tell me not to do all the things the prior art knew that might mess up the claim. I feel like that's what they're doing here. And so --

THE COURT: Let me ask you about that. I appreciate that. That makes sense to me. But this isn't a composition claim, it's claiming a molecule, right?

MR. FRAZIER: It is.

THE COURT: Doesn't that make a difference?

MR. FRAZIER: I don't think, Your Honor. They're essentially talking about modifying the molecule in some way, so they're saying a person of skill can think of ways to modify this molecule using prior art methodologies and it will mess it up somehow, so it will no longer be effective. And my point is just that that's not enablement, that that's essentially raising the bar and saying I need -- you know, that we needed to go through in our specifications and say, well, don't do that, don't do that, and don't do that. And you would have to go through every idea in the prior art or how one can modify a molecule if that were the standard.

THE COURT: Isn't that the risk you take when you claim a molecule with a comprising claim? Maybe this is giving a little theoretical, but that's not -- a lot of times we don't see that type of a claim for a molecule or if

we do, we have this argument about what the genus is that it covers and doesn't the full scope have to be enabled.

MR. FRAZIER: Well, I think we have here the structural components of the molecule, that it's very clearly set out in the terms of its length and the backbone and all of these things. And so, the idea then that just because it's a comprising claim that you have to deal with, you know, what if I put something on the end, I don't think that's the way comprising claim enablement typically works of saying, you know, I have to essentially go through and exemplify every aspect of the prior art that somebody could do. I think, you know --

And you know, the other point here being, obviously the reason people make those modifications is for them to work and so they're sort of saying, well, you didn't exemplify all the ones that didn't work or you didn't tell me the ones that maybe wouldn't work is where I think they're trying to go with this. And the point is sort of it's not required that you put them all in the first place. We said our invention was this thing, it's comprising this, it has ends. If you want to put something on there, that's on you is where the invention leaves it. And it says that the art knew some things you could do. You could try to make it better, but we've given you a whole enabled invention which is this thing, and that that's consistent

with the enablement law and it's consistent with those cases that we cited, the *United Therapeutics* and so forth, that you take the claim as it's written with the words that you see and you don't then drift off and look for issues on words that aren't in there.

THE COURT: All right. Thank you very much.

MR. FRAZIER: Thank you, Your Honor.

MS. GOLDEMBERG: Good afternoon, Your Honor. Julie Goldemberg on behalf of Nippon Shinyaku.

I think Your Honor is correct. Sarepta can't have it both ways. It wants to claim -- it wants a claim that covers the AO with the N modifications, but it doesn't want to have to enable them and that just isn't the bargain that patentees make with the general public.

I want to point Your Honor to the specification that states that the modifications fall within the scope. It was cited in our briefing. It's column 27, lines 47 to 59, and I think it's important that in that part of the specification they describe these as modifications of the oligonucleotides of the invention. So once again, it's 27, lines 47 to 59. And so clearly it is within the scope. They've said it falls within the scope, they need to enable the full scope.

We heard some oral argument as well about *United Therapeutics*. And Your Honor said, well, isn't it different

when it's a molecule versus the composition claim in *United Therapeutics*? And you're absolutely right. In fact, in that case the Federal Circuit said that calling the composition claim in *United Therapeutics*, likening it to a genus species claim, which is what this is basically is an inapt analysis.

And then finally, the molecule must have something on the end. A skilled artisan would know that. We've got a disclosure of possibilities including what's listed here. This is part of the molecule. They need to enable the full scope of the invention.

So unless Your Honor has any questions.

THE COURT: All right. Thank you very much.

MS. GOLDEMBERG: Thank you.

THE COURT: So none of the cases, as I mentioned, cited by the parties, I think none of them are exactly on point. This I think was probably the most interesting legal issue that we had before us, and so, I mean, for the argument, having read the case law, on this one I'm going to deny Sarepta's motion.

At the end of the day, I think the best analogy is to say that this is a genus claim and that the full scope of the claim needs to be enabled.

And again, I'll say for the record, the situation here is that Sarepta has taken the position that

these modifications fall within the scope of the claim. So that's not the question before the Court, that's Sarepta's position, so in light of that, the motion is going to be denied.

All right. Now we have Sarepta motion #4. And this one seemed to have multiple parts. So let's hear from Sarepta.

MR. FRAZIER: David Frazier, again, Your Honor, from Latham. What we're trying to do here is we're seeking to exclude Dr. Hastings' testimony that claim 1 of the '851 Patent fails under written description because based on her review of non-public laboratory notebooks she disagrees with the results in the patent. And so, essentially, you know, the patent says what it says about certain oligos having certain activity and she goes back and looks at the laboratory notebooks and says, well, I disagree with the conclusion that was drawn based on the date that the inventor had available, so I want to tell the jury that that's a written description problem for the patent.

And so all we're saying is we don't think she should be able to say to the jury this patent has a written description problem because I've checked out the lab notebooks underlying it and they don't describe what's in the patent and therefore it's a written description problem. I think that's just wrong as a matter of law.

THE COURT: Well, that's a little bit different than what she's saying though, right? She's saying this is what a person of ordinary skill in the art would have taken and they would have taken that a person would be suspicious and so her looking to see what the inventors actually did, isn't that -- isn't that relevant and corroborates her suspicion? Doesn't it corroborate what she's saying?

MR. FRAZIER: I see what you're saying, Your Honor, but I don't think that's what the law allows. I think the law actually says look at the four corners. Obviously, in the -- for example, they cite the *Biogen* case. You may have some terms that need to be defined, I think in *Biogen* they had some sequences that were deposited. So you're going to sometimes pull from other sources, particularly public sources, but I don't think written description allows a study of, you know, what was in the inventor's mind and then a comparison of that to the disclosure of the patent. I think the patent disclosure is the patent disclosure. And it sort have also goes to this idea we see in the *Alcon* case, and which just came up again in the *Allergan v. MSN* case, written description is really about description and disclosure, not so much about does it work. And I think this is where we're going is that it goes to, oh, did it work or not, when really the question is, I've got a patent, I've got a characterization of data in

the patent, this is an oligo that you use, and it works this well. That's described, with respect to that. We can argue about the genus, but, you know, that type of result, that's a relevant argument or relevant disclosure and you don't need to then go back and say, oh, well, I looked at the underlying data and, you know, it has this or that problem.

THE COURT: Can I ask you this?

MR. FRAZIER: Certainly.

THE COURT: Is Sarepta going to present an invention story for this patent?

MR. FRAZIER: We are, Your Honor. Yes, of course. And so that is the case. That's why I say our limit here is really just on this idea that we're going to tell the jury that it's relevant that, you know, that this is not -- this is not adequate written description unless I can go and find a lab notebook and say this figure 2 corresponds to this experiment conducted at this time.

THE COURT: What's the invention story relevant to?

MR. FRAZIER: Yeah, I mean, I think that's a -- presumably it's background, it's, you know, those sorts of things.

THE COURT: I mean, because what it -- I guess what they could argue is you're going to talk about everything you did, and then you're not going to let their

experts talk about everything you did.

MR. FRAZIER: And I think -- I take that point. And I think we wouldn't object to their experts talking about everything he did. What I'm worried about is just a slide that says problems with written description, notebook doesn't support, you know, something like that, something like that. So I think if they wanted to have a counter to the invention store, I don't think we would quarrel with that, I think it's just where you pigeon hole the evidence for the jury and where you tell the jurors the law requires something.

THE COURT: What if their slide said person of skill in the art would be suspicious by very faint reporting, and by the way, supporting my opinion that a person would be suspicious of that is the fact that I went back and looked at it and they had every right to be suspicious?

MR. FRAZIER: I assume that's what they're planning to do, and I think that's my point.

THE COURT: You don't think they should be able to do that?

MR. FRAZIER: I don't think they should be able to do that.

THE COURT: All right. So that -- I understand your argument on that. But I do -- you did raise another

issue, which had to do with therapeutic stuff and there were a couple of paragraphs of Dr. Hastings' report that looked a little problematic to me. Do you want to address that?

MR. FRAZIER: Yes. So part B is the suggestion that she's going to say that written description for Claim 1 requires therapeutic results in the specification. We think that's just wrong as a matter of law. The specification is written in terms of benchtop results in cells and that's perfectly appropriate. Again, we're mixing written description and enablement, but if you look back at *Brannan* and sort of the classic cases, it's sufficient even for a treatment claim to have a pharmacological sort of assay, and that's what we have here. All the claim says is that there is skipping, there's no requirement in the claim for therapeutic -- so we think it would be wrong to tell the jury that there's a flaw in the patent because it doesn't have therapeutic data in it.

THE COURT: All right. Thank you very much.

MR. FRAZIER: Thank you.

MS. GOLDEMBERG: Hi, Your Honor, Julie Goldemberg again on behalf of Nippon Shinyaku. So I'll address each argument in turn. The first one being that Dr. Hastings can't even refer to laboratory notebooks that she relied upon after she noticed the description of very faint exon skipping in the specification. And she had questions

about what that would mean. She found that that's subjective, what might be very faint or one artisan might be strong for another or might have a different meaning, so she wanted to look and see what evidence. She looked to the lab notebooks, which I think, as Your Honor said, was a reasonable thing for her to do to see what was going on.

THE COURT: But she's not going to say because the lab notebooks say this, this somehow means that there's a lack of written description because the inventors did or didn't possess something. She's not going to say that, right?

MS. GOLDEMBERG: She's going to keep her analysis tethered to the specification.

THE COURT: Right. And we're going to tell the jury that the analysis is based on the specification.

MS. GOLDEMBERG: Absolutely.

THE COURT: Right.

MS. GOLDEMBERG: That is what the law is for written description.

THE COURT: Okay. I think -- I don't know how much more of a dispute we have about this. Counsel?

MR. FRAZIER: I think we agree with that. If that's the standing that she's not going to say that that's a flaw of written description because I looked at the notebooks, then that's where we want to be.

THE COURT: Okay. I proffered what I thought was relevant about it. There's some relevance, she can talk about it, but she's not going to cross the line and say therefore it lacks written description because the inventors didn't possess something. Okay.

All right. Let's talk about the second part. I was looking at exhibit 4, which is her expert report. So I looked at paragraph 109, which is on page 50 and there seemed to be a flaw in logic here. And I found this in a couple pages or paragraphs, which basically says, because the claim requires exon 53 skipping, it would also cover therapeutic exon 53 skipping, and therefore you have to enable therapeutic exon 53 skipping. That's not right, right?

MS. GOLDEMBERG: It actually is. And I'll point Your Honor to the *Magsil* case, which was cited in a motion for summary judgment that we had filed, but I don't think it was cited in these papers here. So they're certainly aware of this case, but if you disclose a claim broadly, undoubtedly they would say therapeutic skipping falls within the scope of the claim. In fact, that's exactly what our product does that they're trying to say infringes it. So if that's the case, you need to again enable and have written description for the full scope of the claim, all levels of the claim from very faint skipping to complete skipping.

The cases from the Federal Circuit have held that, and are continuing to go in that direction.

THE COURT: What case says that? Because I thought the cases say if you just claimed some effect you just need to have some of that, you didn't need to have therapeutic effect.

MS. GOLDEMBERG: It's the Magsil case. I'll give you the cite. It's Magsil Corporation v. Hitachi Global Storage Techs., Inc., 687 F.3d 1377. That's an enablement case. And you'll also see similar concerns from the Federal Circuit regarding written description.

THE COURT: Stand by.

MR. FRAZIER: Do you have a copy of that case per chance. It's not cited in the brief.

MS. GOLDEMBERG: I don't. It was cited in the summary judgement that we had filed earlier, but I didn't bring it with me today. I didn't expect it to be a focus, but she asked the question, so I wanted --

MR. FRAZIER: I didn't expect the case to be a focus either.

