## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NIPPON SHINYAKU CO., LTD.,
        Plaintiff,

v.

SAREPTA THERAPEUTICS, INC.,
        Defendant.

SAREPTA THERAPEUTICS, INC. and THE
UNIVERSITY OF WESTERN AUSTRALIA,
        Defendant/Counter-Plaintiffs,

v.

NIPPON SHINYAKU CO., LTD. and NS
PHARMA, INC.,
        Plaintiff/Counter-Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 21-1015 (JLH)

**DEMAND FOR JURY TRIAL**

### NS'S OPPOSITION TO SAREPTA'S MOTION FOR SUPPLEMENTAL DAMAGES
### AND PRE- AND POST-JUDGMENT INTEREST

Amanda S. Williamson (admitted *pro hac vice*)
Christopher J. Betti (admitted *pro hac* vice)
Krista V. Venegas (admitted *pro hac* vice)
Wan-Shon Lo (admitted *pro hac vice*)
Maria E. Doukas (admitted *pro hac vice*)
Zachary Miller (admitted *pro hac vice*)
Michael T. Sikora (admitted *pro hac vice*)
110 N. Wacker Drive, Suite 2800
Chicago, IL  60601
Telephone:  312.324.1000  |  Fax: 312.324.1001
amanda.williamson@morganlewis.com
christopher.betti@morganlewis.com
krista.venegas@morganlewis.com
shon.lo@morganlewis.com
maria.doukas@morganlewis.com
zachary.miller@morganlewis.com
michael.sikora@morganlewis.com

David L. Schrader (admitted *pro hac vice*)
300 South Grand Ave., 22nd Floor
Los Angeles, CA 9007
Telephone: 213.612.2500  |  Fax: 213.612.2501
david.schrader@morganlewis.com

Amy M. Dudash (DE Bar No. 5741)
**MORGAN, LEWIS & BOCKIUS LLP**
1201 N. Market Street, Suite 2201
Wilmington, DE 19801
Telephone:  302.574.3000  |  Fax: 302.574.3001
amy.dudash@morganlewis.com

Alison P. Patitucci (admitted *pro hac vice*)
Julie S. Goldemberg (admitted *pro hac vice*)
2222 Market Street
Philadelphia, PA  19103
Telephone: 215.693.5000  |  Fax: 215.963.5001
alison.patitucci@morganlewis.com
julie.goldemberg@morganlewis.com

*Attorneys for Plaintiff/Counterclaim Defendant*
*Nippon Shinyaku Co., Ltd. and Counterclaim*
*Defendant NS Pharma, Inc.*

**Dated:  April 1, 2025**

TABLE OF AUTHORITIES ..............................................................ERROR! BOOKMARK NOT DEFINED.

NATURE AND STAGE OF THE PROCEEDINGS........................................................................II

SUMMARY OF THE ARGUMENT ............................................................................................1

ARGUMENT .......................................................................................................................3

I.     If the Court Does Not Overturn the Jury Verdict, Sarepta Is Entitled to an Ongoing Royalty of 4% for Actual US Sales of VILTEPSO. .......................................3

       A.     Sarepta Is at Most Entitled to an Ongoing Reasonable Royalty for Ongoing Sales of VILTEPSO................................................................................3

       B.     An Ongoing Reasonable Royalty Should Be 4% .................................................4

II.    Sarepta Should Be Awarded Pre-Judgment Interest at the Treasury Bill Rate.......................................................................................................................12

III.   NS Does Not Oppose Sarepta's Request for Post-Judgment Interest........................15

IV.    NS Does Not Oppose Post-Judgment Damages for Foreign Sales of VILTEPSO from the U.S. ...........................................................................................16

V.     NS Requests the Court to Order an Accounting of NS's Ongoing Sales of VILTEPSO after June 28, 2025 and that the Parties Meet and Confer on Calculations ....................................................................................................16

CONCLUSION ........................................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*10X Genomics, Inc. v. Bruker Spatial Biology, Inc*.,
    2024 WL 5201115 (D. Del. Dec. 23, 2024)...............................................................................9

*American Tech. Ceramics Corp. v. Presidio Components, Inc*.,
    2020 WL 5665065 (E.D.N.Y. 2020).......................................................................................14

*ArcherDX, LLC v. Qiagen Scis., LLC*,
    2022 WL 4597877 (D. Del. Sept. 30, 2022).......................................................................7, 16

*Atkins v. Fischer*,
    1999 WL 34978916 (D.D. C. Jul. 6, 1999)............................................................................12

*Atkins v. Fischer*,
    2000 WL 35588068 (D.D.C. May 5, 2000)...........................................................................13

*Bos. Sci. Corp. v. Cordis Corp*.,
    838 F. Supp. 2d 259 (D. Del. 2012).........................................................................................9

*Carnegie Mellon U. v. Marvell Tech. Group, Ltd*.,
    2014 WL 1320154 (W.D. Pa. Mar. 31, 2014) .........................................................................4

*Dasso Int'l, Inc. v. Moso N. Am., Inc*.,
    2023 WL 5349374 (D. Del. Aug. 21, 2023) ............................................................................9

*Dow Chem. Co. v. Nova Chemicals Corp. (Canada)*,
    803 F.3d 620 (Fed. Cir. 2015)..................................................................................................3

*Drone Technologies, Inc., v. Parrot S.A.*,
    2015 WL 13531004 (W.D. Pa. Feb. 23, 2015) .......................................................................12