MS. GOLDEMBERG: I apologize.

THE COURT: Well, the cases that I had said if you don't claim the therapeutic effect, you don't have to enable a therapeutic effect. So unless the case says something different, which I guess we'll go back and take a

look at it, I can't imagine it does. Did you say you don't have a copy?

MS. GOLDEMBERG: I didn't bring a copy because I didn't expect it. The focus if this motion was description law, and that's why -- you asked about enablement. It's an enablement case.

THE COURT: So they raised this issue about therapeutic effect, so paragraph 109 looked problematic to me. Paragraph 110 looked problematic to me on this issue. I couldn't tell if 112 was problematic. Exhibit 17, paragraph 81 looked problematic to me for the same reason. Exhibit 3 looked mostly okay, except for paragraph -- I don't think I meant 3. Well, I'm not sure what it was in my notes, but the general link between all these paragraphs I've pointed out are sort of the suggestion that you needed to enable therapeutic effect.

MS. GOLDEMBERG: They've only moved on written description, so to the extent that now the issue before the Court is enablement --

THE COURT: Okay. Well, written description described therapeutic, that you were in possession of something with therapeutic effect. My apologies.

MS. GOLDEMBERG: Understood. Yes. But I've heard argument citing the *Alcon Research* case and other cases that do know the difference and the difference in

requirements. So to the extent Your Honor is inclined to exclude anything based on enablement, we would just perhaps request a an opportunity to submit a brief letter providing that case law, because that wasn't something we had gathered. I was just aware of the *Magsil* case from a previous summary judgment motion, but we want to sort of give you the best cases that we're aware of for this.

THE COURT: Understood. Well, let's do this. We've been going for a little while now. Why don't we just take a 15-minute recess and I'm going to double-check my notes and the cases cited and we'll be back. We need to try to get as much of this resolved as possible because we've got a ton more disputes. We'll take a brief recess.

COURT CLERK: All rise.

(A brief recess was taken.)

COURT CLERK: All rise.

THE COURT: All right. Please be seated.

MS. GOLDEMBERG: Your Honor, we just wanted to state one more case on the record. It was cited in the documents. It relies on *Magsil* but actually applies more to the circumstances. The *Baxalta v. Genentech* case, 579 F. Supp. 3d 595, and it was cited in our responsive brief to their motions, to their Daubert motions. But it was -- it was cited in response to number 3 because that was an enablement issue, so we just wanted to make sure that that

was in front of you.

THE COURT: What technology was that case?

MS. GOLDEMBERG: That was antibody.

THE COURT: Okay.

MS. GOLDEMBERG: Perhaps a little bit more similar to what's going on here. It required enablement of the full scope of the claims despite the fact that there wasn't like an improvement like in *Magsil* where it was a percentage improvement. So that was what we wanted to point your attention to.

THE COURT: I appreciate it. Thank you.

MS. GOLDEMBERG: Thank you.

THE COURT: Okay. Any response?

MR. FRAZIER: And Your Honor, just very briefly on the *Baxalta* case, I think the point there is that was more your classic antibody case where essentially you're claiming a result, you literally have no idea what the structure of the remainder of the genus is, so it's very different from our situation. We've got 168 sequences that people know exactly where they are targeted, and so, it we think it's quite different from that. I'd also point out on appeal the Federal Circuit upheld the *Baxalta* case, but it did not touch the part that they're relying on that is related to the therapeutic level of the activity. The Federal Circuit focused it is opinion solely on the

structural aspects and this point that in a classic antibody claim, the function of an antibody, because describing the structure of it that's where the Federal Circuit's opinion was focused.

THE COURT: All right. Thank you very much. So we're talking about part 2 of this Daubert motion number 4. The motion was based on written description and if I said enablement before the recess, I apologize. You can replace that with written description.

But at bottom, the contention from Sarepta or sorry, the contention from NS in response to Sarepta's motion seems to be that if the claim covers an effect, it has to have a written description that demonstrates the therapeutic effect. That's what I understand NS's argument to be. And that is wrong as a matter of enablement, but it's also wrong as a matter of written description.

I've looked at the *Magsil* case. That's not the situation here. The *Baxalta* case doesn't change my opinion on that either. I think there was a case, that was *United Therapeutics*. I thought that was closer, so that's the ruling on that.

So we're not going to allow NS's expert, Dr. Hastings, to say that there has to be a written description of therapeutic effect. And I've mentioned the paragraphs I thought that pertained to, but there could be others.

That's the general ruling and should apply to any opinions that say that.

Okay. I think that resolves all of Sarepta's Daubert motions.

We had a motion that was somewhat related to Sarepta's Daubert motion number 4, which is NS's motion to exclude opinions of Dr. Dowdy and there was something in the briefs that suggested to me that this was sort of a tit for tat situation where they were worried that I was going to exclude Dr. Hastings on this issue, so they were moving to exclude Dr. Dowdy on this issue.

I think we all agree, which we just talked about, which is that the question is what a skilled artisan would have taken from the disclosure as of the priority date, not a subjective issue. Dr. Dowdy sets forth that standard, says what a skilled artisan would have taken from the disclosure, explains why, and then corroborates his opinion with the facts of stuff that wasn't in the disclosure. That's okay for both sides.

Do we have any questions about that one?

MR. MORIN: No, Your Honor.

MS. GOLDEMBERG: No, Your Honor.

THE COURT: Okay. Great. All right.

So the next one I'll talk about is NS's motion to strike certain supplemental opinions from Sarepta's

economic expert John Jarosz.

I see what happened here. I don't know why it happened. The issue that was framed for me, and I understand why it was framed that way, was that it's an issue about constitutional standing and the Court's subject matter jurisdiction. We have a patentee here in the case, so if you want me to answer the question whether or not the Court has subject matter jurisdiction, the Court has subject matter jurisdiction.

But what I wasn't sure was whether NS was -- never comes out and asks for, but really seems to be asking for summary judgment of no lost profits during a certain time period, but that's never really asked for. So maybe that's because you don't want that and you wanted me to say no subject matter jurisdiction.

What's going on here? So this was framed a subject matter jurisdiction issue, right?

MS. GOLDEMBERG: Originally I think it was just framed as a no standing to assert lost profits for that one-year period. So I don't think it was a pure subject matter jurisdiction, dismiss the whole case issue, Your Honor. I think it was a --

THE COURT: Well, it was talked about as being injury in fact. I mean, is there any case in the history of standing cases that talk about sort of the time period being

lost constitutional standing for some time period in the middle of the case? Is there any case like that?

MS. GOLDEMBERG: So we didn't cite cases for that because we were just concerned with the fact that there's -- we were concerned with the fact that Sarepta can't get lost profits for a one-year time period because of what happened. We would have probably moved for summary judgment on this, but we got all the information just days before the pretrial conference when all summary judgment deadlines had passed. So instead we submitted a letter brief regarding, no lost profits during that one-year time period. And in that letter brief we explained what happened with the agreements and our belief that there is a one-year period in which time they just can't make a case for lost profits.

So the primary ask here is if you would agree with us on that, then you would just hold that they can't tell the jury for a one-year period they can't get lost profits. Their experts already done alternative calculations to that effect and we would keep rolling. So that is the primary ask here. And if not, then we separately have another ask, which is that --

THE COURT: So before you get to the second ask. So for the first ask, there is a dispute of fact, though, about that one-year period. They say it was all of the

package deal and that, in fact, they did have an exclusive license such that they can state lost profits. And there's a dispute with whether or not those agreements were enforced all together, right?

MS. GOLDEMBERG: So there's no dispute of fact if you just look at the words of the agreement. They try to create a dispute of fact by relying on all this extra gap fill evidence that they provided too late. So our position is this was clearly their error, they shouldn't have done this. We'll accept the agreements for what they are, but what happened was they produced these other agreements on a Friday. We asked a few questions, we think they're missing one, they came back on Monday with all this other stuff.

THE COURT: Right.

MS. GOLDEMBERG: And it was all this other stuff -- they were trying to show, oh, this is the course of dealing evidence, showing what everybody thought was happening. We were basically like, we didn't ask for that, we were talking about agreements, and now suddenly you're showing us all this factual stuff without any opportunity to poke holes in it, no opportunities to take more discovery, take a deposition, present a declaration from a guy that we've never heard of before. And you expect the Court just to say, well, now there's a fact dispute and give that to the jury and there's been no opportunity for us to

investigate that issue. So based on that, we requested either you just look at the agreements and hold --

THE COURT: Just the agreements that they gave you on the Friday, not the Monday?

MS. GOLDEMBERG: Well, they didn't give us any other agreements on Monday, they just gave us what I call gap fill information stuff trying to show the course of dealings, so just the agreements, all agreements. You can look at the agreements. But this additional evidence that they should have produced a long time ago, if they were going to rely on it, they produced it too late. If you were to exclude that, you're in a good position to grant us summary judgment for no lost profits or rule that they're precluded from claiming lost profits for that one year. Otherwise you could give it to the jury. But we don't think they should be able to provide that gap fill evidence to the jury, because again, we had no opportunity to poke holes in that. No depositions, no discovery on that. Whatever they threw at us on that Friday is all that we were left with and there was no discovery contemplated in the scheduling order thereafter.

THE COURT: Right. Well, that was -- I saw how all this happened. I do and I get it. But that was also a Friday seven months ago, right? And so this is sort of another situation where, again, I think it's happening on

both sides. I sort of feel like I'm being gamed because I don't think this is going to get tried. It seems like you want a ruling to get you're damages out, but it seems to me that based on the other evidence that was presented you realized this wasn't an issue and probably won't get tried if you lose this.

MS. GOLDEMBERG: That's not correct. We -- we thought -- you know, we had our papers in to you to exclude it and we were waiting for a ruling on that and then supplemental expert reports come in and we were surprised to see that the expert is now relying on this gap fill evidence. And not only that, but going beyond that, in talking to the declarant and relying on new statements from him and providing in paragraph 20 of his supplemental expert report, coming with a brand new argument that we've never even seen before about how the termination in 2016, other clauses would have survived, that's a legal argument. So then we felt like we had to file something else with regard to the experts.

THE COURT: Understood.

MS. GOLDEMBERG: So that's where the D.I. 651 comes in where we move to exclude his opinions interpreting the contracts and relying on this gap fill evidence. He obviously can't interpret contracts. I think we agree he can state I've assumed that they can get lost profits during

the time period, here's my number. You know, he can do that, but he doesn't need to walk the jury through the contractual provisions and say, well, this contract is still in force because of what I've talked to this other guy, who again, during discovery we have no opportunity to talk to. We had this motion pending, we thought it might be granted. We thought if they were going to rely on him certainly they would tell us and give us notice. They didn't. And then they just surprised us by shoe horning it all in via an expert.

THE COURT: And I understand. We, all of us in this room, bear some responsibility for the situation that we're in today, including, but not limited to the fact that this all starts to happen when really, really late right before the pretrial conference, like two days before, you raise an issue about standing based on documents that you had for quite a while. So -- and then I get that they went back and you didn't have everything you thought you need, but then it gets raised to the Court as an issue about injury in fact and standing. And it's not something the Court focuses on, because of course there's standing, so why do I need to decide this now. And then you all went forward and negotiated a schedule and I think there was some calculated risk on both sides about, if we do or don't mention this as part of supplemental discovery, maybe we can

make an argument later if we have the chance. I don't know if that's what happened or not, but now we're in this situation.

What's not going to happen is that I'm not going to rule that -- I'm not going to rule that NS can rely on the documents it got on May 3rd but not the ones -- or that the other side can't really on the ones it got on May 6th. It almost seemed like when you got the declaration that explained what had happened, at that point in time it occurs to me -- why didn't you follow up at that point in time? It occurs to me that maybe it's because you didn't want to know, that maybe you were hoping I would rule that this year is just out.