*EMC Corp. v. Zerto, Inc*.,
    2017 WL 3434212 (D. Del. Aug. 10, 2017) ............................................................................6

*Georgia-Pac. Corp. v. U.S. Plywood Corp*.,
    318 F. Supp. 1116 (S.D.N.Y. 1970).......................................................................................11

*Jiaxing Super Lighting Electric Appliance Co., Ltd. v. CH Lighting Tech. Co., Ltd.*,
    2022 WL 3371630 (W.D. Tex. Aug. 16, 2022).....................................................................14

*Laitram Corp. v. NEC Corp*.,
    115 F.3d 947 (Fed. Cir. 1997)................................................................................................14

*Mars, Inc. v. Coin Acceptors, Inc.*,
    513 F. Supp. 2d 128 (D.N.J. 2007) ...........................................................................................14

*Mentor H/S, Inc., v. Medical Device Alliance, Inc.*,
    1998 WL 35305873 (C.D. Cal. Nov. 2, 1998)...........................................................................13

*Mondis Tech. Ltd. v. LG Electronics, Inc.*,
    2023 WL 3749992 (D.N.J. 2023) ...............................................................................................15

*Paice LLC v. Toyota Motor Corp.*,
    504 F.3d 1293 (Fed. Cir. 2007).....................................................................................................4

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
    575 F.2d 1152 (6th Cir. 1978) .......................................................................................................7

*SynQor, Inc. v. Artesyn Techs., Inc.*,
    709 F.3d 1365 (Fed. Cir. 2013).....................................................................................................3

*Texas Adv. Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*,
    895 F.3d 1304 (Fed. Cir. 2018)...................................................................................................11

*Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*,
    809 F. App'x. 965, 2020 WL 1970571 (Fed. Cir. 2020) ............................................................14

*XY, LLC v. Trans Ova Genetics, L.C.*,
    890 F.3d 1282 (Fed. Cir. 2018).....................................................................................................4

**Statutes**

28 U.S.C. § 1961.............................................................................................................................16

35 U.S.C. § 284........................................................................................................................4, 17

### NATURE AND STAGE OF THE PROCEEDINGS

This Court held a phased jury trial on December 13-20, 2024, where the jury awarded Sarepta damages of $115,222,850 for past sales of NS's VILTEPSO product within the U.S. but found no willful infringement.  D.I. 704.  The parties stipulated to "an agreed-upon 4% rate" for past foreign sales of NS's VILTEPSO shipped from the U.S.  D.I. 708.  On January 7, 2025, this Court entered judgment on the jury verdicts and the foreign sales stipulation.  D.I. 718.  Sarepta filed its motion for supplemental damages on February 14, 2025.  D.I. 734 & 735.  At no point in time has Sarepta sought an injunction, including on continuing sales of NS's VILTEPSO product. *Id*.  NS hereby files its response, while noting that the issues Sarepta raises will become moot should the Court grant NS's co-pending motions for post-verdict relief.  *See* D.I. 730.

### SUMMARY OF THE ARGUMENT

1.    Sarepta purports to seek "ongoing supplemental damages . . . to compensate [it] at the same rate" for post-verdict infringing U.S. sales as what the jury awarded as lost profits damages.  D.I. 735 at 1.  But Sarepta's request (at an astounding effective royalty rate of 57.5%), ignores legal precedent and is based on an unreliable expert declaration that is inconsistent with the facts and jury verdict.

> a.    At trial, Sarepta agreed that the reasonable royalty rate for the Wilton Patent was 4%[1] and further stipulated to a 4% royalty for pre- and post-verdict foreign sales of VILTEPSO.[2]  But now, for ongoing U.S. sales of VILTEPSO, Sarepta seeks supplemental damages that amount to Sarepta's purported profit margin (~57.5%, which was presented by Mr. Jarosz as part of his lost profits analysis and rejected by the jury).

---

[1] Jury Tr. 1458, 1484,1489-1490, 1516.
[2] D.I. 708 & 735 at 6.

b. Sarepta's high proposed ongoing royalty rate (which is greater than its own lost profits) is inconsistent with the case law and not "reasonable" by any measure. Further, by asking for a rate consistent with what Sarepta argued was NS's profit margin, Sarepta is in effect asking this Court to order disgorgement for all profits for NS's ongoing sales. But Congress abolished disgorgement as a utility patent infringement remedy.

c. In an attempt to justify their exceedingly high royalty rate, Sarepta and Mr. Jarosz rely on a flawed assumption—that Sarepta could seek a permanent injunction and exclude NS from the market until the Wilton Patent expires— when Sarepta repeatedly waived such relief. And the only support for the 57.5% rate is Mr. Jarosz's projections based on cherry-picked estimations from NS's expert Mr. Hosfield's report from a small window of time, when Mr. Hosfield never presented that rate to the jury.

d. Mr. Hosfield is the only expert to begin with the correct assumptions (i.e., that Sarepta could not have used the threat of an injunction to demand such a high royalty rate), apply the correct methodology (*Georgia-Pacific* plus post-verdict circumstances), and arrive at a reasonable royalty rate of 4%. If Sarepta is entitled to post-verdict relief, the Court should adopt Mr. Hosfield's rate as an ongoing royalty for U.S. VILTEPSO sales through patent expiration.