MS. GOLDEMBERG: It was because we had already filed for our relief.

THE COURT: Okay.

MS. GOLDEMBERG: I think had this happened in the regular course of discovery we probably would have followed up and tried to work something out with them, but we had already gone to the Court for relief at that point, so we were waiting to hear from the Court on the relief that we were seeking at that point.

THE COURT: And the relief was no subject matter jurisdiction?

MS. GOLDEMBERG: Just no lost profits for one

year was the relief. It was that they don't have standing to raise a lost profits claim, not that they don't have standing to be here.

THE COURT: Right. Okay.

MS. GOLDEMBERG: So that was why that happened that way. It wasn't gamesmanship on our part. We just felt like we had already filed something with the Court, we were waiting for a ruling, and then shocked to receive suddenly an expert report that relies on this guy again, and interprets contracts offering new arguments, as I mentioned, a lot of legal conclusions and that it's clear they want to get through their expert which is improper and then a lot of facts, more facts than even came in via those supplemental documents that we weren't expecting to see. So that's why we filed the second letter, at least seeking exclusion of that. Their expert shouldn't be able to talk about these things. It was definitely outside the scope of the supplemental discovery that Your Honor had order and it was their attempt to try to get it in via him.

THE COURT: Okay. But I ordered it based on the agreement between the parties about what needed to be done, right? And if I'm wrong about that, you can tell me. I just don't remember.

MS. GOLDEMBERG: I think the parties -- yeah, because they noted in that order, subject to your ruling on

this. So they flagged -- we all flagged this issue for you that this was still pending and an open issue, but we just never got a ruling and continued on preparing for trial waiting for that ruling.

THE COURT: Okay. All right. Thank you very much.

MS. GOLDEMBERG: Thank you, Your Honor.

THE COURT: Let's hear from the other side.

MR. O'QUINN: Brian O'Quinn for Sarepta, Your Honor. I would point out a couple of things in this history. I thought you summed it up very well and kind of how things came about. As far as the May 3rd versus the May 6, we absolutely agree they should be two separate buckets. She stated we didn't ask for this information. In fact, they did. In exhibit L to their letter brief in an e-mail on the night of Sunday May 5th, underlined in the paragraph of the e-mail, "As requested on the call, please provide Sarepta's position on the correct chain of title tonight so we may consider it." And our position on whether it was a condition precedent versus a sublicense. We simply were producing everything we could find in the spirit of completeness. We cooperated with them on this issue.

Again, we had a little trouble finding out what the ask was in their letter brief as well. As far as the -- we're kind of mixing two letter briefs here, but the expert

exclusion point, we specifically, during the negotiation of the scheduling order, proposed that these supplemental expert reports be limited solely to the updated financial numbers basically just putting more columns in a profit and loss statement. They rejected that. So what that signaled to us is, if we didn't want to waive being able to argue this issue in front of the jury, it needed to be in these reports. And so that's why we took the position that we took. None of this is prejudicial or surprising. I mean, like you said, this was a Friday night and a Monday night seven months ago.

THE COURT: Did their -- and we've got claims going both ways, so I want to make sure. Did their expert address this issue about this time period that should come out?

MR. O'QUINN: Their expert put in alternative calculations of lost profit depending differential start dates of the damages period that correspond to the dates we're talking about.

THE COURT: So they had an opening expert, supplemental expert report with updated stuff and then this was the responsive, or were they ships crossed in the night? But they addressed taking out this time period as well?

MR. O'QUINN: That's correct, Your Honor. There expert not only had that opportunity in the first instance,

he also had a responsive report a week later, didn't address anything. A further ten days go by and we get this motion to strike.

Mr. Jarosz's paragraphs 13 through 20 are simply providing the context for his alternative calculations in paragraphs 21 and 22, which NS's not challenging.

THE COURT: Okay.

MR. O'QUINN: And we've offered, Your Honor, to amend Mr. Jarosz's report to be ever more clear that he's not going to get up there as an attorney and interpret contractual provisions. That's a matter of law for the Court.

THE COURT: Well, that offer is accepted by the Court, so you should definitely do that.

MR. O'QUINN: I have a copy if you want to see it, but we can serve it later tonight.

THE COURT: All right. At a minimum. What paragraph is it where he talks about having a conversation with Mr. Walsh?

MR. O'QUINN: Paragraph 19, Your Honor, so it's on page 8 of exhibit A to their November 22nd letter.

THE COURT: Ah. And how is that fair? Can that paragraph come out?

MR. O'QUINN: Well, our feeling on this, Your Honor, is all the time damages experts talk to employees,

companies in order to form the assumptions that underlie their opinions. They did it in their reports.

THE COURT: All right. You've got a friend.

MR. MORIN: I'm really sorry. I don't like to interrupt my colleague and friend.

THE COURT: That's fine.

MR. MORIN: If Your Honor finds that there's standing in the case, as there is, then anyone talking about whether or not there's this gap in the damages time, you don't put standing issues to the jury, which is ultimately basically what they're arguing. I would propose that all -- the Jarosz stuff doesn't need to come in at all and you just take the verdict for the entire period of time and if they want to try to argue after trial that something needs to be excised based on the standing issue, we will argue both you don't waive standing. But that's not prudent. They've waited seven months, the case is complicated enough. We don't need any of this Jarosz stuff if we're all under the understanding that there's not a dispute before the jury about the year of damages they're talking about, because that shouldn't be for the jury to decide anyway.

THE COURT: What I'm hearing from you is you want the Court to decide whether or not they're entitled to this year of damages. You want the Court to decide whether or not they're entitled to this year of damages. Doesn't

really matter what I want I guess. I'll do it if you all agree, though.

MR. MORIN: I think we all agree on that, but the point I would make, Your Honor -- I didn't mean to cut you off, but our point would be that certainly that's the Court's issue on an issue of standing, but you layer on top of that that we provided all this information in May and seven months went by with crickets. If they had any issues that they wanted to challenge on what evidence we put in, Your Honor, they should have done it.

THE COURT: Well, the problem is that we've got faults on all sides here about the situation we're in. And so while I appreciate that, let me hear from counsel for NS.

MS. GOLDEMBERG: So, Your Honor, we would want the Court to decide the issue, but the problem is how can you possibly rely on all their self-serving evidence that we never had an opportunity to probe without the declaration.

THE COURT: Right. Well, you had an opportunity to probe it, you didn't, but now we're in this situation. I mean, how could they have known that you were going to try to supplement the Jarosz expert report?

MR. O'QUINN: There's nothing new in Mr. Jarosz's opinions. Everything Mr. Jarosz has was in Mr. Walsh's declaration on May 8th.

Regardless, Your Honor, I don't think this issue

should be decided on three-page letter briefs written hastily over a weekend. We would want fulsome briefing on this issue regardless.

THE COURT: Well, at some point your side submits the Walsh declaration and then what did I get, then, from your side? Did I get anything after that?

MS. GOLDEMBERG: We filed the motion on the lost profits.

THE COURT: Right.

MS. GOLDEMBERG: They filed --

THE COURT: You're not saying you shouldn't rely, Court, on the Walsh declaration because we need to be able to test that, because that's what you're saying now.

MS. GOLDEMBERG: Yeah. That was in response to, to the motion. They -- we filed the motion, they filed the response with the Walsh declaration. We didn't have an opportunity to reply and never got an opportunity to see that.

I also did just want to correct, I don't think he intended to misspeak, but our alternative calculations were provided in a responsive expert report after we saw what Jarosz did. To be clear, we don't have an issue with either expert doing alternative calculations. That's paragraphs 21 and 22 in his report that we didn't move to strike because alternative calculations are just -- if this,

17:12:35 then here's the money. If that, then here's the money. Our issue is that the interpretations of contract in 14 through 20 and the reliance on the Walsh -- and as Your Honor said, how is that fair?

THE COURT: Right. Well, here's what I will say. The Jarosz opinion about having a conversation with Mr. Walsh, that's not coming in. That's not fair. There was never a suggestion on any of the discovery disclosures that Mr. Walsh had evidence that's relevant to a claim or defense. Didn't let them know until the expert reports, supplemental expert report came out, way too late. So that part is coming out.

The rest of it I'm going to ask the parties to discuss this and get back to me with a letter. I'll take a letter by Wednesday at noon. There was an offer on the table about how we could proceed with this. I'm not sure how we can. So I'll want you to figure that out if you can.

Let me ask you this, though. Let me say this. Well, we've resolved the issue about Jarosz recounting on the law. One possibility I was thinking of is that there's a dispute about whether or not there was a contract for an exclusive license at a relevant time period. We can put that to the jury, but I don't think I fully appreciated that you didn't get full discovery on that, so I'll hear a joint letter.

All right. Let's keep moving. We've got a lot more to do.

All right. And by the way, if the argument is that we needed more discovery on this issue relevant to the Walsh declaration, explain why that is and why you didn't ask for it once you saw the declaration.

All right. Sarepta's motion in limine number 1 to exclude evidence or argument regarding other proceedings involving patents not in suit. So this is the second time we've discussed this. The first time was at the first pretrial conference.

This motion is going to be largely denied, but there were a couple things that popped out at me that I wanted to talk to the parties about.

I don't know who I want to hear from first, so hold on. We've got paragraphs and paragraphs and paragraphs that are challenged. So the way that this came to us is that Sarepta had filed an opening brief with a motion in limine that said, really should exclude all stuff that is not the claims in suit and pertains to different proceedings because it's going to be irrelevant and confusing, but it's where the statements were from the opening brief. Were the statements about pending claims and unrelated patent applications, so that I could say that they're irrelevant or that while they might have some probative value, that that's

outweighed by prejudice or were the statements about scientific truth or the state of the art or what a particular reference discloses or something not so wrapped up in the context of a particular claim or interference or prosecution that I could say that it has some probative value that's independent that outweighs the prejudice? And so this is the type of judgment call that the Court has to make all the time. The Court's well equipped to make. I, like most have you, have read hundreds of prosecution histories and know what's going on. But we didn't get that stuff with the opening motion.

The premise of the motion was, we've got evidence from all these other proceedings that you should just exclude. And then NS responded with some papers of some of what it wanted to put to the jury and the Court heard some argument at the pretrial order. We looked at everything that was submitted that's in the record that we could find and I think this is a discretionary call. I have to take into account, and I have taken into account, statements that were made, the identity and the relationship of the parties, and the technologies at issue, the context in which the statements were made, and most of the particular statements in the record are going to come in. The ones that I have flagged are -- I had a note about the Wood declaration and so Wood is now Sarepta's expert, but

Wood made some statements for NS. No, wrong way. Thank you. Wood is now NS's expert, thank you, but Wood had made some statements for Sarepta in a prior proceeding. And so Wood is going to testify at the trial. There's going to be no bolstering of his opinions with the declaration. That's a hearsay problem. If NS tries to introduce it, I recognize that there's an exception if a witness' credibility is attacked, but since this prior statement is consistent with what I assume he's going to say at trial, I can't imagine that it's coming in under that exception. And there's also an exception to a rehabilitated declarant's credibility when a witness has been attacked on another ground. I don't know that it would come under that context either. Of course that's context dependent. I can't imagine that Wood declaration is coming in. And a lot of these paragraphs referred to stuff that wood said on behalf of Sarepta in a prior proceeding. I don't like it. I think it's a hearsay problem. So that's not happening.

Now, the stuff that Sarepta said in its briefs is a statement of party opponent and some of that can come in and largely will come in.