2. Next, Sarepta opportunistically seeks pre-judgment interest at the prime rate, compounded quarterly. D.I. 735 at 8. But Sarepta's request is contradicted by Mr. Jarosz's own economic opinions—presented in this case and many others—that the prime rate results in an unjust windfall for Sarepta, and the Treasury Bill rate is more appropriate. Sarepta also failed to

2

meet its burden to demonstrate it is entitled to the interest compounded quarterly.   In view of the record evidence (or lack thereof), this Court should award Sarepta pre-judgment interest at the Treasury Bill rate and simple interest.[3]

   3. Finally, NS respectfully requests the Court order an accounting of actual VILTEPSO sales following patent expiration (June 28, 2025) rather than rely on sales projections. The previous sales projections have now been proven not to be accurate,[4] and there is no reason to further estimate sales when NS's actual sales data for the remaining patent term will be available in a matter of months.   The parties can then meet and confer on the calculations consistent with the Court's decision.

**ARGUMENT**

I. **If the Court Does Not Overturn the Jury Verdict, Sarepta Is Entitled to an Ongoing Royalty of 4% for Actual US Sales of VILTEPSO.**

  A. **Sarepta Is at Most Entitled to an Ongoing Reasonable Royalty for Ongoing Sales of VILTEPSO**

   Supplemental damages compensate the patentee for periods of infringement not considered by the jury.  *Dow Chem. Co. v. Nova Chemicals Corp., (Canada)*, 803 F.3d 620, 626 (Fed. Cir. 2015).  "The amount of supplemental damages following a jury verdict is a matter committed to the sound discretion of the district court."  *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1384 (Fed. Cir. 2013).  As the Federal Circuit has explained, "[i]n most cases, where the district court determines that a permanent injunction is not warranted, the district court may wish to allow

---

[3] As is explained in Sections III and IV, NS does not dispute that should the Court determine Sarepta is entitled to a monetary award, Sarepta would also be entitled to post-judgment interest on the jury's verdict for pretrial U.S. sales and stipulated pre-trial foreign sales (as of the date of the judgment) as well as any awarded pre-trial interest (as of the date it may be later awarded by the Court).  Nor does NS oppose Sarepta's request that the Court impose a 4% ongoing royalty for any foreign sales of VILTEPSO shipped through the U.S.

[4] Hosfield Decl. at ¶¶ 141-144.

the parties to negotiate a license amongst themselves regarding future use of a patented invention before imposing an ongoing royalty. Should the parties fail to come to an agreement, the district court could step in to assess a **reasonable royalty** in light of the ongoing infringement." *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1315 (Fed. Cir. 2007) (emphasis added).

"In undertaking this assessment, the Court weighs the traditional *Georgia-Pacific* factors to arrive at a reasonable royalty which is adequate to compensate the patentee for the continued infringement." *Carnegie Mellon U. v. Marvell Tech. Group, Ltd*., 2014 WL 1320154, at *37 (W.D. Pa. Mar. 31, 2014), *vacated in part on other grounds*, 807 F.3d 1283 (Fed. Cir. 2015) (citing *Georgia-Pac. Corp. v. U.S. Plywood Corp*., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)). Under 35 U.S.C. § 284, "[t]he court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances." Further, in setting the ongoing royalty rate, the Court must consider: (i) the "change in the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability"; (ii) "changed economic circumstances, such as changes related to the market for the patented products"; and (iii) any other "post-verdict factor" that would impact "what a hypothetical negotiation would look like after the prior infringement verdict*." XY, LLC v. Trans Ova Genetics, L.C*., 890 F.3d 1282, 1297 (Fed. Cir. 2018).

### B.    An Ongoing Reasonable Royalty Should Be 4%

In this case there was no dispute about the reasonable royalty rate pre-verdict. After both parties' experts undertook *Georgia-Pacific* analyses, they both arrived at a 4% reasonable royalty rate at the time of first infringement. *See, e.g.*, Jury Tr. 1458 (Sarepta's counsel during damages phase opening: "There is something called a reasonable royalty. . . . [W]e all agree that would be a 4 percent reasonable royalty on those sales."); *id.* at 1484 & 1489-1490 (Sarepta's expert Mr.

Jarosz agreeing that the reasonable royalty is 4%); *id.* at 1516 (Mr. Hosfield confirming he agrees with the 4% rate).

There is, however, a dispute about what the ongoing post-verdict rate should be. Sarepta provides no analysis of the *XY* or *Georgia-Pacific* case factors and no reliable factual basis to divert from the agreed 4% rate. *Compare* D.I. 735 (Sarepta seeking a 57.5% ongoing rate, supported by the declaration of Mr. Jarosz (D.I. 736), who arrives at this rate purportedly based on the jury's lost profits award but actually divorced from the legal framework and trial record) *with* Ex. A (hereinafter, "Hosfield Decl.") (NS's expert Mr. Hosfield proposing an ongoing royalty rate of 4% (but no more than 9%), based on appropriate assumptions and the proper analysis). As is explained herein, the Court should adopt NS's legal analysis and Mr. Hosfield's methodology.

### 1. Mr. Hosfield Properly Relies on the Correct *XY* and *Georgia-Pacific* Methodology and Facts Pertinent to the Case to Arrive at His Proposed Royalty Rate of 4%

Mr. Hosfield is the only expert that has provided a post-verdict *Georgia-Pacific* analysis, taking into consideration the *XY* post-verdict factors. *See* Hosfield Decl. at ¶ 9, Section III.b.