The other thing I had flagged was I had a question about the letter you gave me with the chart that referred to Hastings' responsive report, D.I. 47-6, paragraphs 192 to 95 and 199. Hastings made some statements

about what Sarepta had done in some of these other proceedings and then I guess Dr. Dowdy responded and explained that these are distinguishable because, for example, there are two different Popplewells. And also the applicants were referring to one molecule and not another, and the fact that the PTO had rejected the arguments that Sarepta made. I wanted to hear argument on those things.

MR. SIKORA: Who would you like to start with?

THE COURT: Why don't I hear from Sarepta. Are there two different Popplewells? Are we going to confuse the jury about what Popplewells that you've talked about?

MR. RAICH: Bill Raich, Your Honor, for Sarepta. Yes. There are multiple Popplewell references. So the Popplewell reference that is in the obviousness combination that we are asserting against the NS patents, that's an article that was published by Popplewell and Wilton and Dixon in 2010, so it's a scientific article. A number of the statements in the prosecution relate to patent applications from the Popplewell and Dixon group, so there are multiple Popplewell references.

I mean, just in general on this, we are very concerned about these statements in that it's just going to create so many sort of mini trials on well, what is the Popplewell, what is the relevant date that we're talking about, are we talking about before the Wilton patent, the

disclosure of the Wilton patent, something that happened after the Wilton patent? And so I understand their argument that these are just factual statements, but factual statements require context. I mean, just necessarily they do and there's an incredible amount of context. Are we talking about skipping exon 53 or are we talking about skipping other exons, are we talking about skipping within the sort have hotspot disclosed in the Wilton patent, are we talking about skipping outside of the hotspot? So, you know, in our view, not to reiterate things, but this is just going to create an incredible amount of confusion. And these statements, they really just aren't relevant. They aren't relevant and they are very prejudicial because it's so confusing to try to sort of unwind all of this.

And so, the Popplewell example, I think is a perfect example of this. A few points that I think are responsive to things that they've raised recently. They said again, these are purportedly factual statements. Context is critical. Statements that are from attorneys or addressing different claims and time points and backgrounds, what's factual in one context just may not be factual in another and that's just the way it is. They said, you know, they're party admissions, some of the statements in prosecution, but that's sort of an exception to hearsay. We're talking about Rule 401 and 403 under evidence. That's

kind of the basis of our problem with these statements and whether or not it's a party admission or not, that's just completely irrelevant.

Something else that I have heard them argue is that the jury is going to be played the patent video. That was something that came up at the last pretrial hearing. And you know, respectfully, I can't see how that's possibly going to educate the jury. So on what it means when you have different priority dates, different disclosures, different patent claims, different types of proceedings, you know, what it means to abandon the application, what the effect of that is, what an interference proceeding is, when frankly normally patent attorneys get confused about what an interference proceeding is, and whether there are different standards of proof. So --

THE COURT: But it's not going to confuse the jury if you're telling the PTAB or the PTO during an interference proceeding that the state of the art is unpredictable. I mean, that's not confusing, right?

MR. RAICH: I think if the statements that were made refer to the time before the Wilton patent, which is what many of the statements were, and before the disclosure of the Wilton patent, I think a statement taken out of context that is talking about exon skipping in general being unpredictable is confusing when this case is about the

written description and enablement of the Wilton patent claims, which is looked at after the disclosure of the Wilton patent. So I think that there is -- it's kind of a fundamental context problem of saying, well, they said that skipping is unpredictable, but that was referring to before the invention. That was in the context of, you know, responding to an obviousness allegation for example. Or it was in the context of an interference attacking a third party patent application that had a different disclosure and an earlier priority date that didn't have the same disclosure of the Wilton patent. So it's just really confusing and I think it is going to create an immense amount of problems trying to unwind this. I just don't think it's fair to the jury. I don't think it's fair to the experts. So we stand on our position in terms of just how context matters. Some of the other prosecution statements, you know, for example, the *Species* case that we talked about, which is an unrelated patent later in time, different disclosure, different inventors, and the case was abandoned.

And so, you know, Sarepta walked away from whatever the statements are that they're seeking to rely on that were made in this very different context. You know, and we would reiterate, I made this point I think last time, but to the extent information about the case comes in that we would want to make the point that, in fact, it was

abandoned, that it did come later and all of that type of thing, so there's a two-way street here. So I think --

THE COURT: All right.

MR. RAICH: I think you asked me one question and I just kept going.

THE COURT: No, that's fine. That's very helpful. Thank you very much. All right. Let me hear from the other side.

MR. SIKORA: So on Dr. Wood's declaration, I just wanted to let you know -- I'm sorry, Mike Sikora on behalf of Nippon Shinyaku just on Dr. Wood's declaration. We appreciate Your Honor's clarification that it's likely to come in only for rehabilitation or for confusion purposes. We did see that as an adoptive admission given that Sarepta relied upon that and urged the patent office to accept it. So that was how we saw the hearsay issue with that result.

THE COURT: I understand. I don't know if that was a request. It's denied.

MR. SIKORA: Understood. Those relate to an application called the 533 application and counsel raised issues about, oh, what is the context, does the context matter, we intent to inform the jury of the context. There's statements by Sarepta. The statements were made in 2017 and 2018. They're referring to a state of time in 2013 priority date, which is long after bolt of the asserted

patents at issue here, the Nippon Shinyaku ones with the 2011 priority date and the UWA patent with a 2005 priority date. At that point what's the scope of the claims. We're going to inform the jury that. It was a picture claim attempting to cover Vyondys 53. Sarepta's product, which is undisputed, Your Honor found that both product -- infringes both patents. So directly within the scope of the claims, directly applicable and the statement, as Your Honor saw, are statements that are factual admissions on the state. What does the art show, whether or not there's unpredictability even then in 2013, whether or not -- and so those statements, the context, I agree is important and it's something we absolutely intend to inform the jury, so there's not going to be any confusion about context.

In addition to that, you know you asked about the Popplewell references, and I think Mr. Raich didn't fully explain the way that their expert reaches his obviousness opinion. Popplewell's group published a first article in 2009 disclosing virtually all of the antisense oligonucleotides that are disclosed in the 2010 publication they use as their 103 reference. In between there she also filed a patent application called the Popplewell 212 application. That again, reports the same results from the 2009 publication and some of the same results from the 2010 publication. Importantly, the starting point, the ASO their

17:30:24 expert Dr. Dowdy uses as the starting point for their
17:30:28 obviousness analysis is in all three references. And
17:30:31 Dr. Dowdy relies upon all three references to create this
17:30:34 thesis that there was a further narrowing of the hotspot
17:30:38 that Popplewell identified in January 2009 that would have
17:30:42 further constricted what one of skill in the art would do.
17:30:46 And it's that thesis that is carried forward to set the
17:30:50 stage for Popplewell 2010.

17:30:51 So, yes, there are multiple Popplewells. They
17:30:54 are fairly needed to set the context for the statements in
17:30:57 the Popplewell 2010 article. And so again, there's not
17:31:00 going to be any confusion by the jury about what statements
17:31:03 or about what articles and how those articles do or do not
17:31:07 relate to Popplewell 2010. We have sponsoring expert
17:31:10 testimony that will make all of that abundantly clear and so
17:31:14 there is no issue when it comes to the '533 application, and
17:31:17 including clarity on what it was rejected over, that it was
17:31:23 ultimately abandoned by Sarepta after the rejections. So we
17:31:26 don't think there's any --

17:31:27 THE COURT: So that's what they want to be able
17:31:30 to present evidence on it and you're okay with that that
17:31:33 they've dropped it?

17:31:35 MR. SIKORA: Absolutely set the stage and make
17:31:37 it very, very clear what the context of that was. And like
17:31:40 I said, '533 application, it's not some kind of -- we don't

have to take two genus claims and put them over each other and compare scope. It's a picture claim directed to their product Vyondys 53. So we think it's in the scope of both sets of patents.

So turning back, counsel mentioned the interference. I'd to go back to that a little bit, and suggested that, oh, well, we're talking about references before. And I think Your Honor likely saw it while going through the reports. Again, the context matters and we -- there are statements where they go beyond that, where Sarepta goes farther and says nope, unpredictability continued, quote, beyond 2005. It remains unpredictable today. So again, the context is going to come out loud and clear, the jury is not going to be confused, we're not going to sort of pull one over the jury. The context is going to come out. There's no possibility of confusion with the way that we intend to present that.

THE COURT: Well, the jury is going to be confused, but I don't know if it's because what you're saying right now, but the jury is going to be confused with this case.

Let me ask you this. Hastings reply report, paragraph 20, I flagged this one. This looks confusing. Sarepta made an argument in the context of anticipation and you're trying to say that it's now as to the written

description standard. Isn't the jury going to be confused by that?

MR. SIKORA: I'm sorry, are you in the original reply?

THE COURT: I am reply expert report of Dr. Michelle L. Hastings regarding invalidity of the UWA patents. Paragraph 20, it's at 427-7, paragraph 20.

MR. SIKORA: I'm sorry, I don't think I have her original report in front of me. Can you just provide the application number?

THE COURT: I'll tell you exactly what it is. It's paragraph 20 and it says -- no, sorry. Did I pick the wrong thing. Yeah. Here's what she says. "Sarepta argued that a POSA would only be able to envision all the compounds or genus when the number of compounds is in the tens not the thousands. Although Sarepta's argument was made in the context of anticipation, I understand that the standard for satisfying the anticipation is analogous to the standard for satisfying written description."

MR. SIKORA: So if memory serves --

THE COURT: That should come out.

MR. SIKORA: My understanding is I believe it's a moot point because Sarepta dropped their written description argument against the NS patent, so I don't believe that's going to be an issue at all.

THE COURT: All right. That -- whether it's in or out, it's out now. Okay. All right. You can have a seat.

So I can tell you that I did look at every single one of these paragraphs that were in this chart that you all gave me, the letter after the first pretrial conference. The things I flagged were paragraph 20 of the Hastings reply report we talked about, the Wood declaration and then I also flagged for questioning the Hastings responsive report, paragraphs 192 to 95 and 199, and I do think that its complicated what NS is arguing. I understand what the argument is. I'm not sure if the jury will. It's complicated, but complicated is not confusing within the meaning of Rule 403. And I can't find on this record that the risk of confusion and prejudice substantially outweighs probative value, so I'm not going to exclude it.

Of course Sarepta will have the chance to cross exam and present its own expert testimony.

So that's my ruling on that. Okay. There was a Sarepta MIL number 3 that apparently got resolved according to paragraph 76 of the pretrial order.

There was a Sarepta MIL number 2 about comparing commercial products and we got additional argument and a long footnote from the pretrial order and I apologies, but I still don't understand what this dispute is, so you might

have to break it down for me in terms of exactly what you're going to say we think the other side is going to say.

MR. MORIN: Yes, Your Honor, Mike Morin again for Sarepta. It's actually hopefully fairly straightforward. There has been no head-to-head trials comparing the two drugs, so there's no ability -- the FDA wouldn't let you do it. No one should be trying to say one is more effective than the other. We have most of the way agreement where they say they won't directly compare the two. That's what they've agreed to. We'd only ask to strike the word "directly," because that invites all sorts of potential problems. I used the example at the last hearing where we didn't get to full resolution of it, you could put a picture of me next to Jack Blumenfeld, who was there last time, but put it next to Mr. Smith and say I'm 6 2, he's 5 10, and you could say they won't put it on the same slide, but they seem to want to be able to want to say sequentially I'm 6 2 and then talk about Roger and say he's 5 10. All I'd ask you to do is strike the word direct. There shouldn't be indirect comparison either. When you see that's the line they're drawing, we'll object if we think that they've gone over the line. If Your Honor makes it clear that they shouldn't be indirectly comparing the two then that would be appropriate. Otherwise you have a mini trial on which one is more speculative. We do not plan --

they failed their clinical trials, missed their primary end points. If you our gives this instruction, we don't plan to make a mini trial about their drug being found effectively ineffective by the FDA, we're just going to assume that they're both safe and effective drugs. But if they're allowed to suggest to the jury that one is better than the other when there's been no head-to-head comparison then we're going to be put in that impossible box. So all we'd ask is to strike the word "direct" from no comparison.