In particular, Mr. Hosfield starts with the pre-verdict reasonable royalty the parties agreed to for the Wilton Patent after assuming the patent was valid and infringed, i.e., a 4% royalty on NS's net sales. Mr. Hosfield then considers if and how the parties' bargaining positions were affected by the juries' determination of liability (finding the Wilton Patent valid, but also finding that NS did not willfully infringe). *See, e.g.* Hosfield Decl. at ¶¶ 24, 27-28. He also considers new developments in the DMD treatment market, including the impact of Sarepta's recently introduced gene therapy product ELEVIDYS on the demand for the two exon 53 skipping products at issue (Sarepta's VYONDYS and NS's VILTEPSO that were at issue at the trial). *See id.* at ¶¶ 39-49. And Mr. Hosfield considers Sarepta's waiver of an injunction that significantly diminishes its power to extract a significantly higher royalty for the remainder of the Wilton Patent's life. *See*

*id.* at ¶ 29.   Indeed, Sarepta's waiver has a significant downward pressure, as "the threat of a permanent injunction serves as a big stick, essentially framing negotiation in terms of how much an adjudged infringer would pay for a license to continue its infringing conduct." *EMC Corp. v. Zerto, Inc*., 2017 WL 3434212, at *3 (D. Del. Aug. 10, 2017) (citing *Paice LLC v. Toyota Motor Corp*., 609 F. Supp. 2d 620, 624 (E.D. Tex. 2009)).   "When an injunction is found to be improper, however, there appears to be no material difference between the parties' current situation [post-verdict] and the one it was in at the time of the hypothetical negotiation." *Id.*   Mr. Hosfield considers all other *Georgia-Pacific* factors as well.   *Id.* at ¶¶ 55-109.   Based on all of these considerations. Mr. Hosfield arrives at a rate of 4% (but no more than 9%).   Hosfield Decl. at ¶ 111.

Mr. Jarosz's own prior opinions in this case support Mr. Hosfield's rate.   When testifying about how he arrived at the 4% royalty rate for the Wilton Patent at trial, Mr. Jarosz relied heavily on what he characterized as an analogous licensing agreement between Sarepta and BioMarin, a competitor for exon 53 skipping therapies.   Jury Tr. 1481-82 (Mr. Jarosz agreeing that the Sarepta-BioMarin agreement had "much more significance than the other [agreements]," "when companies agree to deals . . . to any economist . . . that is strong evidence of the going rate."); PTX146 & DTX141.   For U.S. sales, the BioMarin royalty rates ranged from 4% (for a co-exclusive license) to 5% (for an exclusive license).   Jury Tr. 1485.   Mr. Jarosz also previously opined that royalty rates in the industry typically range from 0-20%.   Ex. B, Jarosz Dep. Tr. at 45.   However, for this case he "would expect something that's in the double digits is probably too high." *Id.* at 56.   Mr. Jarosz's own testimony supports Mr. Hosfield's reasonable royalty rate of 4% and no more than 9% (and demonstrates why Mr. Jarosz's proposal of 57.5% is unreasonably high).

Mr. Hosfield's analysis is reasoned, tied to the facts of the case, and correctly applies the

law. It is also consistent with the agreed to 4% royalty rate for sales made outside the United States. *See* Section IV. The Court should adopt Mr. Hosfield's proposed ongoing royalty rate.

### 2.    **Sarepta and Mr. Jarosz Request Ongoing Lost Profits, Something Sarepta Is Not Entitled to Under the Law**

Sarepta and its expert Mr. Jarosz suggest a significantly higher rate of 57.5%, which they claim to be based on the jury verdict. D.I. 735 at 4-6. Sarepta claims it "merely seek[s] to extend the jury's verdict" to ongoing U.S. sales. *Id.* [5] But that is not the correct legal approach.

NS is aware of no law—and Sarepta has cited none—indicating an award of lost profits requires the Court to enhance the (previously undisputed) pre-verdict reasonable royalty. *See ArcherDX, LLC v. Qiagen Scis., LLC*, 2022 WL 4597877, at *16 (D. Del. Sept. 30, 2022) ("Plaintiffs, however, cite to no law that indicates an award of lost profits requires the Court to enhance the royalty rate. Plaintiffs point to no other factors other than the lost profits award to support their contention that the rate should be higher than [the pre-trial reasonable royalty rate of] 7%.").

### 3.    **Mr. Jarosz Fails to Perform a New *Panduit* Analysis**

Even if ongoing lost profits were available—and to be clear, they should not be available at any point, including post-trial—Mr. Jarosz's opinions would still be deficient because he failed to perform an analysis considering the factors in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978), and the changed circumstances. Mr. Hosfield is the only expert that opines on the *Panduit* factors and considers the changed circumstances, including the introduction of a new gene therapy drug to the market that competes with the parties' exon 53

---

[5] As NS argues in its post-verdict motions, Sarepta failed to prove entitlement to lost profits. For those same reasons, Sarepta is not entitled to an ongoing royalty rate that Sarepta equates to lost profits.

skipping treatments.  Hosfield Decl. at ¶¶ 136-142.  He explains why, based on those changed circumstances, lost profits should not be available on an ongoing basis.  *Id.*

### 4.    Sarepta and Mr. Jarosz Do Not Perform a *Georgia-Pacific* Analysis

Sarepta and Mr. Jarosz also do not perform a *Georgia-Pacific* analysis, nor do they consider the additional factors from *XY* that they were required to take into account.  In fact, Sarepta clearly misunderstands the applicable analysis, claiming "this is an exercise of simply applying the jury's award to a supplemental damages period **rather than assessing a new royalty rate**."  D.I. 735 at 6 n.1 (emphasis added).  For that reason alone, Sarepta's proposal should be disregarded.[6]