THE COURT: So you know exactly what they say, because they said it's going to come from Mr. Hosfield who is going to say that the ramp up would have been equivalent or better because of what's on the label looking good.

MR. MORIN: And the problem with either he or the clinical expert -- that's why we just want a general instruction on that problem, with either of them saying one label is better than the other is there's been no head-to-head comparison and the FDA wouldn't want you to do it and they've agreed, they can't make direct comparisons. All we want to do is eliminate the word "direct" so we're not fighting with them saying here's one label, here's the next and inferring that one is better than the other.

THE COURT: But that's me saying a ruling you can't make comparisons. This is what they're going to do. You don't want them to do that.

MR. MORIN: Correct. They can say it would take more ramp up time because it's a second product or whatever it is, but none of it should be based on efficacy or perceived efficacy between the two products, Your Honor.

THE COURT: All right. Let me hear from the other side.

MR. MILLER: Zach Miller, Your Honor, again, for Nippon Shinyaku. We don't intend to make any comparison. There's been a lot of discussion in meet and confers on this issue and frankly we think it's been a moving target. What they asked for in their motion in limine is NS should not be allowed to argue or suggest that its product performs better than Sarepta's Vyondys 53. And we don't intend to do that. The issue is, and recently conferred, there's clinical studies done on both products that describe the increase in the dystrophin production that occurs when both products are used. And we want to be able to identify what those results that are on the product labels are. For example, there's a clinical study on the face of the product label for the Viltepso product that says there was a baseline increase from X to Y for Veltepso based on clinical studies. There's a separate study on the Vyondys label that says the same thing. We don't intend to compare the two studies or do anything like that, but the level of dystrophin, the fact that these products result in an increase in the dystrophin

level and the amount of that increase is relevant to the claims and defense in this case for different reasons. For Viltepso, the increase is relevant because it's relevant as a benefit of NS's product which is needed to show that NS could have, could obtain lost profits, that NS's product is a viable commercial product that would be able to fulfill the market need and is entitled to lost profits. And see, we need to just talk about the dystrophin increase in order to show that lost profits are available. With Vyondys that increase is separately relevant because in order to show secondary considerations, including long-felt, unmet need and unexpected results.

Now, these levels of dystrophin increase are on the product labels that are going to be entered into the report. It's just a matter of can our experts talk about the evidence that is going to be in the record because it's on the face of both of the products labels. We're not going to compare them and say that this testing shows that the Viltepso level of increase is superior than the Vyondys level of increase or that Viltepso is better in terms of efficacy than Vyondys. We just need to be able to report the actual facts.

THE COURT: But you want to say dystrophin levels induced by Viltepso are the highest reported in clinical trials of exon skipping therapies to date?

17:42:12 MR. MILLER: It's my understanding that we are, unless I'm told otherwise, we do not intend to say that.

17:42:19 THE COURT: That's what I thought we were here for. They don't intend to say that.

17:42:24 MR. MORIN: And Your Honor, that's fine. And he took away the qualifier "directly," so --

17:42:27 THE COURT: We're good to go.

17:42:29 MR. MORIN: The only thing I will stipulate, Your Honor, we will stipulate that both drugs increase the dystrophin levels. But what I'm a little worried about -- if it seems like I'm spending too much of your time, I apologize -- is our label, for example, says it goes from 0.1 to 1, theirs goes from 0.6 to 6. There's been no head-to-head comparison and they're different studies. We don't want to be --

17:42:50 THE COURT: Nobody is going to say this is higher.

17:42:52 MR. MORIN: Right.

17:42:53 THE COURT: But I didn't hear that until just now and so now I've heard it and I think we're good.

17:42:59 MR. MORIN: We've just had a meet and confer in front of Your Honor, so we're good.

17:43:06 THE COURT: All right. Outstanding. All right. Let's talk about the disputes in the pretrial order. I can tell you, I think I mentioned it earlier, this is the kind

of case we've tried the past few months and this is one of the most complicated pretrial orders we've seen in terms of the procedures that the parties have agreed with each other to comply with. I would order it since the parties agreed on it, but I'm not keeping track of all the deadlines. And if they, for whatever reason, are contradictory to each other, I didn't try to figure that out. So I'll leave that to you all. I'll sign it.

All right. We've got disputes in paragraph 4 and paragraph 84 about the number of NS's patent claims.

Sarepta thinks --

I'm not going to need to hear argument on this.

Sarepta thinks that NS should only get to try one. NS says, there are different claims, we can try how many we want. Can you just put on the record for us what the differences are so I can understand?

MS. WILLIAMSON: Differences in claims, Your Honor?

THE COURT: Yes.

MS. WILLIAMSON: The claim terms are different.

THE COURT: The claim terms are different?

MS. WILLIAMSON: Yes. So they're not identical. Your Honor, as a matter of compromise we'd be willing to go down to three claims, if that makes a difference for Your Honor.

THE COURT: Great. I will take that. Counsel?

MR. MORIN: May I briefly be heard on this?

THE COURT: Sure.

MR. MORIN: I think this is important and I recognize Your Honor's comments, but may I pass up and to our friends. So briefly, three still doesn't resolve the problems. It's undisputed that for both issues on the case relating to these patents, and I'll pass through it in this chart, you can just see that it's all the same between the different claims, but the most important things are on slide 5 and 6. On slide 5 here, both sides' experts neither draw any distinction between any of the claims at issue in the case, they treat them as all rising or falling together for obviousness. Both parties' experts. There's not one argument, and I'll ask my friend to confirm, by their expert that would say one claim would and another wouldn't do it. So we have multiple claims for no differences unlike almost every other case you'll see from validity.

On the next slide, with their expert Mr. Hosfield, "My opinion regarding the royalty rate is the same irrespective of the number of claims." So it doesn't matter to liability and it doesn't matter to damages. I suspect that what they'll want to do with identical claims for purposes of this case is to say the patent office looked at them three different times and couldn't have made a mistake

three times. But if we go to slide 4, once they got the first one, they did terminal disclaimers and that was never really examined, so that wouldn't be a fair argument and we would try to bring that out to the hearing also. And then when we get the ultimate issue, which is the verdict form, even with three of them, all it invites is an inconsistent verdict. Either they all rise and fall together, which they'd have to agree with. In this case, if they check one thing wrong on this, we have a new trial because it's an inconsistent verdict. In other words, if they go yes, no, yes, there's got to be a new trial because there's no basis for the jury to find one is valid and one is not. And there's no reason that they should be trying more than one claim when they're identical for all purposes in the case. If they want to have three claims that are valid, we will stipulate that whatever the jury decides can be entered by the Court as validity of three or invalidity of three. But given that there's no differences between claims for purposes of this case, let them say, hey, jury, you know, they have to show that the patent office got it wrong three times when because of the internal disclaimers there was no substantive examination.

But more important, they all rise and fall together and make no differences for damages. They should have one claim. We have multiple patents. We used the

discipline given that Your Honor is giving us four and a half trial days to try the case to get down to one patent and the jury should not be unfairly weighing three versus one when they're all the same. We could bring other patents back even though they're not any different at this point in time. It just doesn't make any sense. There's no reason to do it.

THE COURT: All right. Thank you very much. Counsel, why don't we hear response to this.

MS. WILLIAMSON: Well, we maintain that the claims are different and they are distinct. Counsel is correct that they're not different obviousness arguments or damages arguments.

THE COURT: Okay. So you're going to go down to three?

MS. WILLIAMSON: Yep.

THE COURT: So at least we've got three on the table. Your expert hasn't said, made any distinction between any of the claim limitations on the various claims?

MS. WILLIAMSON: Only during -- I think to some extent during claim construction there are some differences over the 5 prime caps that are in the oligonucleotides, so there is some differences among the claim limitations between the five patents.

THE COURT: Okay. Which ones are those?

MS. WILLIAMSON: So, for example, Claim 1 of the '106 Patent has multiple options for the 5 prime cap whereas some of the others like the '092 Patent in number 3 did not.

THE COURT: Okay. And so they've stipulated to infringement of all of these and so they're saying that all of these claims are obvious and you don't have any different argument as to why some of them are not obvious, it's the same argument for all of them?

MS. WILLIAMSON: That's correct.

THE COURT: And so how does this help you besides what he just said, which is confusion and argument about how we got a lot of different, completely identical claims?

MS. WILLIAMSON: I think there's some -- there are some that allow different kinds of empirical basis, which might come into play and there's also a nexus argument that we will have to make in responding to the obviousness argument.

THE COURT: All right. Well, I will take your -- we're at least going to go down to three based on today. I'll take the rest under advisement. I don't have all the expert reports in a way where I can assess if this is the case or not. And this surely wasn't presented to me the way I'm hearing from counsel now on Sarepta's side.

I guess I can't rule out the possibility that I

17:50:23 tell the jury that they should consider that they should all rise or fall together. That's one possible option we could do in the verdict form. Are you comfortable with that?

17:50:33 MS. WILLIAMSON: I'm comfortable.

17:50:35 MR. MORIN: But then why are we trying it? They're just using it to say, look, we got three, they got one, which is unfair. And we have other patents and why are you even going to risk the chance that they go yes, no, yes when we are stipulating that they all rise and fall together, they agree they all rise and fall together? If they don't really want to drop the other two, then two of them come out, we can agree whatever the jury decides is we agree to dictates the other two. But they agree they all rise and fall together, and the damages also, so it's confusion, multiplication of issues with no advantage other than you really could end up, irrespective of what you tell the jury, if they're compromising in there, if they go yes, no, yes, then all of us are coming back for another trial when they haven't given one reason why they shouldn't go to one claim.

17:51:20 THE COURT: Right. I guess one question is this. Why you couldn't just try one of these patents and then bifurcate the other two and then hold that it's estoppel as to not retrying the other two. So I'm throwing this all out there as ideas that you should all meet and

17:51:38 confer and it sounds like we should be able to come to some agreement, only try one based what I'm hearing, especially counsel's point that they be okay with one point on the verdict.

17:51:47 MR. MORIN: Yeah. And we'll agree.

17:51:49 THE COURT: Want to talk about this and we'll take it on the letter on Wednesday.

17:51:53 MR. MORIN: For the record, we agree to the --

17:51:56 THE COURT: I figured you would. I'm just throwing ideas out there and they're not all gold. Why don't you all get back to me on Wednesday about that as well.

17:52:07 MR. MORIN: Thank you, Your Honor.

17:52:09 THE COURT: If there's some argument why we need to try more than one, I'm going to hear in the letter why it's important that we have more than one, because I can't of course force a party to say that a claim is representative, but the factual and expert record developed in this case suggests that they're representative. I mean, that's what it suggests, so why don't you work on that.

17:52:32 MS. WILLIAMSON: Thank you, Your Honor.

17:52:34 THE COURT: At a minimum, if you can't agree on it, I'll think about telling the jury that you can't say we've got multiple patents and they only have one and I'll instruct the jury.

17:52:49 MR. MORIN: I'm being a little redundant, but then I don't want to hear anything about we have three patents versus their one.

17:52:55 THE COURT: That's what I just said.

17:52:57 MR. MORIN: Okay. Thank you, Your Honor.

17:53:04 THE COURT: Okay. Paragraph 24, just want to make sure we're all on the same page. So exhibits need to be admitted to the Court before they can be published to the jury. We'll admit the exhibits as we go. So lay the foundation, unless you've all agreed that no foundation needs to be laid, offer it into evidence, it will be admitted and then you can publish it to the jury.