### 5.    Sarepta's and Mr. Jarosz Wrongly Assume Sarepta Could Have Sought a Permanent Injunction

The closest Sarepta comes to a potential "post-verdict hypothetical negotiation" is offering a conclusory statement from Mr. Jarosz's declaration claiming a 57.5% rate is appropriate because "faced with the choice of leaving the market for seven months or paying a royalty equivalent to the lost profits . . . NS would agree to a short-term license bearing a 57.5 rate on U.S. sales of VILTEPSO."  D.I. 735 at 6.  But Sarepta explicitly and repeatedly waived the ability to seek a permanent injunction.  *See, e.g.*, D.I. 89 at 46-47, D.I. 195 at 46-47, & D.I. 334 at 86-87 (Sarepta's counterclaims only seeking "monetary relief"); D.I. 590 & 710 (Sarepta failing to request an injunction in the Pretrial Order); Jury Tr. 345 (Sarepta Opening: "I want to be clear about one thing. **Sarepta is not asking for VILTEPSO, for the NS drug to be taken off the market.**  I want to repeat that.  That's an option in patent cases.  We're not asking for that option.  We're not asking for their drug to be taken off the market."); *id.* at 404 (Magnus Cross: "[Y]ou heard in opening that Sarepta is not seeking to take VILTEPSO off the market. There's no claim, there's

---

[6] It is now too late for Sarepta to offer such an alternative theory in reply.

no suggestion."); *id.* at 1452 (Damages Opening: "No one is trying to take drugs off the market."). Of course, Mr. Jarosz knew that. *See* D.I. 653-1 at ¶ 25 (Jarosz's Second Supplemental Rebuttal Expert Report: "I understand that, even if it prevails on liability in this matter, Sarepta will not seek a permanent injunction.").

The factual premise of Sarepta's and Mr. Jarosz's analysis is wrong. Sarepta has repeatedly **waived** the right to seek a permanent injunction. Mr. Jarosz's opinions, and Sarepta's argument parroting them, are unreliable and should not be credited.

### 6.    Sarepta's Caselaw Is Not on Point

The cases on which Sarepta relies are distinguishable. In the first two cases cited by Sarepta, the Court entered injunctions—again, something that is impossible here—so the Court awarded the patentee supplemental damages only for the short period of incremental sales not accounted for at trial in view of willful infringement findings.[7] *See, e.g.*, *Dasso Int'l, Inc. v. Moso N. Am., Inc.*, 2023 WL 5349374 (D. Del. Aug. 21, 2023) (Court awarding supplemental damages for two-month period not calculated by experts before trial; acknowledging jury's willful infringement verdict); *10X Genomics, Inc. v. Bruker Spatial Biology, Inc.*, 2024 WL 5201115 (D. Del. Dec. 23, 2024) ("the jury found that NanoString willfully, directly, and indirectly infringed"; Court awarding supplemental damages between verdict and injunction). In the third case Sarepta cites, the Court denied an injunction but again awarded an ongoing royalty reflecting the jury's finding of willful infringement. *Bos. Sci. Corp. v. Cordis Corp.*, 838 F. Supp. 2d 259, 276 (D. Del. 2012), *aff'd*, 497 F. App'x 69 (Fed. Cir. 2013) ("The court declines to allow Cordis, an adjudicated willful infringer, to effectively owe less for its post-verdict infringement than the jury found for

---

[7] Sarepta frequently conflates the nomenclature of "supplemental damages," generally referring to pre-verdict sales not accounted for in the verdict (due to lags in the availability of actual data), and "ongoing royalty" damages, which refer to post-verdict sales.

its pre-verdict infringement under the circumstances."). Here, again, the jury found no willful infringement. Sarepta's authority—which involved significantly smaller damages verdicts—does not apply, and Sarepta provides no other credible basis to increase the agreed royalty rate.

### 7.  Mr. Jarosz's Proposal Is Not Even Consistent with the Jury Verdict

Another problem with Sarepta's requested 57.5% rate is that, despite what Sarepta claims, it draws no support from the jury verdict. The jury did not find nor has Mr. Hosfield ever opined that Sarepta's profit margin was anywhere near 57.5%.

Instead, and as Sarepta told the jury, Mr. Hosfield's lost profit opinion that the jury credited was a best estimate of Sarepta's profit margin for VYONDYS 53 of 43% based on the limited corporate (not product specific) information Sarepta provided:



DDX-22.008 (left); *see also* Tr. 1456, 1530, 1550, 1582 (damages expert testimony discussing profit margins).

Rather than rely on the jury verdict's 43% (that was based on Mr. Hosfield's analysis of the entire past damages period of August 2020 to December 2024), Mr. Jarosz cherry picks **estimated** data from Mr. Hosfield's report for only the last three months (September 1, 2024-

December 15, 2024), and uses that as support for his proposed higher ongoing rate of 57.5%. D.I. 736 at ¶ 6  n.10. ███████████████████████████████████████████

███████. Hosfield Decl. at ¶ 17.  There is no principled reason to rely on this ███████

███ sales data from one time period that was not even highlighted to the jury.