17:53:58 The parties suggested that we were going to admit stuff later. We're going to admit it as we go and if there are disputes about what was admitted, you can raise it with us the next date.

17:54:12 MR. MORIN: Point of clarification. I think we had agreed with our friends, subject to your blessing, that on the exhibits that were identified and exchanged and that there was no objection to that rather than move them one at a time. Given that there's no objection, we could give them to the witness thereafter where there's no objection. Of course if there's an objection pending we won't publish before going with Your Honor. But if we've identified them, given the constraints of trial, may I ask, with our friends

agreement, that if there's no -- if they're agreed to be admissible that we show them to the witness, they talk about them, and we tally at the end of the day if that's okay, Your Honor.

THE COURT: I've never made it through a trial where they wasn't some objection even though we thought we had resolved them. That's what I'm worried about. And I think where this is going to come into play is on cross-examination.

MR. MORIN: Oh, for cross, for sure.

THE COURT: Let's just keep the rule and have them admitted as we go.

MS. WILLIAMSON: Your Honor, I shared the concern OF time in this trial. I was wondering if we could move in the agreed exhibits in the morning, because I think there is a procedure for resolving objections. At that time if there's anything that's agreed and that we wouldn't have to then ask the extra questions for it would be helpful if that would be agreeable.

THE COURT: Nope. I think we'll want to just do the regular procedure that we always do. It really won't take all that long. Ask them what it is, admit it into evidence, it goes very quickly and then we've got a clean record.

MR. MORIN: Thank you, Your Honor.

THE COURT: All right. And part of this is for my benefit and the jury's benefit as well. I don't know if we had any voluminous exhibits, but the one thing I don't want to have happen is to see some footnote in a 500-page interference that no one discussed during trial and how I hear about it entitled you to a judgment of law or even worse read it in an appeal brief about how I erred because clearly this footnote entitles you to judgment as a matter of law. So we're going to walk through the exhibits with the witnesses and we're going to point out exactly which portions the jury should direct their attention to.

Paragraphs 25 and 35 talk about raising disputes with the Court and they refer to paragraph 101. All I'll say about this is that if you want a ruling on a particular day about something, we need to have it from you by 7 a.m. that morning. And it's okay with me if you want to get a ruling on a depo designation a day before you need it because you need time to prepare the video. That's all fine, but in general if you need me to answer the question, we need to have it by 7 a.m. that morning.

Paragraph 58 talks about giving me a joint submission by 8:30. Again, that's fine, but you're not going to get a ruling on it that morning, then so you'll get it either the next day or later in the day.

MS. WILLIAMSON: Your Honor, would the 7 a.m.

deadline work?

THE COURT: Yes. Get it to me by 7 a.m., but when I go through and rule on depo designations, those will all be on the clock. But we like to have at least an hour and a half to look them over before we come out.

What has worked the best is if I get the entire transcript of the deposition with highlighted portions from each side showing which side has designated what testimony and then if there are disputes of particular ones, highlight those in a different color and just put right in there in a text box what the objection is and what the response is. And then we're not trying to decode and have multiple binders about what the arguments are. And then we can just flip through and look through them in the morning.

Paragraph 41 talks about witnesses. I saw the witness list. And is NS really bringing 15 live witnesses or are those getting cut down today or have they already been cut down?

MS. WILLIAMSON: In our direct case, no. I think our live witnesses include many from Sarepta's side.

THE COURT: Okay. Got it. All right. Then we had a dispute about interpreters. Let's hear that.

MR. MORIN: Yes, Your Honor. Obviously the other side has a number of witnesses testifying in Japanese. We're going to need interpreters. They have proposed and

want to use an interpreter Umi Schweiser who they're been working with for a long time, was their chosen interpreter for four depositions that they presumably paid a lot of money to, whose been a part of privileged discussion and it would put us in a position where they have smooth choreographed direct examination, working with the interpreter behind the scenes on someone that they've worked with and us to have to kind of try to get through the cross-examination clunky while theirs is all going in smooth and having to use a check interpreter and have arguments about what the terms mean. This very issue was actually addressed by Judge Folsom in the *Advanced Technology* case that we cited, Your Honor, and said even if there's no actual bias, and we cited that, there's an appearance of impropriety and these both apply because one, the interpret had been privy to attorney/client communications in preparing for depositions, and 2, Sharp had already paid the interpreter $22,000 for the interpreters translation services. I'm sure they've paid Ms. Schweiser even more by now, so the appearance of impropriety even if that's not actual, we didn't say there was any intentional wrongdoing, but was one where it just couldn't happen. And the practical basis of them working back with the witness being privy to all the communications, we can't cross examine the interpreter on any of that. We have an unbiased court

reporter, we have an unbiased judge, there should be an unbiased translator who is equally accessible for both sides. The other side has complained we've identified a Marie Pappas out of Philadelphia who is a certified court Japanese interpreter that we're informed has translated hundreds of biopharm patents. They apparently have heard that she's not all that good, but we disagree. But we raised this issue in May in our pretrial order and they're the ones with Japanese witness. They're a Japanese biopharm company. If they want to propose someone else who they haven't worked with behind the scenes, choreographed, privy to privileged information. I imagine the Japanese biopharm companies know other Japanese translators, but we would propose this one. And the parties jointly, we could send associates or partners, if they were worried about the terminology, and spend a half day with the interpreter saying we're going to use terms like antisense oligonucleotide, if they want to try to do some of that in advance, but it's plainly unfair for us for them to have a choreographed presentation and us to be clunking through the cross-examination. It puts us at a significant structural disadvantage, Your Honor.

THE COURT: Thank you very much.

MS. WILLIAMSON: Your Honor, if I may, if the choreography is really the point of dispute, which I hadn't

appreciated until counsel's argument here, we would be willing to make Ms. Schweiser, who is undisputedly qualified to undertake this translation, available to them possibly say, say Saturday over the weekend and stop working with her so that, you know, obviously --

THE COURT: That's not going to be accepted by them for reasons -- they don't want to say what their cross-examination questions will be.

MS. WILLIAMSON: But we would agree that there would be no communication between us and her, so she would essentially be frozen to us and to our witnesses starting the beginning of the weekend. So she could work directly with them and choreograph all of their questions.

THE COURT: I'll offer that. Do you want to do that?

MR. MORIN: We respectfully reject that on the basis of trying to figure out the cross questions in advance with an interpreter that they've paid a lot of money to and has worked with them for years.

THE COURT: Right.

MS. WILLIAMSON: There really is no problem with bias here. Ms. Schweiser will be under oath as she would have sworn to tell the true. In the past she just acted as an extension of the witness in all of our witness prep. She has just translated our questions. She doesn't -- we don't

consult our interpreters on issues of strategy, we don't information her of issues of strategy, so she really should be treated no differently than the witnesses themselves. As you'd expect, we work with our witness to prepare for trial so it can go in smoothly, quickly, efficiently. She's just there to translate the words. She is not there to provide additional services. I think in the case that counsel referenced, there seemed to be a lot of additional communications. They referenced social occasions and other things, other communications. It's really not the case here. The only thing that Ms. Schweiser has done has been to interpret in the deposition context. So there is no dispute that her, that the testimony will be accurate. And they themselves have Japanese speaking attorneys on their team, so they'll know if there's any bias that comes into the testimony.

THE COURT: Was there an issue during the depositions?

MS. WILLIAMSON: No. They had their interpreter at the depositions. There actually was a fairly large issue in getting the testimony in. So the interpreter they had did not have pharmaceutical experience during most of the depositions and stumbled over terms like, like clinical trials or phase III. She frequently asked the Czech interpreter, who sometimes was Ms. Schweiser for help. She

had to consult her dictionary frequently. Having these types have missteps on our direct examination would be hugely prejudicial to us in presenting our case because they could be imputed onto the witness having a lack of competence or to my client as having a lack of competence if the testimony doesn't go in well.

THE COURT: Okay. Thank you very much. Let me hear what the issue was during the deposition.

MR. MORIN: Very briefly. First of all, I think our friends are mistaken if they're talking about Ms. Lee. She's Korean, not Japanese. To my knowledge, I don't have anyone who is going to be trying --

MS. WILLIAMSON: Pardon me. Ms. Lee does speak Japanese.

MS. LEE: For the record, I don't speak Japanese. I think you can check my bio. The language that I speak is Korean and English.

MR. MORIN: The separate point still holds, Your Honor. They're worked with this interpreter a lot in the past. Even if they stop now, it doesn't change months and months of that. The problem with the Czech interpreter, when she was trying to advocate for her position shows the opposite is true. You can have fights between the Czech interpreter. There should be one.

THE COURT: Was there a fight?

MR. MORIN: Yes, there were significant, significant battles. I wasn't at the deposition, but my colleague, Mr. Raich -- Dr. Raich.

MR. RAICH: Yeah, there was an incredible amount of dispute among the interpreters. The witnesses were getting involved with interpretation, additional counsel on the Nippon Shinyaku side was getting involved in the interpretation, so it was funny.

THE COURT: Why don't you submit those depositions where there were disputes just so I can lay eyes on them, just send them to the JLH chambers civil e-mail address by midnight tonight and we'll look at it and we'll think about how we want to proceed.

MR. MORIN: Either way, if they want to propose someone, we have identified an option. If they don't think it's good enough, they can identify anyone else that's qualified that they want as long as they haven't worked with the other side. And if they're qualified we'll accept them as a neutral interpreter if they haven't been involved in the case. But that's the right thing to do here.

THE COURT: I am trying to think of what's the most fair here, though. And the issue is that you will get the chance to prepare your witnesses and it seems to take that away from them. If I allow the sides to jointly come up with an agreed upon interpreter, would you be willing to

allow them to have a prep session with that interpreter so they can make sure that the testimony comes in clean? Because then that's actually benefiting you more.

MR. MORIN: No, Your Honor, because our cross-examination doesn't have the same benefit. They can certainly work with their current interpreter behind the scene and work on the testimony, but it should be like everything else in this court, a neutral interpreter is doing the interpretation.

MS. WILLIAMSON: Your Honor, I would just say this is clearly an effort to interrupt the presentation of the direct examination.

THE COURT: All right. Thanks very much. We'll take this under advisement.

MR. MORIN: We have a related issue, Your Honor, if it's helpful on whether deposition testimony needs to have the translation with it, and we just wanted to, we think correctly, to Magistrate Judge Grewal's decision in the case where the other side said they should see the Korean part of the deposition testimony and the English was good enough. He rejected the argument that credibility was -- made it that we should play all of that. Alternatively, if Your Honor is inclined to playing both the Korean and the English, we'd ask for the Japanese time to be charged against them.

MS. WILLIAMSON: Your Honor, may I respond briefly?

THE COURT: Sure. What paragraph are we talking about?

MS. WILLIAMSON: It's 57, Your Honor, footnotes 4 and 5. This should be a relatively minor issue. It's almost all of our witnesses are here, so I'm not even sure that it's going to come up. But here's why I think it's prejudicial to leave out the Japanese portion of the questions. And we're actually -- we don't object to skipping the translation of the question. So English question read, skip interpretation as long as we tell the jurors there is interpretation so they're not confused and then answering Japanese because that's where you're seeing the facial aspects of the witness, the witness testimony. You know, when the interpreter is talking sometimes the witness is staring off into space or maybe not fully engaged because they don't fully understand what is going on, so it gives the impression, it gives -- it's not representative of their testimony.

Now, I think counsel can moot this issue if they want to read only the English version from the transcript and not play the video. We are completely fine with that. There's no issue. So it only arises when they elect the play the video and they want to have the video of the

witness.

THE COURT: I'm starting to worry that we're spending more time arguing about this than time at issue. So why don't you all talk about how much time we're really talking about. I will say this: The video is going to get played, we're going to have the answer in the native language as well and I will think about how the time should be charged. I'm not going to make a ruling on that day, especially since it might only be five minutes, I don't know. So figure that out, but prepare the video such that it's going to display both the native testimony as well as the translation.