As Mr. Hosfield explains, even a royalty rate of 43% based on the jury verdict—which Sarepta does not suggest—would be far too high in view of the parties' pre-verdict agreement to a 4% royalty rate, the analogous BioMarin agreement, Mr. Jarosz's testimony, and post-verdict considerations.  PTX146 & DTX14; Jarosz Dep. Tr. 45:10-24; Hosfield Decl. at ¶ 121.

### 8.    Sarepta Cannot Effectively Recover Disgorgement of NS's Profits

Another problem with Sarepta and Mr. Jarosz's proposed rate is that it is the same as NS's profit margin argued to the jury.[8]  An ongoing rate of 57.5% would fail to allow for NS to make a profit on ongoing sales.  But "[a] reasonable royalty is an amount which a person, desiring to use a patented article, as a business proposition, would be willing to pay as a royalty and **yet be able to use the patented article at a reasonable profit**."  *Georgia-Pacific*, 243 F. Supp. at 539 (emphasis added).  By asking for a 57.5% ongoing rate, Sarepta is effectively asking the Court to award disgorgement of all of NS's profits from future U.S. sales.  As the Federal Circuit has recognized "Congress abolished disgorgement of defendant's profits as a patent remedy" for utility patents.  *Texas Adv. Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc*., 895 F.3d 1304, 1324 (Fed. Cir. 2018).

---

[8] Sarepta argued that Mr. Hosfield's calculations of Sarepta's lost profits was unreliable because his calculation of Sarepta's profit rate was lower than NS's profit rate.  DDX-22.008 (right); *see also* Tr. 1582.  The jury rejected Sarepta's criticism, adopting Mr. Hosfield's calculations as being more reliable.  Further, because NS's lost profits were not at issue, evidence of NS's profitability was not presented to the jury by either expert.

Further, as Mr. Hosfield opines, it is economically unreasonable to assume NS would be willing to take on all the risk that comes with selling and distributing a drug in the United States with no possibility of making a profit and no threat of an injunction. Hosfield Decl. at ¶ 132. The Court should decline Sarepta's invitation to entirely disgorge NS's profits on future sales.

*     *     *

The difference between the parties' proposed ongoing royalty rates results in substantially different ongoing damages. *Compare* Hosfield Decl. at ¶ 115 (calculating ongoing U.S. royalties at $2.3 million for a 4% royalty) *with* D.I. 736 at ¶ 6 (calculating ongoing U.S. royalties at $34.1 million). The Court should decline Sarepta's invitation to award Sarepta such an unjustified windfall.

## II.    Sarepta Should Be Awarded Pre-Judgment Interest at the Treasury Bill Rate

Sarepta also requests an award of pre-judgment interest. *See* D.I. 735 at 8. If the Court does not overturn the jury verdict, then NS does not dispute that Sarepta may collect pre-judgment interest. However, NS challenges Sarepta's assertion that it is entitled to the U.S. Bank Prime Loan rate compounded quarterly. See D.I. 735 at 8; D.I. 736 at ¶ 10. Indeed, in his declaration, Mr. Jarosz offers no opinion on why the prime rate is appropriate **in this case**, because it is not.

As Mr. Jarosz has consistently opined over the years in other cases, "[t]he appropriate interest rate is one that fairly compensates the plaintiff for the time value of its money while properly accounting for risk in a financial sense." Rebuttal Expert Report of John C. Jarosz, *Drone Technologies, Inc., v. Parrot S.A.*, 2015 WL 13531004 (W.D. Pa. Feb. 23, 2015). According to Mr. Jarosz, that appropriate interest rate is the **after-tax short-term Treasury Bill rate** because this relatively low, mostly riskless rate conforms to the fundamental tenet of finance that investors who bear less risk should earn lower profits, or returns. *See, e.g.*, *id.* ("Should the Court determine that prejudgment interest is due after a judgment is entered in this case, the appropriate interest

rate to use is the short-term Treasury bill rate."); Expert Report of John C. Jarosz, *Atkins v. Fischer*, 1999 WL 34978916 (D.D. C. Jul. 6, 1999) ("If the Court determines that prejudgment interest is awardable, I have attached Tab 3, which presents factors to apply based on the 3-Month Treasury Bill rate."); Second Expert Report of John C. Jarosz, *Atkins v. Fischer*, 2000 WL 35588068 (D.D.C. May 5, 2000) (same); Expert Report of John C. Jarosz, *Mentor H/S, Inc., v. Medical Device Alliance, Inc*., 1998 WL 35305873 (C.D. Cal. Nov. 2, 1998) ("Should the Court determine that prejudgment interest is due to Mentor after a judgment is entered in this case, the appropriate interest rate to apply is the after-tax 'risk-free' rate on short-term U.S. government securities. The risk-free rate is the appropriate interest rate to apply because it fairly compensates the Plaintiff for the time value of money and it properly accounts for the risk of the judgment."); John C. Jarosz, *Prejudgment Interest: W.D. Texas Got It Right in the VLSI v. Intel Patent Suit*, 57 LES NOUVELLES 167, 172 (2022) ("Prejudgment interest should adequately embody the risk/return tradeoff that every investor faces. A damages award is not, after the fact, a risky investment. It is a known and awardable amount. As such, a risk-free rate should be used to bring past damages forward to today every time.").