All right. There was some discussion in here about claims that are no longer in issue including the contract claim, and maybe some other claims. To the extent that the parties are getting rid of claims, if you want me to dismiss claims, you should meet and confer and come up with a proposed order that disposes of the claims however is agreed upon.

MS. WILLIAMSON: Your Honor, I think we've resolved the dispute over the contract claim once we resolved the language that could be used to describe the contract claims. So the only reason we wanted to refer to the contract claims that formally resolved was if we had to explain the reasons as to why the IPR were moved from the

PTAB.

THE COURT: Okay.

MR. MORIN: We agree.

THE COURT: But on a related issue, if there are extent claims that are not getting tried that don't belong in the case, those should get resolved if anybody wants to appeal or you're going to get bounced back here to get them resolved. So file that as an order.

Paragraph 69 and 70, there was a dispute but I'm not really sure what the dispute is, if there is one.

MR. MORIN: Your Honor, my colleagues can correct me, but I don't think that's a dispute issue. I think you can probably cross out positions and just say those are the parties' contentions. I don't think there's an issue for you to resolve, but my colleagues can correct me if I'm wrong or my friend. I don't think there's an issue for you.

THE COURT: Okay. Great.

MR. MORIN: I think it's just setting forth what each side is contending.

MS. WILLIAMSON: I think that's right.

THE COURT: Those are just your arguments about it. All right.

And then paragraph 73, 86 and 89, all relating to the NS MIL number 3. That was the one you resolved at

the beginning of the hearing today. So we'll cross that off.

MR. O'QUINN: Your Honor, I think the only thing I would add on page 9 is in case we are educing evidence within the guideposts of the agreed language, we will work with our friends to redact any exhibits that just have leftover mentions of the contract claim, et cetera.

THE COURT: Good idea.

All right. Paragraph 74 and 87 referred to Sarepta MIL number 1, which we already discussed.

Paragraph 57 and 88 refer to Sarepta MIL number 2, which we've discussed.

Paragraph 79 talks about the trial schedule, so we'll start with trial presentations at 9 a.m. each day or as close as we can get to it. I'll take the bench at approximately 8:30 to resolve objections and once I take the bench the time will get charged. And then we'll bring the jury out as close to 9 as we can. We'll take a 15-minute break in the morning and a 15-minute break in the afternoon and between half an hour and an hour for lunch. I try to get as close to six hours for proceedings on the record each day so that we can get done on time. So we'll do 12 hours per side for the jury portion of the trial and that's inclusive of the time the Court spends resolving disputes, opening statements, witness examinations, and closing

arguments.

The parties need to reserve at least one hour for the closing arguments. So in other words, once you get to 11 hours, you're going to be cut off there so you have an hour for your closing.

Is each side only going once?

MR. MORIN: I've never -- I have not tried, Your Honor, a case with patents going both ways. It would seem to me that there's almost always a rebuttal, so they'd have a short rebuttal and we'd have a short rebuttal.

MS. WILLIAMSON: Yes, I would agree.

THE COURT: Okay. So the one hour would be inclusive of both your closing argument and rebuttal closing argument?

MS. WILLIAMSON: Yes.

MR. MORIN: But, Your Honor, if we have an hour and a half left, we would have that time?

THE COURT: That's right.

MR. MORIN: Thank you, Your Honor.

THE COURT: But if you use up your hour, you're not going to get the extra time.

MR. MORIN: Understood, Your Honor. By the way, in terms of the timing for the bench trial, we were thinking, with Your Honor's blessing, because of course evenings are precious, but that the witness, once they

testified in the jury trial would stick around and testify that evening for the bench trial if that would be acceptable to your honor.

THE COURT: That's great. I don't know what your plan is for the schedule, though. We are going to need time to do the charge conference Wednesday or Thursday night. So it could be a late night on one or more of the days then.

MR. MORIN: We understand, Your Honor, and we appreciate the Court's time.

MS. WILLIAMSON: Is that the fact witnesses?

MR. MORIN: I think so, yes.

THE COURT: Okay. Well, why don't you meet and confer and just in your Wednesday submission just give me an idea of how you think it might go in terms of when -- how we're going to get this all done.

MR. MORIN: And, Your Honor, just so we're aligned, we have agreement other side, subject to your approval, on the one up one down, so each witness will testify once and you can cross outside the scope of direct, but so that people aren't being recalled more than they need to.

MS. WILLIAMSON: For fact witnesses.

MR. MORIN: For fact witnesses.

THE COURT: Sounds good. And you're not going

to try to call each others' CEOs adversely in your case in chief.

MR. MORIN: Any adverse fact witnesses, and we've agreed, so to put our friends at ease, we're going to hold JMOLs until the close of all evidence, before it goes to the jury, of course, but not JMOL and right after the case in chief, because they're going to wait to cross examine, for example, Dr. Wilton until our case.

THE COURT: That's fine, great.

Okay. Then we've got paragraph 93. Mr. Foy. So I guess the first couple questions I have are for NS. When did NS, quote unquote, learn that Mr. Gendron had departed?

MR. MILLER: Your Honor, it's my understanding that Mr. Gendron departed on September 5th of this year and we learned it then. We were still trying to determine whether he would be able to testify despite the fact that he had departed. He was not and so we informed opposing counsel that Mr. Foy would be replacing Mr. Gendron in October.

THE COURT: Okay. And what's he going to say?

MR. MILLER: Mr. Foy generally is -- well, he's now the head of commercial, which was Mr. Gendron's former position. He succeeded Mr. Gendron as the head of the commercial group at NS Pharma, the U.S. subsidiary. He is

going to provide general background of NS Pharma including how the Viltepso product at issue in the case is distributed in the United States.

Nippon Shinyaku is also seeking lost profits during the entire period of alleged infringement by Sarepta and so as part of that, NS Pharma has to show it has the capacity to provide Viltepso to the market during the entire period of infringement. Obviously Mr. Foy can testify about his experience with that ability to provide capacity to the market while he's been at NS Pharma. He was head of sales for about a year prior to being made the vice president of the commercial. So he's been at NS Pharma since September of 2023 for about 15 months now, Your Honor.

THE COURT: Okay. Is he going to testify any about anything he doesn't have personal knowledge about?

MR. MILLER: Of course not, Your Honor.

THE COURT: And if he didn't have knowledge about it at his deposition, is he going to show up at trial and say he now knows?

MR. MILLER: No, he will not, Your Honor.

THE COURT: All right. Can we hear from the other side about what's remaining in this dispute?

MS. RABENSTEIN: Thank you, Your Honor. It's Reba Rabenstein from Latham & Watkins again. So there are some issues with Mr. Foy's testimony. We did take it and he

doesn't have a lot of knowledge. In fact, the only testimony that he has that's relevant to this case prior to September 2023 is knowledge that he gained from NS -- excuse me, Nippon Shinyaku's outside counsel. He testified that he had one conversation with his predecessor, Mr. Gendron, and on that call Nippon Shinyaku's outside counsel Ms. Venagas was there, as well as their patent damages expert. It was just an awareness call, it was made for general awareness about the litigation. When we asked him about documents that we had cross examined Mr. Gendron on before from his deposition, most of them he had not seen. Right. So out of 19 documents that we could use at Mr. Gendron's deposition, Mr. Foy had not seen any of them -- or, excuse me, he had not seen 13 of them. They were cherry-picked documents that he had been shown by the lawyers and discussed in terms of the relationship between the financial arrangements between Nippon Shinyaku and NS Pharma. He discussed that he had that conversation, he first saw those documents on a call with NS Pharma's counsel in October 2024. So he doesn't have personal knowledge about anything prior to September 2023. And I just heard my friends say that he had knowledge and he wants to talk about NS Pharma's capacity to provide drug in order for their lost profits claim, but he doesn't have any personal knowledge of that prior to September 2023. So at the very least they're not going to be make out a

capacity aspect of proving lost profits damages if Mr. Foy is their sole basis for the testimony to get that in.

THE COURT: You're saying that he couldn't have acquired personal knowledge after beginning his employment with NS?

MS. RABENSTEIN: I'm saying the knowledge that he acquired after he started with NS is from his lawyers and so he shouldn't be allowed to provide basically the story that was provided by NS's trial lawyers as to this information, an education he got from the lawyers, because he wasn't even shown and he doesn't even know many of the documents that Mr. Gendron had that are contrary and do not support NS Pharma's case. So there's nothing for us to cross examine. It's completely unfair because he's going to get up and he's going to tell the positive story of what he's been told on selected documents to the jury and then we get up to cross examine him on the documents that do not support what they're saying that were produced and that were cross examined with Mr. Gendron and he's just going to say well, I don't know about that document.

THE COURT: Did you depose Mr. Gendron?

MS. RABENSTEIN: Yes.

THE COURT: Are you going to designate his deposition?

MS. RABENSTEIN: Well, there have been

deposition designations made from him on our behalf, but the issue is they want Mr. Foy to testify affirmatively and they want to enter essentially Mr. Gendron's testimony through Mr. Foy despite the fact that Mr. Foy does not have the basis for that, right? So even if we are designating information or designating testimony for Mr. Gendron, we're not going to designate testimony from Mr. Gendron that supports their lost profits claim. That's an affirmative testimony that they want to get in and they want Mr. Foy to say that testimony without being able to be cross examined with Mr. Gendron's and saying I've never seen this, I don't know anything about this, I know only what my lawyers told me.

THE COURT: All right. Thank you very much.

MR. MILLER: Can I respond, Your Honor?

THE COURT: Yes.

MR. MILLER: So a couple of points. First of all, Your Honor, opposing counsel mentioned that -- and I think you suggested as well, opposing counsel suggested that Mr. Foy cannot gain personal knowledge about things that happened before he joined the company. You asked a question about that and we disagree. We do believe he could gain -- you know, based on reviewing company records and his work through the company, he can gain information about things that happened before he was there. And that would be within

his personal knowledge and he would be able to testify about that.

Counsel also suggested that -- as long as its within his personal knowledge, Your Honor.

Counsel also suggested that everything Mr. Foy learned was based on conversations with his outside counsel. That's not correct, Your Honor. Mr. Foy testified at his deposition that he, for example, he's in the process of preparing forecasts for this next fiscal year, so he had to learn and understand how forecasts were prepared and how that works, which is relevant to the lost profit claim. He also explained that he has to review profit and loss statements as part of his normal role as the head of commercial, another thing that is relevant to the loss profits claim.

And so all of this is knowledge that's in Mr. Foy's personal knowledge and that he was deposed about for I believe around four hours on the record and a 182-page transcript. So they had ample opportunity to develop cross-examination evidence for Mr. Foy.

There's also the deposition transcript of Mr. Gendron. Mr. Gendron was a 30(b)(6) witness. There has -- they had the opportunity to question Mr. Gendron and can identify anything that they believe is inconsistent -- that Mr. Foy says that's inconsistent with Mr. Gendron, they can

play the testimony of Mr. Gendron in order to make their argument that we can't show lost profits based on these other documents.

And so we can't call Mr. Gendron live because he's no longer within the control of NS Pharma or Nippon Shinyaku. We need the ability to provide the witness to tell -- to put in our affirmative case. They have other evidence they can use to provide their contrary arguments.

THE COURT: All right. Thank you very much.

I'm going to permit Mr. Foy to testify subject to the limitation that counsel agreed to at the start of the questioning. And of course he can only testify as to what he has personal knowledge about. And personal knowledge may be gained through what he's learned since he started his employment.

All right. Paragraphs 94 and 95 talked about the motions to strike and the economic expert. We've resolved some of that.