Mr. Jarosz provided the same opinion **to this Court in this Case**. *See, e.g.*, Second Supplemental Expert Report of John C. Jarosz, D.I. 653-1, at ¶¶ 27-29 ("Should the Court determine that prejudgment interest is due after a judgment is entered in this case, the appropriate interest rate to use is, at least, the short-term Treasury bill rate" to avoid a "free-lunch situation" whereby Sarepta would obtain too high of a return without actually facing any risk). This is especially true given the size of the jury verdict and the length of infringement, which allows for much more of a windfall. *See* Hosfield Decl. at ¶¶ 146-147 (showing the difference in interest would be approximately $5 million from switching from the prime rate to the Treasury Bill rate).

Since there is no dispute that NS is a large and solvent company, Sarepta bore virtually no risk that NS would be unable to pay the judgment (i.e., there was virtually no "default" risk). Hosfield Decl. at ¶ 148.  Indeed, Sarepta stressed NS's size and financial health throughout the trial, encouraging the jury to award a big verdict because NS could afford to pay it.  *See, e.g.*, Jury Tr. 1580 (in damages closing, referring to NS as a "huge company.  Even on this one product, they made $260 million, but you remember they told you about all the other products that they have.  They're a massive international company.").  Even Mr. Jarosz agrees the correct interest rate is a low, relatively risk-free Treasury Bill rate.  Sarepta does not even attempt to engage with the undisputed expert opinions.

Instead, Sarepta describes the prime rate as "the rule" in Delaware.  But none of the cases on which Sarepta relies involved undisputed expert opinions advocating for a lower rate.  And should the Court set the rate to follow the Treasury Bill, it would be in good company.  Indeed, courts around the country have adopted the Treasury Bill rate.  *See, e.g.*, *Verinata Health, Inc. v. Ariosa Diagnostics, Inc*., 809 F. App'x. 965, 2020 WL 1970571, at \*9 (Fed. Cir. 2020) (affirming award of prejudgment interest at Treasury Bill rate); *Laitram Corp. v. NEC Corp*., 115 F.3d 947, 955 (Fed. Cir. 1997) (affirming district court's award of prejudgment interest at Treasury Bill rate based on absence of evidence of actual costs at a higher rate);  *Jiaxing Super Lighting Electric Appliance Co., Ltd. v. CH Lighting Tech. Co., Ltd.*, 2022 WL 3371630, \*20 (W.D. Tex. Aug. 16, 2022) (awarding prejudgment interest at "the average T-Bill rate, compounded annually"); *American Tech. Ceramics Corp. v. Presidio Components, Inc*., 2020 WL 5665065, at \*29-30 (E.D.N.Y. 2020) (awarding prejudgment interest at the three-month T-Bill rate compounded annually); *Mars, Inc. v. Coin Acceptors, Inc*., 513 F. Supp. 2d 128, 136-137 (D.N.J. 2007)

14

(collecting cases applying treasury bill rate and deciding treasury bill rate was appropriate after analysis of case law).

Finally, Sarepta has not even attempted to meet its burden to show it is entitled to quarterly compounding of interest, so the Court should use simple interest. *See, e.g.*, *Mondis Tech. Ltd. v. LG Electronics, Inc*., 2023 WL 3749992, at *12 (D.N.J. 2023) ("[I]n the absence of any demonstration that Mondis is entitled to quarterly compounding of interest, rather than simple interest, prejudgment interest will be calculated as simple interest."). Again, the compounding Sarepta requests results in a significant additional payment to Sarepta under either rate. Hosfield Decl. at ¶¶ 146-147, 150 ($6,207,576 at simple compared to $6,310,329 at annual compounding at the Treasury Bill rate; $10,744,500 at simple compared to $11,063,817 at annual compounding at the prime rate).

If the Court were to adopt the Treasury Bill rate and simple interest, pre-judgment interest should be awarded at no more than $6,207,576. *See* Hosfield Decl. at ¶ 146. If the Court were to adopt the Treasury Bill rate with annual compounding of interest, prejudgment interest should be awarded at no more than $6,310,329. *Id*.

## III.    NS Does Not Oppose Sarepta's Request for Post-Judgment Interest

Sarepta also requests an award of post-judgment interest required by statute. *See* D.I. 735 at 8. If the Court does not overturn the jury verdict, then NS does not dispute that Sarepta would be entitled to post-judgment interest on the verdict awarded for U.S. sales and stipulated damages for pre-trial foreign sales, at a rate equal to the weekly average 1-year constant maturity Treasury

yield for the calendar week preceding the date of the judgment, starting on the date of the entry of the post-verdict judgement.  *See* 28 U.S.C. § 1961.[9]

## IV.    NS Does Not Oppose Post-Judgment Damages for Foreign Sales of VILTEPSO from the U.S.

Sarepta also requests post-trial damages for ongoing foreign sales from the U.S. (if any) at a 4% royalty rate consistent with the parties' pre-judgment stipulation.  *See* D.I. 735 at 6.  While reserving its objections, NS does not dispute that should the Court not overturn the jury verdict, then Sarepta would be entitled to a reasonable royalty of 4% for NS's foreign sales of VILTEPSO from the U.S. between December 16, 2024 through June 27, 2025, the date of patent expiration.

## V.    NS Requests the Court to Order an Accounting of NS's Ongoing Sales of VILTEPSO after June 28, 2025 and that the Parties Meet and Confer on Calculations

Sarepta seeks supplemental damages to be awarded based on Mr. Jarosz's estimates of NS's ongoing sales of VILTEPSO in the U.S. and foreign sales shipped from the U.S.

But although both experts used a combination of actual and estimated sales to approximate respective damages leading up to trial (actual sales to August 31, 2024, and estimated sales between September 1-December 15, 2024), ███████████████████████████████████ ████████████████.  Hosfield Decl. at ¶ 17.  The ██████████████ should not serve as further evidence of additional sales through expiration.