Paragraph 96 talks about juror notes. The preliminary instructions we saw said that the jury won't get a glossary of abbreviations, which is fine.

The parties recommended giving proposed jury notebooks by 4 p.m. Is there something I was going to be doing with it at that point? I just want to make sure what.

MS. DUDASH: Just for logistical purposes just

so you have them for Monday they're ready to go.

THE COURT: Great. My plan was to read the preliminary jury instructions on Friday. And so if that's the case, then I actually need the notebooks before that so we can read them.

So Judge Fallon has another commitment, so we were going to select a jury, take a brief break and then I'll come out and read the preliminary jury instructions.

MR. MORIN: So then you'd like the notebooks, Your Honor, by 4 p.m. Thursday?

THE COURT: Right. That would probably be better. There was also a discussion about giving the jury the claim construction in the juror notebook. I prefer to do that at the end, because we've already had some discussion today about potentially adding a claim construction, and also, of course claim construction could change. Not that I'm planning on it at all, but I think it would be better to do it at the end.

MS. WILLIAMSON: No objection, Your Honor.

THE COURT: All right.

MR. MORIN: No objection, Your Honor.

THE COURT: All right.

MR. MORIN: By the way, one quick procedural question. Would Your Honor be amenable on stipulated facts that the parties have agreed on, there's a bunch of those,

to you reading those facts to the jury? I think if it's a stipulated or agreed fact it comes better from Your Honor.

THE COURT: That's fine with me if you could put it together for me on one sheet that includes the Third Circuit's model jury instruction for reading in stipulated facts during trial and then I just have it all together and can read right off of it.

MR. MORIN: It may be episodic, before a witness testifies, we'll ask you to read certain of the facts that have been stipulated to.

THE COURT: That's fine. There's a model instruction right in there that the parties always forget about that you can use it for that purpose.

MR. MORIN: I'm sure I forgot it.

THE COURT: Paragraph 97 talks about sealing the courtroom. We need to keep that at a minimum to prevent disruption and preserve the public's constitutional and common law right of access to the trial. Any request to seal the courtroom needs to be reviewed with me in the morning before the jury comes out. I don't want to have it be where we've got everybody out here and all of a sudden somebody says we need to seal the court.

MR. MORIN: We'll try to avoid it, Your Honor. My preference, with Your Honor's permission, I don't know if my friends agree, is to even minimize this further if

there's something on the exhibit we just won't show it on the main screen and try to talk around it. They can point to something rather than sealing the courtroom or sending people out.

THE COURT: And we should try minimize the use of confidential information even on openings and closings. If there's something you really need to give them, we can figure out a way to hand those ones out to the jury so that we can still keep everything moving.

MR. MORIN: I suspect we'll be able to eliminate it, but we'll work with our friends.

MS. WILLIAMSON: The only one we see this coming up is with respect to financials.

THE COURT: I understand. And there's no reason why we can't have the witness say, well, three to the right, column down and that's the number, and we can hand those up to the jury as well. Okay?

MR. MORIN: Thank you, Your Honor.

THE COURT: All right. The parties wanted to play the patent video from the FJC. That's in paragraph 99. The only question I had about that was that in the middle of that video Judge Fogel says you all have been given a copy of the sample patent and if we don't give the jury a copy of the sample patent, we'll tell them that they're not going to get one, then everybody looks at me about where the sample

patent is. So if you think they should get one, it should go in that jury notebook so they'll have it while they're watching the video.

Okay. Before noon on Friday we'd like to have electric versions of all the potential trial exhibits.

MR. MORIN: Your Honor, I should have flagged this earlier, but with Your Honor's blessing we may take another look at the video and if we can get agreement with our friends, for things that are not at issue in this case, so they're not more confused than they need to be, on some small edit, we will propose it, but only if jointly agreed to.

THE COURT: If you've agreed to playing the video, we should move forward playing the video, but I understand what you're saying.

MR. MORIN: I'm only saying that if we should have agreement and it's already been teed up, Your Honor, in which case we'll give you the edited video.

THE COURT: If you agree what to play, that's fine with me.

MR. MORIN: Thank you, Your Honor.

THE COURT: So by noon this Friday I need to have electronic versions of all the trial exhibits. A shared link is fine if you just want to e-mail that to chambers, that way we can pull those up during the trial.

If you can only do it on a flash drive, that's fine too. They should be named with their exhibit numbers, JTX, DTX, PTX. By the time we're finished reading the final jury instructions we'll need to have a binder of all of the exhibits that have been admitted that can go back to the jury room. If there are any videos or native files that are admitted into evidence we also need them loaded onto the laptop that doesn't have anything else on it so we can send that back to the jury room as well.

I mentioned that jury selection will be conducted by Magistrate Judge Fallon. Does anybody have questions about how that's going to proceed?

MR. MORIN: Not that can't be answered that day. I don't know whether she prefers to take the follow up questions with white noise at the bench or whether we'll go to chambers, but obviously we can deal with that on the day.

THE COURT: She'll take it in the jury room.

MR. MORIN: Great. Thank you, Your Honor.

THE COURT: Any other questions about jury selection? All right.

Will the parties agree to provide the jury with lunch?

MS. WILLIAMSON: Of course.

MR. MORIN: Of course, Your Honor.

THE COURT: That would be great. So I'm going

to ask you to coordinate with my courtroom deputy, Mr. Kohler about what we're going to need from you and when the lunches will need to get delivered. We won't need lunch for Friday. We'll start with lunches on Monday, so no lunch for jury selection day. We'll start with the catered lunches on Monday.

All right. We talked about trial time. We talked about closing arguments. We talked about if I'm deciding issues during the morning. That will get charged. The same goes for deciding an objection during trial, all the time, including relocating the jury if we need to do that, is going to be assigned to one or both parties. Usually the loser of the objection, but may do it differently if something else is deemed more fair. We don't charge reading of the jury instructions to the parties and I won't charge the time we spend on the charge conference.

MS. DUDASH: Your Honor, just one question. Are you charging time for the JMOLs with the parties. In the pretrial ordered said the Court will hear orally.

THE COURT: So I will not, but here's what I'll say. We don't need to have extensive argument on the JMOLs. You need to make your motion, you need to state the grounds on which its based, so obviousness, no reasonable jury can find for the other side on obviousness and then whatever your main topic sentences are for that, and then call it a

day. So we wouldn't be needing to spend more than half an hour on both sides' JMOLs I don't think and I wouldn't charge for that.

If you need access to the courtroom before next week or before Friday, coordinate that with Mr. Kohler. We'd like a list of tech materials and witness names for the court reporter. Please put that in a letter filed to the docket by noon on Thursday. And then after the trial we'll need the parties to review the trial transcripts and submit any necessary corrections no later than two weeks after the trial concludes. And that also goes for finalizing any conditional sealing rulings on the transcript.

So we talked about each side's going to have two hours for the bench trial. I'm going to hear from you Wednesday your best guess as to how that's going to get worked in.

MS. DUDASH: Your Honor, the parties, and you may be changing it, but the parties had agreed to two hours and --

THE COURT: Oh. 2 --

MS. DUDASH: 2.25, so to clarify, yeah. Thank you.

THE COURT: We're looking at the preliminary jury instructions and voir dire. We'll get you something as soon as we can this week, probably tomorrow. We'll ask for

objections and then once those are finalized I'm going to need the plaintiff to bring enough pens and copies of the voir dire for the prospective jurors. You can bring those with you when we do the jury selection.

And then with respect to the final jury instructions and the verdict form, we'll do the final charge conference during the trial either Wednesday or Thursday or depending on how many disputes there are, Wednesday continuing into Thursday.

MR. MORIN: And we had the additional potential voir dire question that we had flagged for Your Honor. I think it would be as simple as, do any have you have strong feelings against animal testing in the development of pharmaceutical products. Something like that. Be that simple.

THE COURT: Okay. All right.

Do the parties have any reason to believe that discussing settlement would be productive at this point?

MS. WILLIAMSON: No, Your Honor.

MR. MORIN: No, Your Honor.

THE COURT: Is there anything else we need to address?

MR. MORIN: We want to thank the Court and your staff for your time today.

THE COURT: Absolutely. I know that parties

have been patiently waiting for rulings on many of these things. We've obviously had a busy year. We're still digging out from under it. I can assure you that we're working around the clock and over the weekends to try to get everything done and get you to trial.

MS. WILLIAMSON: Thank you, Your Honor.

MR. MORIN: We have one more short issue, Your Honor.

THE COURT: Okay.

MR. O'QUINN: Since it seems like we're doing kind of an omnibus submission to you on Wednesday, plaintiff's damages expert, Mr. Hosfield, has in his most recent report provided eight different damages scenarios. And we think it might be less prejudicial to us if we have at least some idea of a narrowed set of scenarios that he might be willing to present at trial. A lot of that is within plaintiff's control. Just seems like this close to trial we shouldn't be preparing for eight different damages scenarios.

THE COURT: Why don't you talk with them about it?

MR. O'QUINN: We have. We haven't gotten a response.

THE COURT: All right. Well, we'll hear from the submission on Wednesday, give them a chance to reply.

MR. O'QUINN: Thank you, Your Honor.

THE COURT: The only other thing I wanted to ask you was we started the hearing out today talking about how we might have a situation where you both got valid infringed patents against each other and there was an assumption at least on one of the sides that that would mean that the reasonable royalties would cancel each other out. I don't know if that's the case or not. I'm just throwing that out there. It seems very strange that that's how you would negotiate, but I'm not sure if there's any law on that.

MR. MORIN: And I think my point, Your Honor, is statutorily everyone -- everybody gets at least a reasonable royalty. That wouldn't be the problem. The problem is the lost profits, assuming you're going to make more sales, but then it's become more infringing sales that you would then owe more damages on and so there's a blocking patent issue and a calculation issue. Your Honor, I have to think about it.

THE COURT: The reasonable royalty issue, if you're negotiating you've got blocking patents, I would think that would be taken into account. Was that the experts' opinion?

MR. MORIN: I don't think they did and I don't think it's as profound an issue, because you could say to sell our drug what would we be willing to pay and I guess

you could have some symmetry issues, but it wouldn't be that you're imagining a but-for world where you're infringing more. So I think it's really on the lost profit side of things. I will tell Your Honor, I know it's a little bit of a quagmire, but the other thing we could do is not do anything -- and hear me out on this -- on the jury instructions or the verdict forms, but we don't want to have seemed to have waived the issue and then end up with a verdict that everything is valid. As long as they've also filled out the reasonable royalty aspect, we can then have the fight in the briefing before Your Honor about whether anyone should get those lost profits. And as a matter of law, because I think that's a legal issue, if you don't want to end up with a situation where we have to scramble to get something to the jury, but I wanted flag it as soon as I did because it's a very real issue.

MS. WILLIAMSON: I think we proposed that earlier on today. I also note, the idea of a blocking patent, we haven't spent a lot of time to consider this, so don't want to lock myself into a statement, but there's never been an issue or even an allegation that there would be injunctive relief in this case. Both parties have never sought an injunction, so I'm not sure we wouldn't assume the but-for world wouldn't include both parties entering and making sales.

THE COURT: Well, we'll leave it at that. I'll hear the joint submission.

I will say this. I'm reserving the right to say that this was all brought up too late based on what was proposed in the verdicts that were already filed with the Court, proposed verdicts and expert reports that were already served. If you all can agree on something, we'll take a look at that. If there are disputes that we think are appropriately resolved at this late stage, we'll look at those too.

MR. MORIN: We'll work on it with our friends, Your Honor.

THE COURT: All right. Great. All right. Thanks, everybody.

COURT CLERK: All rise.

(Court adjourned at 6:43 p.m.)

---------------------------------

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceedings.

/s/ Stacy M. Ingram, RPR
Official Court Reporter
U.S. District Court