---

[9] NS disagrees with Sarepta as to the timing of post-judgment interest on any pre-judgment interest awarded.  "To be clear, however, post-judgment interest on a prejudgment interest award does not begin to accrue **until the amended judgment quantifying the prejudgment interest is entered.**" (e.g., until this motion is decided).  *ArcherDX,* 2022 WL 4597877, at *19 (citing *Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am*., 609 F.3d 143, 175 (3d Cir. 2010) ("[P]ost-judgment interest on Travelers' award of prejudgment interest did not begin to run until the December 5, 2007 order was entered quantifying the amount in prejudgment interest owed to Travelers.")).  In his declaration Mr. Jarosz improperly calculates estimated post-judgment interest on the pre-judgment interest to accrue starting on January 7, 2025.  This can be addressed via the accounting requested in Section V.

Further, as noted above, Sarepta's gene therapy product is impacting sales of exon skipping products because it is directed to the same patient population. Hosfield Decl. at ¶¶ 44-46. Thus, post-trial market factors provide an additional basis not to award damages based on estimated sales data; rather the Court should wait for an accounting after the date of patent expiration (June 28, 2025). Adding post-judgment interest further exacerbates the errors attendant to using sales estimates.

Estimates are not as accurate as real data, but the parties will have actual sales data through patent expiration in just a few months and perhaps by the time this Court decides the pending motion. Under 35 U.S.C. §284 "[d]amages are awardable for acts of infringement"; not anticipated acts of infringement that may or may not come to pass. For all post-verdict damages, NS requests the Court order an accounting of actual sales rather than relying on estimates.

## CONCLUSION

For the foregoing reasons, should the Court deny NS's requests for post-verdict relief, then the Court should order post-verdict damages in the amount of an ongoing royalty of 4% for ongoing U.S. sales, an ongoing royalty of the stipulated 4% for ongoing foreign sales, pre-judgment interest at the Treasury Bill rate with simple interest, post-judgment interest per statute, and an accounting of NS's actual sales of VILTEPSO and a meet and confer between the parties after June 28, 2025 to resolve all pending damages issues consistent with the Court's order.

Dated:  April 1, 2025

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

Amanda S. Williamson (admitted *pro hac vice*)
Christopher J. Betti (admitted *pro hac* vice)
Krista V. Venegas (admitted *pro hac* vice)
Wan-Shon Lo (admitted *pro hac* vice)
Maria E. Doukas (admitted *pro hac vice*)
Zachary D. Miller (admitted *pro hac vice*)
Michael T. Sikora (admitted *pro hac vice*)
110 N. Wacker Drive, Suite 2800
Chicago, IL  60601
Telephone:  312.324.1000
Fax:  312.324.1001
amanda.williamson@morganlewis.com
christopher.betti@morganlewis.com
krista.venegas@morganlewis.com
shon.lo@morganlewis.com
maria.doukas@morganlewis.com
zachary.miller@morganlewis.com
michael.sikora@morganlewis.com

Julie S. Goldemberg (admitted *pro hac vice*)
Alison P. Patitucci (admitted *pro hac vice*)
2222 Market Street
Philadelphia, PA  19103
Telephone: 215.693.5000
Fax: 215.963.5001
julie.goldemberg@morganlewis.com
alison.patitucci@morganlewis.com

David L. Schrader (admitted *pro hac vice*)
300 South Grand Ave., 22nd Floor
Los Angeles, CA 9007
Telephone: 213.612.2500
Fax: 213.612.2501
david.schrader@morganlewis.com

*/s/Amy M. Dudash*
Amy M. Dudash (DE Bar No. 5741)
1201 N. Market Street, Suite 2201
Wilmington, Delaware 19801
Telephone:  302.574.3000
Fax:  302.574.3001
amy.dudash@morganlewis.com

*Attorneys for Nippon Shinyaku Co., Ltd.*
*and NS Pharma, Inc.*

18

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 1, 2025 a copy of the foregoing, which was filed under seal, was served via electronic mail on the following counsel of record:

William B. Raich
Michael J. Flibbert
John M. Williamson
Yoonhee Kim
Yoonjin Lee
**FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP**
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000
william.raich@finnegan.com
michael.flibbert@finnegan.com
john.williamson@finnegan.com
yoonhee.kim@finnegan.com
yoonjin.lee@finnegan.com

Charles E. Lipsey
J. Derek McCorquindale
Ryan P. O'Quinn
L. Scott Burwell
1875 Explorer Street, Suite 800
Reston, VA 20190-6023
(571) 203-2700
charles.lipsey@finnegan.com
derek.mccorquindale@finnegan.com
ryan.o'quinn@finnegan.com
scott.burwell@finnegan.com

Alissa K. Lipton
Eric J. Lee, Ph.D.
Two Seaport Lane
Boston, MA 02210-2001
(617) 646-1600
alissa.lipton@finnegan.com
eric.lee@finnegan.com

Jack B. Blumenfeld
Megan E. Dellinger
**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
mdellinger@morrisnichols.com

Amanda P. Reeves
Anna M. Rathbun
Graham B. Haviland
Jesse Aaron Vella
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200
amanda.reeves@lw.com
anna.rathbun@lw.com
graham.haviland@lw.com

*/s/ Amy M. Dudash*
Amy M. Dudash (DE Bar No. 5741)